1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   CHRISTOPHER P. SEEFER (201197)
3  DANIEL J. PFEFFERBAUM (248631)
   Post Montgomery Center
4  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
5  Telephone:  415/288-4545
   415/288-4534 (fax)
6  shawnw@rgrdlaw.com
   chriss@rgrdlaw.com
7  dpfefferbaum@rgrdlaw.com
         – and –
8  JUAN CARLOS SANCHEZ (301834)
   PATTON L. JOHNSON (320631)
9  655 West Broadway, Suite 1900
   San Diego, CA  92101
10 Telephone:  619/231-1058
   619/231-7423 (fax)
11 jsanchez@rgrdlaw.com
   pjohnson@rgrdlaw.com
12
   Lead Counsel for Lead Plaintiff
13
   [Additional Counsel Appear on Signature Page]
14
                    UNITED STATES DISTRICT COURT
15
                  NORTHERN DISTRICT OF CALIFORNIA
16
                      SAN FRANCISCO DIVISION
17

| | |
|---|---|
| HARIRAM SHANKAR, Individually and on Behalf of All Others Similarly Situated, ) ) ) Plaintiff, ) ) vs. ) ) ZYMERGEN INC., JOSH HOFFMAN, ENAKSHI SINGH, STEVEN CHU, JAY T. FLATLEY, CHRISTINE M. GORJANC, TRAVIS MURDOCH, MATTHEW A. OCKO, SANDRA E. PETERSON, ZACH SERBER, ROHIT SHARMA, SVF EXCALIBUR (CAYMAN) LIMITED, SVF ENDURANCE (CAYMAN) LIMITED, SOFTBANK VISION FUND (AIV M1) L.P., DATA COLLECTIVE II, L.P., DCVC OPPORTUNITY FUND, L.P., TRUE VENTURES IV, L.P., TRUE VENTURES SELECT I, L.P., TRUE VENTURES SELECT II, L.P., TRUE VENTURES SELECT III, L.P., TRUE VENTURES SELECT IV, L.P., J.P. | Case No. 3:21-cv-06028-JD  AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS  DEMAND FOR JURY TRIAL |

4856-8867-3806.v1

MORGAN SECURITIES LLC, GOLDMAN )
SACHS & CO. LLC, COWEN AND )
COMPANY, LLC, BOFA SECURITIES, )
INC., UBS SECURITIES LLC, and LAZARD )
FRÈRES & CO. LLC., )
)
                    Defendants. )
_____ )

# TABLE OF CONTENTS

Page

I.     NATURE OF THE ACTION AND OVERVIEW ............................................................ 1

II.    JURISDICTION AND VENUE ................................................................................... 13

III.   PARTIES ..................................................................................................................... 13

IV.   SUBSTANTIVE ALLEGATIONS ............................................................................ 19

      A.      Description of Zymergen and Completion of the IPO ....................................... 19

      B.      The Materially Misleading Representations Contained in the Registration
              Statement ................................................................................................................ 22

      C.      The Materially Misleading Risk Factors in the Registration Statement .............. 30

      D.      August 3, 2021: Zymergen Discloses Numerous Facts Demonstrating the
              Registration Statement Was Inaccurate and Materially Misleading,
              Causing the Company's Stock Price to Decline 75% ........................................ 34

      E.      August 4, 2021: Analysts Report the Catastrophic Disclosures on August
              3, 2021 Destroyed Zymergen's Credibility with Investors ................................ 46

      F.      September 23, 2021-October 21, 2021: Zymergen and the Financial Press
              Report Additional Facts Demonstrating the Registration Statement Was
              Inaccurate and Materially Misleading, and the Financial Press Likens the
              Implosion of Zymergen to that of Theranos ...................................................... 49

      G.      November 3, 2021: Zymergen Reports Six of the Eleven Products
              Featured in the Registration  Statement Will Be Discontinued ......................... 53

      H.      November 15, 2021: Zymergen Reports that Multiple Government
              Agencies, Including the SEC, Are Investigating the Company ......................... 59

      I.      December 9, 2021 – January 10, 2022: Additional Disclosures Show the
              Dramatic and Material Adverse Impacts on Zymergen's Business Since
              the IPO .................................................................................................................. 59

V.    CLASS ACTION ALLEGATIONS ........................................................................... 61

VI.   CLAIMS FOR RELIEF .............................................................................................. 63

FIRST CLAIM FOR RELIEF ........................................................................................... 63

SECOND CLAIM FOR RELIEF ...................................................................................... 64

PRAYER FOR RELIEF ..................................................................................................... 64

JURY TRIAL DEMANDED ............................................................................................. 65

1    Lead Plaintiff Biao Wang ("Wang") and Plaintiff West Palm Beach Firefighters' Pension
2    Fund ("WPBFPF") (collectively, "Plaintiffs"), individually, and on behalf of all others similarly
3    situated, by and through their attorneys, allege the following upon information and belief, except
4    as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.
5    Plaintiffs' information and belief are based upon, among other things, their counsel's investigation,
6    which includes, without limitation: (a) review and analysis of regulatory filings made by
7    Zymergen Inc. ("Zymergen" or the "Company") with the United States Securities and Exchange
8    Commission ("SEC"); (b) review and analysis of press releases, earnings call transcripts and media
9    reports issued and disseminated by Zymergen; and (c) review of other publicly available
10   information concerning Zymergen, including transcripts of Zymergen presentations at investor
11   conferences, reports issued by analysts and articles in the financial press.

12   **I.    NATURE OF THE ACTION AND OVERVIEW**

13       1.    This is a Class action on behalf of persons and entities that purchased or otherwise
14   acquired Zymergen common stock pursuant and/or traceable to the registration statement and
15   prospectus (collectively, the "Registration Statement") issued in connection with the Company's
16   April 2021 initial public offering ("IPO" or "Offering").   Plaintiffs pursue claims against
17   Defendants under the Securities Act of 1933 ("Securities Act").

18       2.    Zymergen integrates computational and manufacturing technologies to design,
19   engineer and optimize microbes for industrial applications.  The Company developed a platform
20   that treats the genome as a search space, using proprietary machine learning algorithms and
21   advanced automation to identify genetic changes that improve the economics for its customers'
22   bio-based products for a range of industries, including electronics, consumer care, chemicals,
23   materials, agriculture and pharmaceuticals.  In addition, Zymergen's platform is used to discover
24   novel molecules used to enable unique material properties.  The Company was incorporated in
25   Delaware on April 24, 2013.

26       3.    The Company reported that it partnered with Nature to design, develop, and
27   commercialize bio-based breakthrough products that deliver extraordinary value to customers in a
28   broad range of industries, including electronics, consumer care and agriculture.  Zymergen

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 3:21-cv-06028-JD                                                                          - 1 -
4856-8867-3806.v1

reported that its goal was to create new products with a proprietary platform that unlocked the design and manufacturing efficiency of biological processes with technology's ability to rapidly iterate and control diverse functions. Zymergen called this process biofacturing and claimed it allowed the Company to create better products faster, cheaper and more sustainably than traditional chemistry by engineering microbes to make novel biomolecules that are the key ingredients in those products.

4.    Zymergen completed its IPO on April 22, 2021. On April 23, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold approximately 18,549,500 shares of common stock at a price of $31.00 per share, raising proceeds of approximately $575 million. The Company received proceeds of approximately $529.9 million from the Offering, net of approximately $40.3 million of underwriting discounts and commissions and $4.9 million of Offering costs. The proceeds from the IPO were purportedly to be used for working capital and other general corporate purposes, including the continued investment in commercializing Zymergen's existing products, launching products in its pipeline and furthering the development of its biofacturing platform and technology.

5.    Following the completion of the IPO, on April 22, 2021, Zymergen's stock began trading on the NASDAQ under the stock symbol "ZY." The Company had approximately 100.4 million shares of common stock outstanding and a market capitalization of approximately $3 billion upon completion of the IPO. On April 29, 2021, the Company's stock price traded as high as $52 per share, increasing market capitalization to approximately $5.2 billion.

6.    As detailed herein, the Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein. The untrue statements of material facts and omissions concerned the Company's biofacturing platform; the Company's ability to create better products faster, cheaper and more sustainably using the biofacturing platform; the product development process; the development status of 11 products in the Company's product pipeline; the market opportunity for those products; and when those products would generate revenue.

7. The representations in the Registration Statement detailed below were materially misleading because, as the Company disclosed on August 3, 2021 and November 3, 2021, Zymergen was unable to produce products that could be sold at a profit when it created, manufactured and distributed the products on its own. In addition, the representations were materially misleading because Defendants failed to disclose that several key target customers had technical issues implementing Hyaline, the Company's first and only product to be launched at the time of the IPO, into their manufacturing processes or that there was only a "hypothetical" near-term market for Hyaline due to there being "no hit product yet in the foldable display market." Indeed, the Company abandoned Hyaline and another optical film product because there was a smaller near-term market opportunity than represented in the Registration Statement and abandoned all of the consumer care products because those products could not be sold at a profit when Zymergen created, manufactured and distributed them on its own. As a result, Zymergen did not generate product revenue in 2021 and 2022, as it represented in the Registration Statement.

8. Defendants represented that Zymergen's biofacturing platform could create better products faster, cheaper and more sustainably than chemical and materials companies; that the demand for innovative materials had never been greater; and that synthetic biology companies like Zymergen were a better alternative to chemical and materials companies that struggled to innovate because they used a limited molecular palette, had substantial capital expenditures and were among the planet's worst industrial polluters.

9. Eleven Zymergen products were highlighted in the Registration Statement: three optical film products and one bio-based epoxy product for the electronics industry; four consumer care products, including a naturally derived insect repellent; and three agricultural products. Defendants represented that these products were in various stages of development and described the development process, representing that: (a) Zymergen's business development personnel worked with customers to define a set of properties for a material that the customers would find valuable; then (b) designed and developed engineered microbes that manufactured the novel biomolecule that would be a key ingredient in a breakthrough product; then (c) had Contract Manufacturing Organizations ("CMOs") manufacture the product; and finally (d) used

1  Zymergen's sales force and marketing capabilities to contract with customers and sell the product
2  to them.

3          10.     In describing the product development process, Defendants highlighted Hyaline,
4  the first and only product launched by Zymergen at the time of the IPO.  They represented Hyaline
5  was launched in December 2020, to customers in the electronic industry, which began the expected
6  6- to 18-month product qualification process with multiple customers.  Defendants emphasized the
7  importance of the qualification process in Zymergen's target markets and represented that Hyaline
8  (and other products) would generate revenue after customers completed all aspects of the
9  qualification process and decided to place an order for the product.

10          11.     Defendants represented that Hyaline was an optical film designed for electronics
11  companies to use for display touch sensors in personal devices and other applications and would
12  allow customers to make robust foldable touchscreens and high density flexible printed circuits.
13  Defendants represented that Hyaline was expected to generate revenue in the second half of 2021,
14  just a few months after the completion of the IPO, and that Zymergen's global direct sales force
15  and a team of application sales engineers were working with customers on the sales qualification
16  process for Hyaline wherein customers would be able to validate the product and qualify it as a
17  standard component in their final electronic devices.

18          12.     Defendants also represented that other optical film products would generate
19  revenue following the 6- to 18-month qualification process and that the four consumer care
20  products and three agricultural products would generate revenue upon launch because a product
21  qualification process was unnecessary.

22          13.     Defendants represented that Zymergen would grow its business in several ways and
23  that it generally targeted products that could support annual sales of greater than $150 million.
24  Defendants assured investors that the market opportunity addressable by Zymergen's biofacturing
25  platform was enormous and diverse – at least $1.2 trillion across 20 separate industries.  They
26  represented that the market opportunity for the three industries being pursued with its 11 pipeline
27  products – electronics, consumer care and agriculture – was approximately $150 billion, including

28

1  the foldable display market for Hyaline being over $1 billion in 2020, and the market for insect

2  repellent being over $1.5 billion.

3      14.    The representations about Zymergen's biofacturing platform; the Company's

4  ability to create better products faster, cheaper and more sustainably; the product development

5  process; the development status of the 11 products in the product pipeline; the market opportunity

6  for those products; and when those products would generate revenue were particularly important

7  to investors given the Company's precarious financial condition.  Zymergen reported just

8  $15.4 million of revenue in 2019, and a net loss of $236.8 million.  In 2020, Zymergen reported

9  just $13.3 million of revenue and a net loss of $262.2 million.  The increasing net losses caused

10 the Company to be insolvent as of December 31, 2020, with an accumulated deficit of

11 $773.7 million.  The recurring losses and accumulated deficit meant Zymergen needed to raise

12 equity or debt to fund its operations until the Company could generate sufficient revenues to fund

13 its operations.  That, in turn, caused the Company's auditors to note that there was substantial

14 doubt about the Company's ability to continue operating as a going concern.

15     15.    The Risk Factors contained in the Registration Statement were also materially

16 inaccurate and misleading.  Defendants represented that various risks "could," "would" or "might"

17 negatively impact Zymergen "if" they occurred.  These representations were materially inaccurate

18 and misleading because the warned-of risks had already occurred and were negatively impacting

19 Zymergen at the time of the IPO.

20     16.    Beginning on August 3, 2021, *less than four months after the completion of the*

21 *IPO*, the Company revealed numerous material adverse facts that informed investors the

22 Registration Statement contained untrue statements of material facts and omitted material facts.

23 On that date, Zymergen issued a press release and held a conference call to provide a business

24 update regarding its commercial product pipeline and financial forecast.  The Company reported

25 that: (i) there were issues with its commercial products pipeline that would impact the Company's

26 delivery timeline and revenue projections; (ii) it was clear the commercial opportunity for the

27 Company's first product, Hyaline, was less than expected; (iii) Zymergen's Board of Directors

28 (the "Board") had initiated a series of deep dives into the Company's product pipeline and

development process; (iv) the Board anticipated that the roadmap and timelines for Zymergen's follow-on products could also be impacted; (v) as a result of the foregoing, the Company no longer expected product revenue in 2021, and only expected immaterial product revenue in 2022; and (vi) without a firm pipeline of customers and visibility on commitments, the Company's projections beyond 2022, were highly uncertain.

17.     The Company provided details stating that, through its receipt of periodic updates regarding the Company's progress toward its goals, the Board had learned of "significant execution challenges within the organization."  The Board had identified several contributing factors to the revisions of its plan for product delivery timelines and revenues.  First, **during the quarter that the IPO was completed**, several key target customers encountered technical issues in implementing Hyaline into their manufacturing processes, resulting in a delay in the commercial ramp of Hyaline.  Second, the total addressable market for foldable display applications, the market for Hyaline, was in an earlier stage than previously expected, with emerging data indicating a smaller near-term market opportunity, with scaled demand pushed out in time and growing more slowly than anticipated.  Indeed, the Company admitted that there was no near-term market for Hyaline and that the market was just "theoretical" because there was "no hit product yet in the foldable display market."  Third, the Company's commercial teams did not have significant insight into the customer qualification process and into their customers and users, which resulted in Zymergen's forecasts overestimating near-term demand.  As a result, the Company reported it was already making substantial changes in the commercial team.

18.     Defendant Jay Flatley ("Flatley"), the Company's acting Chief Executive Officer ("CEO"), who replaced Defendant Josh Hoffman ("Hoffman") after Hoffman was abruptly terminated on August 2, 2021, acknowledged the obvious seriousness of the numerous unexpected adverse disclosures, stating: "*I want to perhaps state the obvious that we're taking this situation extremely seriously*."  Flatley said that as soon as the Board learned of the problems, the Board and management immediately started to work to fully understand the issues and began developing a plan to address them, including the formation of dedicated committees, including a Strategic Oversight Committee, which was working with expert advisors to conduct an in-depth review of

the Company's operational, financial, product and commercialization efforts to facilitate the development of an updated strategic plan.  That work was focused on: (i) a deep dive into the Company's sales forecasting process to examine how the initial forecast was developed, where the issues arose and how to improve the process going forward; (ii) the retention of a number of outside experts to examine the robustness of the products coming out of the pipeline and their readiness for full commercialization; and (iii) digging into the Company's long-term market opportunities to ensure the product pipeline was aligned with industry trends and customer demand.  The Company was also developing a plan to reduce and align expenses with the change in the Company's revenue expectations.

19.     In short, Flatley told investors that just about everything in the Registration Statement concerning the development, commercial opportunity and sale of the 11 products in the Company's pipeline was not true and that Zymergen was now in the process of determining which products and markets the Company would target in the future.  In addition, Flatley acknowledged Zymergen had not previously operated with transparency and openness, stating that the Company would conduct a cultural assessment to ensure that there would be broad-based accountability across the organization and would operate with transparency and openness.  He said that the Board and management were focused on reestablishing the credibility of the leadership team and the Company and that Hoffman had been terminated, effective immediately, as part of the effort to reestablish the credibility of the leadership team and the Company.

20.     The Company never claimed this material adverse information did not exist, or was not known or knowable, at the time of the IPO.  Indeed, the Company admitted the technical issues several key customers encountered implementing Hyaline into their manufacturing processes (which delayed the commercial ramp of the product and caused Zymergen to no longer expect any product revenue in 2021, and only immaterial product revenue in 2022) were occurring during the quarter the Company completed the IPO.

21.     Nor did the Company claim that the emerging data on the total addressable market for foldable display applications (which indicated a smaller near-term market opportunity that was growing less rapidly than anticipated) did not exist, or was not known or knowable, at the time of

1   the IPO.  Other adverse disclosures show that the data did exist at the time of the IPO.  Flatley's

2   admission on August 3, 2021, that there was no market for Hyaline and that it was just "theoretical"

3   because there was "no hit product yet in the foldable display market" establishes that there was no

4   market for Hyaline at the time of the IPO.

5          22.    In addition, the Company admitted it did not have significant insight into the

6   customer qualification process or their customers and users at the time of the IPO, which resulted

7   in the Company's forecasts overestimating near-term demand.  As a result, Zymergen was: (i)

8   making substantial changes in its commercial teams; (ii) conducting a deep dive into the

9   Company's sales forecasting process to examine how the initial forecasts were developed, where

10  the issues arose and how to improve that process going forward; and (iii) examining the robustness

11  of the products coming out of the Company's pipeline and their readiness for full

12  commercialization.

13         23.    The Company also revealed that there were issues with the long-term opportunities

14  for its products, reporting that Zymergen was digging into the Company's long-term market

15  opportunities to ensure the product pipeline was aligned with industry standards and customer

16  demand and that, with the assistance of a top-tier consulting firm, the Company was doing a full

17  assessment of Zymergen's target markets and the fit of its products into the pipeline of those

18  markets, including an exploration of adjacent opportunities that could possibly provide new

19  revenue sources.

20         24.    Other disclosures on August 3, 2021, also demonstrate that the adverse information

21  about Hyaline, the total addressable market for foldable display applications, the commercial

22  teams' lack of significant insight into the customer qualification process and their customers and

23  users and the resulting overestimated forecast of near-term demand for Zymergen products existed

24  at the time of the IPO, including that: (i) Zymergen would conduct a cultural assessment to ensure

25  there would be broad-based accountability across the organization; (ii) Zymergen was focused on

26  reestablishing the credibility of the leadership team and the Company; (iii) Hoffman had been

27  terminated as part of the effort to reestablish the credibility of the leadership team and the

28  Company; and (iv) the Company would operate with transparency and openness in the future.

25.     The reaction of analysts to the unexpected material adverse disclosures indicates that they believed the adverse information existed at the time of the IPO.  Analysts were stunned by the numerous adverse disclosures, questioned the Company's credibility during the August 3, 2021 earnings call and issued reports after the earnings call, in which they downgraded the Company's stock and questioned when the adverse information was known.

26.     During the earnings call, one analyst stated the disclosures were "[o]bviously[] a disappointment for everybody" and "very surprising."  Another analyst asked: "[H]ow can we have any confidence whatsoever in anything that's been put out there in terms of numbers or . . . the market opportunity?"  Flatley acknowledged the lack of credibility was more than justified, responding: "[T]otally fair that you question the credibility of any forecast we give you today."

27.     After the earnings call, analysts issued reports in which they downgraded Zymergen and also questioned the Company's credibility.  William Blair & Company analyst Matt Larew ("Larew") issued a report in which he downgraded Zymergen stock and wrote: "*[G]iven the abrupt and significant about-face just months after the IPO, we believe the company has destroyed its credibility with investors*."  In addition, he questioned how the adverse information about the smaller near-term market opportunity for the foldable display market was not known at the time of the IPO, writing:

> *In our view, what is more confusing and concerning is commentary on the total addressable market for foldable display applications, which suggests a smaller near-term market opportunity that is growing more slowly than anticipated.  Frankly, we are not quite sure how the data could have changed so much over such a short time (again, the company's IPO filings were published less than four months ago)*, and at this point the company does not have enough data to quell our concerns or give us any sense of what the company's actual pipeline might look like following the in-depth review of the company's operational, financial, product, and commercialization efforts.

28.     Multiple government agencies, including the SEC, requested information from the Company related to the unexpected adverse disclosures on August 3, 2021.  Defendants failed to disclose this material adverse information in Zymergen's earnings releases or during the Company's earnings calls.  Instead, this material adverse information was buried in the Company's 3Q21 Report on Form 10-Q, filed with the SEC on November 15, 2021.

29.     Other facts strongly infer that the adverse information revealed on August 3, 2021, existed at the time of the IPO.  The August 3, 2021 adverse disclosures were made just a little more than three months after the completion of the IPO on April 22, 2021.  Many of the adverse disclosures related to the Company's most important product, Hyaline, the first and only product in the launch phase of the product pipeline and the primary product featured in the Registration Statement.  The impacts of the adverse disclosures on Zymergen's business were devastating in magnitude, scope and duration.  No product revenues would be generated in 2021, only immaterial product revenues would be generated in 2022, and projections beyond 2022 were "highly uncertain."  As investors would learn on November 3, 2021, six of the 11 products featured in the Registration Statement, including Hyaline, would be discontinued and never generate any revenue for the Company.  Flatley admitted that dramatic steps were taken to operationally restructure and transform the Company.  The Company's lenders required Zymergen to pay down its loan, shorten the maturity date and deposit the remaining balance of the loan into a blocked account.  Zymergen laid off hundreds of employees; recorded millions of dollars of restructuring, severance and impairment expenses; and was forced to develop a plan to conserve cash.

30.     Following these material adverse disclosures, the Company's stock price plummeted $26.58, or 75%, from $34.83 on August 3, 2021, to $8.25 on August 4, 2021, on unusually large trading volume of more than 21.7 million shares.  The decline wiped out more than $2.7 billion of Zymergen's market capitalization.

31.     Investors learned more adverse news in the following months.  On September 23, 2021, Zymergen announced it was terminating approximately 120 employees as part of a preliminary phase of the Company's plan to reduce costs to align with the delayed revenue ramp up previously disclosed on August 3, 2021. The Company also disclosed that it would incur an estimated $4.5 million of severance and employee-related restructuring costs related to the reduction in force.

32.     On September 30, 2021 and October 13, 2021, articles appeared in the financial press likening Zymergen's implosion to that of Theranos and reporting that Hoffman used exaggerated financial figures and made overly optimistic projections about the Company's

capabilities, both internally and externally.  On October 13, 2021, *Barron's* published an article titled "The Inside Story of How SoftBank-Backed Zymergen Imploded Four Months After Its $3 Billion IPO" and reported, in part:

> According to a former senior-level employee at Zymergen, Hoffman used exaggerated financial figures and made overly optimistic projections about the company's capabilities, both internally and externally.  The former employee – who retains a vested interest in the company – recalls Hoffman's response when he was confronted about this behavior: "***Never underestimate the power of the greater fool***."

33.    On October 21, 2021, Zymergen announced a second reduction in force of approximately 100 employees, which would result in approximately $4.2 million of severance and employee-related restructuring costs.  In addition, the Company reported that it expected to incur impairment charges of $15 million for certain manufacturing equipment as a result of its restructuring activities and that it might incur additional restructuring and impairment charges in 4Q21, including lease expenses.

34.    On October 21, 2021, Zymergen also reported that it had amended its Credit Agreement after its lender notified the Company on August 16, 2021, that it was in default of the material adverse change section of the Amended and Restated Credit Agreement and Guaranty. The amended Credit Agreement required Zymergen to: (i) shorten the term of the Credit Agreement by moving the maturity date from December 19, 2024 to June 30, 2022; (ii) increase the amount of the liquidity covenant; (iii) make a $41 million payment, including a $35 million principal prepayment; and (iv) deposit the remaining outstanding balance of the loan plus accrued interest through the maturity date in a blocked account controlled by the Administrative Agent, which was subject to release from the blocked account upon the Administrative Agent's completion of due diligence to its reasonable satisfaction regarding the Company's anticipated operating costs and budget through the maturity date.

35.    Investors also learned that Jed Dean, a co-founder of Zymergen and the Company's Vice President of Operations and Engineering, was stepping down effective October 31, 2021.

36.    On November 3, 2021, Zymergen revealed that it was discontinuing Hyaline, the main product featured in the Registration Statement, and all but one of the electronics film program

products.  It also revealed that all of the consumer care program products, including the insect repellent product featured in the Registration Statement, were being discontinued.  Thus, the Company revealed that *six of the 11 products highlighted in the Registration Statement, including its main product, had been discontinued* and would not generate any revenue for the Company.

37.     The Company also revealed that its strategy of creating, manufacturing and distributing products on its own was untenable.  Flatley acknowledged that was the reason Zymergen discontinued all of the consumer care products, and he admitted there was "no chance" the consumer care insect repellent product featured in the Registration Statement could be profitable given the costs of manufacturing and distribution.

38.     The Company also revealed it would have run out of cash in 3Q21 had it not raised $529.9 million from the IPO.  Zymergen reported that its cash had declined from $588 million as of June 30, 2021, to $496.2 million as of September 30, 2021, and that the Company reported a net loss of $283.6 million for the nine months ending September 30, 2021.

39.     On November 3, 2021, Zymergen also failed to disclose that government agencies, including the SEC, had requested information from the Company related to the unexpected adverse disclosures on August 3, 2021.  That material adverse information was buried in the Company's 3Q21 Report on Form 10-Q filed with the SEC on November 15, 2021.

40.     On December 9, 2021, *Seeking Alpha* published an article titled "Zymergen: Total Chaos."  The opening paragraph succinctly explained the dramatic change at Zymergen since the IPO, which caused Class members to suffer millions of dollars in damages.  It was reported that Zymergen went from launching Hyaline and preparing to rapidly scale up production and revenue, to a Company that had abandoned Hyaline and other products and was dramatically cutting headcount and cash burn in an effort to avoid bankruptcy.

41.     During a presentation at a January 10, 2022 JPMorgan Healthcare Conference, Flatley acknowledged that over the last five months Zymergen had taken dramatic steps to operationally restructure and transform the business, including the discontinuation of a significant number of programs and a reduction in the Company's headcount from approximately 900 to 500.

He also acknowledged that the negative financial impact on Zymergen would continue for at least another year and possibly longer, stating that the Company thought it would begin to have product revenue in the 2023 timeframe.

42.     Zymergen's stock price has not recovered since the material adverse disclosures on August 3, 2021, closing at $3.84 on February 24, 2022.

43.     As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

44.     The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o).

45.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §22 of the Securities Act (15 U.S.C. §77v).

46.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b).   A substantial part of the events or omissions giving rise to the claims herein occurred in this District as Zymergen's principal place of business is in Emeryville, California.   Many of the other Defendants reside in Northern California.

47.     In connection with the acts, transactions and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## III.    PARTIES

48.     Biao Wang ("Wang") is the Court-appointed Lead Plaintiff (ECF No. 69) and, as set forth in the certification previously filed with the Court (ECF No. 35-3), purchased Zymergen common stock pursuant or traceable to the Registration Statement issued in connection with the Company's IPO.   Wang suffered damages as a result of the federal securities laws violations, the untrue statements of material facts contained in the Registration Statement and the omissions of material facts from the Registration Statement.

49.    Plaintiff West Palm Beach Firefighters' Pension Fund ("WPBFPF"), as set forth in the certification previously filed with the Court (ECF No. 43-2), purchased Zymergen common stock pursuant or traceable to the Registration Statement issued in connection with the Company's IPO.  WPBFPF is a pension fund based in West Palm Beach, Florida that provides retirement benefits for firefighters.  As of September 30, 2021, WPBFPF managed total assets in excess of $306 million on behalf of over 466 current employees, retirees and beneficiaries.  WPBFPF suffered damages as a result of the federal securities laws violations, the untrue statements of material facts contained in the Registration Statement and the omissions of material facts from the Registration Statement.

50.    Defendant Zymergen Inc. ("Zymergen" or the "Company") is incorporated under the laws of Delaware with its principal executive offices located in Emeryville, California. Zymergen's shares trade on the NASDAQ under the stock symbol "ZY."

51.    Defendant Josh Hoffman ("Hoffman") was, at all relevant times, the CEO, director and co-founder of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Hoffman was terminated on August 2, 2021.

52.    Defendant Enakshi Singh ("Singh") was, at all relevant times, the Chief Financial Officer ("CFO") of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

53.    Defendant Steven Chu ("Chu") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

54.    Defendant Jay T. Flatley ("Flatley") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Flatley is currently the acting CEO of the Company.

55.    Defendant Christine M. Gorjanc ("Gorjanc") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

56.    Defendant Travis Murdoch ("Murdoch") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

57.    Defendant Matthew A. Ocko ("Ocko") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

58.    Defendant Sandra E. Peterson ("S. Peterson") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

59.    Defendant Zach Serber ("Serber") was the Chief Science Officer, a director and co-founder of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

60.    Defendant Rohit Sharma ("Sharma") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

61.    Defendants Hoffman, Singh, Chu, Flatley, Gorjanc, Murdoch, Ocko, S. Peterson, Serber and Sharma are hereinafter collectively referred to as the "Individual Defendants."

62.    Defendants SVF Excalibur (Cayman) Limited and SVF Endurance (Cayman) Limited, both incorporated in the Cayman Islands, and Defendant SoftBank Vision Fund (AIV M1) L.P., a Delaware limited partnership (collectively, the "SoftBank Defendants"), are venture capital funds managed by SB Investment Advisers (UK) Limited, a subsidiary of SoftBank Group Corp.  On April 23, 2021, the Company filed its April 21, 2021 prospectus on Form 424B4 with the SEC and reported that the SoftBank Defendants beneficially owned 32.4% of the Company (or beneficially owned over 26.6 million shares) before the IPO and would continue to own 27.1% of the Company after the IPO was completed.

63.    Defendants Data Collective II, L.P. and DCVC Opportunity Fund, L.P. (collectively, the "DCVC Defendants"), both Delaware limited partnerships with their principal place of business in Palo Alto, California, are venture capital funds managed by Ocko and Zachary Bogue.  On April 23, 2021, the Company filed its April 21, 2021 prospectus on Form 424B4 with the SEC and reported that the DCVC Defendants beneficially owned 9% of the Company (or beneficially owned over 7.3 million shares) before the IPO and would continue to own 7.5% of the Company after the IPO was completed.

64.    Defendants True Ventures IV, L.P., True Ventures Select I, L.P., True Ventures Select II, L.P., True Ventures Select III, L.P. and True Ventures Select IV, L.P. (collectively, the

1  "True Ventures Defendants"), all Delaware limited partnerships with their principal place of

2  business in Palo Alto, California, are venture capital funds managed by Philip D. Black and Jon

3  Callaghan.  On April 23, 2021, the Company filed its April 21, 2021 prospectus on Form 424B4

4  with the SEC and reported that the True Ventures Defendants beneficially owned 8.5% of the

5  Company (or beneficially owned over 6.9 million shares) before the IPO and would continue to

6  own 7.1% of the Company after the IPO was completed.

7           65.     By virtue of their ownership of the majority of Zymergen's preferred stock, the

8  SoftBank Defendants, DCVC Defendants and True Ventures Defendants (collectively, the

9  "Controlling Stockholders") had virtually complete control over the Company.  On April 23, 2021,

10  the Company filed its April 21, 2021 prospectus on Form 424B4 with the SEC and reported that

11  there were less than 13 thousand shares of common stock issued prior to the IPO, compared to

12  more than 900 thousand shares of preferred stock.  The Controlling Stockholder's respective SEC

13  Forms 3, 4 and Schedule 13G filed with the SEC show that the majority of the preferred stock

14  were owned by the Controlling Stockholders.  Pursuant to the Company's governing documents,

15  such as its certificate of incorporation, bylaws and investor rights agreement, the series of preferred

16  stock held by the Controlling Stockholders gave them preferential rights and protective provisions

17  to, *inter alia*, amend any provision of the Company's certificate of incorporation or bylaws; issue

18  or redeem any Company shares; change the authorized number of directors; select directors of the

19  Board and pay dividends.  The preferred stock also had antidilutive protections and rights to force

20  the Company to carry out an IPO and effect the sale of their shares to the public.

21           66.     By virtue of their control over Zymergen's Board of Directors, the Controlling

22  Stockholders exercised their control over the Company and its officers and managers.  Of the nine

23  Directors of the Board, the Controlling Stockholders were entitled to select three at any election.

24  The SoftBank Defendants selected Murdoch, the DCVC Defendants selected Ocko and the True

25  Ventures Defendants selected Sharma.  Pursuant to the governing documents, these Directors were

26  given special rights, including that without the approval of the Directors appointed by the

27  Controlling Stockholders, the Company could not, *inter alia*, hire, terminate, or change the

28  compensation of any executive officer.  The Controlling Stockholders also exercised their control

1    over the Company's Audit Committee through the selection of Ocko and Sharma.  The Controlling

2    Stockholders' Directors also held the authority to manage the Company by their required approval

3    of the Company's three-year business plan.  Four other Directors of the Board where chosen by

4    plurality vote, which, through their majority ownership, cemented the Controlling Stockholders'

5    control of Zymergen's Board of Directors.

6         67.    The Controlling Stockholders also had a voting agreement amongst, *inter alios*,

7    themselves and the Company, whereby they agreed on how to vote their shares of the Company

8    together on certain matters, including with respect to the election of Directors.  Indeed, Ocko, Co-

9    Managing Partner of the DCVC Defendants, publically referred to the True Venture Defendants'

10   managers as "essential allies every step of the way" and attributed the IPO to the SoftBank

11   Defendants' "capital muscle & advice when it was essential."

12        68.    At the time of the IPO, all Zymergen's outstanding preferred stock was converted

13   into common stock.  The Controlling Stockholders' preferred stock was converted into over 40

14   million shares of common stock, more than double the number of shares issued in the IPO.  The

15   amount of common stock they owned, as well as other favorable provisions in the Company's

16   governance documents, allowed the Controlling Stockholders to maintain virtually complete

17   control over Zymergen until the Controlling Stockholders fully harvested their investments.

18        69.    By virtue of their ownership, control over Zymergen's Board of Directors and

19   control over the Company's officers, the Controlling Stockholders exercised virtually complete

20   control over the Company.

21        70.    The Individual Defendants and the Controlling Stockholders had a duty to promptly

22   disseminate accurate and truthful information in the Registration Statement and to correct any

23   previously issued statements that were materially misleading or untrue.  The Controlling

24   Stockholders had access to the adverse undisclosed information about the Company's business,

25   products, pipeline and market opportunity and other adverse facts that rendered the positive

26   representations made or adopted by the Company materially false and misleading, as detailed

27   herein.  The Individual Defendants and the Controlling Stockholders, were able to and did control

28   the content of the Registration Statement and other public statements pertaining to the Company.

1   Each of the Individual Defendants and Controlling Stockholders was provided with copies of the

2   documents alleged herein to be misleading prior to or shortly after their issuance and/or had the

3   ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly,

4   each of the Individual Defendants and Controlling Stockholders was responsible for the accuracy

5   of the Registration Statement and is therefore liable as controlling persons for the representations

6   contained therein.

7           71.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter

8   for the Company's IPO.  In the IPO, J.P. Morgan agreed to purchase 5,750,345 shares of the

9   Company's common stock, including the over-allotment option.  J.P. Morgan received an

10  underwriting fee of $2.17 per share, or $12,478,249.

11          72.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an

12  underwriter for the Company's IPO.  In the IPO, Goldman Sachs agreed to purchase

13  5,750,345 shares of the Company's common stock, including the over-allotment option.  Goldman

14  Sachs received an underwriting fee of $2.17 per share, or $12,478,249.

15          73.     Defendant Cowen and Company, LLC ("Cowen") served as an underwriter for the

16  Company's IPO.  In the IPO, Cowen agreed to purchase 2,411,435 shares of the Company's

17  common stock, including the over-allotment option.  Cowen received an underwriting fee of $2.17

18  per share, or $5,232,814.

19          74.     Defendant BofA Securities, Inc. ("BofA") served as an underwriter for the

20  Company's IPO.  In the IPO, BofA agreed to purchase 2,040,445 shares of the Company's

21  common stock, including the over-allotment option.  BofA received an underwriting fee of $2.17

22  per share, or $4,427,766.

23          75.     Defendant UBS Securities LLC ("UBS") served as an underwriter for the

24  Company's IPO.  In the IPO, UBS agreed to purchase 2,040,445 shares of the Company's common

25  stock, including the over-allotment option.  UBS received an underwriting fee of $2.17 per share,

26  or $4,427,766.

27          76.     Defendant Lazard Frères & Co. LLC ("Lazard") served as an underwriter for the

28  Company's IPO.  In the IPO, Lazard agreed to purchase 556,485 shares of the Company's common

1  stock, including the over-allotment option.  Lazard received an underwriting fee of $2.17 per share,

2  or $1,207,572.

3        77.    Defendants J.P. Morgan, Goldman Sachs, Cowen, BofA, UBS and Lazard are

4  hereinafter collectively referred to as the "Underwriter Defendants."  As detailed herein, the

5  material adverse disclosures by Zymergen on August 3, 2021; September 23, 2021; October 21,

6  2021; November 3, 2021; November 15, 2021; and January 10, 2022, along with the other facts

7  alleged, show that the Underwriter Defendants failed in their "gatekeeping" role to ensure the

8  correctness of the Registration Statement.  They failed to conduct a reasonable due diligence

9  investigation, including the verification of information provided by Zymergen, which resulted in

10  the Registration Statement being inaccurate and misleading, containing untrue statements of

11  material facts and omitting material facts.

12  **IV.    SUBSTANTIVE ALLEGATIONS**

13        **A.    Description of Zymergen and Completion of the IPO**

14        78.    Zymergen integrates computational and manufacturing technologies to design,

15  engineer and optimize microbes for industrial applications.  The Company developed a platform

16  – the biofacturing platform – that treats the genome as a search space, using proprietary machine

17  learning algorithms and advanced automation to identify genetic changes that improve the

18  economics for its customers' bio-based products for a range of industries, including chemicals,

19  materials, agriculture and pharmaceuticals.  In addition, Zymergen's platform is used to discover

20  novel molecules used to enable unique material properties.  The Company was incorporated in

21  Delaware on April 24, 2013.

22        79.    Zymergen uses a process it calls "biofacturing" to create products that purportedly

23  combine the design and manufacturing efficiency of biological processes with technology's ability

24  to rapidly iterate and control diverse functions.  Its first product is called Hyaline, an optical film

25  designed for electronics companies to use for display touch sensors, which would purportedly

26  enable customers to make foldable touchscreens and high density flexible printed circuits.  Hyaline

27  was launched in December 2020, but has not generated revenue because it is still in its qualification

28  process with customers.

80.     On January 25, 2021, Zymergen confidentially submitted a draft Registration Statement on Form S-1 to the SEC that did not specify the number of securities to be issued or proceeds to be raised.

81.     On February 22, 2021, the SEC sent a letter to Hoffman that included comments on the January 25, 2021 confidentially submitted draft Registration Statement, and requests for information.  The SEC asked Hoffman to identify the third party that prepared the market data referenced in the draft Registration Statement in support of representations that the market opportunity addressable by Zymergen's biofacturing platform was enormous and diverse – at least $1.2 trillion in 20 separate industries, including $150 billion in the electronics, consumer care and agricultural industries.  The SEC also asked for information about Hyaline, including a description of the process in place to convert from a non-bio-produced molecule sourced from a third party to a bio-produced molecule in 2022.  The SEC asked for support for the representations that Zymergen planned to develop and commercialize product breakthroughs in about half the time and at one-tenth the cost of traditional processes.

82.     On March 8, 2021, Freshfields Bruskhaus Deringer US LLP ("Freshfields") responded to the SEC's February 22, 2021 letter on behalf of Zymergen, and Zymergen filed an amendment to the Registration Statement on Form S-1 with the SEC.  In the letter, Freshfields stated that the amended Registration Statement included revisions to address some of the comments in the February 22, 2021 letter and also provided information in response to the February 22, 2021 letter.  Freshfields informed the SEC that the data regarding the Company's market opportunity were management's estimates based on a bottom-up, industry-by-industry, application-by-application analysis of IHS Markit and similar data.  Freshfields described how Zymergen purportedly estimated the market opportunity and also wrote that the Company consulted industry experts to corroborate market analyses, especially where less granular market data were available.

83.     On March 22, 2021, the SEC sent Hoffman another letter providing comments and requesting information about the draft Registration Statement submitted on March 9, 2021.  The SEC asked Hoffman to amend the disclosures about Hyaline to describe approximately how long

1    Zymergen anticipated the Hyaline qualification process to take and when the Company expected
2    to begin generating revenue from Hyaline.  The SEC also asked Zymergen to disclose when the
3    Company estimated it would begin generating revenue from the other ten products included in the
4    pipeline.

5        84.    On March 23, 2021, Zymergen filed its Registration Statement on Form S-1 with
6    the SEC, which forms part of the Registration Statement.  In this Registration Statement, the
7    Company proposed a maximum offering of $100 million.

8        85.    On March 26, 2021, Freshfields sent a letter to the SEC responding to the SEC's
9    March 22, 2021 letter; and Zymergen filed Amendment No. 1 to the Registration Statement, which
10   forms part of the Registration Statement.  The amended Registration Statement included revisions
11   made in response to the letter received from the SEC on March 22, 2021.

12       86.    On April 14, 2021, Zymergen filed Amendment No. 2 to the Registration
13   Statement, which forms part of the Registration Statement, and increased the proposed maximum
14   offering to $484.8 million, proposing to register 15.64 million shares to be sold for $31.00 per
15   share.

16       87.    On April 21, 2021, the Company filed its final amendment to the Registration
17   Statement with the SEC on Form S-1MEF, which forms part of the Registration Statement.  The
18   sole purpose of the amendment was to increase the number of shares to be registered by 2,909,500.
19   The Registration Statement was declared effective the same day.

20       88.    On April 22, 2021, the Company's stock began publicly trading on the NASDAQ
21   under the stock symbol "ZY."

22       89.    On April 23, 2021, the Company filed its April 21, 2021 prospectus on
23   Form 424B4 with the SEC, which forms part of the Registration Statement.  In the IPO, the
24   Company sold approximately 18,549,500 shares of common stock at a price of $31.00 per share.
25   The Company received proceeds of approximately $529.9 million from the Offering, net of
26   underwriting discounts and commissions of $40.3 million, and approximately $4.9 million of
27   offering costs.  The proceeds from the IPO were purportedly to be used for working capital and
28   other general corporate purposes, including the continued investment in commercializing its

existing products, launching products in its pipeline and furthering the development of its biofacturing platform and technology.

**B.  The Materially Misleading Representations Contained in the Registration Statement**

90.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

91.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, or were reasonably likely to have, an impact on the Company's continuing operations.

92.     As detailed herein, the untrue statements of material facts and omissions concerned the Company's biofacturing platform; the Company's ability to create better products faster, cheaper and more sustainably using the biofacturing platform; the product development process; the development status of 11 products in the Company's product pipeline; the market opportunity for those products; and when those products would generate revenue.   The following misrepresentations were included throughout the Registration Statement, including in the Prospectus Summary, Management's Discussion and Analysis of Financial Condition and Results of Operations and the Business sections.

93.     All of the representations in the Registration Statement detailed below were materially misleading because, as the Company disclosed on August 3, 2021 and November 3, 2021, Zymergen was unable to produce products that could be sold at a profit when it created, manufactured and distributed the products on its own.   In addition, the representations were materially misleading because Defendants failed to disclose that several key target customers had technical issues implementing Hyaline into their manufacturing processes or that there was only a "hypothetical" near-term market for Hyaline due to there being "no hit product yet in the foldable display market."   Indeed, the Company abandoned Hyaline and another optical film product because there was a smaller near-term market opportunity than represented in the Registration

1 | Statement and abandoned all of the consumer care products because those products could not be

2 | sold at a profit when Zymergen created, manufactured and distributed them on its own.  As a result,

3 | Zymergen did not generate product revenue in 2021 and 2022, as it represented in the Registration

4 | Statement.

5 |         94.     In the Registration Statement, Defendants represented that Zymergen partnered

6 | with Nature to design, develop and commercialize bio-based breakthrough products that delivered

7 | extraordinary value to customers in a broad range of industries, including films designed for

8 | electronics companies to use in new categories of smart devices.  Defendants represented that

9 | Zymergen created these products with a proprietary platform that unlocked the design and

10 | manufacturing efficiency of biological processes with technology's ability to rapidly iterate and

11 | control diverse functions.  Defendants called this process "biofacturing" and represented that it

12 | would create better products faster, cheaper and more sustainably than traditional chemistry.

13 | Indeed, Defendants represented that Zymergen's goal was to launch products in about half the time

14 | and at one-tenth of the cost of what traditional chemical and materials companies could deliver.

> We partner with Nature to design, develop, and commercialize bio-based breakthrough products that deliver extraordinary value to customers in a broad range of industries.  Our first innovations include films designed for electronics companies to use in new categories of smart devices, including rollable tablets and naturally derived UV protection.  Our goal is to create new products with a proprietary platform that unlocks the design and manufacturing efficiency of biological processes with technology's ability to rapidly iterate and control diverse functions.  ***We call our process biofacturing and we expect it will create better products faster, cheaper and more sustainably than traditional chemistry by engineering microbes to make novel biomolecules that are the key ingredients in those products.  Our goal is to launch our products in about half the time and 1/10th of the cost of what traditional chemicals and materials companies can deliver, which would allow us to address a wide array of commercial applications.  Based on our experience and expectations with our first four products which are electronic films and insect repellent products, and subject to any regulatory requirements, which could lead to longer timelines and increased cost, we estimate the timelines and costs of launching our products to be roughly five years and $50 million.***  We founded Zymergen in the belief that biofacturing will lead to better products with better economics and a better world.

25 |         95.     Defendants represented that the demand for innovative materials had never been

26 | greater and that synthetic biology companies like Zymergen were a better alternative to chemical

27 | and materials companies that struggled to innovate because those companies used a limited

28 |

molecular palette, had substantial capital expenditures and were among the planet's worst
industrial polluters.

**The demand for innovative materials has never been greater**.

Human civilization is material.  The materials in the things we use, the
clothes we wear, the rooms where we live, the vehicles that take us from place to
place, as well as the inputs that grow the food we eat, are the products of a half
dozen chemical building blocks invented over the last several decades, mostly
derived from cracking hydrocarbons.

We believe the chemicals and materials companies that make these
materials have struggled to innovate because they employ a limited molecular
palette and have substantial capital expenditures.  In addition, they are among the
planet's worst industrial polluters.  Recently, synthetic biology companies
suggested a better alternative, where microorganisms are coaxed to produce
chemicals, but most synthetic biology companies have struggled to manufacture
novel molecules at industrial scales.  **Yet while the traditional chemical industry
is stagnant and synthetic biology companies have disappointed, the demand for
materials that solve important problems and are environmentally sustainable has
never been greater**.

96.     Defendants represented that Zymergen's biofacturing process, by contrast, created
better products faster, cheaper and more sustainably.

**Biofacturing creates better products faster, cheaper and more sustainably**.

Biofacturing is the design, development and commercialization of bio-
based breakthrough products, economically, at industrial scale, where
microorganisms create the biomolecules that are the key ingredients in those
products.   A traditional chemical factory's tons of steel and concrete are
functionally replaced by a tiny, flexible, easily reproduced, but incredibly valuable
engineered cell.  Our goal is to make our biomolecules by fermentation, where all
biofacturing reactions occur inside the engineered cell in standard fermentation
vats, rather than the expensive, purpose-built chemical plants used in synthetic
chemistry.  However, in some cases, so that we may achieve commercial launch
faster, we may initially launch products using molecules that are first produced with
non-fermentation based methods, which is a strategy we refer to as "Launch
Acceleration."   Additionally, since cells naturally make tens of thousands of
different molecules, their genetic pathways can be reprogrammed to carry out any
number of biofacturing reactions, and they can produce a vast array of biomolecules
with unique properties that petrochemicals do not possess.   **Our pioneering
biofacturing process is designed to flexibly and cost effectively create products
with unique characteristics that possess the diversity and power of Nature's own
inventions, such as adhesives stronger than leading products on the market, or
an optical film as clear and thin as a dragonfly's wing**.

97.     In the Registration Statement, Defendants described the product development
process, representing that Zymergen business development personnel: (i) worked with customers
to define a set of properties for a material that the customers would find valuable; then (ii) designed

and developed engineered microbes that manufacture the novel biomolecule that would be a key

ingredient in a breakthrough product; then (iii) had CMOs manufacture the product; and finally

(iv) used Zymergen's sales force and marketing capabilities to contract with customers and sell

the product to them.

> Our product development journey starts with our business development personnel working with a customer to define a set of properties for a material that our customer would find highly valuable. We then design and develop engineered microbes that manufacture the novel biomolecule that will be the key ingredient in a breakthrough product. Next, we leverage Contract Manufacturing Organizations ("CMOs") to manufacture the product for us. Finally, once we have launched our product, we use our own sales force and marketing capabilities to contract with customers and sell our products to them.

98. Defendants included a chart titled "First product launched, with a rich pipeline of

future launches," depicting the stage of development for the 11 products under development,

including four products in the electronics market, four products in the consumer care market and

three products in the agricultural market.



## First product launched, with a rich pipeline of future launches

| | Product | Description | Design Product | Create Microbe | Scale Production | Launch |
|---|---|---|---|---|---|---|
| ELECTRONICS | Hyaline** | High optical quality film (e.g. foldable devices) | | | | Now |
| | ZYM0107 | Optical film with high temp. tolerance (e.g. foldable devices) | | | | 2022* |
| | ZYM0101 | Optical film with high modulus (e.g. foldable devices) | | | | 2023* |
| | ZYM0103 | Bio-based epoxy | | | | |
| CONSUMER CARE | ZYM0201 | Naturally derived insect protection | | | | 2023* |
| | ZYM0205 | Naturally derived, sustainable UV protection | | | | |
| | ZYM0206 | Bio-based, biodegradable film former | | | | |
| | ZYM0207 | Undisclosed | | | | |
| AGRICULTURE | ZYM0301 | Nitrogen fixation partnership | | | | |
| | ZYM0302 | Discovery partnership | | | | |
| | ZYM0303 | Novel bio-based herbicide | | | | |

99. In describing the product development process, Defendants highlighted Hyaline,

the first and only product launched by Zymergen, and represented that it was launched in

December 2020, to customers in the electronic industry, which began the expected 6- to 18-month

product qualification process with multiple customers. Defendants emphasized the importance of

the qualification process in Zymergen's target markets and represented that Hyaline (and other

1    products) would generate revenues only after customers completed all aspects of the qualification

2    process and decided to place an order for the product.

3    > *[T]hrough our global direct sales force and a team of application sales engineers,*
   > *we launched our first product Hyaline in December 2020 to customers in the*
4    > *electronics industry, beginning the expected 6-18 month product qualification*
   > *process with customers.* We have not yet generated revenue from product sales
5    > (except for nominal revenue related to the sale of samples of Hyaline). *We are*
   > *currently in the qualification process on Hyaline with multiple customers,*
6    > *including sampling and discussions on commercial terms with some of them.*
   > *Given the importance of this qualification process in our current target markets,*
7    > *we anticipate that, even after we have launched a product, we will only generate*
   > *revenue after customers have completed all aspects of the qualification process*
8    > *for that product and decided to place an order for our product.*

9    100.    Defendants represented that Hyaline was an optical film designed for electronics

10   companies to use for display touch sensors in personal devices and other applications and would

11   allow customers to make robust foldable touchscreens and high density flexible printed circuits.

12   Defendants also represented that Zymergen was converting to a fermentation-produced molecule

13   for Hyaline and developing commercial scale processes so the Company could produce the

14   molecule  through  fermentation  at  sufficient  volumes  and  costs  to  support  commercial

15   manufacturing.  Defendants represented that Zymergen expected this process to be complete in

16   2022.

17   > *Hyaline is the first in a franchise of optical films, designed for electronics*
   > *companies to use for display touch sensors in personal devices and other*
18   > *applications.   Hyaline will allow our customers to make robust foldable*
   > *touchscreens and high density flexible printed circuits.*   Hyaline uses a
19   > biomolecule that was identified through our biofacturing platform.  *In order to*
   > *accelerate product launch and meet customer demand, we launched Hyaline with*
20   > *a non-fermentation produced biomolecule sourced from a third party.*  We are in
   > the process of converting to a fermentation-produced molecule for Hyaline by using
21   > a microbe that has a demonstrated ability to produce the molecule through
   > fermentation. *We are currently developing commercial scale processes so we can*
22   > *produce the molecule through fermentation at sufficient volumes and costs to*
   > *support commercial manufacturing.   We expect this process to be complete in*
23   > *2022.*

24   101.    In addition to Hyaline, Defendants represented that Zymergen had ten other

25   products in development, including additional optical film products planned to be launched in 2022

26   and 2023; four consumer care products, including insect repellent; and three agricultural products.

27   > *We have 10 other products in development, consisting of three in*
   > *electronics, four with consumer care applications and three in agriculture.*
28   > *ZYM0107, which we plan to launch in 2022, is the next product in our films*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 3:21-cv-06028-JD                                                                                      - 26 -
4856-8867-3806.v1

*franchise and is a high-performance optical film like Hyaline. ZYM0101, planned for launch in 2023, is a breakthrough film for flexible electronics, which is designed to be used to build foldable and rollable phones and personal devices, as insulation for antennas to deliver 5G data speeds and as a coating for transparent monitors. Our consumer products include ZYM0201, a naturally derived non-DEET insect repellent, and we plan on partnering to create a microbial alternative to synthetic nitrogen fertilizer. We expect our biofacturing platform to be an engine of innovation and revenue generation, as we seek to develop new products in the same or adjacent sectors. We are also pursuing new markets for future growth.*

102.    Defendants represented that Hyaline was expected to generate revenue in the second half of 2021, just a few months after the completion of the IPO, and that Zymergen's global direct sales force and a team of application sales engineers were working with customers on the sales qualification process for Hyaline, wherein customers would be able to validate the product and qualify it as a standard component in their final electronic devices. Defendants also represented that other optical film products would generate revenue following the 6- to 18-month qualification process and that consumer care and agricultural products would generate revenue upon launch because a product qualification process was not necessary.

*Following the launch of Hyaline, our global direct sales force and a team of application sales engineers are now working with customers on the sale qualification process in which customers are able to validate the product and qualify it as a standard component in their final electronic devices. During this time, we are providing customers with samples of our products to be tested for use in their own products so they can determine whether to purchase our product. Based on our experience to date since the launch of Hyaline in December 2020, we expect the sale qualification process of our products (including Hyaline) to last 6-18 months, or longer, depending on the customer and end device requirements.* We only generate revenue after customers have completed all aspects of the qualification process for that product and decided to place an order for our product, which is typically done on a purchase order basis rather than a long-term contractual commitment. *In the case of Hyaline, we expect to begin generating revenue in the second half of 2021, which will be prior to the time we expect to convert the nonfermentation produced biomolecule to the fermentation-produced molecule, which we expect to occur in 2022. We do not expect our estimated revenue from Hyaline to be meaningfully impacted by the conversion to the fermentation-produced molecule. We expect other electronics products, including ZYM0101, which we expect to launch in 2023, to follow a similar 6-18 month qualification process following which we expect to generate revenue. For many of our consumer care and agriculture products, including ZYM0201 which we expect to launch in 2023, a product qualification process will not be similarly necessary because we intend to launch and sell those products directly to the end-user and expect to generate revenue upon launch.* For our other products in development for which we do not currently have an anticipated launch date, we cannot predict when we expect to begin generating revenue from such products.

103.     Defendants represented that Zymergen would grow its business in several ways and that it generally targeted products that could support annual sales of greater than $150 million.

> We plan to grow our business in several ways.  *First, we plan to grow as we increase the market penetration of our launched products*.  *Next, we plan to grow by launching additional products in our chosen verticals of electronics, consumer care and agriculture and by continuing to add new products to our pipeline in these verticals*.  *Finally, we plan to grow by entering new markets. We plan to partner with industry leaders to enter these markets, as we believe this approach de-risks and accelerates our time to product launch*.  Today, we are working with various industry leaders and our strategy is to enter into partnerships with these leaders in the future.
>
> *We generally target products with a market opportunity that if successful, at scale, could support annual sales of greater than $150 million*.  We also expect that some portion of those products could be breakthrough products, but it is very hard in the materials market to predict beforehand which products those would be. In the long term, our goal is to launch multiple breakthrough products every year. *We believe that our strategy will drive strong future revenue growth as our revenues from launched products increase and revenues from new product launches stack on top of each other*.

104.     In addition, Defendants assured investors that the market opportunity addressable by Zymergen's biofacturing platform was enormous and diverse – at least $1.2 trillion across 20 separate industries.  They represented the market opportunity for the three industries being pursued with its 11 pipeline products – electronics, consumer care and agriculture – was approximately $150 billion, including the display market for Hyaline being over $1 billion in 2020, and the market for insect repellent being over $1.5 billion.

> *The market opportunity addressable by our biofacturing platform is enormous and diverse*.  *Our bottom-up, industry-by-industry, application-by-application, analysis suggests that our total market opportunity is at least $1.2 trillion across 20 separate industries for our potential products, all ripe for disruption, and that the market opportunity of the first three industries we will pursue, electronics, consumer care and agriculture, is approximately $150 billion*.  *In particular, we estimate that the display market alone for Hyaline was over $1 billion in 2020 and according to Transparency Market Research, the global market for insect repellents is over $1.5 billion across sprays and other traditional formats*.  In addition, our consumer survey, which asked 2,750 adults between 18 and 65 years of age in the United States and an additional 6,000 consumers in five global markets as a follow up about their concerns about insects, their current behavior with insect protection and their interest in better insect repellent products, found that *consumer need to repel insects is global, big and likely to get bigger with current solutions being unsatisfactory, suggesting that there is a large latent demand for better products and therefore we believe that the true market opportunity is much larger*.  *We anticipate deploying our innovation engine to create decades of disruptive breakthrough products using a rigorous discipline to select new opportunities where there's demand for new*

*materials, where bio-based products have an advantage and where industries rapidly adopt new products*.

105.    The representations about Zymergen's biofacturing platform, the products created, their development status, market opportunity and when those products would generate revenue were particularly important to investors given the Company's precarious financial condition. Zymergen reported just $15.4 million of revenue in 2019, and a net loss of $236.8 million.  In 2020, Zymergen reported just $13.3 million of revenue and a net loss of $262.2 million.  The increasing net losses caused the Company to be insolvent as of December 31, 2020, with an accumulated deficit of $773.7 million.  The recurring losses and accumulated deficit meant Zymergen needed to raise equity or debt to fund its operations until the Company could generate sufficient revenues to fund its operations.  That, in turn, caused the Company's auditors to note there was substantial doubt about the Company's ability to continue operating as a going concern.

> The Company has incurred net losses since inception and anticipates net losses and negative operating cash flows for the near future.  For the year ended December 31, 2020, the Company had a net loss of $262.2 million, and as of December 31, 2020, the Company had an accumulated deficit of $773.7 million.  At December 31, 2020, the Company had $210.2 million of unrestricted cash and cash equivalents.  While the Company has signed a number of initial customer contracts, revenues have been insufficient to fund operations.  Accordingly, the Company has funded the portion of operating costs exceeding revenues through a combination of proceeds raised from equity and debt issuances.  The Company's operating costs include the cost of developing and commercializing products as well as providing research services.  As a consequence, the Company will need to raise additional equity and debt financing that may not be available, if at all, at terms acceptable to the Company to fund future operations.

> Based on the Company's current business plan that was approved by the Board of Directors, its existing cash and cash equivalents, are not expected to be sufficient to meet anticipated cash requirements for the next 12 months.  Instead the Company is evaluating plans to restrict spending in order to meet current contract and operating commitments.

> In the event that unforeseen circumstances arise that result in additional cash outflows, the Company has at its disposal a number of cost-cutting measures that it could initiate under these circumstances.

> The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business.  Due to the substantial doubt about the Company's ability to continue operating as a going concern and the material adverse change clause in the loan agreement with its lender, the amounts due as of December 31, 2019 and December 31, 2020, have been classified as current in the consolidated financial statements.  The lender has not invoked the material adverse change clause

as of the date of issuance of these financial statements. The accompanying consolidated financial statements do not reflect any other adjustments relating to the recoverability and reclassification of assets and liabilities that might be necessary if the Company is unable to continue as a going concern. The Company is subject to various covenants related to the credit and guaranty agreement entered into on December 19, 2019 (Note 9) and given the substantial doubt about the Company's ability to continue as a going concern there is a risk that it may not meet its covenants in the future.

C.      The Materially Misleading Risk Factors in the Registration Statement

106.    The Registration Statement also contained inaccurate and materially misleading "Risk Factors" warning investors that Zymergen's business "could be," "might be" or "would be" harmed by various risks "if" they occurred. These Risk Factors were inaccurate and materially misleading because the warned-of risks had already occurred and were adversely impacting Zymergen's business at the time of the IPO.

107.    Each of the risk warnings was materially misleading because, at the time of the IPO, there was only a "hypothetical" near-term market for Hyaline (the Company's first and only product to be launched at the time of the IPO) due to there being "no hit product yet in the foldable display market" and because several key target customers had technical issues implementing Hyaline into their manufacturing processes. In addition, the risk warnings were misleading because the Company was unable to produce products that could be sold at a profit when it created and distributed the product on its own. Thus, the warned-of risks were already adversely and materially affecting Zymergen's current business operations. Indeed, the Company abandoned Hyaline and another optical film product because there was a smaller near-term market opportunity than represented in the Registration Statement, and abandoned all of the consumer care products because those products could not be sold at a profit when Zymergen created, manufactured and distributed them on its own.

108.    Defendants represented that Zymergen's business, results of operations and financial condition "may be" adversely and materially affected "if" the Company was unable to use its biofacturing platform to successfully identify and develop pipeline products into commercially viable products faster and cheaper than traditional materials.

*We may not be successful in our efforts to use our proprietary biofacturing platform to build a pipeline of products.*

1
2
3
4

*A key element of our strategy is to use our experienced management, engineering and scientific teams to build a pipeline of products through our biofacturing platform and develop those pipeline products into commercially viable products faster and cheaper than traditional materials*. **Although our R&D efforts to date have resulted in potential pipeline products**, we may not be able to continue to identify and develop additional pipeline products through the use of our biofacturing platform.

5
6
7
8
9
10
11
12
13
14

*Even if we are successful in continuing to build our product pipeline through the use of our biofacturing platform, not all potential pipeline products we identify will be suitable for development and use in commercial products*. Machine learning and automation, generally, remain in the early stages of development. Although we expect machine learning and automation to improve over time, the operation of our biofacturing platform will continue to require significant human interaction which introduces risks of error and requires us to recruit highly skilled employees in a competitive market. Identifying and developing commercially viable pipeline products may require us to make continued advancements in our biofacturing platform to lower costs, reduce development time or otherwise more quickly identify pipeline products[.] See the risk factor titled "–*Even if we are successful in expanding our biofacturing platform, rapidly changing technology and extensive competition in the synthetic biotech and petrochemical industries could make the products we are developing and producing obsolete or non-competitive unless we continue to develop and manufacture new and improved products and pursue new market opportunities.*". **If we are unable to use our biofacturing platform to successfully identify and develop pipeline products, our business, results of operations and financial condition may be adversely and materially affected**.

15    109.    Similarly, Defendants represented that "if" Zymergen experienced problems or

16  delays in developing pipeline products, the Company "may" be subject to unanticipated costs,

17  including the loss of customers; Zymergen "may" not be able to solve development problems or

18  develop a commercially viable product at all; and "if" the Company did not successfully manage

19  new product development processes, revenue growth from new pipeline products "may" be

20  prevented or delayed and business and operating results "may" be harmed.

21
22
23

*It is difficult to predict the time and cost of development of our pipeline products, which are produced by or based on a relatively novel and complex technology and are subject to many risks, any of which could prevent or delay revenue growth and adversely impact our market acceptance, business and results of operations*.

24
25
26
27
28

*We have concentrated our R&D efforts to date on a select number of pipeline products based on technical feasibility and market opportunity*. **We launched our first product Hyaline in December 2020, beginning the expected 6-18 month product qualification process with customers**. We have not yet generated revenue from product sales (except for nominal revenue related to the sale of samples of Hyaline). **We have 10 other products in development, consisting of three in electronics, four with consumer applications and three in agriculture**.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 3:21-cv-06028-JD                                                                                                      - 31 -
4856-8867-3806.v1

1                              *      *      *

2       *If we experience problems or delays in developing our pipeline products, we may
        be subject to unanticipated costs, including the loss of customers*.  Additionally,
3       even after the incurrence of significant costs to develop a product, *we may not be
        able to solve development problems or develop a commercially viable product at
4       all.  If we do not achieve the required technical specifications or successfully
        manage our new product development processes, or if development work is not
5       performed according to schedule, then our revenue growth from new pipeline
        products may be prevented or delayed, and our business and operating results
6       may be harmed*.

7            110.    Defendants also represented that the success of Zymergen's business relied heavily

8   on the performance of its products and the development of new products at lower costs and faster

9   development timelines and that Zymergen's business and results of operations "will be" adversely

10  affected "if" the Company was unable to successfully transition into becoming a biofacturer of

11  new products and create novel products at lower costs and on accelerated development timelines.

12          *The success of our business relies heavily on the performance of our
        products and developing new products at lower costs and faster development
13      timelines*.

14          To date our revenue has primarily been derived from relationships with
        partners where we seek to test and validate the ability of our biofacturing platform
15      to improve or optimize our clients' products through biofacturing.  However, *our
        future profitability will depend on our ability to successfully execute and
16      maintain a sustainable business model and generate continuous streams of
        revenue through the sale of our products across industries.  We launched our
17      first product Hyaline in December 2020, beginning the expected 6-18 month
        product qualification process with customers*.  We have not yet generated revenue
18      from product sales (except for nominal revenue related to the sale of samples of
        Hyaline).  *We are currently in the qualification process on Hyaline with multiple
19      customers, including sampling and discussions on commercial terms with some
        of them.  Given the importance of this qualification process in our current target
20      markets, we anticipate that, even after we have launched a product, we will only
        generate revenue after customers have completed all aspects of the qualification
21      process for that product and decided to place an order for our product*.  Our
        current business model is premised on innovating and producing new products
22      rapidly and at lower costs than traditional methods and achieving results that may
        only be obtained through leveraging biology.  While we may launch bio-based
23      versions of existing products or existing molecules that are too expensive to utilize
        in products today, biofacturing of previously unavailable, superior molecules and
24      materials is key to our long-term success.  However, *if we are unable to
        successfully transition into becoming a biofacturer of new products and create
25      novel products at lower costs and on accelerated development timelines, our
        business and results of operations will be adversely affected*.

26

27

28

111.    Defendants represented that Zymergen's business, financial condition and results of operations "may be" adversely affected "if" the Company's products contained defects or were delayed.

> ***Our products, or the end products of which they are components, could have defects or errors, which may give rise to claims against us or delays in production and adversely affect our business, financial condition and results of operations***.
>
> Some applications of our technology or products are components of end products and therefore our success is tied to the success of such end products. ***We cannot assure you that material performance problems, defects, errors or delays will not arise in our products or the end products in which they are components, and as we commercialize our products, these risks may increase***. We expect to provide warranties that our products will meet performance expectations and will be free from defects. The costs incurred in correcting any defects or errors may be substantial and could adversely affect our operating margins.
>
> In manufacturing our products, we depend upon third parties for the supply of our instruments and various components, many of which require a significant degree of technical expertise to produce. If our suppliers fail to produce our product components to specification or provide defective products to us and our quality control tests and procedures fail to detect such errors or defects, or if we or our suppliers use defective materials or workmanship in the manufacturing process, the reliability and performance of our products will be compromised.
>
> ***If our products or the end products of which they are components, contain defects or are delayed, we may experience***:
>
> • a failure to achieve market acceptance for our products or expansion of our products sales;
>
> • the development of new technology rendering our products, or the end products of which they are components, obsolete;
>
> • loss of customer orders and delay in order fulfilment;
>
> • damage to our brand reputation;
>
> • increased warranty and customer service and support costs due to product repair or replacement;
>
> • product recalls or replacements;
>
> • inability to attract new customers and collaboration opportunities;
>
> • diversion of resources from our manufacturing and R&D departments into our service department; and
>
> • legal and regulatory claims against us, including product liability claims, which could be costly, time consuming to defend, result in substantial damages and result in reputational damage.

1

2

      **D.**    **August 3, 2021: Zymergen Discloses Numerous Facts Demonstrating the Registration Statement Was Inaccurate and Materially Misleading, Causing the Company's Stock Price to Decline 75%**

3      112.    After the market closed on August 3, 2021, less than four months after the

4 completion of the IPO, the Company revealed numerous facts informing investors the Registration

5 Statement contained untrue statements of material facts and omitted material facts.  On that date,

6 Zymergen issued a press release and held a conference call to provide a business update regarding

7 its commercial product pipeline and financial forecast.

8      113.    The Company reported: (i) there were issues with its commercial products pipeline

9 that would impact the Company's delivery timeline and revenue projections; (ii) the Company no

10 longer expected product revenue in 2021 and only expected immaterial product revenue in 2022;

11 (iii) during the quarter, several key target customers encountered technical issues in implementing

12 Hyaline into their manufacturing processes, resulting in a delay in the commercial ramp up of

13 Hyaline; (iv) the Company was working to strengthen its commercial team to ensure the reliability

14 and robustness of the sales pipeline qualification and forecast process; (v) the Company was

15 evaluating emerging data on the total addressable market for foldable display applications,

16 indicating a smaller near-term market opportunity that was growing less rapidly than anticipated,

17 as well as its impact on Zymergen's sales forecast; (vi) the Company would conduct a full

18 reexamination of all Zymergen target markets to determine if a shift in market focus was

19 appropriate; (vii) the Zymergen's Board of Directors had formed dedicated committees, including

20 a Strategic Oversight Committee, and was working with outside experts to conduct an in-depth

21 review of the Company's operational, financial, product and commercialization efforts to facilitate

22 the development of an updated strategic plan; (viii) the Company would conduct a cultural

23 assessment to ensure that there would be broad-based accountability across the organization and

24 that the Company would operate with transparency and openness; (ix) the Company was focused

25 on reestablishing the credibility of the leadership team and the Company; (x)  Hoffman, the

26 Company's CEO, had been terminated, effective immediately, as part of the effort to reestablish

27 the credibility of the leadership team and the Company; and (xi) the Company was developing a

28 plan to reduce and align expenses with the change in the Company's revenue expectations.

114.    In the press release, Zymergen reported the following:

*Zymergen recently became aware of issues with its commercial product pipeline that will impact the Company's delivery timeline and revenue projections. Accordingly, the Company no longer expects product revenue in 2021, and expects product revenue to be immaterial in 2022.*

*During the quarter, several key target customers encountered technical issues in implementing Hyaline into their manufacturing processes* typical of new product and process development learnings.  The Company has made significant progress towards addressing these challenges and believes there are no intrinsic technical issues with Hyaline.  However, *this issue has resulted in a delay in the Company's commercial ramp.  Zymergen is working to strengthen its commercial team to ensure the reliability and robustness of the sales pipeline qualification and forecast processes.*

*The Company is also evaluating emerging data on the total addressable market for foldable display applications, which indicate a smaller near-term market opportunity that is growing less rapidly than anticipated, as well as its impact on Zymergen's sales forecast.  The Company will conduct a full re-examination of Zymergen's target markets confirming our past views or altering them if the data indicate a shift in market focus is appropriate*.

"*We are disappointed by these developments, and the Board and management team are focused on resolving the underlying issues to ensure Zymergen moves forward as a stronger company with a compelling operating plan*," said Jay Flatley, Acting CEO and Chairman of the Board.  "*The Board has formed dedicated committees, including a Strategic Oversight Committee, and is working with outside experts to conduct an in-depth review of the Company's operational, financial, product, and commercialization efforts to facilitate the development of an updated strategic plan for Zymergen*.  The underlying promise of our business and technology is sound, and I am proud of the work our teams are doing across the organization.  We are confident in Zymergen's opportunities and prospects, although *it will take longer to accomplish our goals than previously expected*."

***CEO Transition***

In connection with the business update, Zymergen also announced that Jay Flatley has been appointed Acting Chief Executive Officer, effective immediately.  Flatley's appointment follows the mutual decision by Zymergen and Josh Hoffman that *Hoffman will step down as CEO and as a member of the Board, effective immediately*.  The Company's Board of Directors will commence a search process to identify a permanent CEO.  Sandi Peterson will serve as Zymergen's Lead Independent Director while Flatley serves as Acting CEO.

*            *            *

"*A key element to ensuring Zymergen is set-up for long-term success is having the right team in place, and the Board and Josh recognize that new leadership is required*," *said Flatley*.  "The Board will take whatever time is needed to conduct a thorough search to identify a world-class leader for Zymergen.  Until then, I am committed to working with our deep bench of talent to drive our company forward.  On behalf of the Board and management team, I thank Josh for his work in advancing our mission and wish him the best in his future endeavors."

1                               \*       \*       \*

2
3
> *In connection with today's business update, Zymergen is developing a plan to reduce and align expenses with the change in the Company's revenue expectations*.

4         115.    During the conference call, Flatley repeated the unexpected adverse disclosures

5 included in the press release related to Hyaline, the total addressable market for foldable display

6 applications and the impact on expected product revenues for Hyaline and other products.

7
8
> At market close today, Zymergen released an important business update.  In addition, the company announced my appointment as acting CEO, while the Board commences a search to identify a permanent successor.

9
10
11
12
> Starting with the update.  *We recently became aware of issues with Zymergen's commercial product pipeline that will impact the company's delivery time lines and revenue projections.  The goal of our call today is to provide you with further details, including our current understanding of the issues and what we continue to review; the actions the Board has already undertaken in connection with these events; and our plan to get the company back on track, reestablish credibility and ensure Zymergen is positioned for success*.

13
14
15
16
> *Specifically, it's become clear that the commercial opportunity for our first product Hyaline is less than we expected*.  In response, the Board initiated a series of deep dives into the company's product pipeline and development processes.  While the work remains ongoing, *the Board anticipates that the road map and time lines for Zymergen's follow-on products could also be impacted.  As a result, we no longer expect product revenue in 2021 and expect product revenue to be immaterial in 2022.  Without a firm pipeline of customers and visibility on commitments, our projections beyond 2022 are highly uncertain*.

17
18
19
20
> Let me now turn to the details of what we know today.  As is typical and important for any company, the Board receives periodic updates regarding the company's progress toward its goals.  It was through these updates that *we recently learned of significant execution challenges within the organization.  Based on the Board's preliminary analysis, we have identified several contributing factors to the revision of our plan*.

21
22
23
> *First, several key target customers had technical issues implementing Hyaline into their manufacturing processes*.  We've made progress toward addressing these challenges and believe there are no intrinsic technical issues with Hyaline.  However, *this resulted in a delay in the commercial ramp*.

24
25
> *Second, emerging data on the total addressable market for foldable display applications indicates a smaller near-term market opportunity with scaled demand pushed out in time and growing more slowly than anticipated.  The market is in an earlier stage than we previously expected*.

26
27
28
> *Third, the company's commercial teams did not have significant insight into the customer qualification process and into their customers and users, which resulted in forecasted overestimated near-term demand.  As a result, we're already making substantive changes in our commercial team*.

116.    After repeating the adverse information included in the earnings release, Flatley emphasized the seriousness of the problems and what the Zymergen's Board of Directors and management were doing to understand the issues and develop a plan to address them.

> *I want to perhaps state the obvious that we're taking this situation extremely seriously.  As soon as we learned of the problems, our Board and management immediately started to work to fully understand the issues and began developing a plan to address them.  The Board has formed dedicated committees, including a strategic oversight committee, to conduct an in-depth review of the company's operational, financial, product and commercialization efforts.  We have also engaged expert advisers to support us in this process.*
>
> *Currently, our work is focused in several key areas.  First, we're conducting a deep dive into the company's sales forecasting process to examine how the initial forecast was developed, where the issues arose and how to improve that process going forward.  Second, we've retained a number of outside experts to examine the robustness of the products coming out of our pipeline and their readiness for full commercialization.  Third, we're digging into the company's long-term market opportunities to ensure our product pipeline is aligned with industry trends and customer demand.*
>
> *With the assistance of a top-tier consulting firm, we're doing a full assessment of Zymergen's target markets and the fit of our products into the pipeline of those markets.*  As part of this work stream, we're exploring adjacent opportunities that could potentially provide for new revenue sources.
>
> *          *          *
>
> *Lastly, we're developing a plan to align our burn rate to match the newly expected revenue ramp.  One of our top priorities will be expense management.*  However, we should note that the Q3 expense rate is likely to be higher than Q2, given the outside resources we've retained and the onetime expenses it will take to manage down the burn rate.  In the meantime, we have ample cash on hand to manage the business.

117.    Flatley also stated that Zymergen would conduct a cultural assessment to ensure there was broad-based accountability across the organization and that the Company operated with transparency and openness; that Zymergen was focused on reestablishing the credibility of the leadership team and the Company; and that the termination of Hoffman was required to ensure accountability, transparency, openness and credibility.

> *We will conduct, additionally, a cultural assessment to ensure that there's broad-based accountability across the organization and that we operate with transparency and openness.*
>
> *          *          *
>
> As a result of the work underway, we will develop an updated strategic plan for Zymergen with clear milestones and goals that the company can be held

accountable to achieving. *We are focused on reestablishing the credibility of the leadership team and the company. We recognize that this will not happen over weeks or months, but will require consistent quarter-after-quarter execution against a credible plan*.

*To that end, another key element to ensuring we're set up for long-term success is [to] have the best possible leadership*. As a co-founder and CEO, Josh Hoffman's vision and passion for partnering with nature to make better products has been instrumental to establishing Zymergen as an industry pioneer and innovator. We're all grateful to him for his work in advancing this mission and thank him for his many contributions.

*As we navigate the current situation and work to move the company forward as a refocused company, the Board and Josh mutually agreed that new leadership is required*. The Board will initiate a comprehensive search to find the right leader to guide Zymergen's strategy moving forward and deliver on its strategic and operational goals. We will take whatever time is necessary to find the world-class leader our company deserves. In the meantime, I'm committed to leading the company and overseeing all operations as well as the reviews underway, and we'll keep you updated as we have more information to announce.

118.   Flatley concluded his opening remarks by stating that the Company was now "committed to acting with transparency" but could not provide a specific forecast for 2022 and 2023, until it completed various tasks, including a full reexamination of the Company's target markets, the strengthening of the commercial team and ensuring the reliability and robustness of Zymergen's sales pipeline and forecast process. He acknowledged the unexpected adverse disclosures were "deeply disappointing" to investors and meant it would take longer for Zymergen to achieve its goals than previously expected.

*The Board's hope was to speak to you today about the company's 2022 and 2023 prospects. However, we have more work to do before we can provide a more specific forecast. We're committed to acting with transparency and look forward to providing updates on our progress*.

Over the next several quarters, we expect to complete and deliver a full reexamination of the company's target markets, confirming our past views or altering them if the data indicate a shift in market focus is appropriate. This will also include exploring potential new markets. Second, a plan to strengthen the commercial team and ensure the reliability and robustness of both our sales pipeline, qualification and our forecast processes. A plan to reduce the company's burn rate to align more closely with our revenue prospects. Fourth, a deep dive into the process by which we prepare and launch products to be sure they're market-ready and can be easily integrated into our customers' workflows. And lastly, a plan for 2022 and 2023, that we have confidence we will meet.

*To close, I want to acknowledge that these developments are deeply disappointing to all of us as supporters of Zymergen and its mission, including you, our analysts and investors, our employees, our customers and our Board of Directors. This is a setback that we're committed to resolving fully and*

*expeditiously. **Our execution challenges do mean it will take longer to achieve our goals than previously expected**. However, we remain focused on our strategy of pursuing continuous launches of breakthrough products and I'm proud of the work our teams are doing across the organization.*

119. Following Flatley's prepared remarks, analysts expressed shock and disappointment with the numerous adverse disclosures made just months after the completion of the IPO and asked many questions.

120. Cowen analyst Doug Schenkel ("Schenkel") asked the first question, stating the disclosures were a disappointment for everybody and very surprising. He noted there was a lot of excitement about the outlook for Hyaline because the Company had attached a large market opportunity to it and because Hyaline working would be a sign that Zymergen's biofacturing platform was worth much more. He asked Flatley if there truly was a real platform value given the unexpected adverse disclosures.

> *Obviously, a disappointment for everybody involved in listening to this call, and it's very surprising.*
>
> If we tick it up a level; from ***Hyaline, there was a lot of excitement about the outlook for that product. I would argue that investors were as focused on Hyaline for the product itself as well as essentially looking at it as a sign that investors and analysts could have more confidence that this platform could work***.
>
> ***So while the product itself had attached to it a large market value, a market opportunity, I think folks looked at Zymergen as not just Hyaline company***. But if Hyaline worked and then the follow-on product worked, that it would be a sign that this platform was worth much, much more.
>
> I know this has just happened, but I think ***it would be really helpful if you could share anything that would make all of us feel better, that there truly is real platform value here. How do we get comfortable with that, Jay***?

121. Flatley claimed he had confidence the platform could produce products but acknowledged the challenge was in the execution related to matching produced products with market opportunity. Flatley also claimed Hyaline still had a material opportunity in the market – a claim he would contradict in Zymergen's 3Q21 earnings call just three months later, when he unexpectedly revealed the Company had stopped all work on Hyaline and cancelled the product because the foldable display market was smaller than initially expected – but admitted that opportunity had been "pushed out" and that the "pipeline [was] thinner than we might have expected back several months ago." He also admitted what happened with Hyaline caused the

Company to "relook at the entire pipeline of products" to determine the Company's ability to manufacture them in a way that they were truly market ready and that they had a match to the best market opportunities.

So everything I've seen to date, Doug, reinforces the confidence that we have in the overall ability of this platform to produce products. ***What I think we've seen, as we look back over the last weeks, is a real challenge in execution related to the match of the products that the platform can produce with the market opportunity***.

And Hyaline, you're right, was certainly an exemplar or intended to be an exemplar of what this platform could produce. ***We think the product still has a material opportunity in the market***. ***It's certainly pushed out, and the pipeline is thinner than we might have expected back several months ago***. But intrinsically, we think the technical characteristics of the products are sound.

***Having said that, what's happened on Hyaline has caused us to relook at the entire pipeline of products that we're producing, not in terms of the actual specification so much of those products, but our ability to manufacture them in a way that they're truly market-ready, number one***. But secondarily, that they also have a match to the best market opportunities that the company has in front of it.

So in summary, I think the platform is solid. ***What we're facing here are execution challenges in matching the products that come off that platform to the market***.

122.    Schenkel mentioned the pipeline of product charts shared by Zymergen – including in the Registration Statement – and asked what had changed if the products were as represented in the pipeline charts.

Okay.  And I guess 1 follow-up on what you've mentioned a couple of times, which is this pipeline.  I just want to make sure I understand that correctly. ***When you talk about pipeline, and maybe I should just understand this inherently, but are you talking about the products and the targets that the company has been talking about for a while in terms of what would come next? Are you talking about the funnel of customers that could be interested in Hyaline and other products?  Or is it actually both?***

123.    Flatley responded that the pipeline of products was as represented during the IPO but that the pipeline of customers was thinner than represented during the IPO.

Your point's a good one.  It's actually both, and pipeline is used to describe both of those things.  And what I would say is that the pipeline of products is as was represented during the IPO. So those products are continuing to be developed by the platform. ***What is thinner than we expected is the pipeline of customers for Hyaline specifically***.

124.    That response caused Schenkel to ask if what changed with the pipeline charts included in the Registration Statement was Zymergen's ability to manufacture at a level that would put the Company in a position to address the markets in a way where the markets would be as previously communicated.

> [Schenkel:] Okay.  But – and then – but in general, so that – *if we think of those product pipeline charts, you guys shared, nothing's changed there*.  *What's changed is your assessment of your ability to manufacture at a level that would put you in a position to address the markets in a way where the TAMs would be what was previously communicated?*

125.    Flatley responded that the problem was not manufacturing, but the actual fit of the product to the market opportunity.  Moreover, he admitted there was no market for Hyaline and that the market was just "theoretical" because there was "no hit product yet in the foldable display market."  Flatley said that problem caused Zymergen to relook at the entire portfolio of products to make sure there were market opportunities for them.

> [Flatley:] *It's not so much the scalability of manufacturing, Doug.  It's the actual fit of the products that we're making to the market opportunity, right?  Do they satisfy the market?  Are they timed in a way to hit the market when the market is actually ready for them?*
>
> So we think, as I mentioned in the script, *that the timing for the foldable display market is getting pushed out*.  *As most people are aware, there's no hit product yet in the foldable display market*.  *So they're all remaining theoretical, and that's sort of pushing out the time line for Hyaline*.  *So that's an example, I think, of where we have a product in a market that's not quite ready for it yet and so the timing gets pushed out*.  *That's what's caused us to go back and relook at the entire pipeline of products to make sure that, that fit is appropriate and that we're hitting the best market opportunities that the company has*.

126.    In response to a question from J.P. Morgan Chase analyst Tycho Peterson ("T. Peterson") about the technical issues key target customers had implementing Hyaline into their manufacturing processes, Flatley revealed there was product shrinkage at one customer site and material compatibility issues at an undisclosed number of customers.  He acknowledged the Company did not do a sufficient job of anticipating and modeling the processes its products went through at its customers or knowing in advance what risks its products could have in the hands of third-party customers.  As a result, Zymergen did not understand the various types of applications for its products and what issues might come up at the customer sites and pretest for as many of those as possible.  Moreover, he acknowledged these failures should not have occurred, stating

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 3:21-cv-06028-JD                                                                              - 41 -

they were "normal sort of cutting-your-teeth problems that happen in the implementation of these advanced types of technologies."

There were 2 specific things, Tycho, that came up post IPO. One was the fact that *we had some product shrinkage in one customer site*. And as I said in the script, we believe we've largely addressed that. There's probably a little bit more testing required to ensure that, that's the case. But we think that's largely behind us.

*The second one has to do with material compatibility*. As you know, these products go into a process that's different at every customer site. And *what we should have done as a company has done a better a job of anticipating and modeling what those processes were at each of those customers, knowing in advance what risks our product could have in the hands of the third-party customers*.

*And that's where we had some execution challenges and where we need to go back into our pipeline of products and make sure that when we produce a product, we understand clearly the various types of applications for that product and what issues might come up in those customer sites and pretest for as many of those as we possibly can. So those were the technical issues that we faced*.

And as I mentioned, we don't think there's any intrinsic problems with the product. *These are normal sort of cutting-your-teeth problems that happen in the implementation of these advanced types of technologies*.

127.  Peterson also asked about the smaller near-term market opportunity for Hyaline, which was growing more slowly, and asked if Zymergen had bad market data or if the Company's customers pushed out the timelines. Flatley said it was a combination. He said the Company had research reports that clearly indicated the foldable display market was at least a year away and that there was no killer product on the horizon, facts that would have existed at the time of the IPO. He also said the smaller near-term market opportunity for Hyaline was a result of customer feedback and acknowledged this information existed at the time of the IPO by stating that it was another point in Zymergen's commercial chain where the Company did not do as good a job as it should have in understanding the ultimate end use of the product and what the demand curve looked like, which was why Zymergen overestimated the near-term demand for Hyaline.

*That was a combination. We've had some research reports that have clearly indicated a shift in market timing that's at least a year and maybe more. And as I mentioned, we all watch the foldable phone market, and there's no killer product immediately on the horizon that, at least, we're aware of. So that time line has largely gotten pushed out*.

*And we've had customer – direct customer contact, deep customer contact through our commercial channels, where we've talked to customers about exactly*

*when they plan to implement it and what product they plan to implement it in. It's another point in our commercial chain where we didn't do as good a job as we should have in understanding, in fact, the ultimate end-use of the product in the stack and understanding what that demand curve look like. And that's why I think we potentially – well, we, in fact, did overestimate the near-term demand for Hyaline.*

128.    Flatley also admitted Zymergen was looking at the fundamental model of the Company to determine whether its at-risk development model was sound compared to the foundry approach used by some of the Company's peers.  Moreover, he admitted the deep dive into the Company's at-risk development model and other business assessments would occur over the next several quarters.

129.    BofA analyst Derik De Bruin ("De Bruin") questioned the representations made during the IPO process given the unexpected adverse disclosures and asked how the analysts could have any confidence in anything the Company was now representing, noting the representations about Hyaline being the Company's breakthrough product were off so much.  De Bruin told Flatley that, during the IPO process, health care analysts like him relied on the Company for information to evaluate the electronics markets, consumer products markets and agriculture product markets because they were a bit beyond the scope of health care analysts.  He asked:

*[H]ow can we have any confidence whatsoever in anything that's been put out there in terms of numbers or putting the market opportunity?  I mean, given that the one product, the one market that was set in stone to come out and be the breakthrough product is off so much?  So . . . the question is like, what's the basis for our forecast for now on this and sort of the opportunity?  And it's like – are you going to reevaluate all the other pipeline products as well?*

130.    Flatley admitted that the Company was reevaluating all the other pipeline products and that it *was* "*totally fair that you question the credibility of any forecast we give you today, which is, frankly, why we didn't give you any forecast today.*"  He claimed the Zymergen Board was as surprised as De Bruin, the other analysts and the Company's investors and that it was part of the reason Zymergen was doing the very deep dive to understand what happened in the forecasting process, the product process and the overall market assessment.

131.    In response to another question from De Bruin about the Company's cash burn, Flatley said Zymergen was in a "great cash position at the moment" with $580+ million of cash in the bank and net cash of about $500 million.  He admitted, however, a key priority was to reduce

1    the cash burn rate sufficiently so cash would last longer and to the point it would match the revenue

2    stream going forward, which Flatley admitted the Company did not know.

3        132.    Flatley failed to mention that the great cash position was the result of the Company

4    raising $529.9 million less than four months earlier, based on a Registration Statement that

5    contained untrue statements of material facts and omitted facts necessary to make the statements

6    made not misleading.

7        133.    Goldman Sachs analyst Matthew Sykes noted the technical issues customers

8    encountered with Hyaline during the evaluation and testing phase were fairly far along in the

9    process when discovered and asked if there were ways Zymergen could check in to avoid these

10   types of surprises in the future.  Like in his response to J.P. Morgan analyst Peterson, Flatley

11   acknowledged the technical issues were knowable at the time of the IPO if Zymergen had done a

12   better job of understanding and anticipating the end use of the product in the customer's hands and

13   having a more intimate relationship with the customer so the Company understood specifically

14   how the customer was going to use the product and what other materials they were using in their

15   factories so that Zymergen's material would be compatible at the time it was provided to the

16   customer.  Flatley also said Zymergen needed to have more talent at the application engineer level

17   who worked directly with the customer and make sure those engineers were on site working

18   directly with the customers.  Flatley admitted that had not happened and blamed COVID for

19   engineers not being on site.

20           *There's 2 key things, Matt, that I think we need to do there.  One is that
21   we need to do a much better job of understanding and anticipating the end-use
     of the product in the customer hands; and having a more intimate relationship
22   with the customer so we understand specifically how they're going to use it, what
     other materials they're using in their factories, so that our material winds up
     being fully compatible at the time we put it in their hands.*  There's always some
23   of this that's going to happen as you put a brand-new product into a new application.

24           *But the second thing we need to do to make that go much more smoothly
     is have more talent at the application engineer level that works directly with the
25   customer on site.*  And COVID, we've never used COVID as an excuse in any of
     this, but there have been some COVID challenges in getting our teams to fly to
26   customer sites and be able to meet with customers.  And so as a backdrop, that's
     been a challenge, frankly, for the customer – company in the last 1.5 years.  And so
27   what we need to do as we come out of COVID it is to make sure we have those
     application engineers on-site working directly with customers in a much more
28   timely way.

134.    Sykes, like other analysts, also questioned the Company's credibility and whether there were also issues with the overall platform.

*And then just on the overall credibility*. ***Obviously, there will be general questions going forward****. And how much of this is – can we attribute to specifically to the technical issues that Hyaline had and/or electronic films versus other end markets and in the conversations that you'll likely have with customers that you've been working with other end markets to assure them that this is a specific issue to a specific end market and a specific product versus the overall platform that you kind of addressed in an earlier question, but just wanted a little more detail on it.*

135.    Flatley responded that there was no concern about the real market opportunities for the Company but that the challenge was to make sure the specific products made would meet the market need of a particular application area, which was where the Company had fallen down.  He stated Zymergen needed to track the evolution of these markets much more closely so that if the markets evolved while Zymergen was developing products, the Company would have the ability to adapt and react to those.

*Yes.   So Matt, we don't have any concerns about the real market opportunities for this company.  We believe the opportunity we have to make new products that don't exist today, to make them in much more organic ways, nature friendly ways is as enormous as we communicated and others in this field have communicated.  So there's no doubt about that.*

***The challenge we have is to make sure that the specific product that we make meets the market need of a particular application area****. **And that's where, I think, we've fallen down is in that execution side of things****. **And we need to track the evolution of these markets much more closely so that if these markets evolve while we're developing products, that we have the ability to adapt and react to those***. But there's no reduction of our optimism about the market opportunities for Zymergen products in the long run.*

136.    In response to a question from Larew, Flatley stated that Zymergen continued to work with the two customers that had problems incorporating Hyaline and the concern was how fast they were going to ramp up and how fast their end-user markets were going to ramp up based on what was known about the foldable display market.

137.    In his closing remarks, Flatley acknowledged the setbacks revealed were "clearly disappointing for all of you and for all of us" and stated Zymergen remained confident in the significant opportunity the Company had in front of it.  Subsequent disclosures by the Company would confirm many of the opportunities presented in the Registration Statement were gone, including the discontinuation of six of the 11 products highlighted in the Registration Statement.

138.    On this news, the Company's stock price fell $26.58 per share, or 76%, from $34.83 on August 3, 2021, to $8.25 on August 4, 2021, on unusually heavy trading volume of 21.7 million shares.

139.    On August 4, 2021, the date this action commenced, the Company's stock was trading as low as $7.85 per share, a nearly 75% decline from the $31.00 per share IPO price.

**E.    August 4, 2021: Analysts Report the Catastrophic Disclosures on August 3, 2021, Destroyed Zymergen's Credibility with Investors**

140.    Following the Company's August 3, 2021 press release and earnings call, many analysts issued reports in which they downgraded the Company's stock and were highly critical of Zymergen, questioning the Company's credibility, including how the foldable display market could have changed so much in the less than four months since the IPO.

141.    On August 4, 2021, Larew issued a report in which he downgraded Zymergen stock, wrote that the Company had destroyed its credibility with investors and questioned how the total addressable market for foldable display applications could have changed so much since the IPO.

> *[G]iven the abrupt and significant about-face just months after the IPO, we believe the company has destroyed its credibility with investors* (who have an ever-growing list of other investible options in the flourishing synthetic biology field). *While shares will be down meaningfully on Wednesday, with no definable catalyst in sight and (in our view) doubt about the credibility of the public information provided by the company to support the long-term investment case we are downgrading shares to Market Perform*.
>
> \*    \*    \*
>
> *In our view, what is more confusing and concerning is commentary on the total addressable market for foldable display applications, which suggests a smaller near-term market opportunity that is growing more slowly than anticipated*.  *Frankly, we are not quite sure how the data could have changed so much over such a short time (again, the company's IPO filings were published less than four months ago)*, and at this point the company does not have enough data to quell our concerns or give us any sense of what the company's actual pipeline might look like following the in-depth review of the company's operational, financial, product, and commercialization efforts.

142.    On August 4, 2021, HSBC analyst Sriharsha Pappu issued a report titled: "***Downgrade to Reduce from Hold: A catastrophic business update***."  He noted the disclosure of significant problems just three months after the IPO, including multiple fundamental problems

1  with Hyaline; raised fundamental questions about Zymergen's ability to bring any products to

2  market; and made it clear the Company lacked fundamental business insights into its customers

3  and end markets.

4        **Everything that could go wrong . . . has**

5            **What happened?  Three months on from its IPO, Zymergen issued an
6  update post market close on 3 August, highlighting significant problems with its
   primary product – Hyaline**.  The company stated that several customers had
7  technical issues incorporating Hyaline into their manufacturing plans, that it had
   overestimated the size and growth of the market for foldable films and that its
8  commercial teams lacked insight into customers' processes and end users –
   resulting in forecasts that overestimated near-term demand.  ZY now expects no
9  product revenue in '21 or '22 (consensus '22e revenue currently stands at
   USD135mn) and is reassessing the fit of its product pipeline, target markets and
10  commercial processes.  Co-founder and CEO Josh Hoffman has been replaced by
   Chairman Jay Flatley with immediate effect.

11            **What does this mean?**  In our ZY initiation (Initiate at Hold, Platforms need
12  to scale, 6 July 2021) we made the point that all of the chat around code base, AI,
   robotics, machine learning, pathways, database, etc, eventually needs to result in
13  products that generate revenue – and ***this update raises fundamental questions
   about ZY's ability to bring products to market.  Hyaline wasn't just the lead
14  product in ZY's portfolio, it was also the proof point for their whole biofacturing
   model and the platform that would have bolstered confidence around the rest of
15  the portfolio.  With the rest of the product pipeline being early-stage, the
   disclosure of multiple fundamental problems with Hyaline – at this late stage –
16  brings the entire pipeline into question***.

17            ***Fundamental questions with the business model***.  We wrote in our
   initiation about the challenges of bringing products to market across multiple end
18  markets – ***and it is clear from the update that the company lacks fundamental
   business insights into its customers and end markets***.  The company might have
19  to pivot to a partnership model from an "at risk" product development model to
   have a viable business model.

20            ***Downgrade to Reduce, TP USD8 from USD42; a long road to re-
21  establishing credibility lies ahead.  With this one update, ZY has gone from a
   fledgling Synbio platform to a turnaround story, needing to rebuild credibility
22  around its products, technology and business model***.  The stock (down c70% after
   hours) is likely to now go from "presuming scale" to "show me" mode on its
23  pipeline.  Downgrade to Reduce.

24      143.   On August 4, 2021, Schenkel issued a report downgrading the stock from

25  Outperform to Market Perform and noting his surprise that such material adverse disclosures were

26  made so soon after the IPO.

***How Could Things Change so Much in the 72 Days Since The Last Earnings Call?***

        The Board of Directors is wondering the same thing – it was noted that this situation is taken extremely seriously.  Thus, the change in leadership and organizational evaluation.  (For what it is worth, we noted that ZY was early at the time of our initiation and that there was risk – ***that said, we are very surprised that something this material could go wrong this quickly***.)

                   *      *      *

***Was There Any Intentional Wrongdoing (Why Change CEO)?***

        At this point, there is nothing to suggest that any of this was intentional wrongdoing.  That said, ***the breakdown in process was so material and so close to the IPO and recent (first) earnings call that the BoD ostensibly had a difficult decision on leadership credibility*** – this led to naming former ILMN CEO Jay Flatley active ZY CEO.

                   *      *      *

What Do We Think?

        We believe we have no choice but to downgrade to Market Perform (which we do not like to do after the news) – pending more details on the outcome of the BoD's evaluation, we cannot recommend purchase of ZY shares.  Our concerns are somewhat assuaged by Jay Flatley's willingness to step in as acting CEO and assertions that this is not a technical issue.  That said, ***there is little precedent (even for an early stage company) to have to make a change like this***.

        144.    On August 4, 2021, T. Peterson issued a report in which he downgraded the stock, noted the adverse disclosures about Hyaline and the total addressable market for foldable display applications causing the Company to no longer expect product revenues in 2021, and immaterial product revenues in 2022.  Moreover, he noted that the Company's previous representations about the total addressable market for foldable display applications were overstated and that J.P. Morgan had never been in the position of seeing a CEO change and significant revenue reset so soon after an IPO.

***Hard to Synthesize . . . CEO Transition & Product Launch Pushouts Announced Amidst TAM Realignment, Downgrade to Neutral***

        We are downgrading our rating on Zymergen (ZY) from Overweight to Neutral after the business update and conference call.  Specifically, the Board has appointed Chairman Jay Flatley (former ILMN CEO) as acting CEO after recently becoming aware of issues with the product pipeline that will impact delivery timelines, which resulted in the departure of former CEO Josh Hoffman.  Looking closer, during 2Q, several target customers experienced technical issues implementing Hyaline into their manufacturing processes (product shrinkage at one customer site, which has largely been addressed, while material compatibility with

1
2
3
4
5
6
7
8
9
10

certain manufacturers' processes remains a work in progress).  ***Combined with an initially overstated TAM for foldable electronic devices (based on bad market data and slower foldable device uptake), ZY no longer expects product revenues in 2021 (vs. JPMe product revenue of $13M) and immaterial product revenues in 2022 (vs. JPMe product revenue of $117M)***.  To address the challenges, the company is evaluating data on the TAM for foldable display applications, which indicates a smaller market opportunity growing less rapidly than anticipated (thinner pipeline of end-users), which will impact ZY's sales forecast for biofilms.  As it relates to the long-term viability of the platform, interim ***CEO Jay Flatley relayed confidence by stating that there are no intrinsic issues, but rather a disconnect between the commercial team and understanding of end-markets, with ZY's focus now to reliably manufacture products that "hit the market when the market is ready"***.  As part of the TAM evaluation, ZY has formed several committees (including a Strategic Oversight Committee) to conduct an in depth review of the sales forecasting process, pipeline commercialization plans and TAM analysis.  Stepping back, ***we are adjusting our model to reflect the newfound uncertainty of the product launches and while we acknowledge the long-term viability of the synbio platform, with little to no visibility on product TAMs, customer pipelines or leadership, we downgrade to Neutral***, while rolling our DCF to establish a Dec. 2022 PT of $12.

11
12
13
14

- ***2Q preliminary results***.  ZY also reported preliminary 2Q revenues of $5-6M (vs. JPMe $4M), all from R&D service and collaboration revenues, while non-GAAP OPEX is expected to be $80-85M.  ZY is currently developing a plan to reduce and align expenses with the changes in revenue expectations (no guidance was given at this point).

15
16
17
18

- ***Downgrading to Neutral on lack of visibility***.  ***Admittedly, we have never been in this position, with a CEO change and significant revenue reset so soon post-IPO (2022 revenues now expected to be "immaterial" vs. Street at $132M), so we do not make the decision lightly, but in the absence of visibility around a turnaround plan, ability to recruit a CEO and the revenue ramp, we are hard pressed to see near-term upside, notwithstanding our high regard for interim CEO Jay Flatley***.

19
20

**F.    September 23, 2021 – October 21, 2021: Zymergen and the Financial Press Report Additional Facts Demonstrating the Registration Statement Was Inaccurate and Materially Misleading, and the Financial Press Likens the Implosion of Zymergen to that of Theranos**

21

145.    On September 23, 2021, investors learned of additional negative impacts from the

22

numerous problems revealed on August 3, 2021.  Zymergen announced it was terminating

23

approximately 120 employees as part of preliminary phase of the Company's plan to reduce costs

24

to align with the delayed revenue ramp up previously disclosed on August 3, 2021.  The Company

25

also disclosed it would incur an estimated $4.5 million of severance and employee-related

26

restructuring costs related to the reduction in force.

27

146.    On October 21, 2021, Zymergen filed a Report on Form 8-K with the SEC in which

28

it revealed more negative impacts from the numerous problems reported on August 3, 2021.

1  Zymergen announced a second reduction in force of approximately 100 employees, which would
2  result in approximately $4.2 million of severance and employee-related restructuring costs.

3      147.   In addition, the Company reported it expected to incur impairment charges of
4  $15 million for certain manufacturing equipment as a result of its restructuring activities and might
5  incur additional restructuring and impairment charges in 4Q21, including lease expenses.

6      148.   Zymergen also reported it had amended its Credit Agreement due to its violation of
7  revenue covenants.  The amended Credit Agreement required Zymergen to: (i) shorten the term of
8  the Credit Agreement by moving the maturity date from December 19, 2024 to June 30, 2022;
9  (ii) increase the amount of the liquidity covenant; (iii) make a $41 million payment, including a
10 $35 million principal prepayment; and (iv) deposit the remaining outstanding balance of the loan
11 plus accrued interest through the maturity date in a blocked account controlled by the
12 Administrative Agent, which was subject to release from the blocked account upon the
13 Administrative Agent's completion of due diligence to its reasonable satisfaction regarding the
14 Company's anticipated operating costs and budget through the maturity date.

15     149.   Investors also learned that co-founder Jed Dean had notified the Company of his
16 decision to step down, effective October 31, 2021.

17     150.   The financial press likened the rapid rise and fall of Zymergen to that of Theranos
18 and reported facts indicating the representations in the Registration Statement were materially
19 misleading, including the representations about Hyaline; the total addressable market for foldable
20 display applications; and when the Company's products, including Hyaline, would generate
21 revenue.

22     151.   On September 30, 2021, the *San Francisco Business Times* published an article
23 titled "The rise and fall of Zymergen: Can biotech veteran Jay Flatley save the company?" likening
24 the rapid rise and fall of Zymergen to that of Theranos:

25         In its rapid rise and equally quick fall as a huge potential turned to imminent
           peril, it is hard not to hear echoes of Theranos in Zymergen's emerging difficulties.
26
27         To be sure, there are parallels with the Palo Alto and East Bay-based blood
           testing company, once valued at $9 billion but now at the center of a high profile
           fraud trial for its enigmatic founder.  Theranos and Zymergen share high valuations,
28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 3:21-cv-06028-JD                                                                - 50 -

the promise of disrupting an old-school industry, a penchant for corporate secrecy and a fondness for signing large leases to meet swelling workforces.

152.   On October 13, 2021, *Barron's* published an article titled "***The Inside Story of How SoftBank-Backed Zymergen Imploded Four Months After Its $3 Billion IPO***." The article reported Zymergen's market capitalization was $3 billion following the completion of the IPO and that "***[j]ust four months later***" the Company made the "***stunning announcement***" on August 3, 2021, that caused the stock to tank, wiping out more than $2.5 billion in market value.

153.   The article also included facts indicating the representations in the Registration Statement were materially misleading, including the representations about Hyaline; the total addressable market for foldable display applications; and when the Company's products, including Hyaline, would generate revenue. Indeed, it was reported that Hoffman used exaggerated financial figures and made overly optimistic projections about the Company's capabilities, both internally and externally.

> ***According to a former senior-level employee at Zymergen, Hoffman used exaggerated financial figures and made overly optimistic projections about the company's capabilities, both internally and externally. The former employee – who retains a vested interest in the company – recalls Hoffman's response when he was confronted about this behavior:*** "*Never underestimate the power of the greater fool*."

154.   In fact, the article reported that such disclosure problems began surfacing long before the IPO.

> Problems began surfacing long before the IPO. At an all-hands meeting in early 2018, for instance, Hoffman walked on stage to deliver a status report to his roughly 500 employees. The company had just acquired Radiant Genomics, a genomic database company, after a year and a half courtship.

> According to the former Zymergen employee, the two Radiant co-founders – Jeff Kim and Oliver Liu – had agreed to the acquisition after being shown Zymergen's internal pipeline, which showed projected contract sizes worth billions by 2021. At the time, Radiant posted revenue just under $10 million, according to the employee, who became familiar with both companies' financial statements through the due diligence process. Prior to the deal's close, Radiant was told that Zymergen was on track to book three times that amount for 2017, the employee says. Liu didn't respond to requests for comment and Kim declined to comment.

> As the gregarious Hoffman delivered his speech at the meeting, he shared with employees Zymergen's annual revenue number: just under $10 million. "Wait a minute," the former employee remembers thinking. "That's Radiant's figure. That's exactly Radiant's figure which indicated to me that Zymergen had zero in revenue."

155.  *Barron's* also reported that the SEC had concerns about the Company's disclosures before the IPO in connection with its review of draft registration statements submitted by Zymergen.  It referenced the letter the SEC sent to Zymergen in February 2021:

> The Securities and Exchange Commission had concerns as well . . . . Correspondence in February with the SEC showed that regulators questioned the company's plans for growing revenue and profitability, its current financial condition and its outstanding indebtedness, which included a $100 million credit facility at the time of the IPO.  It also asked the company to stop comparing its products to Kevlar, a strong and heat resistant fiber developed by chemicals giant DuPont that is used in bulletproof vests, tires and more as it does not appear to be relevant comparison, according to a letter from Katherine Bagley at the SEC's Division of Corporate Finance.  The SEC declined to comment for this article or confirm or deny that it is now investigating Zymergen.

156.  Not surprisingly, *Barron's* reported the stunning disclosures on August 3, 2021, indicated the Underwriter Defendants and Zymergen's Board of Directors failed to conduct appropriate due diligence, and that the Controlling Stockholders were also to blame.

> When high-profile companies like WeWork or Theranos unravel, company founders often take the blame.  But for these venture-backed companies, there's lots of blame to go around.  Investors such as SoftBank enable founders, then pass on their investments to the public through IPOs.  Underwriters, too, like Goldman Sachs and J.P. Morgan in Zymergen's case, may be failing to do the appropriate due diligence (Goldman Sachs did not respond to a request for comment and a spokesperson for J.P. Morgan declined to comment).  Likewise the boards of venture-backed companies have a duty to ensure that company filings and projections are accurate and reliable, says John C. Coffee, Jr., a law professor at Columbia University.
>
> "In the course of preparing the registration for the IPO, you would normally have a good deal of due diligence done by all the people at the law firms of the company and the underwriters.  They apparently didn't detect this problem at all." Coffee says.  "We may have another instance of highly competent people failing to vet a new company and just believing in the founder's endearing tale."

157.  Further, *Barron's* reported that Flatley acknowledged the validity of concerns about the Company's credibility following the August 3, 2021 disclosures.

> Zymergen hasn't commented publicly on the crisis since Hoffman departed in August, except in a call that month with investors at which Flatley, the interim CEO, ***acknowledged the validity of concerns about the company's credibility.  "I want to perhaps state the obvious that we are taking this situation extremely seriously,"*** Flatley said during the call, noting that the firm had formed a strategic oversight committee and planned to conduct an in-depth review with the support of outside advisors.  "We're focused on reestablishing the credibility of the leadership team and the company.  We recognize this will not happen over weeks or months, but will require consistent quarter-after-quarter execution against a credible plan."

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 3:21-cv-06028-JD                                                                                                    - 52 -
4856-8867-3806.v1

**G.      November 3, 2021: Zymergen Reports Six of the Eleven Products
Featured in the Registration Statement Will Be Discontinued**

158.      On November 3, 2021, Zymergen reported its preliminary 3Q21 results and revealed more unexpected negative news, which, like the statements on August 3, 2021, established the Registration Statement contained untrue statements of material facts and omitted facts necessary to make the statements made not misleading.  However, the Company failed to disclose other unexpected negative news – that government agencies, including the SEC – had requested information from the Company related to the unexpected adverse disclosures on August 3, 2021.  That material adverse information was not disclosed until November 15, 2021, when Zymergen reported the multiple government inquiries in the Company's 3Q21 Report on Form 10-Q filed with the SEC.

159.      In the November 3, 2021 earnings release and conference call, Zymergen revealed it was discontinuing Hyaline, the main product featured in the Registration Statement, and all but one of the electronics film program products.  It also revealed that all consumer care programs, including the insect repellent product featured in the Registration Statement, were being discontinued.  Thus, the Company revealed that six of the 11 products highlighted in the Registration Statement had been discontinued and would not generate any revenue for the Company.

160.      Zymergen also reported it had eliminated approximately 220 positions, which, with reductions in overhead spending, would still result in a burn rate that would cause the Company to run out of cash in little more than a year.  In the press release, the Company reported the following:

> Since the previous business update in August, the Company has reviewed the potential market opportunities and its related portfolio, using a rigorous evaluation process applied to current and potential market segments.  As a result of this review, the Company will focus on a smaller number of programs that it believes capitalize on its capabilities and provide clear commercial opportunities.
>
> Accordingly, ***several programs will be discontinued, including***:
>
> - ***The electronics film programs, with the exception of ZYM0101, which is being developed in partnership with Sumitomo Chemical.  Emerging data on the market segment being targeted with Hyaline and other electronics films indicates a smaller near-term opportunity than previously expected***.

- ***The consumer care programs, including insect repellent, ZYM0201. Based on the portfolio review, the costs of customer acquisition with a direct-to-consumer model were prohibitive and, in the case of ZYM0201, it could not be produced and distributed at a price point competitive with incumbent products.***

As a result of these changes, the Company eliminated approximately 220 positions across a variety of levels and functions.  These decisions, along with a reduction in related overhead spending, are expected to slow the Company's cash burn rate sufficiently to operate to the middle of 2023 with cash on hand.

161.    The Company also revealed it would have run out of cash in 3Q21 had it not raised $529.9 million from the IPO.   Zymergen reported that cash and cash equivalents totaled $496.2 million as of September 30, 2021, a $91.8 million decline from the $588 million of cash and cash equivalents reported as of June 30, 2021.   The Company reported a net loss of $283.6 million for the nine months ending September 30, 2021.

162.    During the earnings call, Flatley made numerous statements that also establish the Registration Statement contained untrue statements of material facts and omitted facts necessary to make the statements made not misleading.

163.    Flatley repeated the information included in the earnings release; summarized the work Zymergen had done to date; and shared a high level overview of the Company's forward-looking (and much smaller) portfolio of products, which he claimed would provide a general sense of the Company's direction.  He admitted more bad news would likely arrive in the future – but failed to mention the inquires by the SEC and other government agencies – by also revealing that full details of the Company's future direction would not be provided until the Company completed its strategic plan around year end.

164.    Flatley revealed Zymergen did not have adequate resources to support the 30 different programs on which the Company was working and therefore eliminated two programs Flatley admitted were prominent in the Company's public plans.

Let me now share some additional details.  ***Our portfolio review indicated that we are working – we were working on at least 30 different programs, far too many to adequately resource.  It was imperative that we narrow our focus to a smaller number that we believe capitalize on our strengths and provide clear commercial opportunities.  That resulted in decisions to pause or eliminate several programs while promoting others to a higher level of investment.***

*A critical highlight is the cancellation of 2 programs that were prominent in our public plans, Hyaline, known as ZYM102 (Phonetic) and our direct-to-consumer insect repellent referred to as ZYM201 (Phonetic).  In the case of Hyaline films, we no longer have conviction in the market opportunity*.  To be clear and contrary to many published reports, the product worked as designed, the underlying technology and science are sound.

The technical issues that I discussed on our August call caused delays but were quickly resolved by our teams, and were not a factor in our decision to halt the project.  In fact, at the time we canceled the program, we have made tens of thousands of square meters of Hyaline.  *The issues we uncovered were commercial.  We look more closely at the foldable display market and the emerging data on the market segment that we targeted with Hyaline and other electronic films indicated a smaller near-term opportunity than we initially expected*.

*As a result, we stopped work on our electronic films programs* but are continuing work on our ZYM101 film in partnership with Sumitomo.  We will also continue to explore and develop bio-based polyimides in several different form factors, which we expect will add value to potential future products, not just in electronics, but other markets as well.

*In the case of our insect repellent and other consumer care programs, our reviews show that the cost of customer acquisition with a direct-to-consumer model would have been prohibited for Zymergen*.  While the product performance was satisfactory, *it could not be produced and distributed at a price point competitive with the incumbent products.  With this assessment, we've decided to park all our efforts in consumer care*.  We have, however, developed strong IP and technology around bioactives and remain open to potential future partnerships in clean consumer care.

165.    Singh, the Company's CFO, revealed some of the costs related to the discontinued Hyaline and consumer care products, stating that operating expenses in 3Q21 were $39.1 million, an 80% increase from the prior year, and that the increase was primarily related to work on Hyaline and the insect repellent product prior to the decision to discontinue those products.

166.    Singh also acknowledged the Company's precarious financial condition, stating Zymergen did not expect any product revenue in 2021, and only immaterial product revenue in 2022.  As a result, Singh explained that without visibility into near-term product revenue, one of the Company's top priorities was to closely manage expenses, including the reductions in force implemented in September and October, and the narrowed focus on a smaller number of programs.

167.    Before taking questions, Flatley acknowledged the Company needed to accelerate revenue generation while rebuilding stakeholder confidence.  The questions from the analysts established that rebuilding stakeholder confidence would be difficult.  Indeed, the first question

was from DeBruin, who asked Flatley why investors should remain confident in the agriculture programs, the only programs in the Registration Statement (other than the optical film partnership with Sumitomo and the bio-based epoxy product) that were not discontinued.

168.    Cowen analyst Thomas Stevens asked Flatley why any customer would choose to work with Zymergen and how the Company could explain its value proposition given the pipeline changes and changes in the sales force.

169.    Investors also learned Zymergen's future was too uncertain to even try to recruit a new CEO.  In response to a question from J.P. Morgan Chase analyst Rachael Olson about the status of recruiting a permanent CEO, Flatley acknowledged the problems at Zymergen were too large to recruit a new CEO until the Company developed a credible and defensible strategic plan.

> Yes.  So, we have not started the process yet and that's by choice.  So, the decision that I made, along with the Board of Directors is that we as priority 1, 1 and 2 make sure that we right size the Company, got our processes fixed, got our development teams really focused on the products, the new products in the pipeline that we write a strategic plan that we all believe in, that has credibility and is defensible.  And at that point, we believe we could credibly go recruit a world-class CEO.  Prior to that, I think it would be challenging to sit across the table to try to recruit someone without a plan that you had conviction in and so our intent is to begin working on the recruiting process early in 2022.

170.    Responding to a question from UBS analyst John Sourbeer, Flatley also revealed there was "no chance" the discontinued consumer care programs highlighted in the Registration Statement were going to be profitable.

> [Sourbeer:] I guess just one on the consumer care programs.  You highlighted that some of the costs were prohibitive on the direct-to-consumer model.  Can you just maybe elaborate a little bit there on what specific areas you saw there on the costs that you highlighted?

> [Flatley:] Sure.  So, the history of those programs were that the company a few years back was thinking that it may want to partner those programs and – with a big consumer company, and those partnerships didn't reach any conclusion.  And so, the decision then was made to go direct-to-consumer.  And *as we analyze this recently over the last 30 days, particularly with only a single product in the portfolio in the near term, which would have been our insect repellent*.  *The cost of hiring a direct sales force supporting that and building the infrastructure was quite prohibitive*.  *So, if you look at the profitability profile over the next 3 years, there was no chance that, that product was going to be profitable*.  And so for that reason, we've parked it, and it doesn't mean that we're abandoning the consumer care market because we continue to believe that the technology has great applicability there.  And we can create products in that space.  It's a question of us being – having a financial footing where we can either take the products directly to market ourselves and afford to make that investment or in the alternative, we

develop a partner that we either license the technology to or jointly develop and distribute the products.

171.    Flatley and Singh also confirmed Zymergen would not receive any revenue from the discontinued Hyaline product and the Company could not provide any revenue guidance other than stating immaterial revenues were expected in 2021 and 2022:

[Sourbeer:] And I guess just another one just a little bit on the cash burn and cash on hand through 2023.  I think in the last update, there were – was talk is still launching Hyaline in '22 and maybe having some revenues in '23.  Any additional color you can provide on that?  Does that assume any meaningful revenues in 2023?  Or just any way to think about follow-on product launches there?

[Flatley:] Yes.  *I think we've been pretty clear on Hyaline that we've really canceled that program now*.  *And so we should expect no revenue from Hyaline coming from the company at any point in time*.  Now, there's theoretically a chance that if the market changed in some dramatic way that the company could reevaluate in the future.  And as I alluded to in my remarks, the underlying material that's used in Hyaline has potential other applications.  And so, we're exploring those.  So it's – the R&D work that went into creating that novel material could have future value.  But at this point, I'd say it's unlikely it's going to be in the films market.

[Sourbeer:] I guess I was more trying to get at, when you say the cash burn through 2023, does that assume product launches in revenue generation in '23, is there any revenue in that model?

[Flatley:] Yes.  As I mentioned earlier, we haven't talked about '23 yet.  We've really given some clarity around what we expect in '22.  As we complete the plan here over the next couple of months, we'll get greater visibility on the relative ramp of the products that we now have in the pipeline and solidify our internal forecasts, probably not just '23, but all the way through '24 and we'll decide at that point what external guidance we give.

[Singh:] *But we still expect product revenue to be immaterial, right, in 2022, including in the end of 2022*.

172.    In response to a question from Goldman Sachs analyst Dave Delahunt, Flatley admitted that the Company's previous strategy of creating, manufacturing and distributing products on its own was not tenable.

[Delahunt:] And with the strategic review, has that affected how you think about potential partnerships?  And maybe, are you pretty more inclined now to work with project – with partners on projects instead of taking 100% product risk?

[Flatley:] Yes.  I think it has influenced us to some extent.  And the way it has is that *previously, the company was focused not only on creating the product, but also manufacturing it and distributing it, in many cases, not in every case*.  *And I think both because of cost constraints and of reasons of time to market, we decided to pull that part of the strategy in and really focus on creating the products and doing more partnering, both for the manufacturing and distribution*

*side of this*.  And so that both saves money because we don't have to build a direct sales force as we would have had to do in consumer care, as an example, or to build things like GMP manufacturing, which we might have had to do in other product areas as well.  And so, we can save the money there, which is a large investment and a time delay to market.  And so, we continue to develop the products largely ourselves, sometimes in partnership, but much of the manufacturing and distribution will be through partners in the near term.

173.   In response to a question from William Blair & Company analyst Maxwell Smock, Flatley acknowledged a primary reason one of the three electronic film products, ZYM0101, was not being discontinued was that it was being developed in partnership with Sumitomo.

[Smock:] And then, I just wanted to dig in a little bit more on ZYM0101 and your decision to keep that program alive.  I mean, was that decision based – just based on your partnership with Sumitomo?  Or is there something unique about that market or that product that gave you more comfort in your ability to commercialize it down the line?

[Flatley:] There were 2 factors and at least 2 factors, let me say that.  Clearly, *the fact that it was partnered was a huge part of this so, that we didn't have the expense of distributing the product or manufacturing it*.  *So much of the risk then of the program is taken on by Sumitomo in partnership*.  *So, that was a very important factor*.  The second factor is that if this material is successful as we hope, it has very broad applicability across all types of devices.  And so it has a more general applicability than perhaps Hyaline did.  And so that's the second distinguishing factor.

174.   Following the November 3, 2021 earnings call, Zymergen's stock price declined $0.93, or 8.1% from $11.43 on November 3, 2021, to $10.50 on November 4. 2021.

175.   Analysts issued reports in which they noted that the discontinuation of Hyaline, one of the other optical film products and all of the consumer care products were disappointing and a "key part of the thesis during the IPO" and "prominent in [Zymergen's] initial plans."

176.   On November 4, 2021, T. Peterson issued a report in which he wrote that J.P. Morgan was disappointed in the discontinuation of several key programs (including Hyaline, one of the other electronic film programs and all consumer care programs) and noted that all of the discontinued programs "had been a key part of the thesis during the IPO."

177.   Similarly, Larew issued a report on November 4, 2021, in which he noted that the discontinued products "were prominent in [Zymergen's] initial plans."  He also reported that William Blair & Company had not seen "any proof that the company can monetize its platform"

and that "there [was] still a considerable amount of uncertainty around the company's commercial

pipeline and broader strategy."

**H.     November 15, 2021: Zymergen Reports that Multiple Government Agencies, Including the SEC, Are Investigating the Company**

178.     On November 15, 2021, Zymergen filed its 3Q21 Report on Form 10-Q with the

SEC and disclosed that government agencies, including the SEC, had requested information from

the Company related to the unexpected adverse disclosures on August 3, 2021.

**I.     December 9, 2021 – January 10, 2022: Additional Disclosures Show the Dramatic and Material Adverse Impacts on Zymergen's Business Since the IPO**

179.     On December 9, 2021, *Seeking Alpha* published an article titled "Zymergen: Total

Chaos."   The opening paragraph of the article succinctly explained the dramatic change at

Zymergen since the IPO, which caused Class members to suffer millions of dollars in damages –

going from a Company launching Hyaline and preparing to rapidly scale up production and

revenue, to a Company that had abandoned Hyaline and other products and was dramatically

cutting headcount and cash burn in an effort to avoid bankruptcy.

> Zymergen . . . listed in April 2021 and, after recently launching their Hyaline product were supposedly preparing to rapidly scale up production and revenue.  In August, they indicated that there was an issue integrating Hyaline into the manufacturing process of customers, which would temporarily delay rollout of the product.  The CEO was replaced at the same time though and Zymergen appeared to freeze hiring, indicating that the problems were far larger than the company was letting on.  In November, Zymergen announced that they were abandoning their two main products, rationalizing their product portfolio and dramatically cutting headcount to reduce cash burn.  Zymergen no longer has a clear path to profitability and rather than focusing on growth, the company is clearly positioning to avoid bankruptcy.  Zymergen does not have the narrative of Ginko Bioworks . . . or the revenue growth of Amyris . . . , and there is a real risk of high caliber employees abandoning the company for better opportunities.   While Zymergen's intellectual property is likely worth a significant amount and the company may be able to turn itself around, I consider the company uninvestable given the way management has failed to provide investors with clarity over the last six months.

180.     During a January 10, 2022 presentation at a JPMorgan Healthcare conference

Flatley revealed additional fallout from the unexpected adverse disclosures on August 3, 2021 and

November 3, 2021.  After acknowledging the challenges in 2021, Flatley stated that the issues with

the commercial product pipeline caused a business reset that impacted the Company's revenue

1   projections and product roadmap.  Indeed, he acknowledged that dramatic steps had been taken to

2   operationally restructure and transform the Company including the elimination of almost half of

3   Zymergen's workforce.

4          Let me begin by acknowledging the challenges that we had in 2021.  As we
   discussed in our August and our subsequent earnings call, issues with our
5   commercial product pipeline caused a business reset that impacted the company's
   revenue projections and product road map.  After a lot of hard work by our teams,
6   we've exited 2021 with a clear focus on who we are and on what we do.

7          Zymergen is a biotech company that designs and produces molecules,
   microbes and materials for diverse end markets.  Having a clear mission and vision
8   is critically important, but ultimately, it's execution that matters.  *In the last 5
   months, we've taken dramatic steps to operationally restructure and transform*
9   *the company.  First, we reorganized our teams.  This reduced our head count*
   *from approximately 900 to about 500, focused on creating a much more efficient*
10  *organization by eliminating leadership layers and consolidated distributed*
   *functions*.

11
                           *          *          *
12
   *[We] did a deep dive on our program investments, and we optimized the portfolio*
13  *across the key factors that drive market success.  As a result, we stopped to work*
   *on a significant number of programs, and are focusing now on a handful of*
14  *higher potential ones*.

15         181.    However, Flatley acknowledged that the negative financial impact on Zymergen

16  would continue for at least another year and possibly longer, stating that the Company thought it

17  would begin to have product revenue in the 2023 timeframe.

18         182.    In addition, Flatley admitted that the potential market opportunity for the one

19  optical film product that was not discontinued, the product being produced in partnership with

20  Sumitomo, was still uncertain, stating that there was either going to be significant revenue or

21  potentially zero revenue.

22         [Olson:]  And then shifting gears to project ZYM101.  So the film
   partnership that you have with Sumitomo.  Can you just talk about the decision to
23  retain that project but then for go the other film projects that you're tackling?  And
   then what should we expect in terms of commercialization timing for this project?
24  And is there any opportunity to pull that forward just given you have a more narrow
   focus on your projects now?
25
          [Flatley:]  Yes.  I mean that partnership is going well.  We continue to invest
26  in it as Sumitomo does.  We believe that much like the Hyaline product, the
   technology – the underlying technology works.  And *the reason we decided to*
27  *continue that one is because there is a very large potential market opportunity at*
   *the end of the process.  But we don't know.  It's a very digital opportunity, I would*
28  *say.  It's kind of a 1-0 outcome, either it's going to be significant revenue for us*

*or potentially 0*, depending upon what customers they land. And the amount of work we need to do on the distribution side of it is *de minimis* because all of that customer interface is being handled through Sumitomo. So it made sense for us to continue to make the investments in evolving that Z101 technology and moving it forward. And so that program is the only one that truly remains in the film part of the business at the moment.

183.    Flatley's statements about Hyaline, like his previous statements, also indicated the representations in the Registration Statement about the foldable display market were materially misleading.

> [Olson:] And then stepping back, just kind of going back to your additional business update earlier this summer. So investors were really concerned that there was a broader technical issue with Hyaline following that first business update call. It's clarified during the 3Q call that Hyaline actually worked as designed. But the decision to hold the project was just due to the smaller-than-expected TAM. So can you really walk through what happened from a technical perspective with Hyaline then?

> [Flatley:] Yes. I guess I would reiterate what I said in the presentation. I spent a fair amount of time talking about how we think the underlying technology platform works, and works robustly. *What happened with Hyaline, and in retrospect, we probably made a mistake in how we presented it. When we talked about the challenges there, we began by talking about the fact that we had a couple of month delay because of some process tuning that had to happen with the early customers of Hyaline*.

> We knew from the start that we would figure out those process challenges and overcome them, and we did that. And so those were never going to be barriers to long-term adoption. *There were simply delays in the potential revenue stream*. *The big issue with Hyaline, of course, was that the ultimate market was not large, not large enough to justify continuation of the program*.

## V.    CLASS ACTION ALLEGATIONS

184.    Plaintiffs bring this action as a Class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired Zymergen common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

185.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the relevant period, Zymergen's shares actively traded on the

1  NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and
2  can only be ascertained through appropriate discovery, Plaintiffs believe there are at least hundreds
3  or thousands of members in the proposed Class.  Millions of Zymergen shares were traded publicly
4  during the relevant period on the NASDAQ.  Record owners and other members of the Class may
5  be identified from records maintained by Zymergen or its transfer agent (American Stock
6  Transfer & Trust Company, LLC) and may be notified of the pendency of this action by United
7  States mail, using the form of notice similar to that customarily used in securities class actions.

8      186.    Plaintiffs' claims are typical of the claims of the members of the Class as all
9  members of the Class are similarly affected by Defendants' wrongful conduct in violation of
10  federal law that is complained of herein.

11      187.    Plaintiffs will fairly and adequately protect the interests of the members of the Class
12  and have retained counsel competent and experienced in class and securities litigation.

13      188.    Common questions of law and fact exist as to all members of the Class and
14  predominate over any questions solely affecting individual members of the Class.  Among the
15  questions of law and fact common to the Class are:

16          (a)    whether the federal securities laws were violated by Defendants' acts as
17  alleged herein;

18          (b)    whether the Registration Statement was inaccurate and misleading,
19  contained untrue statements of material facts, omitted to state other facts necessary to make the
20  statements made not misleading and omitted to state material facts required to be stated therein;
21  and

22          (c)    to what extent the members of the Class have sustained damages and the
23  proper measure of damages.

24      189.    A class action is superior to all other available methods for the fair and efficient
25  adjudication of this controversy since joinder of all members is impracticable.  Further, as the
26  damages suffered by individual Class members may be relatively small, the expense and burden
27  of individual litigation makes it impossible for members of the Class to individually redress the
28  wrongs done to them.  There will be no difficulty in the management of this action as a class action.

1

## VI.    CLAIMS FOR RELIEF

2

### FIRST CLAIM FOR RELIEF

3

#### Violation of §11 of the Securities Act
#### (Against Zymergen, the Individual Defendants and the Underwriter Defendants)

4

5          190.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

6   set forth herein.

7          191.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on

8   behalf of the Class, against the Zymergen, the Individual Defendants and the Underwriter

9   Defendants.

10          192.    The Registration Statement for the IPO was inaccurate and misleading, contained

11  untrue statements of material facts, omitted to state other facts necessary to make the statements

12  made not misleading and omitted to state material facts required to be stated therein.

13          193.    Zymergen is the registrant for the IPO.  Zymergen, the Individual Defendants and

14  the Underwriter Defendants named herein were responsible for the contents and dissemination of

15  the Registration Statement.

16          194.    As issuer of the shares, Zymergen is strictly liable to Plaintiffs and the Class for the

17  misstatements and omissions.

18          195.    Zymergen, the Individual Defendants and the Underwriter Defendants named

19  herein did not conduct a reasonable investigation or possess reasonable grounds for the belief that

20  the statements contained in the Registration Statement were true and without omissions of any

21  material facts and were not misleading.

22          196.    By reasons of the conduct herein alleged, Zymergen, the Individual Defendants and

23  the Underwriter Defendants violated and/or controlled a person who violated §11 of the Securities

24  Act.

25          197.    Plaintiffs acquired Zymergen shares pursuant and/or traceable to the Registration

26  Statement for the IPO.

27

28

198.    Plaintiffs and the Class have sustained damages.  The value of Zymergen shares has declined substantially subsequent to and due to Zymergen's, the Individual Defendants' and the Underwriter Defendants' violations.

## SECOND CLAIM FOR RELIEF

### Violation of §15 of the Securities Act
### (Against the Individual Defendants and the Controlling Stockholders)

199.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except any allegation of fraud, recklessness or intentional misconduct.

200.    This count is asserted against the Individual Defendants and the Controlling Stockholders and is based upon §15 of the Securities Act.

201.    The Individual Defendants and the Controlling Stockholders, by virtue of their offices, directorship and specific acts, were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Zymergen within the meaning of §15 of the Securities Act, 15 U.S.C. §77o.  The Individual Defendants and the Controlling Stockholders had the power and influence and exercised the same to cause Zymergen to engage in the acts described herein.

202.    The Individual Defendants' and the Controlling Stockholders' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

203.    By virtue of the conduct alleged herein, the Individual Defendants and the Controlling Stockholders are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

1          C.          Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

2    this action, including attorneys' fees and expert fees; and

3          D.          Such other and further relief as the Court may deem just and proper.

4                                          **JURY TRIAL DEMANDED**

5          Plaintiffs hereby demand a trial by jury.

6    DATED:  February 24, 2022                    ROBBINS GELLER RUDMAN
                                                         & DOWD LLP
7                                                    SHAWN A. WILLIAMS
                                                     CHRISTOPHER P. SEEFER
8                                                    DANIEL J. PFEFFERBAUM

9

10                                                      s/ Christopher P. Seefer
                                                     CHRISTOPHER P. SEEFER
11
                                                     Post Montgomery Center
12                                                   One Montgomery Street, Suite 1800
                                                     San Francisco, CA  94104
13                                                   Telephone:  415/288-4545
                                                     415/288-4534 (fax)
14                                                   shawnw@rgrdlaw.com
                                                     chriss@rgrdlaw.com
15                                                   dpfefferbaum@rgrdlaw.com

16                                                   ROBBINS GELLER RUDMAN
                                                         & DOWD LLP
17                                                   JUAN CARLOS SANCHEZ
                                                     PATTON L. JOHNSON
18                                                   655 West Broadway, Suite 1900
                                                     San Diego, CA  92101
19                                                   Telephone:  619/231-1058
                                                     619/231-7423 (fax)
20                                                   jsanchez@rgrdlaw.com
                                                     pjohnson@rgrdlaw.com
21
                                                     Lead Counsel for Lead Plaintiff
22

23                                                   BERMAN TABACCO
                                                     NICOLE LAVALLEE (SBN 165755)
24                                                   DANIEL E. BARENBAUM (SBN 209261)
                                                     DANIELLE SMITH (SBN 291237)
25                                                   44 Montgomery Street, Suite 650
                                                     San Francisco, CA  94104
26                                                   Telephone:  415/433-3200
                                                     415/433-6382 (fax)
27                                                   nlavallee@bermantabacco.com
                                                     dbarenbaum@bermantabacco.com
28                                                   dsmith@bermantabacco.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BERMAN TABACCO
LESLIE R. STERN
One Liberty Square
Boston, MA  02109
Telephone:  617/542-8300
617/542-1194 (fax)
lstern@bermantabacco.com

Counsel for Plaintiff West Palm Beach
Firefighters' Pension Fund

KLAUSNER, KAUFMAN, JENSEN
   & LEVINSON
ROBERT D. KLAUSNER
BONNI S. JENSEN
7080 NW 4th Street
Plantation, FL  33317
Telephone:  954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com
bonni@robertdklausner.com

Board Counsel for Plaintiff West Palm Beach
Firefighters' Pension Fund

CERTIFICATE OF SERVICE

     I hereby certify under penalty of perjury that on February 24, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

                     s/ Christopher P. Seefer
                     CHRISTOPHER P. SEEFER
                     ROBBINS GELLER RUDMAN
                        & DOWD LLP
                     Post Montgomery Center
                     One Montgomery Street, Suite 1800
                     San Francisco, CA  94104
                     Telephone:  415/288-4545
                     415/288-4534 (fax)
                     E-mail:  chriss@rgrdlaw.com

# Mailing Information for a Case 3:21-cv-06028-JD Shankar v. Zymergen Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **Daniel E. Barenbaum**
  dbarenbaum@bermantabacco.com,sfservice@bermantabacco.com

- **Jennifer N. Caringal**
  JCaringal@rgrdlaw.com

- **John T. Jasnoch**
  jjasnoch@scott-scott.com,rswartz@scott-scott.com,scott-scott@ecf.courtdrive.com,edewan@scott-scott.com

- **Patton L. Johnson**
  pjohnson@rgrdlaw.com,PJohnson2019@ecf.courtdrive.com,tdevries@rgrdlaw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermantabacco.com,sfservice@bermantabacco.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Jeffrey John Miles**
  jmiles@bermantabacco.com,sfservice@bermantabacco.com

- **Kevin Peter Muck**
  Kevin.Muck@wilmerhale.com,whdocketing@wilmerhale.com,joann.ambrosini@wilmerhale.com

- **Susan Samuels Muck**
  susan.muck@wilmerhale.com,Justin.Goodyear@wilmerhale.com,Rama.Attreya@wilmerhale.com,Alison.Jordan@wilmerhale.com,whdocketing@wilmerhale.com,Mo
  muck-3159@ecf.pacerpro.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Kevin M Papay**
  kevin.papay@morganlewis.com,chris.altamirano@morganlewis.com

- **Marion Curry Passmore**
  passmore@bespc.com,ecf@bespc.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@rgrdlaw.com,dpfefferbaumRGRD@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Pavithra Rajesh**
  prajesh@glancylaw.com,pavithra-rajesh-9402@ecf.pacerpro.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Christopher Paul Seefer**
  chriss@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Charlene Sachi Shimada**
  charlene.shimada@morganlewis.com,tristan.mehlin@morganlewis.com

- **David Jay Stone**
  stone@bespc.com,ecf@bespc.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,smorris@rgrdlaw.com,e_file_sd@rgrdlaw.com,smorris@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)