ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
DANIEL J. PFEFFERBAUM (248631)
ALAINA L. GILCHRIST (335807)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
agilchrist@rgrdlaw.com
        – and –
JUAN CARLOS SANCHEZ (301834)
PATTON L. JOHNSON (320631)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jsanchez@rgrdlaw.com
pjohnson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BIAO WANG, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>ZYMERGEN INC., et al.,<br><br>                              Defendants. | Case No. 5:21-cv-06028-PCP<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

**[REDACTED]**

Lead Plaintiff and Class Representative Biao Wang ("Wang") and Plaintiff West Palm Beach Firefighters' Pension Fund ("WPBFPF") (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief are based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Zymergen Inc. ("Zymergen" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, earnings call transcripts and media reports issued and disseminated by Zymergen; (c) review of other publicly available information concerning Zymergen, including transcripts of Zymergen presentations at investor conferences, reports issued by analysts and articles in the financial press; and (d) review and analysis of evidence obtained during ongoing discovery to date.

## I.     SUMMARY OF AMENDMENT

1.     This Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC") contains new allegations that (i) re-plead control claims against defendants previously dismissed from this action alleging control of Zymergen, (ii) add control claims based on the control of certain board-member defendants alleged to be primary violators, (iii) add new defendants closely related to defendants previously named and alleges control claims against them, and (iv) allege liability pursuant to the doctrine of *respondeat superior* against the employer or principal of certain defendants.

2.     First, based on discovery obtained to date, the SAC bolsters the allegations that the Controlling Stockholders (defined below) controlled Zymergen.  The SAC alleges that the Controlling Stockholders possessed and exercised control over Zymergen's day-to-day management and operations through formal and informal methods and that the Controlling Stockholders were necessary for, and exerted control over, the IPO process and the contents of the Registration Statement.

3.     Second, the SAC adds control claims against the Controlling Stockholders based on their control over certain defendants they placed on the Zymergen's Board (defined below).

1 These members of the Board are alleged to be primary violators and discovery has shown they

2 acted at the direction and behest of the Controlling Stockholders.

3     4.    Third, the SAC adds as defendants the venture capital funds' investment

4 management companies (*i.e.*, SB Investment Advisers (US) Inc., DCVC Management Co, LLC,

5 and True Venture Management, L.L.C.) and alleges control claims against these defendants.  In

6 addition to the venture funds previously named, each of the Controlling Stockholders also operated

7 through these investment management companies, thus these new defendants are also subject to

8 liability as control persons.

9     5.    Lastly, the SAC adds an additional theory of vicarious liability under the doctrine

10 of *respondeat superior* against the Controlling Stockholders for violations of the securities laws

11 committed by their employees or agents.

12 **II.     NATURE OF THE ACTION AND OVERVIEW**

13     6.    This is a Class action on behalf of persons and entities that purchased or otherwise

14 acquired Zymergen common stock pursuant and/or traceable to the registration statement and

15 prospectus (collectively, the "Registration Statement") issued in connection with the Company's

16 April 2021 initial public offering ("IPO" or "Offering").  Plaintiffs pursue claims against

17 Defendants under the Securities Act of 1933 ("Securities Act").

18     7.    Zymergen integrates computational and manufacturing technologies to design,

19 engineer and optimize microbes for industrial applications.  The Company developed a platform

20 that treats the genome as a search space, using proprietary machine learning algorithms and

21 advanced automation to identify genetic changes that improve the economics for its customers'

22 bio-based products for a range of industries, including electronics, consumer care, chemicals,

23 materials, agriculture and pharmaceuticals.  In addition, Zymergen's platform is used to discover

24 novel molecules used to enable unique material properties.  The Company was incorporated in

25 Delaware on April 24, 2013.

26     8.    The Company reported that it partnered with Nature to design, develop, and

27 commercialize bio-based breakthrough products that deliver extraordinary value to customers in a

28 broad range of industries, including electronics, consumer care and agriculture.  Zymergen

reported that its goal was to create new products with a proprietary platform that unlocked the design and manufacturing efficiency of biological processes with technology's ability to rapidly iterate and control diverse functions. Zymergen called this process biofacturing and claimed it allowed the Company to create better products faster, cheaper and more sustainably than traditional chemistry by engineering microbes to make novel biomolecules that are the key ingredients in those products.

9.     Zymergen completed its IPO on April 22, 2021. On April 23, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold approximately 18,549,500 shares of common stock at a price of $31.00 per share, raising proceeds of approximately $575 million. The Company received proceeds of approximately $529.9 million from the Offering, net of approximately $40.3 million of underwriting discounts and commissions and $4.9 million of Offering costs. The proceeds from the IPO were purportedly to be used for working capital and other general corporate purposes, including the continued investment in commercializing Zymergen's existing products, launching products in its pipeline and furthering the development of its biofacturing platform and technology.

10.    Following the completion of the IPO, on April 22, 2021, Zymergen's stock began trading on the NASDAQ under the stock symbol "ZY." The Company had approximately 100.4 million shares of common stock outstanding and a market capitalization of approximately $3 billion upon completion of the IPO. On April 29, 2021, the Company's stock price traded as high as $52 per share, increasing market capitalization to approximately $5.2 billion.

11.    As detailed herein, the Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein. The untrue statements of material facts and omissions concerned the Company's biofacturing platform; the Company's ability to create better products faster, cheaper and more sustainably using the biofacturing platform; the product development process; the development status of 11 products in the Company's product pipeline; the market opportunity for those products; and when those products would generate revenue.

12.     The representations in the Registration Statement detailed below were materially misleading because, as the Company disclosed on August 3, 2021 and November 3, 2021, Zymergen was unable to produce products that could be sold at a profit when it created, manufactured and distributed the products on its own.   In addition, the representations were materially misleading because Defendants failed to disclose that several key target customers had technical issues implementing Hyaline, the Company's first and only product to be launched at the time of the IPO, into their manufacturing processes or that there was only a "hypothetical" near-term market for Hyaline due to there being "no hit product yet in the foldable display market." Indeed, the Company abandoned Hyaline and another optical film product because there was a smaller near-term market opportunity than represented in the Registration Statement and abandoned all of the consumer care products because those products could not be sold at a profit when Zymergen created, manufactured and distributed them on its own.   As a result, Zymergen did not generate product revenue in 2021 and 2022, as it represented in the Registration Statement.

13.     Defendants represented that Zymergen's biofacturing platform could create better products faster, cheaper and more sustainably than chemical and materials companies; that the demand for innovative materials had never been greater; and that synthetic biology companies like Zymergen were a better alternative to chemical and materials companies that struggled to innovate because they used a limited molecular palette, had substantial capital expenditures and were among the planet's worst industrial polluters.

14.     Eleven Zymergen products were highlighted in the Registration Statement: three optical film products and one bio-based epoxy product for the electronics industry; four consumer care products, including a naturally derived insect repellent; and three agricultural products. Defendants represented that these products were in various stages of development and described the development process, representing that: (a) Zymergen's business development personnel worked with customers to define a set of properties for a material that the customers would find valuable; then (b) designed and developed engineered microbes that manufactured the novel biomolecule that would be a key ingredient in a breakthrough product; then (c) had Contract Manufacturing Organizations ("CMOs") manufacture the product; and finally (d) used

1  Zymergen's sales force and marketing capabilities to contract with customers and sell the product

2  to them.

3       15.     In describing the product development process, Defendants highlighted Hyaline,

4  the first and only product launched by Zymergen at the time of the IPO.  They represented Hyaline

5  was launched in December 2020, to customers in the electronic industry, which began the expected

6  6- to 18-month product qualification process with multiple customers.  Defendants emphasized the

7  importance of the qualification process in Zymergen's target markets and represented that Hyaline

8  (and other products) would generate revenue after customers completed all aspects of the

9  qualification process and decided to place an order for the product.

10      16.     Defendants represented that Hyaline was an optical film designed for electronics

11  companies to use for display touch sensors in personal devices and other applications and would

12  allow customers to make robust foldable touchscreens and high density flexible printed circuits.

13  Defendants represented that Hyaline was expected to generate revenue in the second half of 2021,

14  just a few months after the completion of the IPO, and that Zymergen's global direct sales force

15  and a team of application sales engineers were working with customers on the sales qualification

16  process for Hyaline wherein customers would be able to validate the product and qualify it as a

17  standard component in their final electronic devices.

18      17.     Defendants also represented that other optical film products would generate

19  revenue following the 6- to 18-month qualification process and that the four consumer care

20  products and three agricultural products would generate revenue upon launch because a product

21  qualification process was unnecessary.

22      18.     Defendants represented that Zymergen would grow its business in several ways and

23  that it generally targeted products that could support annual sales of greater than $150 million.

24  Defendants assured investors that the market opportunity addressable by Zymergen's biofacturing

25  platform was enormous and diverse – at least $1.2 trillion across 20 separate industries.  They

26  represented that the market opportunity for the three industries being pursued with its 11 pipeline

27  products – electronics, consumer care and agriculture – was approximately $150 billion, including

28

1   the foldable display market for Hyaline being over $1 billion in 2020, and the market for insect

2   repellent being over $1.5 billion.

3           19.     The representations about Zymergen's biofacturing platform; the Company's

4   ability to create better products faster, cheaper and more sustainably; the product development

5   process; the development status of the 11 products in the product pipeline; the market opportunity

6   for those products; and when those products would generate revenue were particularly important

7   to investors given the Company's precarious financial condition.   Zymergen reported just

8   $15.4 million of revenue in 2019, and a net loss of $236.8 million.  In 2020, Zymergen reported

9   just $13.3 million of revenue and a net loss of $262.2 million.  The increasing net losses caused

10  the Company to be insolvent as of December 31, 2020, with an accumulated deficit of

11  $773.7 million.  The recurring losses and accumulated deficit meant Zymergen needed to raise

12  equity or debt to fund its operations until the Company could generate sufficient revenues to fund

13  its operations.  That, in turn, caused the Company's auditors to note that there was substantial

14  doubt about the Company's ability to continue operating as a going concern.

15          20.     The Risk Factors contained in the Registration Statement were also materially

16  inaccurate and misleading.  Defendants represented that various risks "could," "would" or "might"

17  negatively impact Zymergen "if" they occurred.  These representations were materially inaccurate

18  and misleading because the warned-of risks had already occurred and were negatively impacting

19  Zymergen at the time of the IPO.

20          21.     Beginning on August 3, 2021, *less than four months after the completion of the*

21  *IPO*, the Company revealed numerous material adverse facts that informed investors the

22  Registration Statement contained untrue statements of material facts and omitted material facts.

23  On that date, Zymergen issued a press release and held a conference call to provide a business

24  update regarding its commercial product pipeline and financial forecast.  The Company reported

25  that: (i) there were issues with its commercial products pipeline that would impact the Company's

26  delivery timeline and revenue projections; (ii) it was clear the commercial opportunity for the

27  Company's first product, Hyaline, was less than expected; (iii) Zymergen's Board of Directors

28  (the "Board") had initiated a series of deep dives into the Company's product pipeline and

development process; (iv) the Board anticipated that the roadmap and timelines for Zymergen's follow-on products could also be impacted; (v) as a result of the foregoing, the Company no longer expected product revenue in 2021, and only expected immaterial product revenue in 2022; and (vi) without a firm pipeline of customers and visibility on commitments, the Company's projections beyond 2022, were highly uncertain.

22.   The Company provided details stating that, through its receipt of periodic updates regarding the Company's progress toward its goals, the Board had learned of "significant execution challenges within the organization."  The Board had identified several contributing factors to the revisions of its plan for product delivery timelines and revenues.  First, **during the quarter that the IPO was completed**, several key target customers encountered technical issues in implementing Hyaline into their manufacturing processes, resulting in a delay in the commercial ramp of Hyaline.  Second, the total addressable market for foldable display applications, the market for Hyaline, was in an earlier stage than previously expected, with emerging data indicating a smaller near-term market opportunity, with scaled demand pushed out in time and growing more slowly than anticipated.  Indeed, the Company admitted that there was no near-term market for Hyaline and that the market was just "theoretical" because there was "no hit product yet in the foldable display market."  Third, the Company's commercial teams did not have significant insight into the customer qualification process and into their customers and users, which resulted in Zymergen's forecasts overestimating near-term demand.  As a result, the Company reported it was already making substantial changes in the commercial team.

23.   Defendant Jay Flatley ("Flatley"), the Company's acting Chief Executive Officer ("CEO"), who replaced Defendant Josh Hoffman ("Hoffman") after Hoffman was abruptly terminated on August 2, 2021, acknowledged the obvious seriousness of the numerous unexpected adverse disclosures, stating: "**I want to perhaps state the obvious that we're taking this situation extremely seriously**."  Flatley said that as soon as the Board learned of the problems, the Board and management immediately started to work to fully understand the issues and began developing a plan to address them, including the formation of dedicated committees, including a Strategic Oversight Committee, which was working with expert advisors to conduct an in-depth review of

the Company's operational, financial, product and commercialization efforts to facilitate the development of an updated strategic plan.  That work was focused on: (i) a deep dive into the Company's sales forecasting process to examine how the initial forecast was developed, where the issues arose and how to improve the process going forward; (ii) the retention of a number of outside experts to examine the robustness of the products coming out of the pipeline and their readiness for full commercialization; and (iii) digging into the Company's long-term market opportunities to ensure the product pipeline was aligned with industry trends and customer demand.  The Company was also developing a plan to reduce and align expenses with the change in the Company's revenue expectations.

24.     In short, Flatley told investors that just about everything in the Registration Statement concerning the development, commercial opportunity and sale of the 11 products in the Company's pipeline was not true and that Zymergen was now in the process of determining which products and markets the Company would target in the future.  In addition, Flatley acknowledged Zymergen had not previously operated with transparency and openness, stating that the Company would conduct a cultural assessment to ensure that there would be broad-based accountability across the organization and would operate with transparency and openness.  He said that the Board and management were focused on reestablishing the credibility of the leadership team and the Company and that Hoffman had been terminated, effective immediately, as part of the effort to reestablish the credibility of the leadership team and the Company.

25.     The Company never claimed this material adverse information did not exist, or was not known or knowable, at the time of the IPO.  Indeed, the Company admitted the technical issues several key customers encountered implementing Hyaline into their manufacturing processes (which delayed the commercial ramp of the product and caused Zymergen to no longer expect any product revenue in 2021, and only immaterial product revenue in 2022) were occurring during the quarter the Company completed the IPO.

26.     Nor did the Company claim that the emerging data on the total addressable market for foldable display applications (which indicated a smaller near-term market opportunity that was growing less rapidly than anticipated) did not exist, or was not known or knowable, at the time of

1   the IPO.  Other adverse disclosures show that the data did exist at the time of the IPO.  Flatley's

2   admission on August 3, 2021, that there was no market for Hyaline and that it was just "theoretical"

3   because there was "no hit product yet in the foldable display market" establishes that there was no

4   market for Hyaline at the time of the IPO.

5          27.     In addition, the Company admitted it did not have significant insight into the

6   customer qualification process or their customers and users at the time of the IPO, which resulted

7   in the Company's forecasts overestimating near-term demand.  As a result, Zymergen was: (i)

8   making substantial changes in its commercial teams; (ii) conducting a deep dive into the

9   Company's sales forecasting process to examine how the initial forecasts were developed, where

10  the issues arose and how to improve that process going forward; and (iii) examining the robustness

11  of the products coming out of the Company's pipeline and their readiness for full

12  commercialization.

13         28.     The Company also revealed that there were issues with the long-term opportunities

14  for its products, reporting that Zymergen was digging into the Company's long-term market

15  opportunities to ensure the product pipeline was aligned with industry standards and customer

16  demand and that, with the assistance of a top-tier consulting firm, the Company was doing a full

17  assessment of Zymergen's target markets and the fit of its products into the pipeline of those

18  markets, including an exploration of adjacent opportunities that could possibly provide new

19  revenue sources.

20         29.     Other disclosures on August 3, 2021, also demonstrate that the adverse information

21  about Hyaline, the total addressable market for foldable display applications, the commercial

22  teams' lack of significant insight into the customer qualification process and their customers and

23  users and the resulting overestimated forecast of near-term demand for Zymergen products existed

24  at the time of the IPO, including that: (i) Zymergen would conduct a cultural assessment to ensure

25  there would be broad-based accountability across the organization; (ii) Zymergen was focused on

26  reestablishing the credibility of the leadership team and the Company; (iii) Hoffman had been

27  terminated as part of the effort to reestablish the credibility of the leadership team and the

28  Company; and (iv) the Company would operate with transparency and openness in the future.

30.     The reaction of analysts to the unexpected material adverse disclosures indicates that they believed the adverse information existed at the time of the IPO.  Analysts were stunned by the numerous adverse disclosures, questioned the Company's credibility during the August 3, 2021 earnings call and issued reports after the earnings call, in which they downgraded the Company's stock and questioned when the adverse information was known.

31.     During the earnings call, one analyst stated the disclosures were "[o]bviously[] a disappointment for everybody" and "very surprising."  Another analyst asked: "[H]ow can we have any confidence whatsoever in anything that's been put out there in terms of numbers or . . . the market opportunity?"  Flatley acknowledged the lack of credibility was more than justified, responding: "[T]otally fair that you question the credibility of any forecast we give you today."

32.     After the earnings call, analysts issued reports in which they downgraded Zymergen and also questioned the Company's credibility.  William Blair & Company analyst Matt Larew ("Larew") issued a report in which he downgraded Zymergen stock and wrote: "*[G]iven the abrupt and significant about-face just months after the IPO, we believe the company has destroyed its credibility with investors*."  In addition, he questioned how the adverse information about the smaller near-term market opportunity for the foldable display market was not known at the time of the IPO, writing:

> *In our view, what is more confusing and concerning is commentary on the total addressable market for foldable display applications, which suggests a smaller near-term market opportunity that is growing more slowly than anticipated.  Frankly, we are not quite sure how the data could have changed so much over such a short time (again, the company's IPO filings were published less than four months ago)*, and at this point the company does not have enough data to quell our concerns or give us any sense of what the company's actual pipeline might look like following the in-depth review of the company's operational, financial, product, and commercialization efforts.

33.     Multiple government agencies, including the SEC, requested information from the Company related to the unexpected adverse disclosures on August 3, 2021.  Defendants failed to disclose this material adverse information in Zymergen's earnings releases or during the Company's earnings calls.  Instead, this material adverse information was buried in the Company's 3Q21 Report on Form 10-Q, filed with the SEC on November 15, 2021.

34.     Other facts strongly infer that the adverse information revealed on August 3, 2021, existed at the time of the IPO.  The August 3, 2021 adverse disclosures were made just a little more than three months after the completion of the IPO on April 22, 2021.  Many of the adverse disclosures related to the Company's most important product, Hyaline, the first and only product in the launch phase of the product pipeline and the primary product featured in the Registration Statement.  The impacts of the adverse disclosures on Zymergen's business were devastating in magnitude, scope and duration.  No product revenues would be generated in 2021, only immaterial product revenues would be generated in 2022, and projections beyond 2022 were "highly uncertain."  As investors would learn on November 3, 2021, six of the 11 products featured in the Registration Statement, including Hyaline, would be discontinued and never generate any revenue for the Company.  Flatley admitted that dramatic steps were taken to operationally restructure and transform the Company.  The Company's lenders required Zymergen to pay down its loan, shorten the maturity date and deposit the remaining balance of the loan into a blocked account.  Zymergen laid off hundreds of employees; recorded millions of dollars of restructuring, severance and impairment expenses; and was forced to develop a plan to conserve cash.

35.     Following these material adverse disclosures, the Company's stock price plummeted $26.58, or 75%, from $34.83 on August 3, 2021, to $8.25 on August 4, 2021, on unusually large trading volume of more than 21.7 million shares.  The decline wiped out more than $2.7 billion of Zymergen's market capitalization.

36.     Investors learned more adverse news in the following months.  On September 23, 2021, Zymergen announced it was terminating approximately 120 employees as part of a preliminary phase of the Company's plan to reduce costs to align with the delayed revenue ramp up previously disclosed on August 3, 2021. The Company also disclosed that it would incur an estimated $4.5 million of severance and employee-related restructuring costs related to the reduction in force.

37.     On September 30, 2021 and October 13, 2021, articles appeared in the financial press likening Zymergen's implosion to that of Theranos and reporting that Hoffman used exaggerated financial figures and made overly optimistic projections about the Company's

capabilities, both internally and externally.  On October 13, 2021, *Barron's* published an article titled "The Inside Story of How SoftBank-Backed Zymergen Imploded Four Months After Its $3 Billion IPO" and reported, in part:

> According to a former senior-level employee at Zymergen, Hoffman used exaggerated financial figures and made overly optimistic projections about the company's capabilities, both internally and externally.  The former employee – who retains a vested interest in the company – recalls Hoffman's response when he was confronted about this behavior: "***Never underestimate the power of the greater fool.***"

38.     On October 21, 2021, Zymergen announced a second reduction in force of approximately 100 employees, which would result in approximately $4.2 million of severance and employee-related restructuring costs.  In addition, the Company reported that it expected to incur impairment charges of $15 million for certain manufacturing equipment as a result of its restructuring activities and that it might incur additional restructuring and impairment charges in 4Q21, including lease expenses.

39.     On October 21, 2021, Zymergen also reported that it had amended its Credit Agreement after its lender notified the Company on August 16, 2021, that it was in default of the material adverse change section of the Amended and Restated Credit Agreement and Guaranty. The amended Credit Agreement required Zymergen to: (i) shorten the term of the Credit Agreement by moving the maturity date from December 19, 2024 to June 30, 2022; (ii) increase the amount of the liquidity covenant; (iii) make a $41 million payment, including a $35 million principal prepayment; and (iv) deposit the remaining outstanding balance of the loan plus accrued interest through the maturity date in a blocked account controlled by the Administrative Agent, which was subject to release from the blocked account upon the Administrative Agent's completion of due diligence to its reasonable satisfaction regarding the Company's anticipated operating costs and budget through the maturity date.

40.     Investors also learned that Jed Dean, a co-founder of Zymergen and the Company's Vice President of Operations and Engineering, was stepping down effective October 31, 2021.

41.     On November 3, 2021, Zymergen revealed that it was discontinuing Hyaline, the main product featured in the Registration Statement, and all but one of the electronics film program

1    products.  It also revealed that all of the consumer care program products, including the insect

2    repellent product featured in the Registration Statement, were being discontinued.  Thus, the

3    Company revealed that *six of the 11 products highlighted in the Registration Statement,*

4    *including its main product, had been discontinued* and would not generate any revenue for the

5    Company.

6          42.    The Company also revealed that its strategy of creating, manufacturing and

7    distributing products on its own was untenable.  Flatley acknowledged that was the reason

8    Zymergen discontinued all of the consumer care products, and he admitted there was "no chance"

9    the consumer care insect repellent product featured in the Registration Statement could be

10   profitable given the costs of manufacturing and distribution.

11         43.    The Company also revealed it would have run out of cash in 3Q21 had it not raised

12   $529.9 million from the IPO.  Zymergen reported that its cash had declined from $588 million as

13   of June 30, 2021, to $496.2 million as of September 30, 2021, and that the Company reported a

14   net loss of $283.6 million for the nine months ending September 30, 2021.

15         44.    On November 3, 2021, Zymergen also failed to disclose that government agencies,

16   including the SEC, had requested information from the Company related to the unexpected adverse

17   disclosures on August 3, 2021.  That material adverse information was buried in the Company's

18   3Q21 Report on Form 10-Q filed with the SEC on November 15, 2021.

19         45.    On December 9, 2021, *Seeking Alpha* published an article titled "Zymergen: Total

20   Chaos."  The opening paragraph succinctly explained the dramatic change at Zymergen since the

21   IPO, which caused Class members to suffer millions of dollars in damages.  It was reported that

22   Zymergen went from launching Hyaline and preparing to rapidly scale up production and revenue,

23   to a Company that had abandoned Hyaline and other products and was dramatically cutting

24   headcount and cash burn in an effort to avoid bankruptcy.

25         46.    During a presentation at a January 10, 2022 JPMorgan Healthcare Conference,

26   Flatley acknowledged that over the last five months Zymergen had taken dramatic steps to

27   operationally restructure and transform the business, including the discontinuation of a significant

28   number of programs and a reduction in the Company's headcount from approximately 900 to 500.

He also acknowledged that the negative financial impact on Zymergen would continue for at least another year and possibly longer, stating that the Company thought it would begin to have product revenue in the 2023 timeframe.

47.     Zymergen's stock price has not recovered since the material adverse disclosures on August 3, 2021, closing at $3.84 on February 24, 2022.

48.     As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## III.   JURISDICTION AND VENUE

49.     The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o).

50.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §22 of the Securities Act (15 U.S.C. §77v).

51.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b).   A substantial part of the events or omissions giving rise to the claims herein occurred in this District as Zymergen's principal place of business is in Emeryville, California.   Many of the other Defendants reside in Northern California.

52.     In connection with the acts, transactions and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## IV.   PARTIES

### A.   Plaintiffs

53.     Biao Wang ("Wang") is the Court-appointed Lead Plaintiff (ECF No. 69) and Class Representative (ECF No. 194), and as set forth in the certification previously filed with the Court (ECF No. 35-3), purchased Zymergen common stock pursuant or traceable to the Registration Statement issued in connection with the Company's IPO.   Wang suffered damages as a result of

1  the federal securities laws violations, the untrue statements of material facts contained in the

2  Registration Statement and the omissions of material facts from the Registration Statement.

3      54.    Plaintiff West Palm Beach Firefighters' Pension Fund ("WPBFPF"), as set forth in

4  the certification previously filed with the Court (ECF No. 43-2), purchased Zymergen common

5  stock pursuant or traceable to the Registration Statement issued in connection with the Company's

6  IPO.  WPBFPF is a pension fund based in West Palm Beach, Florida that provides retirement

7  benefits for firefighters.  As of September 30, 2021, WPBFPF managed total assets in excess of

8  $306 million on behalf of over 466 current employees, retirees and beneficiaries.  WPBFPF

9  suffered damages as a result of the federal securities laws violations, the untrue statements of

10 material facts contained in the Registration Statement and the omissions of material facts from the

11 Registration Statement.

12     **B.    Company Defendants**

13     55.    Defendant Zymergen Inc. ("Zymergen" or the "Company") is incorporated under

14 the laws of Delaware with its principal executive offices located in Emeryville, California.

15 Following its IPO, Zymergen's shares traded on the NASDAQ under the stock symbol "ZY."  On

16 July 25, 2022, Zymergen announced that it entered into an agreement with Ginkgo Bioworks

17 Holdings, Inc. ("Ginkgo"), a Delaware corporation, providing for a merger where Zymergen

18 would become a wholly-owned subsidiary of Ginkgo.  On October 19, 2022, the merger was

19 completed and Zymergen stopped trading on the NASDAQ.  On October 3, 2023, Zymergen filed

20 a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[1]  Ginkgo is Zymergen's

21 successor in interest.[2]

22 _____

23 [1]     As a result of the bankruptcy filing, this litigation is currently stayed as to Defendant
   Zymergen.  ECF No. 218.

24 [2]     The July 25, 2022 press release announcing Ginkgo's merger stated that the transaction
   would be "Ginkgo's largest acquisition to date and is expected to significantly enhance Ginkgo's

25 platform."  Part of the benefits for Ginkgo were stated as "Ginkgo plans to integrate Zymergen's
   core automation and software technologies for scaling strain engineering capacity into its

26 Foundry," and "Ginkgo customers will also benefit from the expansion of Ginkgo's library of
   biological assets."   The merger was an all-stock transaction where Zymergen's shareholders

27 received 0.9179 shares of Ginkgo common stock, which valued Zymergen at $231.8 million or
   less than 8% of its market capitalization at Zymergen's IPO price.  At the time of the merger the

28 directors of the Board of Zymergen were all replaced by three Ginkgo employees, and Zymergen's

56.     Defendant Josh Hoffman ("Hoffman") was, at all relevant times, the CEO, director and co-founder of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Hoffman was terminated on August 2, 2021.

57.     Defendant Enakshi Singh ("Singh") was, at all relevant times, the Chief Financial Officer ("CFO") of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Defendant Steven Chu ("Chu") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

58.     Defendant Jay T. Flatley ("Flatley") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Flatley replaced Hoffman as CEO of the Company until the merger with Ginkgo.

59.     Defendant Christine M. Gorjanc ("Gorjanc") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

60.     Defendant Travis Murdoch ("Murdoch") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

61.     Defendant Matthew A. Ocko ("Ocko") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

62.     Defendant Sandra E. Peterson ("S. Peterson") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

63.     Defendant Zach Serber ("Serber") was the Chief Science Officer, a director and co-founder of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

---

then CEO and CFO also ceased service as officers of the Company.  After the consummation of the merger, on November 14, 2022, Ginkgo's CEO, Jason Kelly, discussed the benefits to Ginkgo of the acquisition at Ginkgo's 3Q22 earnings call, including stating that "the faster time line here means that Zymergen brought in more cash, and we can get to work right away on the potential upside opportunities.  So at close, Zymergen is coming in with over $100 million in cash even after paying all the transaction-related expenses, including severance, bonus acceleration, adviser fees and insurance premia.  So you can think of that as a truly net cash number."

64.     Defendant Rohit Sharma ("Sharma") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

65.     Defendants Hoffman, Singh, Chu, Flatley, Gorjanc, Murdoch, Ocko, S. Peterson, Serber and Sharma are hereinafter collectively referred to as the "Individual Defendants."

66.     The Individual Defendants had a duty to promptly disseminate accurate and truthful information in the Registration Statement and to correct any previously issued statements that were materially misleading or untrue.  The Individual Defendants had access to the adverse undisclosed information about the Company's business, products, pipeline and market opportunity and other adverse facts that rendered the positive representations made or adopted by the Company materially false and misleading, as detailed herein.  The Individual Defendants were able to and did control the content of the Registration Statement and other public statements pertaining to the Company.  Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants was responsible for the accuracy of the Registration Statement and is therefore liable as controlling persons for the representations contained therein.

**C.     The Underwriter Defendants**

67.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO.  In the IPO, J.P. Morgan agreed to purchase 5,750,345 shares of the Company's common stock, including the over-allotment option.   J.P. Morgan received an underwriting fee of $12,478,249.

68.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter for the Company's IPO.  In the IPO, Goldman Sachs agreed to purchase 5,750,345 shares of the Company's common stock, including the over-allotment option.  Goldman Sachs received an underwriting fee of $12,478,249.

69.     Defendant Cowen and Company, LLC ("Cowen") served as an underwriter for the Company's IPO.  In the IPO, Cowen agreed to purchase 2,411,435 shares of the Company's

1  common stock, including the over-allotment option.  Cowen received an underwriting fee of

2  $5,232,814.

3       70.    Defendant BofA Securities, Inc. ("BofA") served as an underwriter for the

4  Company's IPO.  In the IPO, BofA agreed to purchase 2,040,445 shares of the Company's

5  common stock, including the over-allotment option.  BofA received an underwriting fee of

6  $4,427,766.

7       71.    Defendant UBS Securities LLC ("UBS") served as an underwriter for the

8  Company's IPO.  In the IPO, UBS agreed to purchase 2,040,445 shares of the Company's common

9  stock, including the over-allotment option.  UBS received an underwriting fee of $4,427,766.

10      72.    Defendant Lazard Frères & Co. LLC ("Lazard") served as an underwriter for the

11 Company's IPO.  In the IPO, Lazard agreed to purchase 556,485 shares of the Company's common

12 stock, including the over-allotment option.  Lazard received an underwriting fee of $1,207,572.

13      73.    Defendants J.P. Morgan, Goldman Sachs, Cowen, BofA, UBS and Lazard are

14 hereinafter collectively referred to as the "Underwriter Defendants."  As detailed herein, the

15 material adverse disclosures by Zymergen on August 3, 2021; September 23, 2021; October 21,

16 2021; November 3, 2021; November 15, 2021; and January 10, 2022, along with the other facts

17 alleged, show that the Underwriter Defendants failed in their "gatekeeping" role to ensure the

18 correctness of the Registration Statement.  They failed to conduct a reasonable due diligence

19 investigation, including the verification of information provided by Zymergen, which resulted in

20 the Registration Statement being inaccurate and misleading, containing untrue statements of

21 material facts and omitting material facts.

22      D.    **Controlling Stockholder Defendants**

23      74.    Defendants SVF Excalibur (Cayman) Limited and SVF Endurance (Cayman)

24 Limited, both incorporated in the Cayman Islands, and Defendant SoftBank Vision Fund (AIV

25 M1) L.P., a Delaware limited partnership (collectively, the "SoftBank Funds"),[3] are venture capital

26 funds managed by Defendant SB Investment Advisers (US) Inc. ("SBIA," and together with the

27 

28 [3]    The SoftBank Funds are feeder funds that fall under the SoftBank Vison Fund I umbrella.

1  SoftBank Funds, the "SoftBank Defendants").[4]  SBIA is a Delaware corporation, with its principal

2  office and place of business is in Menlo Park, CA., and a registered investment adviser with the

3  SEC.

4          75.     Defendants Data Collective II, L.P. and DCVC Opportunity Fund, L.P.

5  (collectively, the "DCVC Funds"), both Delaware limited partnerships, are venture capital funds

6  managed by DCVC Management Co, LLC ("DCVC," and together with the DCVC Funds, the

7  "DCVC Defendants").  DCVC is a Delaware limited liability company, with its principal office

8  and place of business is in Palo Alto, CA., and a registered exempt reporting advisor with the SEC.

9          76.     Defendants True Ventures IV, L.P., True Ventures Select I, L.P., True Ventures

10  Select II, L.P., True Ventures Select III, L.P., True Ventures Select IV, L.P., all Delaware limited

11  partnerships, are venture capital funds managed by True Venture Management, L.L.C. ("True

12  Ventures," and together with the True Venture Funds, the "True Venture Defendants").  True

13  Ventures is a Delaware limited liability company, with its principal office and place of business is

14  in Palo Alto, CA., and a registered exempt reporting advisor with the SEC.

15          77.     The SoftBank Defendants, the DCVC Defendants and the True Venture Defendants

16  are referred herein as the "Controlling Stockholders."

17  **V.     CONTROL ALLEGATIONS AGAINST THE CONTROLLING
       STOCKHOLDERS**

18
19      **A.     The Controlling Stockholders' Controlled Zymergen**

20          78.     Prior to and at the time of the IPO, the Controlling Stockholders possessed, and

21  exercised, the power to control Zymergen, including the ability to control day-to-day management

22  and operations of Zymergen, as well as the IPO and contents of the Registration Statement.

23
24
25
26

27  [4]      SB Investment Advisers (US) Inc. had sub-advisory agreements with SB Investment
   Advisers (UK) Limited concerning the management of the SoftBank Funds, and their investment
28  in Zymergen.

1

2

### 1. The Controlling Stockholders Controlled Zymergen Through Their Ownership of Zymergen Securities

79. The Controlling Stockholders owned the majority of the outstanding shares of Zymergen prior to the IPO (59.49% of preferred shares and 50.17% of total shares), which gave them power to control Zymergen individually and collectively.

80. Prior to the IPO, the SoftBank Defendants, through the SoftBank Funds, invested approximately $404 million into Zymergen, owning 32.61% of the Company (and making the SoftBank Defendants Zymergen's largest shareholder). The SoftBank Defendants owned 39.07% of Zymergen's preferred shares, which had preferential rights and allowed them to control Zymergen. For their investments, the SoftBank Defendants received a Board seat and the right to be on every Board committee (*i.e.*, audit, compensation, etc.). Dipchand "Deep" Nishar ("Nishar") was initially placed on Zymergen's Board from 2016 to 2020 before the SoftBank Defendants appointed Murdoch in his place. At the IPO all preferred shares were converted into common stock, and at the close of trading on the first day, the SoftBank Defendants' position was worth over $1 billion, or a return on investment of approximately a 150%.

81. Prior to the IPO, the DCVC Defendants were Zymergen's initial seed investors in 2015, and ultimately invested approximately $44.2 million through the DCVC Funds. DCVC is jointly owned by Ocko and Zachary Bogue ("Bogue") and, as reported to the SEC, is controlled by Ocko, Bogue, the COO, Spencer Punter ("Punter"), and the Chief Legal Officer, Ryan Ward ("Ward"). The DCVC Defendants received a seat on Zymergen's Board as a condition of its investment and appointed Ocko to that seat. The DCVC Defendants were Zymergen's largest investor until the SoftBank Defendants' investment in October 2016. The DCVC Defendants had a management rights agreement with Zymergen that allowed them to directly control many aspects of Zymergen and receive inside information. The DCVC Defendants' early investment gave them special influence over Zymergen and many of its Board members. Through these rights obtained in its early investment, the DCVC Defendants were able to negotiate and maintain significant control over Zymergen. At the time of the IPO, the DCVC Defendants beneficially owned 9.03% of Zymergen and 10.81% of the preferred shares, making them the second largest shareholder. On

1   the first day of trading, the DCVC Defendants' position was worth over $230 million, or a return
2   on investment of approximately 530%.

3       82.     Prior to the IPO, the True Venture Defendants were an initial seed investor and
4   continued to invest in Zymergen eventually investing approximately $75 million prior to the IPO.
5   True Ventures is owned by Jon Callaghan ("Callaghan") and Phil Black ("Black"), and reports to
6   the SEC that they are controlled by Callaghan, Black, CFO Ulrike Kellmereit ("Kellmereit"), and
7   COO Jim Stewart ("Stewart").   The True Venture Defendants received a seat on Zymergen's
8   Board as a condition of its investment and placed its employee, Sharma in that seat.  The True
9   Venture Defendants also were granted management rights and, as an early investor, had leverage
10  to maintain its significant control even after subsequent rounds of investment.  At the time of the
11  IPO the True Venture Defendants beneficially owned 8.52% of Zymergen and 9.61% of the
12  preferred stock, making them the third largest shareholder.  At the close of trading on the first day
13  of the IPO, the True Venture Defendants' $75 million investment was valued at approximately
14  $246 million, or a return on investment of approximately a 230%.

15      83.     As shown in the table below, whether calculated just by the preferred stock that had
16  preferential rights or including common stock, at the IPO, the Controlling Stockholders owned a
17  majority of the shares outstanding:

18
19
20
21
22
23
24
25
26
27
28

| Stock Type | Outstanding as of March 31, 2021 | SoftBank Defendants | DCVC Defendants | True Venture Defendants | Controlling Stockholders' Ownership Percentage |
|---|---|---|---|---|---|
| Series A | 7,332,750 | - | 3,146,733 | 1,002,144 | 56.58% |
| Series A-1 | 8,719,611 | - | 2,014,506 | 1,576,798 | 41.19% |
| Series B | 14,081,522 | 7,818,079 | 1,684,397 | 1,374,470 | 77.24% |
| Series C | 24,700,286 | 17,664,099 | 294,401 | 1,472,007 | 78.67% |
| Series D | 13,259,111 | 1,119,726 | 223,945 | 1,119,725 | 18.58% |
| Total Preferred Stock | 68,093,280 | 26,601,904 | 7,363,982 | 6,545,144 | **59.49%** |
| Common Stock | 13,473,832 | - | - | 408,317 | 3.03% |
| Total Including Common Stock | 81,567,112 | 26,601,904 | 7,363,982 | 6,953,461 | **50.17%** |

84.     At the time of the IPO, all Zymergen's outstanding preferred stock was converted into common stock. The Controlling Stockholders' preferred stock was converted into over 40 million shares of common stock, more than double the number of shares issued in the IPO, giving the Controlling Stockholders an ownership of approximately 41% of the outstanding shares. After the IPO the SoftBank Defendants owned 26.34%, the DCVC Defendants owned 7.29%, and the True Venture Defendants owned 7.20%.

85.     As an additional condition of their investments, each of the Controlling Stockholders required that Zymergen indemnify both their individual representative serving on the Board, *i.e.*, Defendants Murdoch, Sharma, and Ocko, and the Controlling Stockholders themselves (including "the partners, members, officers, directors and stockholders of each [Controlling Stockholder], legal counsel, accountants and investment managers for each [Controlling Stockholder], any underwriter (as defined in the Act) for such [Controlling Stockholder] and each Person, if any, who controls such [Controlling Stockholder]") from certain securities claims arising from their role as members of the Board (including the claims asserted in this litigation).

1

2

**2.   The Controlling Stockholders Possessed the Right to and
Exercised Control of Zymergen's Operations and Management**

86.    Pursuant to contractual rights obtained in exchange for their investments, implicit or explicit agreements with Zymergen executives, as well as personal and professional relationships with Zymergen executives, the Controlling Stockholders had the right to and dictated significant aspects of the day-to-day operations of Zymergen and exercised control over the conduct of its executives, as well as the IPO and contents of the Registration Statement.

87.    Zymergen's governance documents required that 2 out of the 3 Controlling Stockholders' approval was required for most business matters.  For example, the Controlling Stockholders approval was required for any budget or business plan, executive level hiring, granting of stock or options, and entering or exiting a line of business or incurring debt.  The Controlling Stockholders also individually held control of Zymergen through protective provisions, such as antidilutive protections, and Zymergen's inability to amend the governing documents without their consent.

88.    The Controlling Stockholders also entered into a voting agreement that they would vote their shares together on certain key issues, including that at each election of a Controlling Stockholders' Board seat they would vote for each of the other Controlling Stockholders' nominee and that only upon the agreement of the Controlling Stockholders could its representative be removed.  The Controlling Stockholders' rights were incorporated into Zymergen's certificate of incorporation and investor rights agreement.  Thus, each of the Controlling Stockholders' had the ability to single-handedly preserve its seat, and agreed to preserve each other Controlling Stockholders' seat as well.  Notably, no other Zymergen investor had Board seats, even though there were significant large investors in the Series D round just prior to the IPO.

89.    The Controlling Stockholders also controlled the day-to-day management of Zymergen though their complete control of the Audit Committee.  In the lead up to the IPO, the Audit Committee was comprised of Defendants Murdoch, Ocko, and Sharma.  Each of the Controlling Stockholders had an additional employee/partner attend Audit Committee meetings: SBIA CFO, Navneet Govil; True Ventures CFO Kellmereit; and DCVC founder Bogue all

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 5:21-cv-06028-PCP                                      - 23 -
4861-4775-1850.v1

1  attended.  In addition, all of the Company documents used to facilitate the Audit Committee

2  meetings were provided to the Controlling Stockholders and analyzed by their respective teams.

3  The Controlling Stockholders participated in the Company's material financial decisions,

4  including, for example, the decision to delay the 2019 audited financial results until September

5  2020 in order to close the Series D investments without a going concern qualification.

6         90.    Through their complete control of the Audit Committee, the Controlling

7  Stockholders exercised their ability to control Zymergen's management by putting in place

8  processes and controls designed to give the Audit Committee control over the Company's financial

9  statements, the Company's auditors, and its internal audit function.  The Audit Committee also

10 provided oversight to the Company's risk mitigation strategies and internal control framework.

11 The Audit Committee is independent of all other organizations within the Company, and was

12 responsible for the disclosure controls in connection with financial reporting to the public,

13 including in the Registration Statement that was filed with the SEC.

14        91.    The Controlling Stockholders also possessed and exercised their power to appoint

15 a new independent director to the Board.  In 2019, Zymergen's Board established an ad hoc

16 committee to identify possible independent Board member candidates, which included Defendant

17 Ocko and Nishar from SBIA.  The addition of an independent director (*i.e.*, not representatives of

18 the Controlling Stockholders, the founders, or the CEO) required authorization from the majority

19 of the preferred shareholders.  As the majority of the preferred shares were owned by the

20 Controlling Stockholders, these Board members were also approved directly by the Controlling

21 Stockholders.  Ocko and Nishar nominated Flatley and S. Peterson, and Murdoch, Ocko, and

22 Sharma each unanimously approved electing them to the Board.  Defendant Flatley was elected

23 on September 16, 2019 to Zymergen's Board as an independent director and attended Board

24 meetings prior to January 2020.  Defendant S. Peterson was elected to the Board as an independent

25 director on December 13, 2019.  Ongoing emails, text message, and records of phone calls show

26 that Ocko retained his significant influence over Flatley and S. Peterson throughout all relevant

27 times.

28

92.     Electing an additional independent Board member was necessary for the Company to proceed with the IPO in 2021.  Because of SoftBank's large ownership share, Murdoch was deemed an affiliated director and could not remain on the Audit Committee following the IPO under NASDAQ and SEC rules.  Increasing the size of the Board (to nine), as well as the addition of an independent director required authorization from the majority of the preferred shareholders.  On March 1, 2021, the Controlling Stockholders directed the appointment of Defendant Gorjanc, unanimously approving her as a ninth Board member and new member of the Audit Committee.  The Controlling Stockholders thus held power over the governance of Zymergen and the functions necessary for the Company to conduct its IPO.[5]

93.     The True Venture Defendants also exercised control over Zymergen through a personal relationship between defendant Singh and DCVC employee Stewart.  Stewart was considered a "mentor" to Singh and sat in on Audit Committee meetings guiding the CFO's approach to issues, including the IPO.  Stewart was instrumental in Singh's elevation to CFO just before the IPO when other directors and executives viewed her as unqualified for the position.  Stewart "steer[ed] the ship" of Zymergen's Audit Committee and was considered the "most knowledgeable person on it."  For example, Stewart helped Singh structure the finance organization, gave advice on audit committee matters, and guided her on which insurance company to choose for Zymergen's Director & Officer coverage going into the IPO.  Even after the IPO, when the True Venture Defendants lost their rights to observe Board and committee meetings, Stewart continued to attend Audit Committee meetings and advise Singh.[6]

94.     The SoftBank Defendants also placed Murdoch on the Compensation Committee.  In this role, Murdoch exercised significant control over the compensation of directors, officers, and employees.  The SoftBank Defendants paid close attention to compensation, especially in 2020

---

[5]     The SoftBank Defendants did not allow Murdoch to be removed from the Audit Committee until just days before the IPO and after the Registration Statement was already filed.

[6]     In connection with the IPO, as mentioned above, all the preferred shares were converted to common stock, and the preferred shareholders (the majority of which were the Controlling Stockholders) gave up their preferential control rights over Zymergen.  Thus, Stewart being still allowed to attend Audit Committee meetings as a mentor demonstrates the power to influence and control Defendant Singh.

1    and leading up to the IPO when Zymergen continued to miss revenue targets and was burning

2    through cash.  Demonstrating their control of Zymergen, the SoftBank Defendants made multiple

3    objections to other directors and executives plans and shaped hiring, compensation, and bonuses

4    compensation policies and activities.  For example, on February 17, 2021, Nishar pressed Murdoch

5    on the executives' failure to achieve performance goals and he reported that "we reduced the award

6    to Josh [Hoffman] by 1M."

7         95.    Ocko, a joint owner of the DCVC Defendants, served on Zymergen's Technology

8    & Science Committee, which was formed in February 2020, to monitor management's direction

9    and investment in research and development and technology initiatives.  This committee oversaw

10   a review of Zymergen's product development process, demonstrating Ocko's control over the very

11   issues and businesses that are the subjects of the alleged false and misleading statements and

12   omissions.  The SoftBank Defendants also had the right to have Murdoch serve or designate

13   someone else as a member of the Technology & Science Committee, but did not.  As Nishar

14   explicitly told Defendant Hoffman and Hoffman shared with Defendant Flatley such unexercised

15   rights were insurance for the SoftBank Defendants, which they used to ensure their control over

16   Zymergen.

17        96.    Ocko was also a board member of a company called Pivot Bio, Inc. ("Pivot Bio").

18   Zymergen was performing research and development for Pivot Bio on Pivot Bio's agricultural

19   product.  Pivot Bio controlled the project with little room for input from Zymergen, and paid

20   Zymergen a fixed fee.  However, in the Registration Statement Zymergen touted this same product

21   as its lead agricultural product, ZYM0301, and did not disclose its secondary role in the product

22   development.  Thus, Ocko, who was a member of Zymergen's Science & Technology Committee

23   and Audit Committee, as well as a board member of Pivot Bio, had significant control over this

24   business relationship.

25        97.    Sharma was also a board member of a company called Enveda Therapeutics, Inc.

26   ("Enveda").  At the time of the IPO, Enveda was in discussions with Zymergen about a research

27   contract.  Thus, Sharma also had significant control over this business relationship.

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 5:21-cv-06028-PCP
4861-4775-1850.v1

1     98.    DCVC publicly touted what it considered to be its instrumental role in Zymergen's

2 early development.  For example, on October 10, 2016, DCVC published in an article after the

3 Series B investment in the Company titled "Bringing Zymergen to Scale: Enabling Engineering

4 Biology with AI & Robotics."  The article detailed how the DCVC Defendants viewed the role of

5 the Controlling Stockholders to drive results and described its intimate involvement in multiple

6 aspects of Zymergen's day-to-day operations:

7          We're pleased that this success attracted the support of SoftBank, which brings Deep Nishar to join us on the Zymergen Board.  Both SoftBank as a

8 company and Deep as a person have track records of ***driving category-killer results***.

9                          \*      \*      \*

10          DCVC is pleased that ***we were able to contribute materially to Zymergen's current and ongoing success***.  From day one, we were involved in technology

11 strategy, helping analyze and decide on software and systems implementations, providing expert knowledge from our Equity Partners (our network of world-class

12 technologists, scientists, and entrepreneurs who share in common in our firm's results) and key introductions from across our portfolio of other cutting edge

13 companies.

14          ***We played a hands-on role in recruiting key employees, delivered critical Fortune 500 customers from initial introduction through making sure they***

15 ***signed contracts, advised on important intellectual property and patent issues based on decades of experience, and offered management unyielding support and***

16 ***a sounding board while still delivering frank and constructive advice***.  At elite gatherings of both research and industry leaders we host, we made sure Zymergen

17 had a chance to recruit talent, make alliances, and pitch customers.

18                          \*      \*      \*

19          And, ***DCVC played an essential and active role in assembling the participants*** for and then closing this current round of funding.

20

21        **3.**        **The Controlling Stockholders Had Access to Zymergen's Employees and Inside Information**

22     99.    Each Controlling Stockholder had access to inside information and inspection

23 rights.  They had rights to all Board material, including the budget and business plan, all financial

24 statements, all books and records, including rights to discuss the business affairs, finances, and

25 accounts with any Zymergen officer upon request.  Each held, and exercised, the right to have

26 another one of their employees or affiliates observe every Board meeting and every Board

27 committee meeting.  The Controlling Stockholders exercised these rights on an ongoing basis up

28 to and through the IPO in order to assess the risks of their investments in Zymergen and to value

1   their investment in the Company at fair value, which they were required to do.  Valuing Zymergen

2   required a thorough understanding of, among other things, Zymergen's financial position, business

3   operation, and sales prospects.

4         100.    The Controlling Stockholders had the power to and did require Zymergen's

5   executives, including Singh and Hoffman, to attend conferences conducted by the Controlling

6   Stockholders (including their consultants) to answer questions and discuss inside information

7   essential to the valuation process, including commercial updates, operational performance, market

8   development, and Zymergen's competitive and strategic outlook.  The information the Controlling

9   Stockholders received was shared across their own funds and affiliates with no regard for

10  distinctions between legal entities.[7]

11        101.    In 2020, Zymergen was on track to breach the terms of its $100 million credit

12  agreement with Perceptive Credit Holdings II, LP because it did not have sufficient funds

13  (primarily attributable to Zymergen's failure to generate revenue).  The Controlling Stockholders

14  were heavily involved in re-negotiating the terms and amendments to this credit agreement.  The

15  credit agreement also acknowledges the Controlling Stockholders' control, providing that a

16  "Change of Control" from these Controlling Stockholders would be considered an event of default.

17  The agreement for this credit facility was amended several times, including in February 2021,

18  which also required the Controlling Stockholders' approval.

19        102.    The Controlling Stockholders also received updates regarding Zymergen's sales

20  pipeline, Zymergen's repeated failure to meet its stated product development targets, and the

21  technical difficulties Zymergen was experiencing.  In 2019, Zymergen's sales goals for 2020

22  included $221 million in revenue.  However, by 3Q19, the Controlling Stockholders were

23  informed this was not achievable.  On December 30, 2019, Hoffman wrote to Nishar, Ocko and

24

25

---

26  [7]    Even Zymergen disregarded any legal distinction between the Controlling Stockholders'
affiliates with respect to information sharing.  Zymergen's contracts and governance documents

27  also treat the SoftBank Defendants, the DCVC Defendants, and the True Venture Defendants as
single entities, even though they are made up of multiple different entities.  The Registration

28  Statement does the same.

1     Sharma that they needed more financing, saying that revenue by 2023 would be $300 million at

2     gross margins of 50%.  Ocko instructed Hoffman on how to position Zymergen to new investors.

3          103.     Based on its access to internal information, SoftBank wrote down its investment in

4     Zymergen ████████████████████████████████████████████

5     ████████████████████████████████████████████████████

6     ████████████████████████████████████████████████████

7     ████████████████████████████████████████████████████

8     ████████████████████████████████████████████████████

9     ████████ These decisions were all made based on Zymergen's inside projections and budgeting

10     and stood in stark contrast to the revenue expectations set forth in the Registration Statement.

11          104.     The Controlling Stockholders played a critical role in Zymergen's desperate efforts

12     during 2020 to raise additional capital.  Term sheets were signed with a potential outside investor,

13     Novo Holdings, but funding fell through because Novo Holding asked for downside protections.

14     International investors such as Singapore's sovereign wealth fund, GIC, and the UK's Ballie

15     Gifford, both agreed to invest in Zymergen, and Zymergen represented in this financing round that

16     it expected to launch an IPO process in the second half of 2021.  The Series D financing round

17     went from July 2020 through to November 2020, and each of the Controlling Stockholders were

18     involved in these efforts.  For example, Stewart gave Sharma comments to discuss with the Board

19     on Ballie Gifford's term sheet, and Ocko attempted to find investors for the financing.  The

20     Controlling Stockholders approved and amended the governance documents, which were written

21     with the express intent to conduct an IPO.  Demonstrating how desperate Zymergen was for

22     additional funding, the SoftBank Defendants gave up their rights to have an IPO at two times the

23     price of the their Series C shares in exchange for GIC and Ballie Gifford's investment.

24          105.     As part of the Series D financing, the SoftBank Defendants initially agreed to invest

25     $12.5 million for every $100 million Zymergen raised.  But after they reviewed the September

26     2020 Board materials, the SoftBank Defendants ████████████████████████

27     ████████████████████████████████████████████████████

28     ████████████████████████████████████████████████████

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 5:21-cv-06028-PCP                        - 29 -
4861-4775-1850.v1

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 █████  Conceding SoftBank's control, Hoffman informed the other Board members that

6 Zymergen would proceed to close the lower amount and amend the Series D purchase agreement.

7    106.   Through their virtually unfettered access to inside information, the Controlling

8 Stockholders possessed the information showing that the representations in the Registration

9 Statement, concerning, among other things, Hyaline, Zymergen's products in development, and

10 platform capabilities were false and misleading.  For example, Zymergen's executives made

11 presentations to the Board that showed Hyaline was a floundering product, unable to generate

12 revenue, and plagued with manufacturing problems and technical issues that Zymergen had not

13 solved.

14    107.   On February 20, 2020, the Board was told that Zymergen estimated $6 to $20

15 million in Hyaline revenue in 2020.  At the April 20, 2020 Board meeting, this goal was reduced

16 to $4-$10 million; and at the September 16, 2020 Board meeting this was reduced further to $4-

17 $6 million.  At each meeting the reasons for the delay in revenue, technical issues encountered,

18 and sales prospects were discussed in depth.  At the December 16, 2020 Board meeting executives

19 admitted there would be no sales of Hyaline in 2020.

20    108.   With cash running out and no revenue materializing, the Board collectively made

21 the decision to bring Zymergen public at the December 16, 2020 Board Meeting.  Notably, this

22 was only a few weeks from Zymergen's close of its Series D financing.  The IPO would then be

23 put on a very aggressive track with Zymergen conducting a roadshow on January 12, 2023 at the

24 J.P. Morgan Healthcare Conference and filing the Registration Statement confidentially on

25 January 25, 2023.  The Controlling Stockholders were involved in every step of this process.

26    109.   Leading up to the IPO, the Controlling Stockholders received constant updates from

27 Zymergen concerning the IPO and the Registration Statement process, directly from executives

28 and other Board members or from Board meetings that Murdoch, Ocko, and Sharma attended.  For

1  example, Ocko regularly discussed Zymergen issues over the phone or through text with Hoffman.

2  On February 8, 2021, the Board was given an update on the IPO, including financials, Hyaline

3  expected revenue, information about an upcoming analyst day, and dry runs executives had done

4  with analysts, who were mostly affiliated with the Underwriter Defendants.  On March 16, 2021,

5  J.P. Morgan gave an update on the IPO, including the Testing the Waters discussions, messaging

6  with institutional investors, and investors' reaction to the messaging.  Murdoch, Ocko, and Sharma

7  circulated presentations to the Controlling Stockholders from Zymergen, its Board and the

8  Underwriter Defendants.  Nishar forced himself into meetings over other Board member's

9  objections.  The Controlling Stockholders even received sensitive information concerning demand,

10  pricing, and IPO investors.  Hoffman allowed the underwriters to provide Nishar with the status

11  of the IPO directly.

12      110.    The Controlling Stockholders also received preferential treatment concerning IPO

13  matters.  For example, the SoftBank Defendants used their rights to receive a favorable, non-

14  market, lockup agreement from the Underwriter Defendants, including a clause the SoftBank

15  Defendants insisted on that allowed them to pledge their Zymergen shares as collateral during the

16  180 day lockup.  Such a transaction is typically, and was for other investors, prohibited.

17          **4.      The Controlling Stockholders Controlled the Registration**
18                  **Statement**

19      111.    Each Controlling Stockholder formally authorized the IPO.  In order to issue the

20  common stock (including any conversions from preferred shares) or amend Zymergen's

21  governance documents for the IPO, the Controlling Stockholders authorization was needed.

22  Zymergen's IPO required that the Controlling Stockholders give up their rights they obtained as

23  Zymergen's significant early investors, including rights to Board seats, information and control

24  over the management of the Company, and various other rights they had as preferential owners of

25  preferred shares.

26      112.    On April 5, 2021, Zymergen sought the Controlling Stockholders' authorization for

27  the IPO.  Their unanimous consent authorized a 1 for 3 reverse stock split, anti-takeover measures,

28  the conversion of Zymergen to a public corporation, necessary compensation matters and, most

1  importantly, the amendment of the governance documents.  Acting as the majority of the preferred

2  shareholders, and on behalf of themselves, each of the Controlling Stockholders signed the action

3  by written consent, effectively authorized the IPO, without which the IPO would not have

4  occurred.  The authorization was executed by Karen Ellerbe for the SoftBank Defendants, Bogue

5  for the DCVC Defendants, and Stewart for the True Venture Defendants.

6       113.    Each Controlling Stockholder was also involved in the drafting of the Registration

7  Statement, which was a joint undertaking between Zymergen, the Underwriter Defendants, and

8  the Controlling Stockholders.  Zymergen's general counsel provided drafts of the Registration

9  Statement to the Controlling Stockholders' directors requesting comments, with the Controlling

10  Stockholders other employees sending their comments back directly.   All the Controlling

11  Stockholders reviewed drafts and redlines and provided their comments and input.

12       114.    Jason Pontin ("Pontin"), a DCVC employee prior to and during the IPO, was

13  retained as a consultant by Zymergen for IPO positioning, narrative and media relations.  Pontin

14  was the lead drafter of the Registration Statement and was in the IPO working group, he received

15  comments on the Registration Statement and determined whose edits to accept and reject.  Pontin

16  shared drafts of the Form S-1 with the DCVC Defendants and asked for their comments.  Thus,

17  the DCVC Defendants had direct control over the contents of the Registration Statement.  Pontin

18  also consulted directly with Zymergen executives, including Defendant Hoffman and Singh, on

19  the Form S-1, roadshows, other IPO related matters, and had inside information to the underwriting

20  process and IPO decision making.  Pontin signed-off on the drafts filed with the SEC, and also

21  worked to formulate the positioning with Zymergen's counsel Freshfields and underwriter counsel

22  Wilson Sonsini.

23       115.    Each of the Controlling Stockholders also had the ability to prevent the issuance of

24  the alleged false and misleading statements or cause the statements to be corrected.   The

25  Controlling Stockholders were requested to sign off on filing the Registration Statement, and

26  provide their consent.

27       116.    After the IPO, Ocko thanked the SoftBank Defendants and the True Venture

28  Defendants, acknowledging their joint effort to bring about the IPO in an April 2021 tweet:

I want to thank our friend @drorberman, the 1st institutional VC to take this seriously, & our friends at @trueventures – major co-investors & essential allies every step of the way . . .

\*         \*         \*

last but definitely not least @deepnishar, @tbmurdoch & SoftBank for capital muscle & advice when it was essential

**B.      The Controlling Stockholders Each Controlled Their Respective Representative on Zymergen's Board of Directors**

117.      As a condition of their investment in Zymergen, each of the Controlling Stockholders received a seat on Zymergen's Board.  Each Controlling Stockholder appointed an employee or partner to Zymergen's Board: Murdoch (SoftBank Defendants); Ocko (DCVC Defendants); and Sharma (True Venture Defendants).

118.      Each of the Controlling Stockholders is an investment advisor and has a fiduciary duty to their own investors, *i.e.*, investors in the SoftBank Funds, True Venture Funds, and DCVC Funds, respectively.[8]  Each Controlling Stockholder, through its partners and employees, has a duty of undivided loyalty and utmost good faith to their clients and investors, which required them to ensure that each decision made by their representatives concerning the management and operation of Zymergen was made in the best interest of the SoftBank Defendants, DCVC Defendants, and True Venture Defendants' investors, respectively.  The Controlling Stockholders ensured that they could control that their employee's or partner's decisions to act in the best interest of the Controlling Stockholders (not Zymergen's). The Controlling Stockholders each exercised control over the Individual Defendants they respectively appointed to Zymergen's Board (and each of those Individual Defendants are alleged to be primary violators of §11).

119.      Murdoch was a SBIA employee who received a base salary, a cash bonus, ██████ ████████████████████████████████████████████████████████████████████

---

[8]      In particular, the SoftBank Defendants are required under SEC Rule 206(4)-6 to adopt and implement written policies and procedures to ensure that the SoftBank Defendants voted Zymergen's securities "in the best interest of clients."  17 CFR § 275.206(4)-6.  Their SEC filing on Form ADV states that the "Proxy Policy seeks to ensure that SoftBank Investment Advisers votes proxies (or similar instruments) in the best interest of the relevant Funds, including where there may be material conflicts of interest in voting proxies."

1 ██████████████████████████████   The SoftBank Defendants controlled

2 Murdoch through the employer-employee relationship and by providing financial incentives to

3 work in the interest of the SoftBank Defendants.[9]

4    120.    Sharma is a True Venture employee.  He received a salary and carried interest in

5 the True Venture Funds that invested in Zymergen.  The True Venture Defendants controlled

6 Sharma through the employer-employee relationship and by providing financial incentives to work

7 in the interest of the True Venture Defendants.

8    121.    Ocko was appointed by the DCVC Defendants to sit on Zymergen's Board and was

9 controlled by the DCVC Defendants in his capacity as a member of the Zymergen Board.  The

10 DCVC Defendants, respectively, were controlled by Ocko, Bogue, Punter, and Ward.  Ocko had

11 financial incentives that he would receive from the DCVC Defendants if Zymergen was a

12 successful investment.

13    122.    Defendants Murdoch and Sharma lacked authority to act in their capacity as

14 Zymergen Board Members without approval from their employers, SoftBank Defendants and True

15 Venture Defendants, respectively.  Murdoch and Sharma relayed relevant information to their

16 employers and sought approval for their actions as members of Zymergen's Board.

17    123.    The SoftBank Defendants' investment into Zymergen was overseen by Nishar who

18 initially held the Zymergen Board seat.  Following the substitution of Murdoch, Nishar directed

19 Murdoch in his role as member of the Board.  Nishar was responsible for the Zymergen investment

20 through the IPO, after which another SBIA managing partner, Vikas Parekh, became responsible.

21 Murdoch was a relatively junior employee at SBIA and had no authority on major decisions.

22    124.    The True Venture Defendants' investment into Zymergen was overseen by

23 Callaghan, Black, Kellmereit, and Stewart.  Rohit reported to these individuals and was required

24 to receive explicit authorizations on every major decision.

25

26

27

28

---

[9]    After the IPO, in May 2021, Murdoch resigned from SBIA.  However, SBIA entered into an advisory agreement with Murdoch whereby he would continue to provide information about Zymergen to SBIA and follow their direction.  The SoftBank Defendants maintained their control over Murdoch until October 2021 when they closed out their advisory relationship with Murdoch.

1     125.    The DCVC Defendants' investment into Zymergen was overseen by Ocko, Bogue,

2     and Punter.  The DCVC Funds appointed Ocko to its Zymergen Board seat, and even though he is

3     a control person of the DCVC Funds, in his capacity as a Zymergen Board member, he is also

4     controlled by Bogue, Punter, and Ward as control persons of DCVC.  In other words, Ocko wore

5     two hats, as a control person for DCVC and as an agent of the DCVC Funds.

6     126.    The Controlling Stockholders explicitly and implicitly required that all information

7     shared with or learned by Murdoch, Ocko, or Sharma about Zymergen was shared with the

8     Controlling Stockholders and its employees.  Each provided their respective Controlling

9     Stockholder with Zymergen's Board and Board Committee materials and inside information

10    concerning Zymergen.  Each Controlling Stockholder directed that Zymergen's executives and

11    officers provide information to employees of the Controlling Stockholders concerning, among

12    other things, Zymergen's financial performance and outlook, product development and pipeline

13    management, and personnel decisions.  During the IPO process, these Defendants shared drafts of

14    the Form S-1 for the Controlling Stockholders' comments and provided highly sensitive

15    information concerning IPO demand, pricing, and investors.  The Controlling Stockholders were

16    even provided the underwriters' models and analysis.

17    127.    Because Murdoch and Sharma lacked authority without instruction and approval

18    from their employers, other directors and officers at Zymergen would communicate directly with

19    their superiors, including Nishar (SoftBank Defendants) and Stewart or Black (True Venture

20    Defendants).  With respect to DCVC Defendants, even though Ocko was one of two DCVC

21    founders, Zymergen's other directors and executives would go directly to Bogue and include him

22    in the decision-making process, as Bogue, in addition to Punter and Ward, also controlled DCVC.

23    128.    With respect to the IPO, Murdoch, Ocko, and Sharma acted in the best interest of

24    their respective Controlling Stockholders, and it was only with the authorization of the Controlling

25    Stockholders that they allowed the IPO to be completed.  Each of these Defendants signed the

26    Registration Statement only after being authorized to do so by their respective Controlling

27    Stockholders, and would not have signed it if the Registration Statement was not approved by the

28    Controlling Stockholders.

1  ## VI.      ALLEGATIONS OF *RESPONDEAT SUPERIOR* LIABILITY

2       129.      Each Controlling Stockholder is vicariously liable as principals for their respective

3  agent, Murdoch, Ocko, or Sharma, under the doctrine of *respondeat superior*.  The conduct that

4  makes Murdoch, Ocko, and Sharma liable under Plaintiffs' Securities Act claims occurred while

5  they were employees or agents of the Controlling Stockholders.  Murdoch and Sharma were

6  employees of the SoftBank Defendants and True Venture Defendants, respectively.  Ocko was the

7  DCVC Funds' agent to serve as a Zymergen Board member.  Leading up to and throughout the

8  IPO, the scope of Controlling Stockholders' agent-principal relationship with these Defendants

9  included their directorships, managing Zymergen, doing what is necessary to carry out the IPO,

10  and signing the Registration Statement.

11       130.      As agents of the Controlling Stockholders, Murdoch, Ocko, and Sharma acted as

12  representatives of the Controlling Stockholders acting on their behalf.  These Individual

13  Defendants were appointed to the Board in their capacity as agents of the Controlling Stockholders.

14  These Individual Defendants were required to share all information they learned and discuss issues

15  with their principals and negotiate with Zymergen on behalf of the Controlling Stockholders.  Even

16  though certain decisions benefited Zymergen or shareholders at large, Murdoch, Ocko, and Sharma

17  each only voted and made decisions that were to the Controlling Stockholders' and their funds'

18  benefit.  Their decision to commence the IPO process and filing of the Registration Statement was

19  in line with Zymergen's decision to do so because Zymergen was quickly running out of cash, and

20  without revenue assured from Hyaline (or any other product), it was in the best interest of the

21  Controlling Stockholders and their funds to have Zymergen conduct the IPO.

22       131.      Murdoch, Ocko, and Sharma were each motivated, at least in part, by a purpose to

23  serve the Controlling Stockholders.  Each had carried interest tied to the performance of the

24  Controlling Stockholders' funds that invested in Zymergen.  Each also had relationship incentives,

25  Murdoch and Sharma as employees, and Ocko as a partner of the Controlling Stockholders.

26       132.      Acting as a Board member, controlling portfolio companies, and signing

27  registration statements were acts within the scope of Murdoch, Ocko, and Sharma and the

28  Controlling Stockholders' agency relationship.  For the five years leading up to the IPO and during

1  the IPO, each of these Defendants served on multiple boards for the Controlling Stockholders,

2  protecting their investments and working toward the venture capital funds' exits at maximized

3  rates of return.  Murdoch served on the boards of Karius, Inc. and Guardant Health, AMEA, Inc.

4  Ocko served on the boards of Atomwise, Inc., Embark Trucks, Inc., Fortem Technologies, Inc.,

5  Halter Inc., Jupiter Inteligence, Inc., Pivot Bio, Inc., Primer Technologies, Inc., Supply, Inc.

6  (Reach Labs), Rocket Lab, Inc.[10] and Agility Robotics, Inc.  Sharma was a board member of Seurat

7  Technologies, Inc., Avidbots Corp., Iceye Oy, Prellis Biologices, Inc., Aurora Insight, Inc.,

8  Diligent Robotics, Inc., Bear Flag Robotics, Inc., Fauna Bio Incorporated, Scythe Robotics, Inc.,

9  Fixaposition AG, Dextrous Robotics, Inc., Enveda Therapeutics, Inc., Vanti Analytics, Ltd., and

10  Alberta Innovates.

11  **VII.    SUBSTANTIVE ALLEGATIONS**

12      **A.    Description of Zymergen and Completion of the IPO**

13      133.    Zymergen integrates computational and manufacturing technologies to design,

14  engineer and optimize microbes for industrial applications.  The Company developed a platform

15  – the biofacturing platform – that treats the genome as a search space, using proprietary machine

16  learning algorithms and advanced automation to identify genetic changes that improve the

17  economics for its customers' bio-based products for a range of industries, including chemicals,

18  materials, agriculture and pharmaceuticals.  In addition, Zymergen's platform is used to discover

19  novel molecules used to enable unique material properties.  The Company was incorporated in

20  Delaware on April 24, 2013.

21      134.    Zymergen uses a process it calls "biofacturing" to create products that purportedly

22  combine the design and manufacturing efficiency of biological processes with technology's ability

23  to rapidly iterate and control diverse functions.  Its first product is called Hyaline, an optical film

24  designed for electronics companies to use for display touch sensors, which would purportedly

25  enable customers to make foldable touchscreens and high density flexible printed circuits.  Hyaline

26

27

28  [10]    Ocko has singed registration statements for Rocket Lab, Inc.

1 was launched in December 2020, but has not generated revenue because it is still in its qualification

2 process with customers.

3      135.    On January 25, 2021, Zymergen confidentially submitted a draft Registration

4 Statement on Form S-1 to the SEC that did not specify the number of securities to be issued or

5 proceeds to be raised.

6      136.    On February 22, 2021, the SEC sent a letter to Hoffman that included comments on

7 the January 25, 2021 confidentially submitted draft Registration Statement, and requests for

8 information. The SEC asked Hoffman to identify the third party that prepared the market data

9 referenced in the draft Registration Statement in support of representations that the market

10 opportunity addressable by Zymergen's biofacturing platform was enormous and diverse – at least

11 $1.2 trillion in 20 separate industries, including $150 billion in the electronics, consumer care and

12 agricultural industries. The SEC also asked for information about Hyaline, including a description

13 of the process in place to convert from a non-bio-produced molecule sourced from a third party to

14 a bio-produced molecule in 2022. The SEC asked for support for the representations that

15 Zymergen planned to develop and commercialize product breakthroughs in about half the time and

16 at one-tenth the cost of traditional processes.

17      137.    On March 8, 2021, Freshfields Bruskhaus Deringer US LLP ("Freshfields")

18 responded to the SEC's February 22, 2021 letter on behalf of Zymergen, and Zymergen filed an

19 amendment to the Registration Statement on Form S-1 with the SEC. In the letter, Freshfields

20 stated that the amended Registration Statement included revisions to address some of the

21 comments in the February 22, 2021 letter and also provided information in response to the

22 February 22, 2021 letter. Freshfields informed the SEC that the data regarding the Company's

23 market opportunity were management's estimates based on a bottom-up, industry-by-industry,

24 application-by-application analysis of IHS Markit and similar data. Freshfields described how

25 Zymergen purportedly estimated the market opportunity and also wrote that the Company

26 consulted industry experts to corroborate market analyses, especially where less granular market

27 data were available.

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 5:21-cv-06028-PCP                      - 38 -
4861-4775-1850.v1

1     138.    On March 22, 2021, the SEC sent Hoffman another letter providing comments and

2  requesting information about the draft Registration Statement submitted on March 9, 2021.  The

3  SEC asked Hoffman to amend the disclosures about Hyaline to describe approximately how long

4  Zymergen anticipated the Hyaline qualification process to take and when the Company expected

5  to begin generating revenue from Hyaline.  The SEC also asked Zymergen to disclose when the

6  Company estimated it would begin generating revenue from the other ten products included in the

7  pipeline.

8     139.    On March 23, 2021, Zymergen filed its Registration Statement on Form S-1 with

9  the SEC, which forms part of the Registration Statement.  In this Registration Statement, the

10  Company proposed a maximum offering of $100 million.

11     140.    On March 26, 2021, Freshfields sent a letter to the SEC responding to the SEC's

12  March 22, 2021 letter; and Zymergen filed Amendment No. 1 to the Registration Statement, which

13  forms part of the Registration Statement.  The amended Registration Statement included revisions

14  made in response to the letter received from the SEC on March 22, 2021.

15     141.    On April 14, 2021, Zymergen filed Amendment No. 2 to the Registration

16  Statement, which forms part of the Registration Statement, and increased the proposed maximum

17  offering to $484.8 million, proposing to register 15.64 million shares to be sold for $31.00 per

18  share.

19     142.    On April 21, 2021, the Company filed its final amendment to the Registration

20  Statement with the SEC on Form S-1MEF, which forms part of the Registration Statement.  The

21  sole purpose of the amendment was to increase the number of shares to be registered by 2,909,500.

22  The Registration Statement was declared effective the same day.

23     143.    On April 22, 2021, the Company's stock began publicly trading on the NASDAQ

24  under the stock symbol "ZY."

25     144.    On April 23, 2021, the Company filed its April 21, 2021 prospectus on

26  Form 424B4 with the SEC, which forms part of the Registration Statement.  In the IPO, the

27  Company sold approximately 18,549,500 shares of common stock at a price of $31.00 per share.

28  The Company received proceeds of approximately $529.9 million from the Offering, net of

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 5:21-cv-06028-PCP
4861-4775-1850.v1

- 39 -

underwriting discounts and commissions of $40.3 million, and approximately $4.9 million of offering costs.  The proceeds from the IPO were purportedly to be used for working capital and other general corporate purposes, including the continued investment in commercializing its existing products, launching products in its pipeline and furthering the development of its biofacturing platform and technology.

**B.      The Materially Misleading Representations Contained in the Registration Statement**

145.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

146.    Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, or were reasonably likely to have, an impact on the Company's continuing operations.

147.    As detailed herein, the untrue statements of material facts and omissions concerned the Company's biofacturing platform; the Company's ability to create better products faster, cheaper and more sustainably using the biofacturing platform; the product development process; the development status of 11 products in the Company's product pipeline; the market opportunity for those products; and when those products would generate revenue.  The following misrepresentations were included throughout the Registration Statement, including in the Prospectus Summary, Management's Discussion and Analysis of Financial Condition and Results of Operations and the Business sections.

148.    All of the representations in the Registration Statement detailed below were materially misleading because, as the Company disclosed on August 3, 2021 and November 3, 2021, Zymergen was unable to produce products that could be sold at a profit when it created, manufactured and distributed the products on its own.  In addition, the representations were materially misleading because Defendants failed to disclose that several key target customers had technical issues implementing Hyaline into their manufacturing processes or that there was only a

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 5:21-cv-06028-PCP
4861-4775-1850.v1

- 40 -

1   "hypothetical" near-term market for Hyaline due to there being "no hit product yet in the foldable

2   display market."   Indeed, the Company abandoned Hyaline and another optical film product

3   because there was a smaller near-term market opportunity than represented in the Registration

4   Statement and abandoned all of the consumer care products because those products could not be

5   sold at a profit when Zymergen created, manufactured and distributed them on its own.  As a result,

6   Zymergen did not generate product revenue in 2021 and 2022, as it represented in the Registration

7   Statement.

8          149.    In the Registration Statement, Defendants represented that Zymergen partnered

9   with Nature to design, develop and commercialize bio-based breakthrough products that delivered

10  extraordinary value to customers in a broad range of industries, including films designed for

11  electronics companies to use in new categories of smart devices.  Defendants represented that

12  Zymergen created these products with a proprietary platform that unlocked the design and

13  manufacturing efficiency of biological processes with technology's ability to rapidly iterate and

14  control diverse functions.  Defendants called this process "biofacturing" and represented that it

15  would create better products faster, cheaper and more sustainably than traditional chemistry.

16  Indeed, Defendants represented that Zymergen's goal was to launch products in about half the time

17  and at one-tenth of the cost of what traditional chemical and materials companies could deliver.

18          We partner with Nature to design, develop, and commercialize bio-based
    breakthrough products that deliver extraordinary value to customers in a broad
19  range of industries.  Our first innovations include films designed for electronics
    companies to use in new categories of smart devices, including rollable tablets and
20  naturally derived UV protection.  Our goal is to create new products with a
    proprietary platform that unlocks the design and manufacturing efficiency of
21  biological processes with technology's ability to rapidly iterate and control diverse
    functions.  ***We call our process biofacturing and we expect it will create better
22  products faster, cheaper and more sustainably than traditional chemistry by
    engineering microbes to make novel biomolecules that are the key ingredients in
23  those products.  Our goal is to launch our products in about half the time and
    1/10th of the cost of what traditional chemicals and materials companies can
24  deliver, which would allow us to address a wide array of commercial applications.
    Based on our experience and expectations with our first four products which are
25  electronic films and insect repellent products, and subject to any regulatory
    requirements, which could lead to longer timelines and increased cost, we
26  estimate the timelines and costs of launching our products to be roughly five
    years and $50 million***.  We founded Zymergen in the belief that biofacturing will
27  lead to better products with better economics and a better world.

28

1    150.    Defendants represented that the demand for innovative materials had never been

2    greater and that synthetic biology companies like Zymergen were a better alternative to chemical

3    and materials companies that struggled to innovate because those companies used a limited

4    molecular palette, had substantial capital expenditures and were among the planet's worst

5    industrial polluters.

6         ***The demand for innovative materials has never been greater***.

7              Human civilization is material.  The materials in the things we use, the
      clothes we wear, the rooms where we live, the vehicles that take us from place to

8    place, as well as the inputs that grow the food we eat, are the products of a half
      dozen chemical building blocks invented over the last several decades, mostly

9    derived from cracking hydrocarbons.

10             We believe the chemicals and materials companies that make these
      materials have struggled to innovate because they employ a limited molecular

11   palette and have substantial capital expenditures.  In addition, they are among the
      planet's worst industrial polluters.  Recently, synthetic biology companies

12   suggested a better alternative, where microorganisms are coaxed to produce
      chemicals, but most synthetic biology companies have struggled to manufacture

13   novel molecules at industrial scales.  ***Yet while the traditional chemical industry
      is stagnant and synthetic biology companies have disappointed, the demand for***

14   ***materials that solve important problems and are environmentally sustainable has
      never been greater***.

15

16   151.    Defendants represented that Zymergen's biofacturing process, by contrast, created

17   better products faster, cheaper and more sustainably.

18        ***Biofacturing creates better products faster, cheaper and more sustainably***.

19             Biofacturing is the design, development and commercialization of bio-
      based breakthrough products, economically, at industrial scale, where

20   microorganisms create the biomolecules that are the key ingredients in those
      products.  A traditional chemical factory's tons of steel and concrete are

21   functionally replaced by a tiny, flexible, easily reproduced, but incredibly valuable
      engineered cell.  Our goal is to make our biomolecules by fermentation, where all

22   biofacturing reactions occur inside the engineered cell in standard fermentation
      vats, rather than the expensive, purpose-built chemical plants used in synthetic

23   chemistry.  However, in some cases, so that we may achieve commercial launch
      faster, we may initially launch products using molecules that are first produced with

24   non-fermentation based methods, which is a strategy we refer to as "Launch
      Acceleration."  Additionally, since cells naturally make tens of thousands of

25   different molecules, their genetic pathways can be reprogrammed to carry out any
      number of biofacturing reactions, and they can produce a vast array of biomolecules

26   with unique properties that petrochemicals do not possess.  ***Our pioneering
      biofacturing process is designed to flexibly and cost effectively create products***

27   ***with unique characteristics that possess the diversity and power of Nature's own
      inventions, such as adhesives stronger than leading products on the market, or***

28   ***an optical film as clear and thin as a dragonfly's wing***.

152.    In the Registration Statement, Defendants described the product development process, representing that Zymergen business development personnel: (i) worked with customers to define a set of properties for a material that the customers would find valuable; then (ii) designed and developed engineered microbes that manufacture the novel biomolecule that would be a key ingredient in a breakthrough product; then (iii) had CMOs manufacture the product; and finally (iv) used Zymergen's sales force and marketing capabilities to contract with customers and sell the product to them.

> Our product development journey starts with our business development personnel working with a customer to define a set of properties for a material that our customer would find highly valuable.  We then design and develop engineered microbes that manufacture the novel biomolecule that will be the key ingredient in a breakthrough product.  Next, we leverage Contract Manufacturing Organizations ("CMOs") to manufacture the product for us.  Finally, once we have launched our product, we use our own sales force and marketing capabilities to contract with customers and sell our products to them.

153.    Defendants included a chart titled "First product launched, with a rich pipeline of future launches," depicting the stage of development for the 11 products under development, including four products in the electronics market, four products in the consumer care market and three products in the agricultural market.



# First product launched, with a rich pipeline of future launches

| | Product | Description | Design Product | Create Microbe | Scale Production | Launch |
|---|---|---|---|---|---|---|
| ELECTRONICS | Hyaline** | High optical quality film (e.g. foldable devices) | | | | Now |
| | ZYM0107 | Optical film with high temp. tolerance (e.g. foldable devices) | | | | 2022* |
| | ZYM0101 | Optical film with high modulus (e.g. foldable devices) | | | | 2023* |
| | ZYM0103 | Bio-based epoxy | | | | |
| CONSUMER CARE | ZYM0201 | Naturally derived insect protection | | | | 2023* |
| | ZYM0205 | Naturally derived, sustainable UV protection | | | | |
| | ZYM0206 | Bio-based, biodegradable film former | | | | |
| | ZYM0207 | Undisclosed | | | | |
| AGRICULTURE | ZYM0301 | Nitrogen fixation partnership | | | | |
| | ZYM0302 | Discovery partnership | | | | |
| | ZYM0303 | Novel bio-based herbicide | | | | |

154.    In describing the product development process, Defendants highlighted Hyaline, the first and only product launched by Zymergen, and represented that it was launched in

December 2020, to customers in the electronic industry, which began the expected 6- to 18-month

product qualification process with multiple customers.  Defendants emphasized the importance of

the qualification process in Zymergen's target markets and represented that Hyaline (and other

products) would generate revenues only after customers completed all aspects of the qualification

process and decided to place an order for the product.

> ***[T]hrough our global direct sales force and a team of application sales engineers, we launched our first product Hyaline in December 2020 to customers in the electronics industry, beginning the expected 6-18 month product qualification process with customers***.  We have not yet generated revenue from product sales (except for nominal revenue related to the sale of samples of Hyaline).  ***We are currently in the qualification process on Hyaline with multiple customers, including sampling and discussions on commercial terms with some of them***.  ***Given the importance of this qualification process in our current target markets, we anticipate that, even after we have launched a product, we will only generate revenue after customers have completed all aspects of the qualification process for that product and decided to place an order for our product***.

155.    Defendants represented that Hyaline was an optical film designed for electronics

companies to use for display touch sensors in personal devices and other applications and would

allow customers to make robust foldable touchscreens and high density flexible printed circuits.

Defendants also represented that Zymergen was converting to a fermentation-produced molecule

for Hyaline and developing commercial scale processes so the Company could produce the

molecule through fermentation at sufficient volumes and costs to support commercial

manufacturing.  Defendants represented that Zymergen expected this process to be complete in

2022.

> ***Hyaline is the first in a franchise of optical films, designed for electronics companies to use for display touch sensors in personal devices and other applications***.  ***Hyaline will allow our customers to make robust foldable touchscreens and high density flexible printed circuits***.  Hyaline uses a biomolecule that was identified through our biofacturing platform.  ***In order to accelerate product launch and meet customer demand, we launched Hyaline with a non-fermentation produced biomolecule sourced from a third party***.  We are in the process of converting to a fermentation-produced molecule for Hyaline by using a microbe that has a demonstrated ability to produce the molecule through fermentation.  ***We are currently developing commercial scale processes so we can produce the molecule through fermentation at sufficient volumes and costs to support commercial manufacturing***.  ***We expect this process to be complete in 2022***.

156.   In addition to Hyaline, Defendants represented that Zymergen had ten other products in development, including additional optical film products planned to be launched in 2022 and 2023; four consumer care products, including insect repellent; and three agricultural products.

> *We have 10 other products in development, consisting of three in electronics, four with consumer care applications and three in agriculture. ZYM0107, which we plan to launch in 2022, is the next product in our films franchise and is a high-performance optical film like Hyaline. ZYM0101, planned for launch in 2023, is a breakthrough film for flexible electronics, which is designed to be used to build foldable and rollable phones and personal devices, as insulation for antennas to deliver 5G data speeds and as a coating for transparent monitors. Our consumer products include ZYM0201, a naturally derived non-DEET insect repellent, and we plan on partnering to create a microbial alternative to synthetic nitrogen fertilizer. We expect our biofacturing platform to be an engine of innovation and revenue generation, as we seek to develop new products in the same or adjacent sectors. We are also pursuing new markets for future growth.*

157.   Defendants represented that Hyaline was expected to generate revenue in the second half of 2021, just a few months after the completion of the IPO, and that Zymergen's global direct sales force and a team of application sales engineers were working with customers on the sales qualification process for Hyaline, wherein customers would be able to validate the product and qualify it as a standard component in their final electronic devices. Defendants also represented that other optical film products would generate revenue following the 6- to 18-month qualification process and that consumer care and agricultural products would generate revenue upon launch because a product qualification process was not necessary.

> *Following the launch of Hyaline, our global direct sales force and a team of application sales engineers are now working with customers on the sale qualification process in which customers are able to validate the product and qualify it as a standard component in their final electronic devices. During this time, we are providing customers with samples of our products to be tested for use in their own products so they can determine whether to purchase our product. Based on our experience to date since the launch of Hyaline in December 2020, we expect the sale qualification process of our products (including Hyaline) to last 6-18 months, or longer, depending on the customer and end device requirements. We only generate revenue after customers have completed all aspects of the qualification process for that product and decided to place an order for our product, which is typically done on a purchase order basis rather than a long-term contractual commitment. In the case of Hyaline, we expect to begin generating revenue in the second half of 2021, which will be prior to the time we expect to convert the nonfermentation produced biomolecule to the fermentation-produced molecule, which we expect to occur in 2022. We do not expect our estimated revenue from Hyaline to be meaningfully impacted by the conversion to the fermentation-produced molecule. We expect other electronics products, including ZYM0101, which we expect to launch in 2023, to follow a similar 6-18*

*month qualification process following which we expect to generate revenue. For many of our consumer care and agriculture products, including ZYM0201 which we expect to launch in 2023, a product qualification process will not be similarly necessary because we intend to launch and sell those products directly to the end-user and expect to generate revenue upon launch.* For our other products in development for which we do not currently have an anticipated launch date, we cannot predict when we expect to begin generating revenue from such products.

158.    Defendants represented that Zymergen would grow its business in several ways and that it generally targeted products that could support annual sales of greater than $150 million.

We plan to grow our business in several ways. *First, we plan to grow as we increase the market penetration of our launched products. Next, we plan to grow by launching additional products in our chosen verticals of electronics, consumer care and agriculture and by continuing to add new products to our pipeline in these verticals. Finally, we plan to grow by entering new markets. We plan to partner with industry leaders to enter these markets, as we believe this approach de-risks and accelerates our time to product launch.* Today, we are working with various industry leaders and our strategy is to enter into partnerships with these leaders in the future.

*We generally target products with a market opportunity that if successful, at scale, could support annual sales of greater than $150 million.* We also expect that some portion of those products could be breakthrough products, but it is very hard in the materials market to predict beforehand which products those would be. In the long term, our goal is to launch multiple breakthrough products every year. *We believe that our strategy will drive strong future revenue growth as our revenues from launched products increase and revenues from new product launches stack on top of each other.*

159.    In addition, Defendants assured investors that the market opportunity addressable by Zymergen's biofacturing platform was enormous and diverse – at least $1.2 trillion across 20 separate industries.  They represented the market opportunity for the three industries being pursued with its 11 pipeline products – electronics, consumer care and agriculture – was approximately $150 billion, including the display market for Hyaline being over $1 billion in 2020, and the market for insect repellent being over $1.5 billion.

*The market opportunity addressable by our biofacturing platform is enormous and diverse. Our bottom-up, industry-by-industry, application-by-application, analysis suggests that our total market opportunity is at least $1.2 trillion across 20 separate industries for our potential products, all ripe for disruption, and that the market opportunity of the first three industries we will pursue, electronics, consumer care and agriculture, is approximately $150 billion. In particular, we estimate that the display market alone for Hyaline was over $1 billion in 2020 and according to Transparency Market Research, the global market for insect repellents is over $1.5 billion across sprays and other traditional formats.* In addition, our consumer survey, which asked 2,750 adults between 18 and 65 years of age in the United States and an additional 6,000 consumers in five global markets as a follow up about their concerns about insects,

their current behavior with insect protection and their interest in better insect repellent products, found that ***consumer need to repel insects is global, big and likely to get bigger with current solutions being unsatisfactory, suggesting that there is a large latent demand for better products and therefore we believe that the true market opportunity is much larger. We anticipate deploying our innovation engine to create decades of disruptive breakthrough products using a rigorous discipline to select new opportunities where there's demand for new materials, where bio-based products have an advantage and where industries rapidly adopt new products***.

160.    The representations about Zymergen's biofacturing platform, the products created, their development status, market opportunity and when those products would generate revenue were particularly important to investors given the Company's precarious financial condition. Zymergen reported just $15.4 million of revenue in 2019, and a net loss of $236.8 million. In 2020, Zymergen reported just $13.3 million of revenue and a net loss of $262.2 million. The increasing net losses caused the Company to be insolvent as of December 31, 2020, with an accumulated deficit of $773.7 million. The recurring losses and accumulated deficit meant Zymergen needed to raise equity or debt to fund its operations until the Company could generate sufficient revenues to fund its operations. That, in turn, caused the Company's auditors to note there was substantial doubt about the Company's ability to continue operating as a going concern.

> The Company has incurred net losses since inception and anticipates net losses and negative operating cash flows for the near future. For the year ended December 31, 2020, the Company had a net loss of $262.2 million, and as of December 31, 2020, the Company had an accumulated deficit of $773.7 million. At December 31, 2020, the Company had $210.2 million of unrestricted cash and cash equivalents. While the Company has signed a number of initial customer contracts, revenues have been insufficient to fund operations. Accordingly, the Company has funded the portion of operating costs exceeding revenues through a combination of proceeds raised from equity and debt issuances. The Company's operating costs include the cost of developing and commercializing products as well as providing research services. As a consequence, the Company will need to raise additional equity and debt financing that may not be available, if at all, at terms acceptable to the Company to fund future operations.

> Based on the Company's current business plan that was approved by the Board of Directors, its existing cash and cash equivalents, are not expected to be sufficient to meet anticipated cash requirements for the next 12 months. Instead the Company is evaluating plans to restrict spending in order to meet current contract and operating commitments.

> In the event that unforeseen circumstances arise that result in additional cash outflows, the Company has at its disposal a number of cost-cutting measures that it could initiate under these circumstances.

1
2
3
4
5
6
7
8

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business.  Due to the substantial doubt about the Company's ability to continue operating as a going concern and the material adverse change clause in the loan agreement with its lender, the amounts due as of December 31, 2019 and December 31, 2020, have been classified as current in the consolidated financial statements.  The lender has not invoked the material adverse change clause as of the date of issuance of these financial statements.  The accompanying consolidated financial statements do not reflect any other adjustments relating to the recoverability and reclassification of assets and liabilities that might be necessary if the Company is unable to continue as a going concern.  The Company is subject to various covenants related to the credit and guaranty agreement entered into on December 19, 2019 (Note 9) and given the substantial doubt about the Company's ability to continue as a going concern there is a risk that it may not meet its covenants in the future.

9
10

**C.     The Materially Misleading Risk Factors in the Registration Statement**

11
12
13
14
15

161.     The Registration Statement also contained inaccurate and materially misleading "Risk Factors" warning investors that Zymergen's business "could be," "might be" or "would be" harmed by various risks "if" they occurred.  These Risk Factors were inaccurate and materially misleading because the warned-of risks had already occurred and were adversely impacting Zymergen's business at the time of the IPO.

16
17
18
19
20
21
22
23
24
25
26
27

162.     Each of the risk warnings was materially misleading because, at the time of the IPO, there was only a "hypothetical" near-term market for Hyaline (the Company's first and only product to be launched at the time of the IPO) due to there being "no hit product yet in the foldable display market" and because several key target customers had technical issues implementing Hyaline into their manufacturing processes.  In addition, the risk warnings were misleading because the Company was unable to produce products that could be sold at a profit when it created and distributed the product on its own.  Thus, the warned-of risks were already adversely and materially affecting Zymergen's current business operations.  Indeed, the Company abandoned Hyaline and another optical film product because there was a smaller near-term market opportunity than represented in the Registration Statement, and abandoned all of the consumer care products because those products could not be sold at a profit when Zymergen created, manufactured and distributed them on its own.

28

163.    Defendants represented that Zymergen's business, results of operations and financial condition "may be" adversely and materially affected "if" the Company was unable to use its biofacturing platform to successfully identify and develop pipeline products into commercially viable products faster and cheaper than traditional materials.

*We may not be successful in our efforts to use our proprietary biofacturing platform to build a pipeline of products.*

*A key element of our strategy is to use our experienced management, engineering and scientific teams to build a pipeline of products through our biofacturing platform and develop those pipeline products into commercially viable products faster and cheaper than traditional materials. Although our R&D efforts to date have resulted in potential pipeline products, we may not be able to continue to identify and develop additional pipeline products through the use of our biofacturing platform.*

*Even if we are successful in continuing to build our product pipeline through the use of our biofacturing platform, not all potential pipeline products we identify will be suitable for development and use in commercial products.* Machine learning and automation, generally, remain in the early stages of development. Although we expect machine learning and automation to improve over time, the operation of our biofacturing platform will continue to require significant human interaction which introduces risks of error and requires us to recruit highly skilled employees in a competitive market. Identifying and developing commercially viable pipeline products may require us to make continued advancements in our biofacturing platform to lower costs, reduce development time or otherwise more quickly identify pipeline products[.] See the risk factor titled "*–Even if we are successful in expanding our biofacturing platform, rapidly changing technology and extensive competition in the synthetic biotech and petrochemical industries could make the products we are developing and producing obsolete or non-competitive unless we continue to develop and manufacture new and improved products and pursue new market opportunities.*". *If we are unable to use our biofacturing platform to successfully identify and develop pipeline products, our business, results of operations and financial condition may be adversely and materially affected.*

164.    Similarly, Defendants represented that "if" Zymergen experienced problems or delays in developing pipeline products, the Company "may" be subject to unanticipated costs, including the loss of customers; Zymergen "may" not be able to solve development problems or develop a commercially viable product at all; and "if" the Company did not successfully manage new product development processes, revenue growth from new pipeline products "may" be prevented or delayed and business and operating results "may" be harmed.

*It is difficult to predict the time and cost of development of our pipeline products, which are produced by or based on a relatively novel and complex technology and are subject to many risks, any of which could prevent or delay*

*revenue growth and adversely impact our market acceptance, business and results of operations*.

*We have concentrated our R&D efforts to date on a select number of pipeline products based on technical feasibility and market opportunity*.  We launched our first product Hyaline in December 2020, beginning the expected 6-18 month product qualification process with customers.  We have not yet generated revenue from product sales (except for nominal revenue related to the sale of samples of Hyaline).  *We have 10 other products in development, consisting of three in electronics, four with consumer applications and three in agriculture*.

\*     \*     \*

*If we experience problems or delays in developing our pipeline products, we may be subject to unanticipated costs, including the loss of customers*.  Additionally, even after the incurrence of significant costs to develop a product, *we may not be able to solve development problems or develop a commercially viable product at all*.  *If we do not achieve the required technical specifications or successfully manage our new product development processes, or if development work is not performed according to schedule, then our revenue growth from new pipeline products may be prevented or delayed, and our business and operating results may be harmed*.

165.   Defendants also represented that the success of Zymergen's business relied heavily on the performance of its products and the development of new products at lower costs and faster development timelines and that Zymergen's business and results of operations "will be" adversely affected "if" the Company was unable to successfully transition into becoming a biofacturer of new products and create novel products at lower costs and on accelerated development timelines.

*The success of our business relies heavily on the performance of our products and developing new products at lower costs and faster development timelines*.

To date our revenue has primarily been derived from relationships with partners where we seek to test and validate the ability of our biofacturing platform to improve or optimize our clients' products through biofacturing.  However, *our future profitability will depend on our ability to successfully execute and maintain a sustainable business model and generate continuous streams of revenue through the sale of our products across industries*.  *We launched our first product Hyaline in December 2020, beginning the expected 6-18 month product qualification process with customers*.  We have not yet generated revenue from product sales (except for nominal revenue related to the sale of samples of Hyaline).  *We are currently in the qualification process on Hyaline with multiple customers, including sampling and discussions on commercial terms with some of them*.  *Given the importance of this qualification process in our current target markets, we anticipate that, even after we have launched a product, we will only generate revenue after customers have completed all aspects of the qualification process for that product and decided to place an order for our product*.  Our current business model is premised on innovating and producing new products rapidly and at lower costs than traditional methods and achieving results that may

only be obtained through leveraging biology.  While we may launch bio-based versions of existing products or existing molecules that are too expensive to utilize in products today, biofacturing of previously unavailable, superior molecules and materials is key to our long-term success.  However, *if we are unable to successfully transition into becoming a biofacturer of new products and create novel products at lower costs and on accelerated development timelines, our business and results of operations will be adversely affected*.

166.    Defendants represented that Zymergen's business, financial condition and results of operations "may be" adversely affected "if" the Company's products contained defects or were delayed.

> ***Our products, or the end products of which they are components, could have defects or errors, which may give rise to claims against us or delays in production and adversely affect our business, financial condition and results of operations***.
>
> Some applications of our technology or products are components of end products and therefore our success is tied to the success of such end products.  ***We cannot assure you that material performance problems, defects, errors or delays will not arise in our products or the end products in which they are components, and as we commercialize our products, these risks may increase***.  We expect to provide warranties that our products will meet performance expectations and will be free from defects.  The costs incurred in correcting any defects or errors may be substantial and could adversely affect our operating margins.
>
> In manufacturing our products, we depend upon third parties for the supply of our instruments and various components, many of which require a significant degree of technical expertise to produce.  If our suppliers fail to produce our product components to specification or provide defective products to us and our quality control tests and procedures fail to detect such errors or defects, or if we or our suppliers use defective materials or workmanship in the manufacturing process, the reliability and performance of our products will be compromised.
>
> ***If our products or the end products of which they are components, contain defects or are delayed, we may experience***:
>
> • a failure to achieve market acceptance for our products or expansion of our products sales;
>
> • the development of new technology rendering our products, or the end products of which they are components, obsolete;
>
> • loss of customer orders and delay in order fulfilment;
>
> • damage to our brand reputation;
>
> • increased warranty and customer service and support costs due to product repair or replacement;
>
> • product recalls or replacements;
>
> • inability to attract new customers and collaboration opportunities;

- diversion of resources from our manufacturing and R&D departments into our service department; and

- legal and regulatory claims against us, including product liability claims, which could be costly, time consuming to defend, result in substantial damages and result in reputational damage.

D. **August 3, 2021: Zymergen Discloses Numerous Facts Demonstrating the Registration Statement Was Inaccurate and Materially Misleading, Causing the Company's Stock Price to Decline 75%**

167.    After the market closed on August 3, 2021, less than four months after the completion of the IPO, the Company revealed numerous facts informing investors the Registration Statement contained untrue statements of material facts and omitted material facts.  On that date, Zymergen issued a press release and held a conference call to provide a business update regarding its commercial product pipeline and financial forecast.

168.    The Company reported: (i) there were issues with its commercial products pipeline that would impact the Company's delivery timeline and revenue projections; (ii) the Company no longer expected product revenue in 2021 and only expected immaterial product revenue in 2022; (iii) during the quarter, several key target customers encountered technical issues in implementing Hyaline into their manufacturing processes, resulting in a delay in the commercial ramp up of Hyaline; (iv) the Company was working to strengthen its commercial team to ensure the reliability and robustness of the sales pipeline qualification and forecast process; (v) the Company was evaluating emerging data on the total addressable market for foldable display applications, indicating a smaller near-term market opportunity that was growing less rapidly than anticipated, as well as its impact on Zymergen's sales forecast; (vi) the Company would conduct a full reexamination of all Zymergen target markets to determine if a shift in market focus was appropriate; (vii) the Zymergen's Board of Directors had formed dedicated committees, including a Strategic Oversight Committee, and was working with outside experts to conduct an in-depth review of the Company's operational, financial, product and commercialization efforts to facilitate the development of an updated strategic plan; (viii) the Company would conduct a cultural assessment to ensure that there would be broad-based accountability across the organization and that the Company would operate with transparency and openness; (ix) the Company was focused

1   on reestablishing the credibility of the leadership team and the Company; (x) Hoffman, the

2   Company's CEO, had been terminated, effective immediately, as part of the effort to reestablish

3   the credibility of the leadership team and the Company; and (xi) the Company was developing a

4   plan to reduce and align expenses with the change in the Company's revenue expectations.

5        169.   In the press release, Zymergen reported the following:

6        ***Zymergen recently became aware of issues with its commercial product
         pipeline that will impact the Company's delivery timeline and revenue
7        projections***. ***Accordingly, the Company no longer expects product revenue in
         2021, and expects product revenue to be immaterial in 2022***.

8        ***During the quarter, several key target customers encountered technical
9        issues in implementing Hyaline into their manufacturing processes*** typical of new
         product and process development learnings. The Company has made significant
10       progress towards addressing these challenges and believes there are no intrinsic
         technical issues with Hyaline. However, ***this issue has resulted in a delay in the
11       Company's commercial ramp. Zymergen is working to strengthen its commercial
         team to ensure the reliability and robustness of the sales pipeline qualification
12       and forecast processes***.

13       ***The Company is also evaluating emerging data on the total addressable
         market for foldable display applications, which indicate a smaller near-term
14       market opportunity that is growing less rapidly than anticipated, as well as its
         impact on Zymergen's sales forecast. The Company will conduct a full re-
15       examination of Zymergen's target markets confirming our past views or altering
         them if the data indicate a shift in market focus is appropriate***.

16
         "***We are disappointed by these developments, and the Board and
17       management team are focused on resolving the underlying issues to ensure
         Zymergen moves forward as a stronger company with a compelling operating
18       plan***," said Jay Flatley, Acting CEO and Chairman of the Board. "***The Board has
         formed dedicated committees, including a Strategic Oversight Committee, and is
19       working with outside experts to conduct an in-depth review of the Company's
         operational, financial, product, and commercialization efforts to facilitate the
20       development of an updated strategic plan for Zymergen***. The underlying promise
         of our business and technology is sound, and I am proud of the work our teams are
21       doing across the organization. We are confident in Zymergen's opportunities and
         prospects, although ***it will take longer to accomplish our goals than previously
22       expected***."

23       ***CEO Transition***

24            In connection with the business update, Zymergen also announced that Jay
         Flatley has been appointed Acting Chief Executive Officer, effective immediately.
25       Flatley's appointment follows the mutual decision by Zymergen and Josh Hoffman
         that ***Hoffman will step down as CEO and as a member of the Board, effective
26       immediately***. The Company's Board of Directors will commence a search process
         to identify a permanent CEO. Sandi Peterson will serve as Zymergen's Lead
27       Independent Director while Flatley serves as Acting CEO.

28                                *     *     *

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 5:21-cv-06028-PCP                                              - 53 -
4861-4775-1850.v1

"*A key element to ensuring Zymergen is set-up for long-term success is having the right team in place, and the Board and Josh recognize that new leadership is required*," *said Flatley*.  "The Board will take whatever time is needed to conduct a thorough search to identify a world-class leader for Zymergen.  Until then, I am committed to working with our deep bench of talent to drive our company forward.  On behalf of the Board and management team, I thank Josh for his work in advancing our mission and wish him the best in his future endeavors."

\*          \*          \*

*In connection with today's business update, Zymergen is developing a plan to reduce and align expenses with the change in the Company's revenue expectations*.

170.    During the conference call, Flatley repeated the unexpected adverse disclosures included in the press release related to Hyaline, the total addressable market for foldable display applications and the impact on expected product revenues for Hyaline and other products.

At market close today, Zymergen released an important business update.  In addition, the company announced my appointment as acting CEO, while the Board commences a search to identify a permanent successor.

Starting with the update.  *We recently became aware of issues with Zymergen's commercial product pipeline that will impact the company's delivery time lines and revenue projections*.  *The goal of our call today is to provide you with further details, including our current understanding of the issues and what we continue to review; the actions the Board has already undertaken in connection with these events; and our plan to get the company back on track, reestablish credibility and ensure Zymergen is positioned for success*.

*Specifically, it's become clear that the commercial opportunity for our first product Hyaline is less than we expected*.  In response, the Board initiated a series of deep dives into the company's product pipeline and development processes.  While the work remains ongoing, *the Board anticipates that the road map and time lines for Zymergen's follow-on products could also be impacted*.  *As a result, we no longer expect product revenue in 2021 and expect product revenue to be immaterial in 2022*.  *Without a firm pipeline of customers and visibility on commitments, our projections beyond 2022 are highly uncertain*.

Let me now turn to the details of what we know today.  As is typical and important for any company, the Board receives periodic updates regarding the company's progress toward its goals.  It was through these updates that *we recently learned of significant execution challenges within the organization*.  *Based on the Board's preliminary analysis, we have identified several contributing factors to the revision of our plan*.

*First, several key target customers had technical issues implementing Hyaline into their manufacturing processes*.  We've made progress toward addressing these challenges and believe there are no intrinsic technical issues with Hyaline.  However*, this resulted in a delay in the commercial ramp*.

*Second, emerging data on the total addressable market for foldable display applications indicates a smaller near-term market opportunity with scaled*

*demand pushed out in time and growing more slowly than anticipated. The market is in an earlier stage than we previously expected.*

*Third, the company's commercial teams did not have significant insight into the customer qualification process and into their customers and users, which resulted in forecasted overestimated near-term demand. As a result, we're already making substantive changes in our commercial team.*

171.    After repeating the adverse information included in the earnings release, Flatley emphasized the seriousness of the problems and what the Zymergen's Board of Directors and management were doing to understand the issues and develop a plan to address them.

*I want to perhaps state the obvious that we're taking this situation extremely seriously. As soon as we learned of the problems, our Board and management immediately started to work to fully understand the issues and began developing a plan to address them. The Board has formed dedicated committees, including a strategic oversight committee, to conduct an in-depth review of the company's operational, financial, product and commercialization efforts. We have also engaged expert advisers to support us in this process.*

*Currently, our work is focused in several key areas. First, we're conducting a deep dive into the company's sales forecasting process to examine how the initial forecast was developed, where the issues arose and how to improve that process going forward. Second, we've retained a number of outside experts to examine the robustness of the products coming out of our pipeline and their readiness for full commercialization. Third, we're digging into the company's long-term market opportunities to ensure our product pipeline is aligned with industry trends and customer demand.*

*With the assistance of a top-tier consulting firm, we're doing a full assessment of Zymergen's target markets and the fit of our products into the pipeline of those markets.* As part of this work stream, we're exploring adjacent opportunities that could potentially provide for new revenue sources.

\*       \*       \*

*Lastly, we're developing a plan to align our burn rate to match the newly expected revenue ramp. One of our top priorities will be expense management.* However, we should note that the Q3 expense rate is likely to be higher than Q2, given the outside resources we've retained and the onetime expenses it will take to manage down the burn rate. In the meantime, we have ample cash on hand to manage the business.

172.    Flatley also stated that Zymergen would conduct a cultural assessment to ensure there was broad-based accountability across the organization and that the Company operated with transparency and openness; that Zymergen was focused on reestablishing the credibility of the leadership team and the Company; and that the termination of Hoffman was required to ensure accountability, transparency, openness and credibility.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 5:21-cv-06028-PCP
4861-4775-1850.v1

- 55 -

*We will conduct, additionally, a cultural assessment to ensure that there's broad-based accountability across the organization and that we operate with transparency and openness.*

\*      \*      \*

As a result of the work underway, we will develop an updated strategic plan for Zymergen with clear milestones and goals that the company can be held accountable to achieving. *We are focused on reestablishing the credibility of the leadership team and the company. We recognize that this will not happen over weeks or months, but will require consistent quarter-after-quarter execution against a credible plan.*

*To that end, another key element to ensuring we're set up for long-term success is [to] have the best possible leadership.* As a co-founder and CEO, Josh Hoffman's vision and passion for partnering with nature to make better products has been instrumental to establishing Zymergen as an industry pioneer and innovator. We're all grateful to him for his work in advancing this mission and thank him for his many contributions.

*As we navigate the current situation and work to move the company forward as a refocused company, the Board and Josh mutually agreed that new leadership is required.* The Board will initiate a comprehensive search to find the right leader to guide Zymergen's strategy moving forward and deliver on its strategic and operational goals. We will take whatever time is necessary to find the world-class leader our company deserves. In the meantime, I'm committed to leading the company and overseeing all operations as well as the reviews underway, and we'll keep you updated as we have more information to announce.

173.    Flatley concluded his opening remarks by stating that the Company was now "committed to acting with transparency" but could not provide a specific forecast for 2022 and 2023, until it completed various tasks, including a full reexamination of the Company's target markets, the strengthening of the commercial team and ensuring the reliability and robustness of Zymergen's sales pipeline and forecast process. He acknowledged the unexpected adverse disclosures were "deeply disappointing" to investors and meant it would take longer for Zymergen to achieve its goals than previously expected.

*The Board's hope was to speak to you today about the company's 2022 and 2023 prospects. However, we have more work to do before we can provide a more specific forecast. We're committed to acting with transparency and look forward to providing updates on our progress.*

Over the next several quarters, we expect to complete and deliver a full reexamination of the company's target markets, confirming our past views or altering them if the data indicate a shift in market focus is appropriate. This will also include exploring potential new markets. Second, a plan to strengthen the commercial team and ensure the reliability and robustness of both our sales pipeline, qualification and our forecast processes. A plan to reduce the company's burn rate to align more closely with our revenue prospects. Fourth, a deep dive into

the process by which we prepare and launch products to be sure they're market-ready and can be easily integrated into our customers' workflows. And lastly, a plan for 2022 and 2023, that we have confidence we will meet.

*To close, I want to acknowledge that these developments are deeply disappointing to all of us as supporters of Zymergen and its mission, including you, our analysts and investors, our employees, our customers and our Board of Directors. This is a setback that we're committed to resolving fully and expeditiously. Our execution challenges do mean it will take longer to achieve our goals than previously expected.* However, we remain focused on our strategy of pursuing continuous launches of breakthrough products and I'm proud of the work our teams are doing across the organization.

174.   Following Flatley's prepared remarks, analysts expressed shock and disappointment with the numerous adverse disclosures made just months after the completion of the IPO and asked many questions.

175.   Cowen analyst Doug Schenkel ("Schenkel") asked the first question, stating the disclosures were a disappointment for everybody and very surprising. He noted there was a lot of excitement about the outlook for Hyaline because the Company had attached a large market opportunity to it and because Hyaline working would be a sign that Zymergen's biofacturing platform was worth much more. He asked Flatley if there truly was a real platform value given the unexpected adverse disclosures.

*Obviously, a disappointment for everybody involved in listening to this call, and it's very surprising.*

If we tick it up a level; from *Hyaline, there was a lot of excitement about the outlook for that product. I would argue that investors were as focused on Hyaline for the product itself as well as essentially looking at it as a sign that investors and analysts could have more confidence that this platform could work.*

*So while the product itself had attached to it a large market value, a market opportunity, I think folks looked at Zymergen as not just Hyaline company. But if Hyaline worked and then the follow-on product worked, that it would be a sign that this platform was worth much, much more.*

I know this has just happened, but I think *it would be really helpful if you could share anything that would make all of us feel better, that there truly is real platform value here. How do we get comfortable with that, Jay*?

176.   Flatley claimed he had confidence the platform could produce products but acknowledged the challenge was in the execution related to matching produced products with market opportunity. Flatley also claimed Hyaline still had a material opportunity in the market – a claim he would contradict in Zymergen's 3Q21 earnings call just three months later, when he

1   unexpectedly revealed the Company had stopped all work on Hyaline and cancelled the product

2   because the foldable display market was smaller than initially expected – but admitted that

3   opportunity had been "pushed out" and that the "pipeline [was] thinner than we might have

4   expected back several months ago."  He also admitted what happened with Hyaline caused the

5   Company to "relook at the entire pipeline of products" to determine the Company's ability to

6   manufacture them in a way that they were truly market ready and that they had a match to the best

7   market opportunities.

8           So everything I've seen to date, Doug, reinforces the confidence that we
            have in the overall ability of this platform to produce products.  *What I think we've*
9           *seen, as we look back over the last weeks, is a real challenge in execution related*
            *to the match of the products that the platform can produce with the market*
10          *opportunity*.

11          And Hyaline, you're right, was certainly an exemplar or intended to be an
            exemplar of what this platform could produce.  *We think the product still has a*
12          *material opportunity in the market*.  *It's certainly pushed out, and the pipeline is*
            *thinner than we might have expected back several months ago*.  But intrinsically,
13          we think the technical characteristics of the products are sound.

14          *Having said that, what's happened on Hyaline has caused us to relook at*
            *the entire pipeline of products that we're producing, not in terms of the actual*
15          *specification so much of those products, but our ability to manufacture them in*
            *a way that they're truly market-ready, number one*.  *But secondarily, that they*
16          *also have a match to the best market opportunities that the company has in front*
            *of it*.

17
            So in summary, I think the platform is solid.  *What we're facing here are*
18          *execution challenges in matching the products that come off that platform to the*
            *market*.

19
20      177.    Schenkel mentioned the pipeline of product charts shared by Zymergen – including

21   in the Registration Statement – and asked what had changed if the products were as represented in

22   the pipeline charts.

23          Okay.  And I guess 1 follow-up on what you've mentioned a couple of
            times, which is this pipeline.  I just want to make sure I understand that correctly.
24          *When you talk about pipeline, and maybe I should just understand this*
            *inherently, but are you talking about the products and the targets that the*
25          *company has been talking about for a while in terms of what would come next?*
            *Are you talking about the funnel of customers that could be interested in Hyaline*
26          *and other products?  Or is it actually both?*

27      178.    Flatley responded that the pipeline of products was as represented during the IPO

28   but that the pipeline of customers was thinner than represented during the IPO.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 5:21-cv-06028-PCP                                              - 58 -

Your point's a good one.  It's actually both, and pipeline is used to describe both of those things.  And what I would say is that the pipeline of products is as was represented during the IPO.  So those products are continuing to be developed by the platform.  ***What is thinner than we expected is the pipeline of customers for Hyaline specifically***.

179.    That response caused Schenkel to ask if what changed with the pipeline charts included in the Registration Statement was Zymergen's ability to manufacture at a level that would put the Company in a position to address the markets in a way where the markets would be as previously communicated.

[Schenkel:] Okay.  But – and then – but in general, so that – ***if we think of those product pipeline charts, you guys shared, nothing's changed there.  What's changed is your assessment of your ability to manufacture at a level that would put you in a position to address the markets in a way where the TAMs would be what was previously communicated?***

180.    Flatley responded that the problem was not manufacturing, but the actual fit of the product to the market opportunity.  Moreover, he admitted there was no market for Hyaline and that the market was just "theoretical" because there was "no hit product yet in the foldable display market."  Flatley said that problem caused Zymergen to relook at the entire portfolio of products to make sure there were market opportunities for them.

[Flatley:] ***It's not so much the scalability of manufacturing, Doug.  It's the actual fit of the products that we're making to the market opportunity, right?  Do they satisfy the market?  Are they timed in a way to hit the market when the market is actually ready for them?***

So we think, as I mentioned in the script, ***that the timing for the foldable display market is getting pushed out.  As most people are aware, there's no hit product yet in the foldable display market.  So they're all remaining theoretical, and that's sort of pushing out the time line for Hyaline.  So that's an example, I think, of where we have a product in a market that's not quite ready for it yet and so the timing gets pushed out.  That's what's caused us to go back and relook at the entire pipeline of products to make sure that, that fit is appropriate and that we're hitting the best market opportunities that the company has***.

181.    In response to a question from J.P. Morgan Chase analyst Tycho Peterson ("T. Peterson") about the technical issues key target customers had implementing Hyaline into their manufacturing processes, Flatley revealed there was product shrinkage at one customer site and material compatibility issues at an undisclosed number of customers.  He acknowledged the Company did not do a sufficient job of anticipating and modeling the processes its products went through at its customers or knowing in advance what risks its products could have in the hands of

1   third-party customers.  As a result, Zymergen did not understand the various types of applications

2   for its products and what issues might come up at the customer sites and pretest for as many of

3   those as possible.  Moreover, he acknowledged these failures should not have occurred, stating

4   they were "normal sort of cutting-your-teeth problems that happen in the implementation of these

5   advanced types of technologies."

6        There were 2 specific things, Tycho, that came up post IPO.  One was the
         fact that **we had some product shrinkage in one customer site**.  And as I said in
7        the script, we believe we've largely addressed that.  There's probably a little bit
         more testing required to ensure that, that's the case.  But we think that's largely
8        behind us.

9        **The second one has to do with material compatibility**.  As you know, these
         products go into a process that's different at every customer site.  And **what we**
10       **should have done as a company has done a better a job of anticipating and**
         **modeling what those processes were at each of those customers, knowing in**
11       **advance what risks our product could have in the hands of the third-party**
         **customers**.
12
         **And that's where we had some execution challenges and where we need**
13       **to go back into our pipeline of products and make sure that when we produce a**
         **product, we understand clearly the various types of applications for that product**
14       **and what issues might come up in those customer sites and pretest for as many**
         **of those as we possibly can.  So those were the technical issues that we faced**.
15
         And as I mentioned, we don't think there's any intrinsic problems with the
16       product.  **These are normal sort of cutting-your-teeth problems that happen in the**
         **implementation of these advanced types of technologies**.
17
18       182.   T. Peterson also asked about the smaller near-term market opportunity for Hyaline,

19   which was growing more slowly, and asked if Zymergen had bad market data or if the Company's

20   customers pushed out the timelines.  Flatley said it was a combination.  He said the Company had

21   research reports that clearly indicated the foldable display market was at least a year away and that

22   there was no killer product on the horizon, facts that would have existed at the time of the IPO.

23   He also said the smaller near-term market opportunity for Hyaline was a result of customer

24   feedback and acknowledged this information existed at the time of the IPO by stating that it was

25   another point in Zymergen's commercial chain where the Company did not do as good a job as it

26   should have in understanding the ultimate end use of the product and what the demand curve

27   looked like, which was why Zymergen overestimated the near-term demand for Hyaline.

28       That was a combination.  **We've had some research reports that have**
         **clearly indicated a shift in market timing that's at least a year and maybe more**.

*And as I mentioned, we all watch the foldable phone market, and there's no killer product immediately on the horizon that, at least, we're aware of. So that time line has largely gotten pushed out.*

*And we've had customer – direct customer contact, deep customer contact through our commercial channels, where we've talked to customers about exactly when they plan to implement it and what product they plan to implement it in. It's another point in our commercial chain where we didn't do as good a job as we should have in understanding, in fact, the ultimate end-use of the product in the stack and understanding what that demand curve look like. And that's why I think we potentially – well, we, in fact, did overestimate the near-term demand for Hyaline.*

183.    Flatley also admitted Zymergen was looking at the fundamental model of the Company to determine whether its at-risk development model was sound compared to the foundry approach used by some of the Company's peers. Moreover, he admitted the deep dive into the Company's at-risk development model and other business assessments would occur over the next several quarters.

184.    BofA analyst Derik De Bruin ("De Bruin") questioned the representations made during the IPO process given the unexpected adverse disclosures and asked how the analysts could have any confidence in anything the Company was now representing, noting the representations about Hyaline being the Company's breakthrough product were off so much. De Bruin told Flatley that, during the IPO process, health care analysts like him relied on the Company for information to evaluate the electronics markets, consumer products markets and agriculture product markets because they were a bit beyond the scope of health care analysts. He asked:

*[H]ow can we have any confidence whatsoever in anything that's been put out there in terms of numbers or putting the market opportunity? I mean, given that the one product, the one market that was set in stone to come out and be the breakthrough product is off so much? So . . . the question is like, what's the basis for our forecast for now on this and sort of the opportunity? And it's like – are you going to reevaluate all the other pipeline products as well?*

185.    Flatley admitted that the Company was reevaluating all the other pipeline products and that it *was* "*totally fair that you question the credibility of any forecast we give you today, which is, frankly, why we didn't give you any forecast today.*" He claimed the Zymergen Board was as surprised as De Bruin, the other analysts and the Company's investors and that it was part of the reason Zymergen was doing the very deep dive to understand what happened in the forecasting process, the product process and the overall market assessment.

186.     In response to another question from De Bruin about the Company's cash burn, Flatley said Zymergen was in a "great cash position at the moment" with $580+ million of cash in the bank and net cash of about $500 million.  He admitted, however, a key priority was to reduce the cash burn rate sufficiently so cash would last longer and to the point it would match the revenue stream going forward, which Flatley admitted the Company did not know.

187.     Flatley failed to mention that the great cash position was the result of the Company raising $529.9 million less than four months earlier, based on a Registration Statement that contained untrue statements of material facts and omitted facts necessary to make the statements made not misleading.

188.     Goldman Sachs analyst Matthew Sykes noted the technical issues customers encountered with Hyaline during the evaluation and testing phase were fairly far along in the process when discovered and asked if there were ways Zymergen could check in to avoid these types of surprises in the future.  Like in his response to J.P. Morgan analyst T. Peterson, Flatley acknowledged the technical issues were knowable at the time of the IPO if Zymergen had done a better job of understanding and anticipating the end use of the product in the customer's hands and having a more intimate relationship with the customer so the Company understood specifically how the customer was going to use the product and what other materials they were using in their factories so that Zymergen's material would be compatible at the time it was provided to the customer.  Flatley also said Zymergen needed to have more talent at the application engineer level who worked directly with the customer and make sure those engineers were on site working directly with the customers.  Flatley admitted that had not happened and blamed COVID for engineers not being on site.

> ***There's 2 key things, Matt, that I think we need to do there.  One is that we need to do a much better job of understanding and anticipating the end-use of the product in the customer hands; and having a more intimate relationship with the customer so we understand specifically how they're going to use it, what other materials they're using in their factories, so that our material winds up being fully compatible at the time we put it in their hands.***  There's always some of this that's going to happen as you put a brand-new product into a new application.

> ***But the second thing we need to do to make that go much more smoothly is have more talent at the application engineer level that works directly with the customer on site***.  And COVID, we've never used COVID as an excuse in any of

this, but there have been some COVID challenges in getting our teams to fly to customer sites and be able to meet with customers. And so as a backdrop, that's been a challenge, frankly, for the customer – company in the last 1.5 years. And so what we need to do as we come out of COVID it is to make sure we have those application engineers on-site working directly with customers in a much more timely way.

189.   Sykes, like other analysts, also questioned the Company's credibility and whether there were also issues with the overall platform.

*And then just on the overall credibility. **Obviously, there will be general questions going forward**. And how much of this is – can we attribute to specifically the technical issues that Hyaline had and/or electronic films versus other end markets and in the conversations that you'll likely have with customers that you've been working with other end markets to assure them that this is a specific issue to a specific end market and a specific product versus the overall platform that you kind of addressed in an earlier question, but just wanted a little more detail on it.*

190.   Flatley responded that there was no concern about the real market opportunities for the Company but that the challenge was to make sure the specific products made would meet the market need of a particular application area, which was where the Company had fallen down. He stated Zymergen needed to track the evolution of these markets much more closely so that if the markets evolved while Zymergen was developing products, the Company would have the ability to adapt and react to those.

Yes.   So Matt, we don't have any concerns about the real market opportunities for this company. We believe the opportunity we have to make new products that don't exist today, to make them in much more organic ways, nature friendly ways is as enormous as we communicated and others in this field have communicated. So there's no doubt about that.

***The challenge we have is to make sure that the specific product that we make meets the market need of a particular application area. And that's where, I think, we've fallen down is in that execution side of things. And we need to track the evolution of these markets much more closely so that if these markets evolve while we're developing products, that we have the ability to adapt and react to those***. But there's no reduction of our optimism about the market opportunities for Zymergen products in the long run.

191.   In response to a question from Larew, Flatley stated that Zymergen continued to work with the two customers that had problems incorporating Hyaline and the concern was how fast they were going to ramp up and how fast their end-user markets were going to ramp up based on what was known about the foldable display market.

192.     In his closing remarks, Flatley acknowledged the setbacks revealed were "clearly disappointing for all of you and for all of us" and stated Zymergen remained confident in the significant opportunity the Company had in front of it.  Subsequent disclosures by the Company would confirm many of the opportunities presented in the Registration Statement were gone, including the discontinuation of six of the 11 products highlighted in the Registration Statement.

193.     On this news, the Company's stock price fell $26.58 per share, or 76%, from $34.83 on August 3, 2021, to $8.25 on August 4, 2021, on unusually heavy trading volume of 21.7 million shares.

194.     On August 4, 2021, the date this action commenced, the Company's stock was trading as low as $7.85 per share, a nearly 75% decline from the $31.00 per share IPO price.

**E.     August 4, 2021: Analysts Report the Catastrophic Disclosures on August 3, 2021, Destroyed Zymergen's Credibility with Investors**

195.     Following the Company's August 3, 2021 press release and earnings call, many analysts issued reports in which they downgraded the Company's stock and were highly critical of Zymergen, questioning the Company's credibility, including how the foldable display market could have changed so much in the less than four months since the IPO.

196.     On August 4, 2021, Larew issued a report in which he downgraded Zymergen stock, wrote that the Company had destroyed its credibility with investors and questioned how the total addressable market for foldable display applications could have changed so much since the IPO.

> *[G]iven the abrupt and significant about-face just months after the IPO, we believe the company has destroyed its credibility with investors* (who have an ever-growing list of other investible options in the flourishing synthetic biology field). *While shares will be down meaningfully on Wednesday, with no definable catalyst in sight and (in our view) doubt about the credibility of the public information provided by the company to support the long-term investment case we are downgrading shares to Market Perform.*
>
> *             *        *        *
>
> *In our view, what is more confusing and concerning is commentary on the total addressable market for foldable display applications, which suggests a smaller near-term market opportunity that is growing more slowly than anticipated.  Frankly, we are not quite sure how the data could have changed so much over such a short time (again, the company's IPO filings were published less than four months ago)*, and at this point the company does not have enough

1  data to quell our concerns or give us any sense of what the company's actual
2  pipeline might look like following the in-depth review of the company's
   operational, financial, product, and commercialization efforts.

3      197.    On August 4, 2021, HSBC analyst Sriharsha Pappu issued a report titled:

4  "***Downgrade to Reduce from Hold: A catastrophic business update***."  He noted the disclosure of

5  significant problems just three months after the IPO, including multiple fundamental problems

6  with Hyaline; raised fundamental questions about Zymergen's ability to bring any products to

7  market; and made it clear the Company lacked fundamental business insights into its customers

8  and end markets.

9          *Everything that could go wrong . . . has*

10         ***What happened?  Three months on from its IPO, Zymergen issued an***
           ***update post market close on 3 August, highlighting significant problems with its***
11         ***primary product – Hyaline***.  The company stated that several customers had
           technical issues incorporating Hyaline into their manufacturing plans, that it had
12         overestimated the size and growth of the market for foldable films and that its
           commercial teams lacked insight into customers' processes and end users –
13         resulting in forecasts that overestimate near-term demand.  ZY now expects no
           product revenue in '21 or '22 (consensus '22e revenue currently stands at
14         USD135mn) and is reassessing the fit of its product pipeline, target markets and
           commercial processes.  Co-founder and CEO Josh Hoffman has been replaced by
15         Chairman Jay Flatley with immediate effect.

16         ***What does this mean?***  In our ZY initiation (Initiate at Hold, Platforms need
           to scale, 6 July 2021) we made the point that all of the chat around code base, AI,
17         robotics, machine learning, pathways, database, etc, eventually needs to result in
           products that generate revenue – and ***this update raises fundamental questions***
18         ***about ZY's ability to bring products to market.  Hyaline wasn't just the lead***
           ***product in ZY's portfolio, it was also the proof point for their whole biofacturing***
19         ***model and the platform that would have bolstered confidence around the rest of***
           ***the portfolio.  With the rest of the product pipeline being early-stage, the***
20         ***disclosure of multiple fundamental problems with Hyaline – at this late stage –***
           ***brings the entire pipeline into question***.

21         ***Fundamental questions with the business model***.  We wrote in our
22         initiation about the challenges of bringing products to market across multiple end
           markets – ***and it is clear from the update that the company lacks fundamental***
23         ***business insights into its customers and end markets***.  The company might have
           to pivot to a partnership model from an "at risk" product development model to
24         have a viable business model.

25         ***Downgrade to Reduce, TP USD8 from USD42; a long road to re-***
           ***establishing credibility lies ahead.  With this one update, ZY has gone from a***
26         ***fledgling Synbio platform to a turnaround story, needing to rebuild credibility***
           ***around its products, technology and business model***.  The stock (down c70% after
27         hours) is likely to now go from "presuming scale" to "show me" mode on its
           pipeline.  Downgrade to Reduce.

28

198.   On August 4, 2021, Schenkel issued a report downgrading the stock from Outperform to Market Perform and noting his surprise that such material adverse disclosures were made so soon after the IPO.

**How Could Things Change so Much in the 72 Days Since The Last Earnings Call?**

The Board of Directors is wondering the same thing – it was noted that this situation is taken extremely seriously.   Thus, the change in leadership and organizational evaluation.  (For what it is worth, we noted that ZY was early at the time of our initiation and that there was risk – *that said, we are very surprised that something this material could go wrong this quickly*.)

\*      \*      \*

**Was There Any Intentional Wrongdoing (Why Change CEO)?**

At this point, there is nothing to suggest that any of this was intentional wrongdoing.  That said, *the breakdown in process was so material and so close to the IPO and recent (first) earnings call that the BoD ostensibly had a difficult decision on leadership credibility* – this led to naming former ILMN CEO Jay Flatley active ZY CEO.

\*      \*      \*

What Do We Think?

We believe we have no choice but to downgrade to Market Perform (which we do not like to do after the news) – pending more details on the outcome of the BoD's evaluation, we cannot recommend purchase of ZY shares.  Our concerns are somewhat assuaged by Jay Flatley's willingness to step in as acting CEO and assertions that this is not a technical issue.  That said, *there is little precedent (even for an early stage company) to have to make a change like this*.

199.   On August 4, 2021, T. Peterson issued a report in which he downgraded the stock, noted the adverse disclosures about Hyaline and the total addressable market for foldable display applications causing the Company to no longer expect product revenues in 2021, and immaterial product revenues in 2022.  Moreover, he noted that the Company's previous representations about the total addressable market for foldable display applications were overstated and that J.P. Morgan had never been in the position of seeing a CEO change and significant revenue reset so soon after an IPO.

**Hard to Synthesize . . . CEO Transition & Product Launch Pushouts Announced Amidst TAM Realignment, Downgrade to Neutral**

We are downgrading our rating on Zymergen (ZY) from Overweight to Neutral after the business update and conference call.  Specifically, the Board has

1   appointed Chairman Jay Flatley (former ILMN CEO) as acting CEO after recently
2   becoming aware of issues with the product pipeline that will impact delivery
    timelines, which resulted in the departure of former CEO Josh Hoffman. Looking
3   closer, during 2Q, several target customers experienced technical issues
    implementing Hyaline into their manufacturing processes (product shrinkage at one
4   customer site, which has largely been addressed, while material compatibility with
    certain manufacturers' processes remains a work in progress). *Combined with an*
5   *initially overstated TAM for foldable electronic devices (based on bad market*
    *data and slower foldable device uptake), ZY no longer expects product revenues*
6   *in 2021 (vs. JPMe product revenue of $13M) and immaterial product revenues*
    *in 2022 (vs. JPMe product revenue of $117M).* To address the challenges, the
7   company is evaluating data on the TAM for foldable display applications, which
    indicates a smaller market opportunity growing less rapidly than anticipated
8   (thinner pipeline of end-users), which will impact ZY's sales forecast for biofilms.
    As it relates to the long-term viability of the platform, interim *CEO Jay Flatley*
9   *relayed confidence by stating that there are no intrinsic issues, but rather a*
    *disconnect between the commercial team and understanding of end-markets,*
10  *with ZY's focus now to reliably manufacture products that "hit the market when*
    *the market is ready".* As part of the TAM evaluation, ZY has formed several
11  committees (including a Strategic Oversight Committee) to conduct an in depth
    review of the sales forecasting process, pipeline commercialization plans and TAM
12  analysis. Stepping back, *we are adjusting our model to reflect the newfound*
    *uncertainty of the product launches and while we acknowledge the long-term*
13  *viability of the synbio platform, with little to no visibility on product TAMs,*
    *customer pipelines or leadership, we downgrade to Neutral*, while rolling our DCF
14  to establish a Dec. 2022 PT of $12.

15  • *2Q preliminary results*. ZY also reported preliminary 2Q revenues of $5-
       6M (vs. JPMe $4M), all from R&D service and collaboration revenues,
16     while non-GAAP OPEX is expected to be $80-85M. ZY is currently
       developing a plan to reduce and align expenses with the changes in revenue
17     expectations (no guidance was given at this point).

18  • *Downgrading to Neutral on lack of visibility. Admittedly, we have never*
       *been in this position, with a CEO change and significant revenue reset so*
19     *soon post-IPO (2022 revenues now expected to be "immaterial" vs. Street*
       *at $132M), so we do not make the decision lightly, but in the absence of*
20     *visibility around a turnaround plan, ability to recruit a CEO and the*
       *revenue ramp, we are hard pressed to see near-term upside,*
21     *notwithstanding our high regard for interim CEO Jay Flatley*.

    F.  **September 23, 2021 – October 21, 2021: Zymergen and the Financial**
22      **Press Report Additional Facts Demonstrating the Registration**
        **Statement Was Inaccurate and Materially Misleading, and the**
23      **Financial Press Likens the Implosion of Zymergen to that of Theranos**

24      200.  On September 23, 2021, investors learned of additional negative impacts from the

25  numerous problems revealed on August 3, 2021. Zymergen announced it was terminating

26  approximately 120 employees as part of preliminary phase of the Company's plan to reduce costs

27  to align with the delayed revenue ramp up previously disclosed on August 3, 2021. The Company

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 5:21-cv-06028-PCP                                                      - 67 -
4861-4775-1850.v1

1   also disclosed it would incur an estimated $4.5 million of severance and employee-related

2   restructuring costs related to the reduction in force.

3       201.    On October 21, 2021, Zymergen filed a Report on Form 8-K with the SEC in which

4   it revealed more negative impacts from the numerous problems reported on August 3, 2021.

5   Zymergen announced a second reduction in force of approximately 100 employees, which would

6   result in approximately $4.2 million of severance and employee-related restructuring costs.

7       202.    In addition, the Company reported it expected to incur impairment charges of

8   $15 million for certain manufacturing equipment as a result of its restructuring activities and might

9   incur additional restructuring and impairment charges in 4Q21, including lease expenses.

10      203.    Zymergen also reported it had amended its Credit Agreement due to its violation of

11  revenue covenants.  The amended Credit Agreement required Zymergen to: (i) shorten the term of

12  the Credit Agreement by moving the maturity date from December 19, 2024 to June 30, 2022;

13  (ii) increase the amount of the liquidity covenant; (iii) make a $41 million payment, including a

14  $35 million principal prepayment; and (iv) deposit the remaining outstanding balance of the loan

15  plus accrued interest through the maturity date in a blocked account controlled by the

16  Administrative Agent, which was subject to release from the blocked account upon the

17  Administrative Agent's completion of due diligence to its reasonable satisfaction regarding the

18  Company's anticipated operating costs and budget through the maturity date.

19      204.    Investors also learned that co-founder Jed Dean had notified the Company of his

20  decision to step down, effective October 31, 2021.

21      205.    The financial press likened the rapid rise and fall of Zymergen to that of Theranos

22  and reported facts indicating the representations in the Registration Statement were materially

23  misleading, including the representations about Hyaline; the total addressable market for foldable

24  display applications; and when the Company's products, including Hyaline, would generate

25  revenue.

26      206.    On September 30, 2021, the *San Francisco Business Times* published an article

27  titled "The rise and fall of Zymergen: Can biotech veteran Jay Flatley save the company?" likening

28  the rapid rise and fall of Zymergen to that of Theranos:

1

In its rapid rise and equally quick fall as a huge potential turned to imminent peril, it is hard not to hear echoes of Theranos in Zymergen's emerging difficulties.

2

3

To be sure, there are parallels with the Palo Alto and East Bay-based blood testing company, once valued at $9 billion but now at the center of a high profile fraud trial for its enigmatic founder.  Theranos and Zymergen share high valuations, the promise of disrupting an old-school industry, a penchant for corporate secrecy and a fondness for signing large leases to meet swelling workforces.

4

5

6

207.    On October 13, 2021, *Barron's* published an article titled "***The Inside Story of How SoftBank-Backed Zymergen Imploded Four Months After Its $3 Billion IPO***."   The article reported Zymergen's market capitalization was $3 billion following the completion of the IPO and that "***[j]ust four months later***" the Company made the "***stunning announcement***" on August 3, 2021, that caused the stock to tank, wiping out more than $2.5 billion in market value.

7

8

9

10

208.    The article also included facts indicating the representations in the Registration Statement were materially misleading, including the representations about Hyaline; the total addressable market for foldable display applications; and when the Company's products, including Hyaline, would generate revenue.  Indeed, it was reported that Hoffman used exaggerated financial figures and made overly optimistic projections about the Company's capabilities, both internally and externally.

11

12

13

14

15

16

***According to a former senior-level employee at Zymergen, Hoffman used exaggerated financial figures and made overly optimistic projections about the company's capabilities, both internally and externally.  The former employee – who retains a vested interest in the company – recalls Hoffman's response when he was confronted about this behavior:* "*Never underestimate the power of the greater fool*.***"***

17

18

19

20

209.    In fact, the article reported that such disclosure problems began surfacing long before the IPO.

21

22

Problems began surfacing long before the IPO.  At an all-hands meeting in early 2018, for instance, Hoffman walked on stage to deliver a status report to his roughly 500 employees.  The company had just acquired Radiant Genomics, a genomic database company, after a year and a half courtship.

23

24

According to the former Zymergen employee, the two Radiant co-founders – Jeff Kim and Oliver Liu – had agreed to the acquisition after being shown Zymergen's internal pipeline, which showed projected contract sizes worth billions by 2021.  At the time, Radiant posted revenue just under $10 million, according to the employee, who became familiar with both companies' financial statements through the due diligence process.  Prior to the deal's close, Radiant was told that Zymergen was on track to book three times that amount for 2017, the employee says.  Liu didn't respond to requests for comment and Kim declined to comment.

25

26

27

28

As the gregarious Hoffman delivered his speech at the meeting, he shared with employees Zymergen's annual revenue number: just under $10 million. "Wait a minute," the former employee remembers thinking. "That's Radiant's figure. That's exactly Radiant's figure which indicated to me that Zymergen had zero in revenue."

210. *Barron's* also reported that the SEC had concerns about the Company's disclosures before the IPO in connection with its review of draft registration statements submitted by Zymergen. It referenced the letter the SEC sent to Zymergen in February 2021:

The Securities and Exchange Commission had concerns as well . . . . Correspondence in February with the SEC showed that regulators questioned the company's plans for growing revenue and profitability, its current financial condition and its outstanding indebtedness, which included a $100 million credit facility at the time of the IPO. It also asked the company to stop comparing its products to Kevlar, a strong and heat resistant fiber developed by chemicals giant DuPont that is used in bulletproof vests, tires and more as it does not appear to be relevant comparison, according to a letter from Katherine Bagley at the SEC's Division of Corporate Finance. The SEC declined to comment for this article or confirm or deny that it is now investigating Zymergen.

211. Not surprisingly, *Barron's* reported the stunning disclosures on August 3, 2021, indicated the Underwriter Defendants and Zymergen's Board of Directors failed to conduct appropriate due diligence, and that the Controlling Stockholders were also to blame.

When high-profile companies like WeWork or Theranos unravel, company founders often take the blame. But for these venture-backed companies, there's lots of blame to go around. Investors such as SoftBank enable founders, then pass on their investments to the public through IPOs. Underwriters, too, like Goldman Sachs and J.P. Morgan in Zymergen's case, may be failing to do the appropriate due diligence (Goldman Sachs did not respond to a request for comment and a spokesperson for J.P. Morgan declined to comment). Likewise the boards of venture-backed companies have a duty to ensure that company filings and projections are accurate and reliable, says John C. Coffee, Jr., a law professor at Columbia University.

"In the course of preparing the registration for the IPO, you would normally have a good deal of due diligence done by all the people at the law firms of the company and the underwriters. They apparently didn't detect this problem at all." Coffee says. "We may have another instance of highly competent people failing to vet a new company and just believing in the founder's endearing tale."

212. Further, *Barron's* reported that Flatley acknowledged the validity of concerns about the Company's credibility following the August 3, 2021 disclosures.

Zymergen hasn't commented publicly on the crisis since Hoffman departed in August, except in a call that month with investors at which Flatley, the interim CEO, *acknowledged the validity of concerns about the company's credibility. "I want to perhaps state the obvious that we are taking this situation extremely seriously,"* Flatley said during the call, noting that the firm had formed a strategic

1    oversight committee and planned to conduct an in-depth review with the support of
2    outside advisors.  "We're focused on reestablishing the credibility of the leadership
     team and the company.  We recognize this will not happen over weeks or months,
3    but will require consistent quarter-after-quarter execution against a credible plan."

     G.    **November 3, 2021: Zymergen Reports Six of the Eleven Products**
4          **Featured in the Registration Statement Will Be Discontinued**

5          213.    On November 3, 2021, Zymergen reported its preliminary 3Q21 results and

6    revealed more unexpected negative news, which, like the statements on August 3, 2021,

7    established the Registration Statement contained untrue statements of material facts and omitted

8    facts necessary to make the statements made not misleading.  However, the Company failed to

9    disclose other unexpected negative news – that government agencies, including the SEC – had

10   requested information from the Company related to the unexpected adverse disclosures on

11   August 3, 2021.  That material adverse information was not disclosed until November 15, 2021,

12   when Zymergen reported the multiple government inquiries in the Company's 3Q21 Report on

13   Form 10-Q filed with the SEC.

14         214.    In the November 3, 2021 earnings release and conference call, Zymergen revealed

15   it was discontinuing Hyaline, the main product featured in the Registration Statement, and all but

16   one of the electronics film program products.  It also revealed that all consumer care programs,

17   including the insect repellent product featured in the Registration Statement, were being

18   discontinued.  Thus, the Company revealed that six of the 11 products highlighted in the

19   Registration Statement had been discontinued and would not generate any revenue for the

20   Company.

21         215.    Zymergen also reported it had eliminated approximately 220 positions, which, with

22   reductions in overhead spending, would still result in a burn rate that would cause the Company to

23   run out of cash in little more than a year.  In the press release, the Company reported the following:

24             Since the previous business update in August, the Company has reviewed
              the potential market opportunities and its related portfolio, using a rigorous
25            evaluation process applied to current and potential market segments.  As a result of
              this review, the Company will focus on a smaller number of programs that it
26            believes capitalize on its capabilities and provide clear commercial opportunities.

27

28

Accordingly, *several programs will be discontinued, including*:

- *The electronics film programs, with the exception of ZYM0101, which is being developed in partnership with Sumitomo Chemical. Emerging data on the market segment being targeted with Hyaline and other electronics films indicates a smaller near-term opportunity than previously expected*.

- *The consumer care programs, including insect repellent, ZYM0201. Based on the portfolio review, the costs of customer acquisition with a direct-to-consumer model were prohibitive and, in the case of ZYM0201, it could not be produced and distributed at a price point competitive with incumbent products*.

As a result of these changes, the Company eliminated approximately 220 positions across a variety of levels and functions. These decisions, along with a reduction in related overhead spending, are expected to slow the Company's cash burn rate sufficiently to operate to the middle of 2023 with cash on hand.

216.    The Company also revealed it would have run out of cash in 3Q21 had it not raised $529.9 million from the IPO. Zymergen reported that cash and cash equivalents totaled $496.2 million as of September 30, 2021, a $91.8 million decline from the $588 million of cash and cash equivalents reported as of June 30, 2021. The Company reported a net loss of $283.6 million for the nine months ending September 30, 2021.

217.    During the earnings call, Flatley made numerous statements that also establish the Registration Statement contained untrue statements of material facts and omitted facts necessary to make the statements made not misleading.

218.    Flatley repeated the information included in the earnings release; summarized the work Zymergen had done to date; and shared a high level overview of the Company's forward-looking (and much smaller) portfolio of products, which he claimed would provide a general sense of the Company's direction. He admitted more bad news would likely arrive in the future – but failed to mention the inquires by the SEC and other government agencies – by also revealing that full details of the Company's future direction would not be provided until the Company completed its strategic plan around year end.

219.    Flatley revealed Zymergen did not have adequate resources to support the 30 different programs on which the Company was working and therefore eliminated two programs Flatley admitted were prominent in the Company's public plans.

Let me now share some additional details. *Our portfolio review indicated that we are working – we were working on at least 30 different programs, far too many to adequately resource. It was imperative that we narrow our focus to a smaller number that we believe capitalize on our strengths and provide clear commercial opportunities. That resulted in decisions to pause or eliminate several programs while promoting others to a higher level of investment*.

*A critical highlight is the cancellation of 2 programs that were prominent in our public plans, Hyaline, known as ZYM102 (Phonetic) and our direct-to-consumer insect repellent referred to as ZYM201 (Phonetic). In the case of Hyaline films, we no longer have conviction in the market opportunity.* To be clear and contrary to many published reports, the product worked as designed, the underlying technology and science are sound.

The technical issues that I discussed on our August call caused delays but were quickly resolved by our teams, and were not a factor in our decision to halt the project. In fact, at the time we canceled the program, we have made tens of thousands of square meters of Hyaline. *The issues we uncovered were commercial. We look more closely at the foldable display market and the emerging data on the market segment that we targeted with Hyaline and other electronic films indicated a smaller near-term opportunity than we initially expected*.

*As a result, we stopped work on our electronic films programs* but are continuing work on our ZYM101 film in partnership with Sumitomo. We will also continue to explore and develop bio-based polyimides in several different form factors, which we expect will add value to potential future products, not just in electronics, but other markets as well.

*In the case of our insect repellent and other consumer care programs, our reviews show that the cost of customer acquisition with a direct-to-consumer model would have been prohibited for Zymergen.* While the product performance was satisfactory, *it could not be produced and distributed at a price point competitive with the incumbent products. With this assessment, we've decided to park all our efforts in consumer care*. We have, however, developed strong IP and technology around bioactives and remain open to potential future partnerships in clean consumer care.

220.     Singh, the Company's CFO, revealed some of the costs related to the discontinued Hyaline and consumer care products, stating that operating expenses in 3Q21 were $39.1 million, an 80% increase from the prior year, and that the increase was primarily related to work on Hyaline and the insect repellent product prior to the decision to discontinue those products.

221.     Singh also acknowledged the Company's precarious financial condition, stating Zymergen did not expect any product revenue in 2021, and only immaterial product revenue in 2022. As a result, Singh explained that without visibility into near-term product revenue, one of the Company's top priorities was to closely manage expenses, including the reductions in force implemented in September and October, and the narrowed focus on a smaller number of programs.

222.    Before taking questions, Flatley acknowledged the Company needed to accelerate revenue generation while rebuilding stakeholder confidence.  The questions from the analysts established that rebuilding stakeholder confidence would be difficult.  Indeed, the first question was from De Bruin, who asked Flatley why investors should remain confident in the agriculture programs, the only programs in the Registration Statement (other than the optical film partnership with Sumitomo and the bio-based epoxy product) that were not discontinued.

223.    Cowen analyst Thomas Stevens asked Flatley why any customer would choose to work with Zymergen and how the Company could explain its value proposition given the pipeline changes and changes in the sales force.

224.    Investors also learned Zymergen's future was too uncertain to even try to recruit a new CEO.  In response to a question from J.P. Morgan Chase analyst Rachael Olson about the status of recruiting a permanent CEO, Flatley acknowledged the problems at Zymergen were too large to recruit a new CEO until the Company developed a credible and defensible strategic plan.

> Yes.  So, we have not started the process yet and that's by choice.  So, the decision that I made, along with the Board of Directors is that we as priority 1, 1 and 2 make sure that we right size the Company, got our processes fixed, got our development teams really focused on the products, the new products in the pipeline that we write a strategic plan that we all believe in, that has credibility and is defensible.  And at that point, we believe we could credibly go recruit a world-class CEO.  Prior to that, I think it would be challenging to sit across the table to try to recruit someone without a plan that you had conviction in and so our intent is to begin working on the recruiting process early in 2022.

225.    Responding to a question from UBS analyst John Sourbeer, Flatley also revealed there was "no chance" the discontinued consumer care programs highlighted in the Registration Statement were going to be profitable.

> [Sourbeer:] I guess just one on the consumer care programs.  You highlighted that some of the costs were prohibitive on the direct-to-consumer model.  Can you just maybe elaborate a little bit there on what specific areas you saw there on the costs that you highlighted?
>
> [Flatley:] Sure.  So, the history of those programs were that the company a few years back was thinking that it may want to partner those programs and – with a big consumer company, and those partnerships didn't reach any conclusion.  And so, the decision then was made to go direct-to-consumer.  And *as we analyze this recently over the last 30 days, particularly with only a single product in the portfolio in the near term, which would have been our insect repellent.  The cost of hiring a direct sales force supporting that and building the infrastructure was quite prohibitive.  So, if you look at the profitability profile over the next 3 years,*

1    ***there was no chance that, that product was going to be profitable***.  And so for that
reason, we've parked it, and it doesn't mean that we're abandoning the consumer
2    care market because we continue to believe that the technology has great
applicability there.  And we can create products in that space.  It's a question of us
3    being – having a financial footing where we can either take the products directly to
market ourselves and afford to make that investment or in the alternative, we
4    develop a partner that we either license the technology to or jointly develop and
distribute the products.

5

6    226.     Flatley and Singh also confirmed Zymergen would not receive any revenue from

7 the discontinued Hyaline product and the Company could not provide any revenue guidance other

than stating immaterial revenues were expected in 2021 and 2022:
8

9    [Sourbeer:] And I guess just another one just a little bit on the cash burn and cash
on hand through 2023.  I think in the last update, there were – was talk is still
10    launching Hyaline in '22 and maybe having some revenues in '23.  Any additional
color you can provide on that?  Does that assume any meaningful revenues in 2023?
Or just any way to think about follow-on product launches there?
11

12    [Flatley:] Yes.  ***I think we've been pretty clear on Hyaline that we've really
canceled that program now***.  ***And so we should expect no revenue from Hyaline
coming from the company at any point in time***.  Now, there's theoretically a
13    chance that if the market changed in some dramatic way that the company could
reevaluate in the future.  And as I alluded to in my remarks, the underlying material
14    that's used in Hyaline has potential other applications.  And so, we're exploring
those.  So it's – the R&D work that went into creating that novel material could
15    have future value.  But at this point, I'd say it's unlikely it's going to be in the films
market.
16

17    [Sourbeer:] I guess I was more trying to get at, when you say the cash burn
through 2023, does that assume product launches in revenue generation in '23, is
there any revenue in that model?
18

19    [Flatley:] Yes.  As I mentioned earlier, we haven't talked about '23 yet.
We've really given some clarity around what we expect in '22.  As we complete
20    the plan here over the next couple of months, we'll get greater visibility on the
relative ramp of the products that we now have in the pipeline and solidify our
internal forecasts, probably not just '23, but all the way through '24 and we'll
21    decide at that point what external guidance we give.

22    [Singh:] ***But we still expect product revenue to be immaterial, right, in
2022, including in the end of 2022***.
23

24    227.     In response to a question from Goldman Sachs analyst Dave Delahunt, Flatley

25 admitted that the Company's previous strategy of creating, manufacturing and distributing

products on its own was not tenable.
26

27    [Delahunt:] And with the strategic review, has that affected how you think about
potential partnerships?  And maybe, are you pretty more inclined now to work with
project – with partners on projects instead of taking 100% product risk?
28

1      [Flatley:] Yes.  I think it has influenced us to some extent.  And the way it
2   has is that ***previously, the company was focused not only on creating the product,
    but also manufacturing it and distributing it, in many cases, not in every case.***
3   ***And I think both because of cost constraints and of reasons of time to market, we
    decided to pull that part of the strategy in and really focus on creating the
    products and doing more partnering, both for the manufacturing and distribution***
4   ***side of this***.  And so that both saves money because we don't have to build a direct
    sales force as we would have had to do in consumer care, as an example, or to build
5   things like GMP manufacturing, which we might have had to do in other product
    areas as well.  And so, we can save the money there, which is a large investment
6   and a time delay to market.  And so, we continue to develop the products largely
    ourselves,  sometimes  in  partnership,  but  much  of  the  manufacturing  and
7   distribution will be through partners in the near term.

8      228.   In response to a question from William Blair & Company analyst Maxwell Smock,

9   Flatley acknowledged a primary reason one of the three electronic film products, ZYM0101, was

10  not being discontinued was that it was being developed in partnership with Sumitomo.

11     [Smock:] And then, I just wanted to dig in a little bit more on ZYM0101 and your
    decision to keep that program alive.  I mean, was that decision based – just based
12  on your partnership with Sumitomo?  Or is there something unique about that
    market or that product that gave you more comfort in your ability to commercialize
13  it down the line?

14     [Flatley:] There were 2 factors and at least 2 factors, let me say that.  Clearly,
    ***the fact that it was partnered was a huge part of this so, that we didn't have the***
15  ***expense of distributing the product or manufacturing it***.  ***So much of the risk then***
    ***of the program is taken on by Sumitomo in partnership***.  ***So, that was a very***
16  ***important factor***.  The second factor is that if this material is successful as we hope,
    it has very broad applicability across all types of devices.  And so it has a more
17  general  applicability  than  perhaps  Hyaline  did.    And  so  that's  the  second
    distinguishing factor.
18
19     229.   Following the November 3, 2021 earnings call, Zymergen's stock price declined

20  $0.93, or 8.1% from $11.43 on November 3, 2021, to $10.50 on November 4. 2021.

21     230.   Analysts issued reports in which they noted that the discontinuation of Hyaline, one

22  of the other optical film products and all of the consumer care products were disappointing and a

23  "key part of the thesis during the IPO" and "prominent in [Zymergen's] initial plans."

24     231.   On November 4, 2021, T. Peterson issued a report in which he wrote that J.P.

25  Morgan was disappointed in the discontinuation of several key programs (including Hyaline, one

26  of the other electronic film programs and all consumer care programs) and noted that all of the

27  discontinued programs "had been a key part of the thesis during the IPO."

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 5:21-cv-06028-PCP                                          - 76 -
4861-4775-1850.v1

232.    Similarly, Larew issued a report on November 4, 2021, in which he noted that the discontinued products "were prominent in [Zymergen's] initial plans."  He also reported that William Blair & Company had not seen "any proof that the company can monetize its platform" and that "there [was] still a considerable amount of uncertainty around the company's commercial pipeline and broader strategy."

**H.    November 15, 2021: Zymergen Reports that Multiple Government Agencies, Including the SEC, Are Investigating the Company**

233.    On November 15, 2021, Zymergen filed its 3Q21 Report on Form 10-Q with the SEC and disclosed that government agencies, including the SEC, had requested information from the Company related to the unexpected adverse disclosures on August 3, 2021.

**I.    December 9, 2021 – January 10, 2022: Additional Disclosures Show the Dramatic and Material Adverse Impacts on Zymergen's Business Since the IPO**

234.    On December 9, 2021, *Seeking Alpha* published an article titled "Zymergen: Total Chaos."  The opening paragraph of the article succinctly explained the dramatic change at Zymergen since the IPO, which caused Class members to suffer millions of dollars in damages – going from a Company launching Hyaline and preparing to rapidly scale up production and revenue, to a Company that had abandoned Hyaline and other products and was dramatically cutting headcount and cash burn in an effort to avoid bankruptcy.

> Zymergen . . . listed in April 2021 and, after recently launching their Hyaline product were supposedly preparing to rapidly scale up production and revenue.  In August, they indicated that there was an issue integrating Hyaline into the manufacturing process of customers, which would temporarily delay rollout of the product.  The CEO was replaced at the same time though and Zymergen appeared to freeze hiring, indicating that the problems were far larger than the company was letting on.  In November, Zymergen announced that they were abandoning their two main products, rationalizing their product portfolio and dramatically cutting headcount to reduce cash burn.  Zymergen no longer has a clear path to profitability and rather than focusing on growth, the company is clearly positioning to avoid bankruptcy.  Zymergen does not have the narrative of Ginko Bioworks . . . or the revenue growth of Amyris . . . , and there is a real risk of high caliber employees abandoning the company for better opportunities.  While Zymergen's intellectual property is likely worth a significant amount and the company may be able to turn itself around, I consider the company uninvestable given the way management has failed to provide investors with clarity over the last six months.

235.   During a January 10, 2022 presentation at a JPMorgan Healthcare conference Flatley revealed additional fallout from the unexpected adverse disclosures on August 3, 2021 and November 3, 2021.  After acknowledging the challenges in 2021, Flatley stated that the issues with the commercial product pipeline caused a business reset that impacted the Company's revenue projections and product roadmap.  Indeed, he acknowledged that dramatic steps had been taken to operationally restructure and transform the Company including the elimination of almost half of Zymergen's workforce.

> Let me begin by acknowledging the challenges that we had in 2021.  As we discussed in our August and our subsequent earnings call, issues with our commercial product pipeline caused a business reset that impacted the company's revenue projections and product road map.  After a lot of hard work by our teams, we've exited 2021 with a clear focus on who we are and on what we do.

> Zymergen is a biotech company that designs and produces molecules, microbes and materials for diverse end markets.  Having a clear mission and vision is critically important, but ultimately, it's execution that matters.  ***In the last 5 months, we've taken dramatic steps to operationally restructure and transform the company.  First, we reorganized our teams.  This reduced our head count from approximately 900 to about 500, focused on creating a much more efficient organization by eliminating leadership layers and consolidated distributed functions***.

> \*       \*       \*

> ***[We] did a deep dive on our program investments, and we optimized the portfolio across the key factors that drive market success.  As a result, we stopped to work on a significant number of programs, and are focusing now on a handful of higher potential ones***.

236.   However, Flatley acknowledged that the negative financial impact on Zymergen would continue for at least another year and possibly longer, stating that the Company thought it would begin to have product revenue in the 2023 timeframe.

237.   In addition, Flatley admitted that the potential market opportunity for the one optical film product that was not discontinued, the product being produced in partnership with Sumitomo, was still uncertain, stating that there was either going to be significant revenue or potentially zero revenue.

> [Olson:] And then shifting gears to project ZYM101.  So the film partnership that you have with Sumitomo.  Can you just talk about the decision to retain that project but then for go the other film projects that you're tackling?  And then what should we expect in terms of commercialization timing for this project?

1    And is there any opportunity to pull that forward just given you have a more narrow focus on your projects now?

2

3    [Flatley:] Yes. I mean that partnership is going well. We continue to invest in it as Sumitomo does. We believe that much like the Hyaline product, the technology – the underlying technology works. And ***the reason we decided to***

4    ***continue that one is because there is a very large potential market opportunity at the end of the process. But we don't know. It's a very digital opportunity, I would***

5    ***say. It's kind of a 1-0 outcome, either it's going to be significant revenue for us or potentially 0***, depending upon what customers they land. And the amount of

6    work we need to do on the distribution side of it is *de minimis* because all of that customer interface is being handled through Sumitomo. So it made sense for us to

7    continue to make the investments in evolving that Z101 technology and moving it forward. And so that program is the only one that truly remains in the film part of

8    the business at the moment.

9    238.    Flatley's statements about Hyaline, like his previous statements, also indicated the

10   representations in the Registration Statement about the foldable display market were materially

11   misleading.

12   [Olson:] And then stepping back, just kind of going back to your additional business update earlier this summer. So investors were really concerned that there was a broader technical issue with Hyaline following that first business update call.

13   It's clarified during the 3Q call that Hyaline actually worked as designed. But the decision to hold the project was just due to the smaller-than-expected TAM. So

14   can you really walk through what happened from a technical perspective with

15   Hyaline then?

16   [Flatley:] Yes. I guess I would reiterate what I said in the presentation. I spent a fair amount of time talking about how we think the underlying technology platform

17   works, and works robustly. ***What happened with Hyaline, and in retrospect, we probably made a mistake in how we presented it. When we talked about the***

18   ***challenges there, we began by talking about the fact that we had a couple of month delay because of some process tuning that had to happen with the early***

19   ***customers of Hyaline***.

20   We knew from the start that we would figure out those process challenges and overcome them, and we did that. And so those were never going to be barriers to

21   long-term adoption. ***There were simply delays in the potential revenue stream***. ***The big issue with Hyaline, of course, was that the ultimate market was not large,***

22   ***not large enough to justify continuation of the program***.

23   **VIII.    CLASS ACTION ALLEGATIONS**

24   239.    Plaintiffs bring this action as a Class action pursuant to Rules 23(a) and (b)(3) of

25   the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities that

26   purchased or otherwise acquired Zymergen common stock pursuant and/or traceable to the

27   Registration Statement issued in connection with the Company's IPO. Excluded from the Class

28   are Defendants, the officers and directors of the Company, at all relevant times, members of their

1   immediate families and their legal representatives, heirs, successors or assigns and any entity in

2   which Defendants have or had a controlling interest.

3         240.   The members of the Class are so numerous that joinder of all members is

4   impracticable.   Throughout the relevant period, Zymergen's shares actively traded on the

5   NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and

6   can only be ascertained through appropriate discovery, Plaintiffs believe there are at least hundreds

7   or thousands of members in the proposed Class.  Millions of Zymergen shares were traded publicly

8   during the relevant period on the NASDAQ.  Record owners and other members of the Class may

9   be identified from records maintained by Zymergen or its transfer agent (American Stock

10   Transfer & Trust Company, LLC) and may be notified of the pendency of this action by United

11   States mail, using the form of notice similar to that customarily used in securities class actions.

12         241.   Plaintiffs' claims are typical of the claims of the members of the Class as all

13   members of the Class are similarly affected by Defendants' wrongful conduct in violation of

14   federal law that is complained of herein.

15         242.   Plaintiffs will fairly and adequately protect the interests of the members of the Class

16   and have retained counsel competent and experienced in class and securities litigation.

17         243.   Common questions of law and fact exist as to all members of the Class and

18   predominate over any questions solely affecting individual members of the Class.  Among the

19   questions of law and fact common to the Class are:

20               (a)   whether the federal securities laws were violated by Defendants' acts as

21   alleged herein;

22               (b)   whether the Registration Statement was inaccurate and misleading,

23   contained untrue statements of material facts, omitted to state other facts necessary to make the

24   statements made not misleading and omitted to state material facts required to be stated therein;

25   and

26               (c)   to what extent the members of the Class have sustained damages and the

27   proper measure of damages.

28

244.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Violation of §11 of the Securities Act
#### (Against Zymergen, the Individual Defendants and the Underwriter Defendants)

245.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

246.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Zymergen, the Individual Defendants and the Underwriter Defendants.

247.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

248.     Zymergen is the registrant for the IPO.  Zymergen, the Individual Defendants and the Underwriter Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

249.     As issuer of the shares, Zymergen is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

250.     Zymergen, the Individual Defendants and the Underwriter Defendants named herein did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

251.     By reasons of the conduct herein alleged, Zymergen, the Individual Defendants and the Underwriter Defendants violated §11 of the Securities Act.

252.    By virtue of their employment and/or principal/agent relationship, the Controlling Stockholders as employers and/or principals are liable under the doctrine of *respondeat superior*, for the actions of their respective employee and/or agent, Defendants Murdoch, Ocko and Sharma, who violated §11 of the Securities Act while acting within the scope of their employment and/or agency.

253.    Plaintiffs acquired Zymergen shares pursuant and/or traceable to the Registration Statement for the IPO.

254.    Plaintiffs and the Class have sustained damages.  The value of Zymergen shares has declined substantially subsequent to and due to Zymergen's, the Individual Defendants' and the Underwriter Defendants' violations.

## SECOND CLAIM FOR RELIEF

### Violation of §15 of the Securities Act
### (Against the Individual Defendants and the Controlling Stockholders)

255.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except any allegation of fraud, recklessness or intentional misconduct.

256.    This count is asserted against the Individual Defendants and the Controlling Stockholders and is based upon §15 of the Securities Act.

257.    The Individual Defendants and the Controlling Stockholders, by virtue of their offices, directorship, ownership, employment relationship and specific acts, were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Zymergen within the meaning of §15 of the Securities Act, 15 U.S.C. §77o.  The Individual Defendants and the Controlling Stockholders had the power and influence and exercised the same to cause Zymergen to engage in the acts described herein.

258.    The Controlling Stockholders, by virtue of their employment relationship, agency relationship, incentives, and association with Murdoch, Ocko, and Sharma, respectively, were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Defendants Murdoch, Ocko and Sharma, respectively, within the meaning of §15 of the Securities Act, 15 U.S.C. §77o.  The Controlling Stockholders had the power and influence and exercised the same

1  to cause Defendants Murdoch, Ocko and Sharma, respectively, to engage in the acts described

2  herein.

3      259.    By virtue of their employment and/or principal/agent relationship, the Controlling

4  Stockholders as employers and/or principals are liable under the doctrine of *respondeat superior*,

5  for the actions of their respective employee and/or agent, Defendants Murdoch, Ocko and Sharma,

6  who violated §15 of the Securities Act while acting within the scope of their employment and/or

7  agency.

8      260.    By virtue of the conduct alleged herein, the Individual Defendants and the

9  Controlling Stockholders are liable for the aforesaid wrongful conduct and are liable to Plaintiffs

10  and the Class for damages suffered.

11                                    **PRAYER FOR RELIEF**

12      WHEREFORE, Plaintiffs pray for relief and judgment as follows:

13      A.    Determining that this action is a proper class action under Rule 23 of the Federal

14  Rules of Civil Procedure;

15      B.    Awarding compensatory damages in favor of Plaintiffs and the other Class

16  members against all Defendants, jointly and severally, for all damages sustained as a result of

17  Defendants' wrongdoing, or as control persons or principals of Defendants under the doctrine of

18  *respondeat superior*, in an amount to be proven at trial, including interest thereon;

19      C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

20  this action, including attorneys' fees and expert fees; and

21      D.    Such other and further relief as the Court may deem just and proper.

22                                    **JURY TRIAL DEMANDED**

23      Plaintiffs hereby demand a trial by jury.

24  DATED:  March 4, 2024                    ROBBINS GELLER RUDMAN & DOWD LLP
                                            SHAWN A. WILLIAMS
25                                          DANIEL J. PFEFFERBAUM
                                            ALAINA L. GILCHRIST
26

27                                              s/ Daniel J. Pfefferbaum

28                                          DANIEL J. PFEFFERBAUM

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 5:21-cv-06028-PCP                                      - 83 -
4861-4775-1850.v1

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
agilchrist@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
JUAN CARLOS SANCHEZ
PATTON L. JOHNSON
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jsanchez@rgrdlaw.com
pjohnson@rgrdlaw.com

Counsel for Plaintiffs

BERMAN TABACCO
NICOLE LAVALLEE (SBN 165755)
KRISTIN J. MOODY (SBN 206326)
JEFFREY V. ROCHA (SBN 304852)
425 California Street, Suite 2300
San Francisco, CA  94104
Telephone:  415/433-3200
415/433-6382 (fax)
nlavallee@bermantabacco.com
kmoody@bermantabacco.com
jrocha@bermantabacco.com

BERMAN TABACCO
LESLIE R. STERN
One Liberty Square
Boston, MA  02109
Telephone:  617/542-8300
617/542-1194 (fax)
lstern@bermantabacco.com

Counsel for Plaintiff West Palm Beach
Firefighters' Pension Fund

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KLAUSNER, KAUFMAN, JENSEN
 & LEVINSON
ROBERT D. KLAUSNER
BONNI S. JENSEN
7080 NW 4th Street
Plantation, FL  33317
Telephone:  954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com
bonni@robertdklausner.com

Board Counsel for Plaintiff West Palm Beach
Firefighters' Pension Fund