1
2
3
4
UNITED STATES DISTRICT COURT
5
NORTHERN DISTRICT OF CALIFORNIA
6

7
BIAO WANG,                                    Case No.  21-cv-06028-PCP

8
              Lead Plaintiff,

9
       v.                                     **ORDER ON MOTIONS TO DISMISS
                                              AND REQUESTS FOR JUDICIAL
10
ZYMERGEN INC., et al.,                        NOTICE**

11
              Defendants.                     Re: Dkt. Nos. 370, 371, 372, and 385-5

12

13        When materials manufacturing startup Zymergen Inc. went public at $31 per share in 2021,

14 it touted its "biofacturing" process that combines the "efficiency of biological processes" and

15 "technology's ability to rapidly iterate," which would allow Zymergen to make products "faster,

16 cheaper and more sustainably than traditional chemistry." Zymergen's first product, Hyaline, had

17 launched and the company claimed a "rich pipeline" of other products under development. But a

18 few months later the company revealed that "issues with its commercial product pipeline" would

19 "impact the Company's delivery timeline and revenue projections" and that the CEO was stepping

20 down. Zymergen's share price fell 76% the next day, to $8.25. Within a year the company was

21 acquired at less than 10% of its public offering valuation. It petitioned for bankruptcy last year.

22        This is a securities fraud case arising from Zymergen's 2021 public offering. Lead plaintiff

23 Biao Wang, representing a putative class of people who bought the stock, claims that the

24 registration statement for Zymergen's public offering was inaccurate and misleading. He seeks

25 damages from the company, its underwriters, and the board members and executives who signed

26 the statement. He also asserts that Zymergen's three largest investors—SoftBank, DCVC, and

27 True Ventures—are liable as well because they controlled Zymergen and the three board members

28 they had picked.

Those three sets of investors, composed of management companies and individual funds, now argue that the Section 15 control person claims (which were previously asserted against some of the funds but dismissed with leave to amend), as well as Mr. Wang's new respondeat superior claims, are both time barred and inadequately pleaded. For the reasons that follow, DCVC's motion is granted in part and the other motions are denied in full.

## I.    Background

The Court accepts the following allegations from the complaint in resolving these motions.

Zymergen is a biotechnology company incorporated in 2013. It set out to bring together computing and manufacturing to design and produce molecules, microbes, and materials for industrial use. Its "biofacturing platform" used algorithms to identify gene changes that could make it cheaper to produce bio-products and identify new molecules with unique properties. Zymergen is headquartered in Emeryville, California. It was co-founded by Josh Hoffman, Jed Dean, and Zach Serber. Mr. Hoffman was its chief executive officer and Mr. Serber its chief science officer. Zymergen went public in April 2021. It sold over 18.5 million shares at $31 each.

Zymergen had three early investors: DCVC, True Ventures, and SoftBank. DCVC was Zymergen's initial seed investor.[1] It invested around $44 million before Zymergen's IPO and received the right to appoint one of Zymergen's board members as a condition of investment. True Ventures was another seed investor.[2] It invested around $75 million before the IPO and also received the right to appoint a board member. SoftBank was Zymergen's largest pre-IPO investor.[3] It invested around $404 million and received the right to appoint a board member and the right to have that board member serve on every board committee.

---

[1] Except where noted this order refers collectively to the management companies and the individual funds they managed. Defendant DCVC Management Co, LLC manages the defendant funds Data Collective II, L.P. and DCVC Opportunity Fund, L.P.

[2] Defendant True Venture Management, L.L.C. manages the defendant funds True Ventures IV, L.P.; True Ventures Select I, L.P.; True Ventures Select II, L.P.; True Ventures Select III, L.P.; and True Ventures Select IV, L.P.

[3] Defendant SB Investment Advisers (US) Inc. manages the defendant funds SVF Excalibur (Cayman) Limited, SVF Endurance (Cayman) Limited, and SoftBank Vision Fund (AIV M1) L.P.

At the time of Zymergen's public offering, these three investors were Zymergen's three largest shareholders, and the only investors entitled to appoint a board member. SoftBank owned around a third of Zymergen's shares, while DCVC and True Ventures each owned just under 10%. Together, these three investors owned more than half of Zymergen's outstanding shares before the public offering, including nearly 60% of its preferred shares.

Zymergen's governance documents required that the company obtain approval from at least two of these three investors for most business matters, including adopting any budget or business plan, hiring executives, granting stock or options, entering or exiting a line of business, or incurring debt. Zymergen could not amend its governing documents or issue common stock without all three investors' consent. The three investors also entered an agreement to vote their shares together on certain issues, including each firm's board nominee. The investors required that Zymergen indemnify not only their board appointees but also the firms and associated individuals from certain securities claims arising from their appointees' board service.

SoftBank's investment in Zymergen was overseen by two of its managing partners, Dipchand Nishar and Vikas Parekh. SoftBank appointed another of its employees, Travis Murdoch, to its seat on Zymergen's board.[4] Mr. Murdoch was a junior SoftBank employee who had no authority on major decisions and was not authorized to act in his capacity as a Zymergen board member without approval from SoftBank. Mr. Murdoch received a salary and cash bonus as well as a significant carried interest in the SoftBank fund that invested in Zymergen. The complaint alleges that SoftBank controlled Mr. Murdoch through the employer relationship and through Mr. Murdoch's personal financial incentive to work in SoftBank's interest.

DCVC's investment in Zymergen was overseen by the firms' two co-owners, Matthew Ocko and Zachary Bogue, as well as its chief operating officer, Spencer Punter. DCVC appointed Mr. Ocko to its board seat. The complaint alleges that DCVC controlled Mr. Ocko because Mr. Ocko served as an agent of DCVC and would receive financial incentives from DCVC if its Zymergen investment succeeded.

---

[4] Mr. Murdoch was appointed in 2020. Prior to that SoftBank's appointee was Mr. Nishar.

True Ventures's investment was similarly overseen by the firm's two co-owners, Jon Callaghan and Phil Black, as well as chief financial officer Ulrike Kellmereit and chief operating officer Jim Stewart. True Ventures appointed its employee Rohit Sharma to its board seat. Like Mr. Murdoch, Mr. Sharma received both a salary as well as a carried interest in the True Ventures funds that invested in Zymergen. Mr. Sharma reported to Mr. Callaghan, Mr. Black, Ms. Kellmereit, and Mr. Stewart. He had to receive explicit authorization for major decisions.

In addition to Mr. Murdock, Mr. Ocko, and Mr. Sharma, the other directors on Zymergen's nine-seat board were Mr. Hoffman (the CEO), Enakshi Singh (the chief financial officer), Zach Serber (the chief science officer), Jay Flatley, Christine Gorjanc, and Sandra Peterson.

Because Mr. Murdoch and Mr. Sharma were not authorized to make decisions without instruction and approval from their employers, Zymergen directors and officers communicated directly with their superiors, including Mr. Nishar at SoftBank and Mr. Stewart and Mr. Black at True Ventures. Similarly, even though Mr. Ocko co-owned DCVC, Zymergen directors and executives frequently communicated directly with Mr. Bogue (the other co-owner) as well.

The complaint asserts that serving on Zymergen's board, controlling Zymergen, and signing its registration statement fell within the scope of the respective agency relationships between the VC firms and their board appointees. Each of the appointed board members served on the boards of multiple companies in which his respective VC firm had invested.

During the lead up to Zymergen's public offering, the three VC firm board appointees were the three sole members of the Zymergen board's audit committee, which controlled Zymergen's financial statements and its internal audit function.

*     *     *

Zymergen began preparing to go public in early 2021, shortly after it launched Hyaline. It filed its initial registration statement with the SEC on March 23, 2021. On April 5, 2021, the company asked the three investors to authorize its public offering. All three agreed to authorize a 1-for-3 reverse stock split, change Zymergen's governing documents, adopt anti-takeover measures, address compensation matters, and convert Zymergen to a public company. These actions, which needed each investor's approval, were required before Zymergen could go public.

United States District Court
Northern District of California

Zymergen finalized its registration statement on April 21, 2021. Its stock began trading the next day. Zymergen sold around 18.5 million shares of common stock at $31 per share in the public offering, yielding proceeds of nearly $530 million.

The registration statement discussed Hyaline and ten other products in Zymergen's development pipeline. It estimated large markets for Zymergen's products, including a total market opportunity of $1.2 trillion across twenty industries and a $1 billion opportunity in the display market alone for Hyaline. It suggested that the company expected to begin generating revenue from Hyaline in late 2021. The complaint alleges these and other statements in the registration statement were either untrue statements of material facts or omitted material facts about Zymergen's product pipeline, market opportunity, and revenue timeline.

On August 3, 2021, less than four months after its IPO, Zymergen revealed "issues with its commercial product pipeline" that would impact its "delivery timeline and revenue projections." The company said it no longer expected revenue in 2021 and expected immaterial revenue in 2022. It also announced that the CEO was stepping down. Zymergen's stock price fell from $26.58 per share to $8.25 per share on the next day.

Over the next few months Zymergen announced layoffs of 220 employees. Cofounder Jed Dean stepped down. News reports compared Zymergen to Theranos and addressed how the company "imploded." In November 2021, the company announced that it was discontinuing Hyaline and that it was under investigation by the SEC.

In October 2022, more than a year after the IPO, Zymergen completed an all-stock merger to become a subsidiary of Ginkgo Bioworks Holdings, Inc. Zymergen shareholders received Ginkgo shares at a rate that valued Zymergen at less than one tenth of its IPO valuation.

A year later, in October 2023, Zymergen filed a Chapter 11 bankruptcy petition.

\*         \*         \*

This case was filed on August 4, 2021, the day after Zymergen's "unexpected" disclosure. The initial complaint named Zymergen, Mr. Hoffman (the CEO), Mr. Singh (the CFO), the other members of the board, and the underwriters of the IPO as defendants. That complaint was filed by Hariram Shankar, represented by Glancy Prongay & Murray LLP.

1   On December 20, 2021, the Court appointed Mr. Wang lead plaintiff and appointed his

2   selected counsel, Robbins Geller Rudman & Dowd LLP, as lead counsel for the putative class.

3   On February 24, 2022, Mr. Wang filed the first amended complaint. Dkt. No. 78. This

4   complaint added the individual SoftBank, True Ventures, and DCVC funds (but not the

5   management companies) as defendants. It included a claim under Section 11 of the Securities Act

6   against Zymergen, individual board members and executives, and the underwriters, as well as a

7   Section 15 claim against the individual defendants and the three investors.

8   Three motions to dismiss followed: one by Zymergen, the individual defendants, and the

9   True Ventures funds (also joined by the underwriters); one by the DCVC funds; and one by the

10   SoftBank funds. On November 29, 2022, the Court denied the motions to dismiss as to the Section

11   11 claim and granted them as to the Section 15 claim. Dkt. No. 162, 2022 WL 17259057

12   (Chhabria, J.). The order stated that the dismissal of the Section 15 claim was "with leave to

13   amend" and that an "amended complaint is due within 28 days of this order." But the order also

14   noted that "if the plaintiffs wish to proceed on this complaint, they can always seek leave to amend

15   at a later stage if discovery reveals additional information relevant to the dismissed claims."

16   Mr. Wang did not file an amended complaint within 28 days. The Court held a case

17   management conference and set a December 21, 2023 deadline to amend pleadings. Dkt. No. 167.

18   On August 11, 2023, the Court granted Mr. Wang's motion to certify the class. Zymergen,

19   the individual defendants, and the underwriters had indicated that they did not oppose this motion.

20   The SoftBank, DCVC, and True Ventures funds did not participate.

21   On December 21, 2023, after this case was reassigned to a new district judge, Mr. Wang

22   filed a motion for leave to file a second amended complaint that would reassert the Section 15

23   claim against the individual defendants and the SoftBank, DCVC, and True Ventures funds and

24   add the three respective management companies as defendants to the Section 15 claim. SoftBank,

25   DCVC, and True Ventures each opposed the proposed amendment, as did the individual

26   defendants. The Court granted Mr. Wang's motion. The SoftBank, DCVC, and True Ventures

27   defendants then filed motions to dismiss the second amended complaint and the Court held a

28   hearing.

United States District Court
Northern District of California

## II.     Legal Standards

A complaint that does not state a plausible claim upon which relief can be granted can be dismissed under Federal Rule of Civil Procedure 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal conclusions "must be supported by factual allegations." *Id.* at 679. The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).

There are two exceptions to the general rule that "courts may not consider material outside the pleadings when assessing the sufficiency of a complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). First, Federal Rule of Evidence 201 permits judicial notice of "a fact that is not subject to reasonable dispute" because the fact is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Second, the doctrine of incorporation by reference permits a court to treat an extrinsic document as if it were part of the complaint if the pleading "refers extensively to the document" or if "the document forms the basis" of a claim. *Khoja*, 899 F.3d at 1002. This can be proper "when assessing the sufficiency of a claim requires that the document at issue be reviewed," but is not warranted when "the document merely creates a defense to the well-ple[aded] allegations." *Id.*

## III.    Requests For Judicial Notice

DCVC and True Ventures request judicial notice of several documents filed with the SEC. Dkt. Nos. 371-4, 383-5. First is Zymergen's pre-IPO registration statement (SEC Form S-1), including the prospectus and Amended and Restated Investors' Rights Agreement that were part of that filing. These requests are granted. These documents are publicly available on the SEC's website and the Court previously took judicial notice of the prospectus and investors' rights agreement. This judicial notice is limited to the existence of these filings and does not extend to the accuracy of their contents.

True Ventures also requests judicial notice of the Wayback Machine's archive of the webpage available at trueventures.com/team as it appeared on July 30, 2021. This request is

granted, but only as to the existence of the page and its contents and the fact that the page was saved by the Internet Archive as it appeared on the indicated date. The Court cannot draw further inferences from these facts. In particular, in both its request for judicial notice and its reply in support of its motion to dismiss, True Ventures characterizes the website as belonging to the management company, True Venture Management, L.L.C. But while the submitted webpage includes a logo at the top that reads "True Ventures," nowhere does the page mention the entity True Venture Management, L.L.C. Accordingly, the Court can draw no conclusions about the True Ventures entity or entities with which this website is affiliated.

## IV.     Motions To Dismiss

### A.     Defendants Cannot Establish a Statute of Limitations Defense At This Stage.

All three sets of investors argue that plaintiffs' claims against them are time barred. At the pleading stage, however, the investors fail to establish that this defense is certain to apply.

A statute of limitations provides an affirmative defense. *See* Fed. R. Civ. P. 8(c)(1). To establish a statute of limitations defense at this stage defendants must show, based only on the pleadings and judicially noticeable material, that there can be no factual dispute that the claims are time barred. If the "asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper." *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014). "Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 n.8 (9th Cir. 2018).

The Section 15 claims against both the funds and the management companies are subject to the one-year statute of limitations set forth in Section 13, which provides:

> No action shall be maintained to enforce any liability created under section 77k [i.e., Section 11] … of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.

15 U.S.C. § 77m (codifying Section 13). Plaintiffs briefly contend that because Section 13 only refers explicitly to liability created under Section 11, it does not apply to Section 15 claims. This

argument fails. Section 11 makes several people liable when a registration statement issued ahead of a public offering includes a false statement of material fact or omits a material fact, including everyone who signed the statement, every director/partner of the issuer, and every underwriter. *Id.* § 77k. Section 15 then extends this liability to anyone who "controls" someone liable under Section 11. *Id.* § 77o. It provides that a controlling person is liable "jointly and severally with and to the same extent" as the controlled person. *Id.* Because Section 15 controlling person liability is "created under" Section 11 and exists "to the same extent" as the underlying Section 11 liability, both Section 11 and Section 15 claims are subject to the same Section 13 limitations period.

Under Section 13, liability under Section 11 or Section 15 accrues when a plaintiff discovers (or should have discovered) the statement or omission on which the claim is based. Plaintiffs assert that for control person claims brought under Section 15, actions must be brought within one year of the discovery of facts showing control rather than facts showing the underlying violation. This contradicts the text of Section 13, however, which clearly states that an action must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." In this case, the latest time when the untrue statement or omission could have been discovered was August 4, 2021, when plaintiffs filed their initial complaint. The first amended complaint was filed within one year of that date. But the second amended complaint at issue here was not. As a result, the amended claims at issue are timely only if they relate back to the date the first amended complaint was filed.

The date that amended claims are treated as having been filed is determined in part by Federal Rule of Civil Procedure 15, which governs amendments to pleadings. Rule 15(c) sets out the circumstances where an amendment to a pleading "relates back to the date of the original pleading" and is treated as though it was filed on that date. Two of these circumstances are relevant here: First, Rule 15(c)(1)(B) allows relation back when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Second, Rule 15(c)(1)(C) allows relation back when "the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule

15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint [usually 90 days], the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."

Here, the relation back analysis is different for the Section 15 claims against the funds, which were named as defendants in the first amended complaint, and the management companies, which were not. These two sets of defendants are addressed in turn.

### 1.    The Claims Against the Funds Relate Back.

The first amended complaint asserted a Section 15 claim against the funds. The Court dismissed this claim with leave to amend.

In a case with multiple claims or multiple parties and in the absence of court order entering final judgment as to some of the claims or parties, Rule 54(b) provides that "any order … that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Here, because the Court did not enter final judgment as to the funds, the order dismissing the Section 15 claim against the funds did not end the action as to the Section 15 claim or the funds, and the funds remained parties to this action. *See Crostley v. Lamar Cnty.*, 717 F.3d 410, 421 (5th Cir. 2013) ("Because the … dismissal of the claims against Lamar County was not a final judgment, and because the order 'adjudicate[d] fewer than all the claims or the rights and liabilities of fewer than all the parties,' the dismissal did 'not end the action as to [Lamar County] and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.' Fed. R. Civ. P. 54(b)."); *Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1159 (10th Cir. 2023) ("'[E]ntitlement' to repose … depends on whether the dismissal was a final judgment. An order, even a dismissal, other than a final judgment 'does not end the action as to any of the claims or parties and *may be revised at any time* before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.' Fed. R. Civ. P. 54(b) (emphasis added). Setting

aside a dismissal before final judgment is entered is no more the bringing of a new action than resuming play after a timeout is the start of a new football game.").[5] Because the claims against the funds in the second amended complaint are asserted against existing parties, whether they relate back to the date the first amended complaint was filed is governed by Rule 15(c)(1)(B).

Relation back under Rule 15(c)(1)(B) depends entirely on the contents of the original and amended pleadings. *See* Fed. R. Civ. P. 15(c)(1)(B) (permitting relation back if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out … in the original pleading"). Here, the Section 11 and Section 15 claims asserted against the funds in the second amended complaint clearly "arose out of the conduct, transaction, or occurrence set out" in the first amended complaint. Indeed, the very same claims were asserted in that prior complaint. The claims against the funds therefore relate back to the date on which the first amended complaint was filed and are not barred by the statute of limitations.

### 2. The Claims Against the Management Companies May Relate Back.

The first amended complaint did not name the management companies as defendants. Accordingly, Rule 15(c)(1)(C), which governs changes to the party against whom a claim is asserted, determines whether the claims against the management companies relate back to the timely filed first amended complaint. Under this rule, an amendment relates back if:

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint [usually 90 days], the party to be brought in by amendment:
>
> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would have been

---

[5] To avoid such an outcome, Rule 54(b) permits any party in a multi-party or multi-claim case to request a court order "direct[ing] entry of a final judgment as to one or more, but fewer than all, claims or parties … if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). Here, the defendants never sought such an order (perhaps because doing so would have permitted an immediate appeal by Mr. Wang), so the Court's order dismissing the claims against them in the first amended complaint "d[id] not end the action as to any of the claims or parties" therein.

brought against it, but for a mistake concerning the proper party's identity.

Unlike under Rule 15(c)(1)(B), relation back under Rule 15(c)(1)(C) depends not just on the pleadings but on questions of fact focused on the defendant, including whether the defendant had actual notice of the action and whether the defendant knew (or should have known) that it would have been named except for a mistake. To establish an affirmative statute of limitations defense at this stage, the management companies must show that the pleadings establish beyond any potential factual dispute that the claims cannot relate back under Rule 15(c)(1)(C). They do not.

First, as with the claims against the funds, the claims against the management companies easily satisfy the requirements of Rule 15(c)(1)(B). Both the Section 11 and Section 15 claims against the management companies clearly "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."

Second, the pleadings and judicially noticeable materials at least suggest that the management companies should have received notice of this action when the funds were named in the first amended complaint. The complaint alleges that each set of funds is managed by the respective management company. The Court can draw the reasonable inference from this allegation that the management companies would have received notice of this action when it was initially brought against the funds they managed. This inference is further bolstered by the fact that each newly-named management company is now represented by the same counsel as each set of previously-named funds.

Finally, the pleadings and judicially noticeable materials at least suggest that the management companies knew or should have known that the action would have been brought against them but for a mistake concerning their identity. The Supreme Court has explained that "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the plaintiff knew or should have known at the time of filing her original complaint." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 548 (2010). In this context, "[a] mistake is 'an error, misconception, or misunderstanding; an erroneous belief.'" *Id.* (cleaned

up). The kinds of mistake that can warrant relation back under Rule 15(c)(1)(C) are not limited to mistakes over a party's existence:

> That a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity. A plaintiff may know that a prospective defendant—call him party A—exists, while erroneously believing him to have the status of party B. Similarly, a plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the "conduct, transaction, or occurrence" giving rise to her claim. If the plaintiff sues party B instead of party A under these circumstances, she has made a "mistake concerning the proper party's identity" notwithstanding her knowledge of the existence of both parties. The only question under Rule 15(c)(1)(C)(ii), then, is whether party A knew or should have known that, absent some mistake, the action would have been brought against him.

*Id.* at 549.

Here, regardless of whether Mr. Wang knew that the management companies existed when he filed the first amended complaint, the pleadings suggest that the management companies should have known that the action would have been brought against them but for a mistake concerning the role the management companies played in the conduct, transaction, or occurrence giving rise to Mr. Wang's claims. In his second amended complaint, Mr. Wang alleges that each set of investment funds is managed by the respective management company. While the first amended complaint alleged that only the funds were the controlling persons (in addition to the individual defendants), the second amended complaint alleges that the management companies were also controlling persons. Taken in context, these allegations are enough to at least suggest that Mr. Wang could have made a mistake concerning the management companies' role in the alleged misconduct when he filed the first amended complaint, and that the management companies should have known that they would have been named absent this mistake over their role.

Of course, whether the requirements of Rule 15(c)(1)(C) are actually satisfied for each of the management companies ultimately involves questions of fact that cannot be definitively resolved based on the pleadings. But at this stage, there are plausible allegations to suggest that the claims against the management companies will relate back. This is enough to require the denial of a motion to dismiss based on a statute of limitations defense at this stage.

**B.      The Section 15 Controlling Person Claim Is Adequately Pleaded.**

Mr. Wang claims that the investors as well as the individual defendants are liable under Section 15 of the Securities Act—the individual defendants because they controlled Zymergen, and the investors because they controlled both Zymergen and their respective board appointees. The investors challenge Mr. Wang's Section 15 claim against them on both bases.

Section 15 makes liable anyone "who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [Section 11 or 12], … unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

There are two elements to a Section 15 claim: First, that another person violated Section 11 or 12. Second, that the defendant had "actual power or control over" that person. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).[6] And while an underlying Section 11 or 12 violation that sounds in fraud must be pleaded with particularly under Rule 9(b), allegations of control—the second element—are subject to Rule 8's less stringent standard.

The Court previously concluded that plaintiffs have adequately pleaded the first element of their Section 15 claims, the underlying violation of Section 11 by Zymergen, Mr. Murdoch, Mr. Ocko, and Mr. Sharma (among others). The question on this motion is only whether plaintiffs have adequately pleaded that the investors possessed power or control over any of these people.

The statute does not itself define control other than by example: control can be exercised "by or through stock ownership, agency, or otherwise." 15 U.S.C. § 77o. The SEC's implementing regulations define "control" to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of

---

[6] *Howard* addressed a claim under Section 20(a) of the Securities Exchange Act. Section 20(a) was modelled after Section 15, and while the provisions are not identical, "the controlling person analysis is the same." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990).

United States District Court
Northern District of California

voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; *see also Howard*, 228 F.3d at 1065 n.9 (citing § 230.405).

As the Ninth Circuit has noted, control "is an intensely factual question." *Howard*, 228 F.3d at 1065. Sections 11 and 12 liability can extend to natural people as well as corporate entities. In the context of an individual alleged to control a corporation, this inquiry requires "scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* In the context of a business entity alleged to control a natural person, the inquiry will differ. Ultimately, "the concept of control, in the context of the securities law, is an elusive notion for which no clear-cut rule or standard can be devised," and the "test for establishing control should be construed liberally and flexibly." *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987), *overruled on other grounds as recognized in Flood v. Miller*, 35 Fed. Appx. 701, 703 n.3 (9th Cir. 2002). The "focus should be on how to characterize the relationship between the various alleged controlling persons and the alleged violator." *Id.*

Whether someone has the ability to control someone else and whether they in fact exercised this control are separate questions. To establish actual power or control for purposes of a Section 15 claim, a plaintiff "need not show that the defendant was a culpable participant in the violation." *Howard*, 228 F.3d at 1065. In other words, "it is not necessary to show actual participation or the exercise of actual power." *Id.* It is enough to allege at the pleading stage that the defendant *possessed* actual power, even if the plaintiff cannot show that the defendant *used* that power to cause the underlying violation.

### 1.    Investors' Control of Individual Board Members

The complaint alleges that each of the investors controlled their respective appointees to Zymergen's board. The three investor/appointee pairs are addressed in turn.

The complaint alleges that the SoftBank defendants appointed Mr. Murdoch to the board seat to which SoftBank was entitled. It alleges that Mr. Murdoch was employed by SoftBank's management company, SB Investment Advisors, and had a carried interest in funds that invested in Zymergen. The complaint alleges that Mr. Murdoch had to receive approval from SoftBank to

15

1    make decisions in his capacity as a board member. Taken together, these allegations are sufficient

2    to plausibly allege that the SoftBank defendants controlled Mr. Murdoch.[7]

3           The allegations pertaining to True Ventures's control of its board appointee, Mr. Sharma,

4    are similar. According to the complaint, Mr. Sharma is a True Ventures employee who received a

5    carried interest in the funds that invested in Zymergen. Mr. Sharma similarly lacked authority to

6    act as a board member without approval from True Ventures. These allegations suffice to

7    plausibly allege that True Ventures controlled Mr. Sharma.

8           The allegations with respect to DCVC and Mr. Ocko are more difficult. Mr. Ocko was not

9    an employee of DCVC but rather a co-owner. The complaint alleges that DCVC controlled Mr.

10   Ocko and that Mr. Ocko acted as DCVC's agent. But these are legal conclusions which must be

11   ignored at this stage. The complaint also alleges that Zymergen executives communicated directly

12   with Mr. Bogue, the other co-owner, in addition to Mr. Ocko. But it does not allege that Mr. Ocko

13   had to receive approval from either Mr. Bogue or DCVC to make decisions as a board member.

14   Ultimately, while the question is close, the complaint as currently formulated does not include

15   enough factual allegations to support a claim that DCVC possessed control over Mr. Ocko.

16          All three of the investors also argue that the allegations that they controlled their respective

17   board appointees are undercut by the fact that the appointees owed fiduciary duties to Zymergen.

18   True Ventures suggests, for example, that the "more plausible inference" from the complaint is

19   that Dr. Sharma (its appointee) was controlled by the Zymergen shareholders to which he owed

20   fiduciary duties, not by True Ventures. DCVC goes so far as to assert that board members are

21   entitled to a presumption that they acted in accordance with their fiduciary duties. *See Beam ex rel.*

22   *Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004) (applying

23   Delaware corporate law's presumption that corporate directors were faithful to fiduciary duties in

24   the context of a breach of fiduciary duty claim). As an initial matter, these factual disputes are

27   [7] Further development of the factual record may reveal which specific SoftBank defendants
     controlled Mr. Murdoch and how. At the pleading stage, the allegations are sufficient to suggest
28   that the various SoftBank funds and the management company acted together through an
     agreement or understanding in controlling Mr. Murdoch in the ways alleged in the complaint.

United States District Court
Northern District of California

premature, because the Court must draw all reasonable inferences in Mr. Wang's favor for in deciding defendants' Rule 12(b)(6) motion. Whatever fiduciary duties the board appointees might have owed Zymergen, Mr. Wang has done enough to plausibly allege that SoftBank and True Ventures had the power to exercise control over Mr. Murdoch and Mr. Sharma. Moreover, even if the board appointees were entirely faithful to their alleged fiduciary duties to Zymergen and its shareholders, it is not clear that a Section 15 claim based on the investors' power to control their appointees would be precluded.

### 2.    Investors' Control of Zymergen

Section 15 extends control person liability to anyone who individually controls a liable party, as well as to anyone who "pursuant to or in connection with an agreement or understanding with one or more other persons" exercises such control. Here, each of the investors is liable if they exercised control over Zymergen either on their own or via an agreement or understanding with other parties, including the other investors.

As amended, the complaint alleges that two of the three investors had to sign off on most business matters, that each of the investors' authorization was required in order to issue common stock, and that each of the investors formally authorized Zymergen's IPO and the prerequisite governance changes. It alleges that the investors helped write Zymergen's registration statement and provided input throughout the drafting process. It also alleges that each of the investors could have blocked the challenged statements from being issued or required them to be corrected by not signing off on Zymergen's registration statement. The complaint does not allege that the three investors had a formal agreement to act together specifically with respect to Zymergen's public offering. But it does allege that that the three investors did have a formal agreement to vote their shares together on other key issues, including voting for each other's board nominees.

Taken together, these allegations are sufficient to plead that each of the three investors possessed the power to control Zymergen as it prepared for and registered its public offering, both individually and acting together. Courts have held that owning a minority of shares in a company, even with the power to appoint a director, does not demonstrate power to control. *See, e.g.*, *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397, at *13 (W.D. Wash. Dec. 29, 2008).

But here, plaintiffs allege more. The amended complaint alleges that, individually, each investor had the power to prevent Zymergen from going public. It also alleges that, collectively, the three investors considered, and two of the three had to approve, most business decisions, and that the investors had a formal agreement to vote together on some issues. These allegations are sufficient to establish that the investors at least possessed the power to control Zymergen.

*     *     *

In sum, the amended complaint adequately pleads that SoftBank and True Ventures controlled their respective board appointees, and that all three investors controlled Zymergen. The Section 15 claim that DCVC controlled Mr. Ocko is dismissed with leave to amend. The motions to dismiss the Section 15 claims against the investors are otherwise denied.

### C.      Respondeat Superior Liability Is Adequately Pleaded.

On this motion, the parties do not dispute that Mr. Wang has adequately pleaded both a Section 11 and a Section 15 claim against each of the three investor-appointed board members. The amended complaint asserts that because each board member was an agent of the investor that appointed them, the investors are secondarily liable for both the Section 11 and Section 15 claims under the respondeat superior doctrine.

The Ninth Circuit has held that the securities statutes do not supplant secondary liability available at common law. In *Hollinger*, it explained that the controlling person liability provisions of the Securities Act and the Securities Exchange Act were intended "to prevent evasion of the law" by "impos[ing] liability on controlling persons … who would not be liable under respondeat superior because they were not the actual employers." *Hollinger*, 914 F.2d at 1577 (1990). In enacting these provisions, "Congress expanded upon the common law." *Id.* According to the Ninth Circuit, the combination of statutory control person liability and respondeat superior makes "the statutory scheme comprehensive" and ensures that the public is fully "protected by the federal securities laws." *Id.*

Several years after *Hollinger*, the Supreme Court ruled that civil liability under Section 10(b) of the Securities Exchange Act does not extend secondarily to those who aid or abet the violation. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164,

18

United States District Court
Northern District of California

191 (1994). In dissent, Justice Stevens noted that the majority's rationale called into question whether other forms of secondary liability would continue to be available for securities violations. He noted in particular that *Hollinger* "appear[ed] unlikely to survive the Court's decision." *Id.* at 200 n.12 (Stevens, J., dissenting).

Justice Stevens' speculation notwithstanding, *Hollinger* remains good law and has not been explicitly overruled by the Supreme Court or the Ninth Circuit. Nor is *Hollinger*'s holding that respondeat superior liability is available for statutory securities claims clearly irreconcilable with *Central Bank*'s holding regarding aiding and abetting liability for Section 10(b) claims, as would be required for this Court to conclude that *Hollinger* has been effectively overruled. *See Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) ("A prior decision is effectively overruled if intervening higher authority has so undercut the theory or reasoning underlying the prior circuit precedent as to make the precedent clearly irreconcilable with the intervening authority. The clearly irreconcilable requirement is a high standard." (cleaned up)). Under still-binding Ninth Circuit precedent, respondeat superior liability remains available for statutory securities violations like those alleged here.

Under the doctrine of respondeat superior, "the principal who acts through the agent … is secondarily liable" for the agent's violation, "assuming the agent is acting within the scope of his agency." *Hollinger*, 914 F.2d at 1578. Common law secondary liability is a matter of state law. This Court applies California's choice of law rules, *see Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941), and under those rules applies California law absent the invocation of another jurisdiction's law. Under California law, "the determination whether an employee has acted within the scope of employment presents a question of fact" unless "the facts are undisputed and no conflicting inferences are possible." *Mary M. v. City of L.A.*, 54 Cal. 3d 202, 213 (1991) (cleaned up); *see also Oswald Mach. & Equip., Inc. v. Yip*, 10 Cal. App. 4th 1238, 1247 (1992) ("Unless the evidence is undisputed, the scope of an agency relationship is a question of fact, and the burden of proof rests on the party asserting the relationship.").

Here, the complaint plausibly alleges that Mr. Murdoch and Mr. Sharma were acting within the scope of their respective employment relationships in carrying out the actions alleged to

violate Section 11 and Section 15. The parties do not dispute that Mr. Murdoch was employed by SoftBank and appointed to Zymergen's board by SoftBank, and that Mr. Sharma was similarly employed by True Ventures and appointed to the board by True Ventures. The complaint also alleges that the scope of Mr. Murdoch's and Mr. Sharma's employment included serving on portfolio companies' boards. This assertion is further supported by the allegations that both Mr. Murdoch and Mr. Sharma had to receive approval from SoftBank and True Ventures in making major decisions even in their capacity as board members, and that both also served on other boards as part of their jobs. Whether Mr. Murdoch and Mr. Sharma were in fact acting within the scope of their employment in taking the actions alleged to violate Section 11 and Section 15 is a question to be resolved at summary judgment or trial. At this stage, the allegations are sufficient to invoke respondeat superior liability.

As with the control claims, the arrangement between DCVC and Mr. Ocko is different because Mr. Ocko is alleged to be a co-owner rather than an employee of DCVC. The complaint alleges that Mr. Ocko was DCVC's agent and was acting within the scope of his agency in serving on Zymergen's board. But without additional factual allegations, these assertions are conclusory. Unlike Mr. Murdoch and Mr. Sharma, for example, the complaint does not allege that Mr. Ocko had to receive approval from DCVC before making decisions as a board member. Because the complaint does not plausibly allege that Mr. Ocko was acting as DCVC's agent in taking the actions alleged to violate Section 11 and Section 15, the allegations are insufficient to hold DCVC secondarily liable for his actions.

For these reasons, SoftBank's and True Ventures's motions to dismiss are denied as to the claims for secondary liability under the doctrine of respondeat superior, but DCVC's motion is granted as to secondary liability.

## V.     Conclusion

For the foregoing reasons, defendants requests for judicial notice are granted. DCVC's motion to dismiss is granted with leave to amend as to the Section 15 claim based on control of Mr. Ocko, as well as the secondary liability claims based on respondeat superior. Any amended

complaint is due September 12, 2024. DCVC's motion is otherwise denied, and SoftBank's and True Ventures's motions are denied in full.

**IT IS SO ORDERED.**

Dated: August 14, 2024



P. Casey Pitts
United States District Judge