# EXHIBIT 17

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Liaison Counsel for Plaintiff*

*[Additional Counsel on Signature Page]*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SHAUNA MELLOR, derivatively on behalf of ZYMERGEN INC., | |
| Plaintiff, | Case No.: |
| v. | |
| JOSH HOFFMAN, ENAKSHI SINGH, STEVEN CHU, JAY T. FLATLEY, CHRISTINE M. GORJANC, TRAVIS MURDOCH, MATTHEW A. OCKO, SANDRA E. PETERSON, ZACH SERBER, and ROHIT SHARMA, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| ZYMERGEN INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Shauna Mellor ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Zymergen Inc. ("Zymergen" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Josh Hoffman ("Hoffman"), Enakshi Singh ("Singh"), Steven Chu ("Chu"), Jay T. Flatley ("Flatley"), Christine M. Gorjanc ("Gorjanc"), Travis Murdoch ("Murdoch"), Matthew A. Ocko ("Ocko"), Sandra E. Peterson ("Peterson"), Zach Serber ("Serber"), and Rohit Sharma ("Sharma") (collectively, the "Individual Defendants," and together with Zymergen, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Zymergen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zymergen, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Zymergen's current and/or former directors and officers from April 26, 2021 through August 2, 2021 (the "Relevant Period") based on misleading statements and omissions made in connection with the Company's April 2021 initial public offering of stock (the "IPO"), and subsequent failures to correct them.

2.     Zymergen is a Delaware corporation based in Emeryville, California, that integrates molecular biology, chemistry, materials science, lab automation systems, software applications, databases, and machine learning algorithms to develop and commercialize novel materials. The Company calls its

Verified Shareholder Derivative Complaint

proprietary process "biofacturing," which it defines as "the design, development and commercialization of bio-based breakthrough products, economically, at industrial scale, where microorganisms create the biomolecules that are the key ingredients in those products."

3.     Zymergen is designated as a public benefit corporation under the Delaware General Corporation Law, having the following purported public benefit:

> to displace the petrochemicals that pollute the Planet by designing, developing, and commercializing bio-based materials that deliver better performance than existing products, at attractive costs. We make products with broad applications and global reach that are safer for the people who manufacture them, healthier for the people who use them and better for the environment.

4.     The Company's first product is "Hyaline," an optical film designed for electronics companies to use in display touch sensors. Since Hyaline's launch in 2020, the product has been undergoing the "qualification process," in which customers validate that the product meets certain performance requirements.

5.     Incorporated in 2013, the Company had its IPO in April 2021, which closed on April 26, 2021. In conjunction with the IPO, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning Zymergen's business, operations, and prospects. Specifically, the Company stated that it expected to begin generating revenue in the second half of 2021, that the total market opportunity for its products was at least $1.2 trillion, and that the market for Hyaline was over $1 billion.

6.     However, during the IPO and throughout the Relevant Period, the Individual Defendants failed to disclose that customers were encountering technical issues in implementing Hyaline into their manufacturing processes, that the Company had lacked significant insight into the qualification process, and that the Company's revenue projections were based on overestimations of customer demand.

7.     The Individual Defendant's misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock at the time of the Company's IPO—during which the Company sold 18,549,500 shares of common stock at $31.00/share, netting $530.1 million after expenses—and throughout the Relevant Period.

8.     The truth emerged on August 3, 2021, when the Company issued a press released titled

"Zymergen Provides Business Update" that revealed, *inter alia*, that several key customers encountered technical issues in implementing Hyaline and that the market for Hyaline was smaller than anticipated. Furthermore, the Company stated that it "no longer expects product revenue in 2021, and expects product revenue to be immaterial in 2022."

9.      On this news, the Company's share price declined $26.58 per share—more than 76%—from its August 3, 2021 closing price of $34.83 per share to close August 4, 2021 at $8.25.

10.     The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public, in conjunction with the Company's IPO and during the Relevant Period, a series of materially false and misleading statements regarding the Company's business, operations, and prospects that the Individual Defendants failed to correct throughout the Relevant Period. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) key customers encountered technical issues in implementing Hyaline into their manufacturing processes; (2) the Company's commercial teams lacked insight into the qualification process, causing the Company to overestimate demand for Hyaline; (3) the market opportunity for Hyaline was smaller than the Company had previously represented; (4) as a result of the foregoing, the Company's timeline for delivery of Hyaline was likely to be delayed, which would also delay revenue generation; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

12.     In further breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company and the Individual Defendants to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action") and which has further

subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the Individual Defendants' liability in this derivative action and in the Securities Class Action, of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

17.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act of 1933 (the "Securities Act").

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by conducting business in this District. Venue is

additionally proper in this District because Zymergen is headquartered in this District.

**PARTIES**

**Plaintiff**

21.     Plaintiff is a current shareholder of Zymergen. Plaintiff has continuously held Zymergen common stock at all relevant times.

**Nominal Defendant Zymergen**

22.     Zymergen is a Delaware corporation with its principal executive offices at 5980 Horton Street, Suite 105, Emeryville, California 94608. Zymergen's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "ZY."

**Defendant Hoffman**

23.     Defendant Hoffman co-founded Zymergen and served as CEO from September 2014 until August 2, 2021. In addition, he served as a Company director from April 2013 until August 2, 2021. According to the Company's prospectus filed with the SEC on April 23, 2021 on Form 424B4 (the "April 23, 2021 Prospectus"), Defendant Hoffman beneficially owned 3,011,281 shares of the Company's common stock following the IPO, which closed on April 26, 2021. Given that the price per share of the Company's common stock at the close of trading on April 26, 2021 was $43.00, Defendant Hoffman owned $129,485,083 worth of Zymergen stock.

24.     For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Hoffman received $1,430,129 in compensation from the Company, including $377,000 in salary, $94,250 in bonus, and $958,879 in option awards.

25.     The Company's prospectus filed with the SEC on April 23, 2021 on Form 424B4 (the "April 23, 2021 Prospectus") stated the following about Defendant Hoffman:

*Josh Hoffman* co-founded Zymergen and has served as our Chief Executive Officer since September 2014 and as a co-founder and a member of our board of directors since April 2013. Prior to co-founding our company, Mr. Hoffman was a partner at Norcob Capital Management LLC, a private equity firm, from January 2009 to April 2013, and a managing director in Merchant Banking at Rothschild, a multinational investment bank, from February 2005 to December 2008. He holds a M.A. in international relations and a MPPM from Yale University, as well as a B.A. from University of California, Berkeley. We believe that Mr. Hoffman is qualified to serve as a member of our board of directors

because of the perspective and experience he brings as our co-founder and Chief Executive Officer.

**Defendant Singh**

26.     Defendant Singh joined the Company in August 2014 and has served as CFO since February 17, 2021.

27.     The April 23, 2021 Prospectus stated the following about Defendant Singh:

*Enakshi Singh* has served as our Chief Financial Officer since February 17, 2021. Previously she served as our VP of Finance since August 2014. Prior to Zymergen, Ms. Singh served as SVP, Asset Management at Mubadala Development Company, Abu Dhabi's sovereign wealth fund, from December 2009 to August 2014. Ms. Singh's prior experience was in finance and strategic financial management, at Salomon Smith Barney, Merrill Lynch and Mubadala. She received a B.A. in economics at Cornell University and an M.B.A. at MIT Sloan School of Management.

**Defendant Chu**

28.     Defendant Chu has served as a Company director since July 2016. He is the chairperson of the Technology and Science Committee and also serves as a member of the Nominating and Corporate Governance Committee. According to the April 23, 2021 Prospectus, Defendant Chu beneficially owned 146,222 shares of the Company's common stock following the IPO, which closed on April 26, 2021. Given that the price per share of the Company's common stock at the close of trading on April 26, 2021 was $43.00, Defendant Chu owned $6,287,546 worth of Zymergen stock.

29.     According to the Company's Non-Employee Director Compensation Policy adopted in April 2021 (the "2021 Director Compensation Policy"), Defendant Chu receives an annual fee of $75,000 for his service on the Board and $10,000 for his service as Science and Technology Committee Chair, in addition to certain annual awards of restricted stock units. Following the completion of the IPO, Defendant Chu was granted an initial award of restricted stock units valued at $700,000, one third of which will vest per year over a period of three years. According to the April 23, 2021 Prospectus, Defendant Chu received $220,196 in compensation from the Company in the 2020 Fiscal Year, consisting entirely of option awards.

30.     The April 23, 2021 Prospectus stated the following about Defendant Chu:

*Steven Chu, Ph.D.* has served on our board of directors since July 2016. Dr. Chu has served as the William R. Kenan, Jr., Professor of Physics and Professor of Molecular & Cellular

Physiology in the Medical School at Stanford University since May 2013. Dr. Chu was the 12th U.S. Secretary of Energy from January 2009 until the end of April 2013. Prior to his cabinet post, he was director of the Lawrence Berkeley National Laboratory, where he was active in pursuit of alternative and renewable energy technologies, and Professor of Physics and Applied Physics at Stanford University from 1987 to 2008, where he helped launch Bio-X, a multi-disciplinary institute combining the physical and biological sciences with medicine and engineering. Previously he was head of the Quantum Electronics Research Department at AT&T Bell Laboratories. Dr. Chu is the co-recipient of the 1997 Nobel Prize in Physics for his contributions to laser cooling and atom trapping and has received numerous other awards. He is a member of the National Academy of Sciences, the American Philosophical Society, the American Academy of Arts and Sciences, the Academia Sinica and is a foreign member of the Royal Society, the Royal Academy of Engineering, the Chinese Academy of Sciences, the Korean Academy of Sciences and Technology and the National Academy of Sciences, Belarus. He is the Chair of the American Association for the Advancement of Science. He received an A.B. degree in mathematics and a B.S. degree in physics from the University of Rochester, and a Ph.D. in physics from the University of California, Berkeley, as well as 32 honorary degrees. We believe Dr. Chu is qualified to serve on our board of directors because of his extensive background in life sciences, academia and government.

**Defendant Flatley**

31.    Defendant Flatley is currently Acting CEO. In addition, he has served as a Company director since January 2020 and as chairperson of the Board since April 2021. Defendant Flatley is a member of the Compensation Committee, the Nominating Corporate Governance Committee, and the Technology and Science Committee. According to the April 23, 2021 Prospectus, Defendant Flatley beneficially owned 119,651 shares of the Company's common stock following the IPO, which closed on April 26, 2021. Given that the price per share of the Company's common stock at the close of trading on April 26, 2021 was $43.00, Defendant Flatley owned $5,144,993 worth of Zymergen stock.

32.    According to an August 2, 2021 letter filed with the SEC as an exhibit to the Company's quarterly report for the fiscal quarter ended June 30, 2021, Defendant Flatley receives a base salary of $1,000,000 for his service as Acting CEO, in addition to a one-time incentive grant of stock options for 1,520,000 shares of the Company's common stock, to vest over two years, which represented approximately 1.5% of the Company's outstanding common stock as of June 30, 2021, when the price of the Company's common stock closed at $40.01.

33.    The April 23, 2021 Prospectus stated the following about Defendant Flatley:

*Jay T. Flatley* has served on our board of directors since January 2020 and has served as our chairperson since April 2021. From December 2013 through July 2016, Mr. Flatley

served as the Chief Executive Officer of Illumina, Inc., a public company focused on sequencing and array-based solutions for genetic analysis and from October 1999 through December 2013, he served as the President and Chief Executive Officer of Illumina. Prior to joining Illumina, Mr. Flatley was co-founder, President, Chief Executive Officer and a director of Molecular Dynamics, a life sciences company focused on genetic discovery and analysis, from 1994 until its sale to Amersham Pharmacia Biotech in 1998. Mr. Flatley has also served on the board of directors of Illumina, Inc. since 1999, the Executive Chair of Illumina from July 2016 through January 2020 and the Chair of the Board of Illumina since January 2020, Denali Therapeutics Inc., a public biotechnology company since 2015, Coherent Inc., a publicly traded photonics manufacturing company, since 2011; he previously served on the board of directors of Juno Therapeutics, Inc., from 2017 to 2018. Mr. Flatley is an advisory board member for U.C. San Diego's Moore Cancer Center and serves on the board of trustees of the Salk Institute for Biological Studies. Mr. Flatley received his B.S. and M.S. in industrial engineering from Stanford University and his B.A. in economics from Claremont McKenna College. We believe Mr. Flatley is qualified to serve on our board of directors because of his extensive background in the life sciences industry and leadership experience as a senior executive of companies in the life sciences industry.

### Defendant Gorjanc

34.     Defendant Gorjanc has served as a Company director since March 2021, and she serves as chairperson of the Audit Committee. According to the 2021 Director Compensation Policy, Defendant Gorjanc receives an annual fee of $75,000 for her service on the Board and $25,000 for her service as Audit Committee Chair, in addition to certain annual awards of restricted stock units. Following the completion of the IPO, Defendant Gorjanc was granted an initial award of restricted stock units valued at $700,000, one third of which will vest per year over a period of three years.

35.     The April 23, 2021 Prospectus stated the following about Defendant Gorjanc:

*Christine M. Gorjanc* has served on our board of directors since March 2021. She retired from her Chief Financial Officer role at Arlo Technologies Inc., a publicly traded home automation company in June 2020. Ms. Gorjanc served as the Chief Financial Officer of Arlo since Arlo's IPO in August 2018. She previously served as the Chief Financial Officer of NETGEAR, Inc., a publicly traded provider of networking products and services, from January 2008 to August 2018, where she also served as Chief Accounting Officer from December 2006 to January 2008 and Vice President, Finance from November 2005 to December 2006. From September 1996 through November 2005, Ms. Gorjanc served as Vice President, Controller, Treasurer and Assistant Secretary of Aspect Communications Corporation, a provider of workforce and customer management solutions. From October 1988 through September 1996, she served as the Manager of Tax for Tandem Computers, Inc., a provider of fault-tolerant computer systems. Prior to that, Ms. Gorjanc served in management positions at Xidex Corporation, a manufacturer of storage devices, and spent eight years in public accounting with a number of public accounting firms. Ms. Gorjanc serves as a director of Juniper Networks, Inc., a publicly

traded company that develops high performance networking products giving customers agility and improved operating efficiency through automation, since May 2019. She also serves as a director of Invitae Corporation, a publicly traded medical genetics company that brings comprehensive genetic information into mainstream medicine to improve healthcare for billions of people, since November 2015. She holds a B.A. in Accounting (with honors) from the University of Texas at El Paso and a M.S. in Taxation from Golden Gate University. We believe that Ms. Gorjanc is qualified to serve as a member of our board of directors and as chair of the Audit Committee because of her extensive experience in the technology industry and her management and financial experience.

**Defendant Murdoch**

36.     Defendant Murdoch has served as a Company director since September 2020, and he currently serves as a member of the Compensation Committee. According to the 2021 Director Compensation Policy, Defendant Murdoch receives an annual fee of $75,000 for his service on the Board, in addition to certain annual awards of restricted stock units. Following the completion of the IPO, Defendant Murdoch was granted an initial award of restricted stock units valued at $700,000, one third of which will vest per year over a period of three years.

37.     The April 23, 2021 Prospectus stated the following about Defendant Murdoch:

*Travis Murdoch, M.D.* has served on our board of directors since September 2020. Dr. Murdoch has served as an Investment Director at Softbank Investment Advisers since January 2018, where he focuses on life sciences investments. Prior to that, Dr. Murdoch served as a Principal at Third Rock Ventures from 2017 to 2018, where he was part of the founding teams of Ambys Medicines and Rheos Medicines. Prior to that, Dr. Murdoch served as a Gastroenterologist and Internist at Alberta Health Sciences from 2013 to 2018, and a consultant at McKinsey and Company from 2015 to 2017. Dr. Murdoch holds a M.S. in integrated immunology from University of Oxford, as well as a M.D. and Bachelor of Medical Science from the University of Alberta. Dr. Murdoch is a director selected to serve on our board of directors by SVF Excalibur (Cayman) Limited pursuant to the Voting Agreement dated as of July 29, 2020. We believe Dr. Murdoch is qualified to serve on our board of directors because of his extensive experience in the venture capital, biotechnology and healthcare industries, advising technology companies as an investor and physician.

**Defendant Ocko**

38.     Defendant Ocko has served as a Company director since June 2015, and he currently serves as a member of the Audit Committee and the Technology and Science Committee. According to the April 23, 2021 Prospectus, Defendant Ocko beneficially owned 7,366,635 shares of the Company's common stock following the IPO, which closed on April 26, 2021. Given that the price per share of the Company's common stock at the close of trading on April 26, 2021 was $43.00, Defendant Ocko owned $316,765,305

worth of Zymergen stock.

39.     According to the 2021 Director Compensation Policy, Defendant Ocko receives an annual fee of $75,000 for his service on the Board, in addition to certain annual awards of restricted stock units. Following the completion of the IPO, Defendant Ocko was granted an initial award of restricted stock units valued at $700,000, one third of which will vest per year over a period of three years.

40.     Defendant Ocko was selected to serve as a Company director by DCVC Opportunity Fund, L.P. Defendant Ocko is a managing member of DCVC Opportunity Fund GP, LLC, the general partner of DCVC Opportunity Fund L.P.

41.     The April 23, 2021 Prospectus stated the following about Defendant Ocko:

*Matthew A. Ocko* has served on our board of directors since June 2015. Mr. Ocko is the Co-Founder and Co-Managing Partner of venture capital fund DCVC since 2011, where his investments span computational and synthetic biology, geospatial and space access platforms, robotics, applied artificial intelligence, antiterror systems and large-scale enterprise platforms including quantum computers. Mr. Ocko has led significant investments and served on the board of directors of several private companies, including Rocket Lab, Inc., Pivot Bio, Inc., Embark Trucks, Inc., Primer Technologies, Inc., Fortem Technologies, Inc., Jupiter Intelligence, Inc., Atomwise, Inc., Halter, Inc., Agility Robotics Inc., Supply Inc. (d/b/a Reach Labs), Nervana, Inc. (acquired by Intel Corp) and Blue River Technology Inc. (acquired by Deere & Co). In addition to successful IPO outcomes, a number of Mr. Ocko's prior investments were acquired by large public technology companies. Prior to co-founding DCVC, Mr. Ocko was an active angel investor, and his institutional venture capital experience encompasses significant prior roles at VantagePoint AI, LLC, SOFTBANK Technology Ventures Corp (aka Mobius Venture Capital), Sevin Rosen Funds and Helix Investments. Mr. Ocko founded Da Vinci Systems, a pioneering e-mail software vendor with over one million users world-wide prior to its acquisition in 1994. Mr. Ocko holds a B.S. in physics from Yale University. Mr. Ocko is a director selected to serve on our board of directors by DCVC Opportunity Fund, L.P. pursuant to the Voting Agreement. We believe Mr. Ocko is qualified to serve on our board of directors because of his extensive experience in the venture capital industry, advising technology companies as both a director and executive.

**Defendant Peterson**

42.     Defendant Peterson has served as a Company director since December 2019. She currently serves as chairperson of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the April 23, 2021 Prospectus, Defendant Peterson beneficially owned 89,233 shares of the Company's common stock following the IPO, which closed on April 26, 2021. Given that

the price per share of the Company's common stock at the close of trading on April 26, 2021 was $43.00, Defendant Peterson owned $3,837,019 worth of Zymergen stock.

43.     According to the 2021 Director Compensation Policy, Defendant Peterson receives an annual fee of $75,000 for her service on the Board, $20,000 for her service as Compensation Committee Chair, and $10,000 for her service as Nominating and Corporate Governance Committee Chair, in addition to certain awards of restricted stock units. Following the completion of the IPO, Defendant Peterson was granted an initial award of restricted stock units valued at $700,000, one third of which will vest per year over a period of three years. According to the April 23, 2021 Prospectus, Defendant Peterson received $634,700 in compensation from the Company in the 2020 Fiscal Year, consisting entirely of option awards.

44.     The April 23, 2021 Prospectus stated the following about Defendant Peterson:

*Sandra E. Peterson* has served on our board of directors since December 2019. Ms. Peterson is an operating partner at Clayton, Dubilier & Rice, a private investment firm, where she has served since 2019. Previously, Ms. Peterson served as group worldwide chairman for Johnson & Johnson, the world's largest broadly based healthcare company, from 2012 to 2018. From 2005 through 2012, Ms. Peterson was chair and Chief Executive Officer of Bayer CropScience AG in Germany and Chief Executive Officer of Bayer Medical Devices. Prior to that she worked for Medco Health Solutions Inc. (formerly Merck-Medco) from 1999 to 2004. Ms. Peterson is a member of the board of directors for Covetrus, Inc. since June 2020 and Microsoft Corp. since December 2015. Ms. Peterson holds a B.A. from Cornell University and an M.P.A. from Princeton University. We believe Ms. Peterson is qualified to serve on our board of directors because of her extensive global career background in healthcare, life sciences, consumer goods and consulting.

### Defendant Serber

45.     Defendant Serber co-founded the Company in 2013 and has served as Chief Science Officer since September 2014. In addition, he served as a Company director from April 2013 to May 2017 and from December 2020 to the present. He is a member of the Technology and Science Committee. According to the April 23, 2021 Prospectus, Defendant Serber beneficially owned 2,699,446 shares of the Company's common stock following the IPO, which closed on April 26, 2021. Given that the price per share of the Company's common stock at the close of trading on April 26, 2021 was $43.00, Defendant Serber $116,076,178 worth of Zymergen stock.

46.     The April 23, 2021 Prospectus stated the following about Defendant Serber:

*Zach Serber, Ph.D.* co-founded Zymergen and has served as our Chief Science Officer since September 2014 and a co-founder since April 2013. He served as a member of our board of directors from April 2013 to May 2017 and rejoined our board of directors in December 2020. Dr. Serber has extensive experience in industrial biotechnology, with 17 peer-reviewed publications and several patents across biomolecular discovery and microbial engineering. Prior to co-founding our company, Dr. Serber served as a director of biology at Amyris, Inc., a public biotechnology company, from August 2011 to February 2013 and a scientist from September 2007 to July 2011. Dr. Serber holds a Ph.D. in biophysics from University of California, San Francisco, an M.Sc. in neuroscience from the University of Edinburgh in the United Kingdom and a B.A. in biophysics from Columbia University. We believe that Dr. Serber is qualified to serve as a member of our board of directors because of the perspective and experience he brings as our co-founder and Chief Science Officer.

**Defendant Sharma**

47.     Defendant Sharma has served as a Company director since June 2015, and he currently serves as a member of the Audit Committee. According to the 2021 Director Compensation Policy, Defendant Sharma receives an annual fee of $75,000 for his service on the Board, in addition to certain annual awards of restricted stock units. Following the completion of the IPO, Defendant Sharma was granted an initial award of restricted stock units valued at $700,000, one third of which will vest per year over a period of three years.

48.     The April 23, 2021 Prospectus stated the following about Defendant Sharma:

*Rohit Sharma*, *Ph.D.* has served on our board of directors since June 2015. Mr. Sharma has served as a Partner at True Ventures since July 2018, and as a Venture Partner since September 2012. Prior to that, Mr. Sharma served as President and Chief Executive Officer of Syfto, Inc. an e-commerce company, from 2011 to 2012. Prior to that, Mr. Sharma held SVP and CTO positions at Metro Networks Group for Ciena. Before that he founded ONI Systems, where he also served as CTO. Mr. Sharma holds a Ph.D. and M.Sc. in Electrical Engineering from University of Alberta, Canada, as well as a D.Sc. (Hon) in Engineering and B.Sc. in Electronics & Communications Engineering from India's National Institute of Technology, Kurukshetra. Mr. Sharma is a director selected to serve on our board of directors by True Ventures IV, L.P. pursuant to the Voting Agreement. We believe Mr. Sharma is qualified to serve on our board of directors because of his extensive experience in the venture capital and technology industries, advising technology companies as both a director and executive.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

49.     By reason of their positions as officers, directors, and/or fiduciaries of Zymergen and

because of their ability to control the business and corporate affairs of Zymergen, the Individual Defendants owed Zymergen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zymergen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zymergen and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to Zymergen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zymergen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the officers and directors of Zymergen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zymergen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Zymergen's Board at all relevant times.

54.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and

untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

55.     To discharge their duties, the officers and directors of Zymergen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Zymergen were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Zymergen's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Zymergen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Zymergen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zymergen's operations would comply with all applicable laws and Zymergen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to Zymergen and the shareholders the duty of loyalty requiring that each favor Zymergen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Zymergen and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial positions with Zymergen, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zymergen.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of

law, including but not limited to breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Zymergen was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zymergen, and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Code of Conduct

65.     Zymergen's Code of Conduct "focuses on the expectations, values, ethical conduct and commitment that the Company expects from each of its employees in furthering the Company's mission." The Code of Conduct states that "[a]ll of our employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior."

66.     In a section titled, "Compliance with Laws, Rules and Regulations, the Code of Conduct states the following, in relevant part:

> We are committed to conducting our business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations. Additionally, you must observe these standards when dealing with government officials, representatives, or agencies that regulate the markets in which we do business. No employee, officer or director of the Company shall commit an illegal or unethical act, or instruct others to do so, for any reason.

67.     In a section titled, "Trading on Inside Information," the Code of Conduct states the following:

> Using non-public, Company information to trade in securities, or providing a family member, friend or any other person with a "tip", is illegal. All such non-public information should be considered inside information and should never be used for personal gain. Non-public information should be viewed broadly and may be information that is not financially-related information. You are required to comply with the Company's policy against insider trading. You should contact the Legal Department with any questions about your ability to buy or sell securities.

68.     In a section titled, "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> All employees, officers and directors should endeavor to avoid situations that present a potential or actual conflict between their interest and the interest of the Company.
>
> A "conflict of interest" occurs when a person's private interest interferes in any way, or even appears to interfere, with the interest of the Company, including its subsidiaries and affiliates. A conflict of interest can arise when an employee, officer or director takes an action or has an interest that may make it difficult for them to perform their work objectively and effectively. Conflicts of interest may also arise when an employee, officer or director (or their family members) receives improper personal benefits as a result of the employee's, officer's or director's position in the Company.

69.     In a section titled, "Fair Dealing," the Code of Conduct states the following, in relevant part:

> Each employee, officer and director of the Company should endeavor to deal fairly with customers, suppliers, competitors, the public and one another at all times and in accordance with ethical business practices. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice. No bribes, kickbacks or other similar payments in any form shall be made directly or indirectly to or for anyone for the purpose of obtaining or retaining business or obtaining any other favorable action. The Company and the

employee, officer or director involved may be subject to disciplinary action as well as potential civil or criminal liability for violation of this policy.

70.     In a section titled, "Accuracy of the Company's Records," the Code of Conduct states the following, in relevant part:

All official records showing the conduct of the Company's business must be accurate and complete in all material respects. All those involved in the preparation of such materials should consider the accuracy of the records to be of critical importance, and should understand that the Company does not maintain, nor does it countenance, any off-the-books funds for any purposes. It is the policy of the Company to fully and fairly disclose the financial condition of the Company in compliance with applicable accounting principles, laws, regulations and rules. All books and records of the Company shall be kept in such a way as to fully and fairly reflect all Company transactions in accordance with generally accepted accounting principles.

The Company has a responsibility to provide full and accurate information in our public disclosures, in all material respects, about the Company's financial condition and results of operations. Our reports and documents filed with or submitted to the Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely and understandable disclosure, and the Company has established a Disclosure Committee to assist in monitoring such disclosures.

### *Code of Ethics*

71.     The Company has a "Code of Ethics for CEO and Senior Financial Officers" (the "Code of Ethics") which provides that the CEO and all senior financial officers, including the Principal Financial Officer and principal accounting officer, "are expected to engage in ethical conduct, avoid conflicts of interest, comply with specific company policies and comply with applicable law."

72.     The Code of Ethics sets forth the following specific policies that the CEO and senior financial officers are subject to in addition to their obligations under the Code of Conduct and associated policies:

1. ***The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission*** as well as in other public communications made by the Company. Accordingly, it is the responsibility of the CEO and each senior financial officer to promptly bring to the attention of the Chief Legal Officer any material information of which they may become aware that affects the disclosures made by the Company in its public filings and communications.

2. The CEO and each senior financial officer shall promptly bring to the attention of the Chief Legal Officer and the Audit Committee any information they may have concerning (a) significant deficiencies in the design or operation of internal controls which

could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

3. The CEO and each senior financial officer shall act with honesty and integrity in the performance of their duties at the Company, shall comply with laws, rules and regulations of federal, state and local governments and other private and public regulatory agencies that affect the conduct of the Company's business and the Company's financial reporting.

4. The CEO and each senior financial officer shall promptly bring to the attention of the Chief Legal Officer and the Audit Committee any information they may have concerning any violation of the Code of Conduct, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

5. The CEO and each senior financial officer shall promptly bring to the attention of the Chief Legal Officer and Audit Committee any information they may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

6. ***The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of the Code of Conduct or of these additional procedures by the CEO and the Company's senior financial officers.*** Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code of Conduct and to these additional procedures, and may include written notices to the individual involved that the Board of Directors has determined that there has been a violation, censure by the Board of Directors, demotion or re-assignment of the individual involved, suspension with or without pay or benefits (as determined by the Board of Directors) and termination of the individual's employment.

(Emphasis added.)

***Audit Committee Charter***

73.    The Company's Audit Committee Charter specifies that the Audit has the following purposes:

- Oversee the integrity of the Company's accounting and financial reporting processes, including the Company's disclosure controls and procedures, system of internal controls, internal audit function (if any) and audits of the Company's consolidated financial statements;
- Oversee the Company's relationship with its auditors, including appointing or changing the Company's auditors and ensuring their independence, qualification and performance;
- Provide oversight regarding significant financial matters, including the Company's tax planning, treasury policies, financial risk exposures, dividends and share issuances and repurchases; and
- Oversee the Company's compliance with applicable legal and regulatory requirements and

the Company's enterprise risk management program.

74.    The Audit Charter Committee states that "[t]he Audit Committee's main responsibility is to oversee the Company's financial reporting process, including the Company's disclosure controls and procedures and system of internal controls."

75.    The Audit Committee Charter states that the Audit Committee's responsibilities include oversight of internal controls, as follows:

> The Audit Committee will discuss with management, the head of internal audit (if any) and the auditors the Company's overall system of internal control, including management's annual assessment of the Company's internal control over financial reporting and any related report issued by the auditors (in each case, if applicable). The Audit Committee will oversee and review with management and the auditors, the design, implementation, adequacy and effectiveness of the Company's internal controls and material changes in such controls. The Audit Committee will review (a) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, (b) any fraud (regardless of materiality) involving management or other employees who have a significant role in internal control over financial reporting, (c) changes in the Company's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, such internal control over financial reporting and (d) any special audit steps adopted in light of material control deficiencies.

76.    The Audit Committee Charter also states that the Audit Committee's responsibilities include the review of the Company's quarterly and annual financial statements, as follows:

> The Audit Committee will review and discuss the annual audited financial statements and the quarterly financial statements with management and the auditors. At any time the Company is subject to the requirements of the Exchange Act, the Audit Committee will review and discuss with management and the auditors the financial information and related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," to be included in each Annual Report on Form 10-K and each Quarterly Report on Form 10-Q, and be responsible for making a recommendation to the Board as to whether the Company's annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

77.    The Audit Committee Charter provides that the Audit Committee's responsibilities include the review of the Company's earnings announcements, as follows:

> The Committee shall review the Company's earnings press releases and related materials prior to public dissemination, the type and presentation of information included therein (including any forward-looking guidance), as well as financial information and earnings guidance provided to analysts and rating agencies, paying particular attention to the use of non-GAAP financial information.

78.    The Audit Committee Charter provides that the Audit Committee's responsibilities include

the review of disclosure controls and procedures, as follows:

> The Audit Committee shall review with management the Company's disclosure controls and procedures and shall review periodically, but in no event less frequently than quarterly, management's conclusions about the effectiveness of such disclosure controls and procedures, including any material non- compliance with them.

79.     In violation of the Code of Conduct, the Code of Ethics, the Audit Committee Charter, and the Company's corporate governance documents, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and aiding and abetting thereof. Also in violation of the Company's corporate governance documents, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

80.     Zymergen is an Emeryville, California-based biotechnology company founded in 2013. The Company's asserts that its nature-inspired "biofacturing" platform fuses biology, chemistry, and technology to develop new products and materials from a wider molecular palette than is used by most synthetic biology companies. The Company seeks to use microorganisms to create biomolecules by fermentation, in purported contrast with the purpose-built chemical plants used in synthetic chemistry.

81.     Zymergen's first released product is Hyaline, an optical film designed for electronics companies to use for display touch sensors in personal devices and other applications. The Company asserts that Hyaline will allow manufacturers to make robust foldable touchscreens and high density flexible printed circuits.

82.     The Company issued a press release on April 1, 2020 stating as follows, in relevant part: Today Zymergen is launching Hyaline, a revolutionary new film for electronics applications. This breakthrough bio-manufactured product has successfully been used in flexible circuits, display touch sensors and printable electronics, and by merging the benefits of advanced bio-fabrication with traditionally generated materials, the new Hyaline film paves the way for more sustainable, biologically produced products that are

expected within the coming year.

**April 2020 IPO**

83.     In early 2021, the Individual Defendants began implementing steps to take the Company public. On January 25, 2021, the Company filed a draft registration statement on Form DRS with the SEC. Two months later, on March 23, 2021, the Company filed a registration statement on Form S-1 (the "Registration Statement"), which was subsequently amended. On April 21, 2021, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1MEF. On the same day, the SEC declared the Registration Statement effective. The Company then filed the April 23, 2021 Prospectus.

84.     Zymergen's stock began trading publicly on April 22, 2021. Through the IPO, the Company sold an aggregate of 18,549,500 shares of its common stock at a price of $31.00 per share for aggregate cash proceeds of approximately $530.1 million, after discounts, commissions, and estimated costs.

**Disclosure Requirements**

85.     SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as Zymergen, with respect to their finances and operations. Specifically, Item 303(b)(2)(i) required Zymergen to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

86.     Item 303(b)(2)(ii) required Zymergen to:

> Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

87.     Additionally, Item 105 of Regulation S-K required the Individual Defendants to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."

88.     Even after the IPO was effectuated, the Individual Defendants had a duty to disclose

pursuant to Item 303 of Regulation S-K, which requires that all Form 10-Qs and 10-Ks filed with the SEC include a section on "[m]anagement's discussion and analysis of financial condition and results of operations" that includes, *inter alia*: (1) "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations," (2) "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," (3) "descriptions and amounts of matters that have had a material impact on reported operations," and (4) "matters that are reasonably likely based on management's assessment to have a material impact on future operations."

89.     Therefore, the Individual Defendants had a duty to cause the Company to disclose all material facts related to: (1) technical issues customers were having implementing Hyaline into their manufacturing processes; (2) the Company's overestimating of demand for Hyaline due to a lack of insight into the qualification process; (3) the resulting negative implications for the Company's delivery timelines and revenues; and (4) the Company's failure to maintain adequate controls. These issues had a foreseeable impact on the Company's financial performance and prospects.

**False and Misleading Statements**

*March 23, 2021 Registration Statement*

90.     On March 23, 2021, the Company filed with the SEC its registration statement on form S-1 (the "Registration Statement"). The Registration Statement was signed by or on behalf of Defendants Hoffman, Singh, Chu, Flatley, Gorjanc, Murdoch, Ocko, Peterson, Serber, and Sharma. The Company subsequently filed amendments to the Registration on March 26, April 14, and April 21, 2021, and the Registration Statement, as amended, was declared effective on April 21, 2021.

91.     The Registration Statement stated that the qualification process for the Company's products, including Hyaline, was expected to last between six to eighteen months:

> Following the launch of Hyaline, our global direct sales force and a team of application sales engineers are now working with customers on the sale qualification process in which customers are able to validate the product and qualify it as a standard component in their final electronic devices. During this time, we are providing customers with samples of our products to be tested for use in their own products so they can determine whether to

purchase our product. The sale qualification process typically lasts 6-18 months, or longer, depending on the customer and end device requirements. We only generate revenue after customers have completed all aspects of the qualification process for that product and decided to place an order for our product, which is typically done on a purchase order basis rather than a long-term contractual commitment.

92.     The Registration Statement also stated that the Company faced a total market opportunity in excess of $1.2 trillion:

The market opportunity addressable by our biofacturing platform is enormous and diverse. Our bottom-up, industry-by-industry, application-by-application, analysis suggests that our total market opportunity is at least $1.2 trillion across 20 separate industries for our potential products, all ripe for disruption, and that the market opportunity of the first three industries we will pursue, electronics, consumer care and agriculture, is approximately $150 billion. ***In particular, we estimate that the display market alone for Hyaline was over $1 billion in 2020*** and according to Transparency Market Research, the global market for insect repellents is over $1.5 billion across sprays and other traditional formats.

(Emphasis added.)

93.     In a section titled "Risk Factors," the Registration Statement purported to warn of risks that could hamper the Company's revenue growth:

***It is difficult to predict the time and cost of development of our pipeline products, which are produced by or based on a relatively novel and complex technology and are subject to many risks, any of which could prevent or delay revenue growth and adversely impact our market acceptance, business and results of operations.***

We have concentrated our R&D efforts to date on a select number of pipeline products based on technical feasibility and market opportunity. We launched our first product Hyaline in December 2020, beginning the typically 6-18 month product qualification process with customers. We have not yet generated revenue from product sales (except for nominal revenue related to the sale of samples). We have 10 other products in development, consisting of three in electronics, four with consumer applications and three in agriculture.

\*                    \*                    \*

If we experience problems or delays in developing our pipeline products, we may be subject to unanticipated costs, including the loss of customers. Additionally, even after the incurrence of significant costs to develop a product, we may not be able to solve development problems or develop a commercially viable product at all. If we do not achieve the required technical specifications or successfully manage our new product development processes, or if development work is not performed according to schedule, then our revenue growth from new pipeline products may be prevented or delayed, and our business and operating results may be harmed.

94.     The Registration Statement also underscored the centrality of the qualification process to the Company's revenue generation:

***The success of our business relies heavily on the performance of our products and***

*developing new products at lower costs and faster development timelines.*

To date our revenue has primarily been derived from relationships with partners where we seek to test and validate the ability of our biofacturing platform to improve or optimize our clients' products through biofacturing. However, our future profitability will depend on our ability to successfully execute and maintain a sustainable business model and generate continuous streams of revenue through the sale of our products across industries. We launched our first product Hyaline in December 2020, beginning the typically 6-18 month product qualification process with customers. We have not yet generated revenue from product sales (except for nominal revenue related to the sale of samples). We are currently in the qualification process on Hyaline with multiple customers, including sampling and discussions on commercial terms with some of them. ***Given the importance of this qualification process in our current target markets, we anticipate that, even after we have launched a product, we will only generate revenue after customers have completed all aspects of the qualification process for that product and decided to place an order for our product.*** Our current business model is premised on innovating and producing new products rapidly and at lower costs than traditional methods and achieving results that may only be obtained through leveraging biology. While we may launch bio-based versions of existing products or existing molecules that are too expensive to utilize in products today, biofacturing of previously unavailable, superior molecules and materials is key to our long-term success. However, if we are unable to successfully transition into becoming a biofacturer of new products and create novel products at lower costs and on accelerated development timelines, our business and results of operations will be adversely affected.

(Second emphasis added.)

95.     Further, the Registration Statement purported to warn that the Company's products "could" have defects or errors that could result in production delays or adversely affect the company's business:

*Our products, or the end products of which they are components, **could** have defects or errors, which may give rise to claims against us or delays in production and adversely affect our business, financial condition and results of operations.*

Some applications of our technology or products are components of end products and therefore our success is tied to the success of such end products. We cannot assure you that material performance problems, defects, errors or delays will not arise in our products or the end products in which they are components, and as we commercialize our products, these risks may increase. We expect to provide warranties that our products will meet performance expectations and will be free from defects. The costs incurred in correcting any defects or errors may be substantial and could adversely affect our operating margins.

In manufacturing our products, we depend upon third parties for the supply of our instruments and various components, many of which require a significant degree of technical expertise to produce. If our suppliers fail to produce our product components to specification or provide defective products to us and our quality control tests and procedures fail to detect such errors or defects, or if we or our suppliers use defective materials or workmanship in the manufacturing process, the reliability and performance of our products will be compromised.

If our products or the end products of which they are components, contain defects or are delayed, we may experience:

- a failure to achieve market achieve market acceptance for our products or expansion of our products sales;
- the development of new technology rendering our products, or the end products of which they are components, obsolete;
- loss of customer orders and delay in order fulfilment;
- damage to our brand reputation;
- increased warranty and customer service and support costs due to product repair or replacement;
- product recalls or replacements;
- inability to attract new customers and collaboration opportunities;
- diversion of resources from our manufacturing and R&D departments into our service department; and
- legal and regulatory claims against us, including product liability claims, which could be costly, time consuming to defend, result in substantial damages and result in reputational damage.

(Emphasis altered.)

### April 23, 2021 Prospectus

96.     The Company filed the April 23, 2021 Prospectus contemporaneously with the IPO.

97.     The April 23, 2021 Prospectus stated that the qualification process for the Company's products, including Hyaline, was expected to last between six to eighteen months:

> Following the launch of Hyaline, our global direct sales force and a team of application sales engineers are now working with customers on the sale qualification process in which customers are able to validate the product and qualify it as a standard component in their final electronic devices. During this time, we are providing customers with samples of our products to be tested for use in their own products so they can determine whether to purchase our product. Based on our experience to date since the launch of Hyaline in December 2020, *we expect the sale qualification process of our products (including Hyaline) to last 6-18 months, or longer, depending on the customer and end device requirements. We only generate revenue after customers have completed all aspects of the qualification process for that product and decided to place an order for our product, which is typically done on a purchase order basis rather than a long-term contractual commitment. In the case of Hyaline, we expect to begin generating revenue in the second half of 2021*, which will be prior to the time we expect to convert the non-fermentation produced biomolecule to the fermentation-produced molecule, which we expect to occur in 2022. We do not expect our estimated revenue from Hyaline to be meaningfully impacted by the conversion to the fermentation-produced molecule.

(Emphasis added.)

98.     The April 23, 2021 Prospectus also stated that the Company faced a total market opportunity in excess of $1.2 trillion:

> The market opportunity addressable by our biofacturing platform is enormous and diverse.

Our bottom-up, industry-by-industry, application-by-application, analysis suggests that our total market opportunity is at least $1.2 trillion across 20 separate industries for our potential products, all ripe for disruption, and that the market opportunity of the first three industries we will pursue, electronics, consumer care and agriculture, is approximately $150 billion. ***In particular, we estimate that the display market alone for Hyaline was over $1 billion in 2020*** and according to Transparency Market Research, the global market for insect repellents is over $1.5 billion across sprays and other traditional formats.

(Emphasis added.)

99.     The April 23, 2021 Prospectus purported to warn of risks that could hamper the Company's revenue growth:

> ***It is difficult to predict the time and cost of development of our pipeline products, which are produced by or based on a relatively novel and complex technology and are subject to many risks, any of which could prevent or delay revenue growth and adversely impact our market acceptance, business and results of operations.***
>
> We have concentrated our R&D efforts to date on a select number of pipeline products based on technical feasibility and market opportunity. We launched our first product Hyaline in December 2020, beginning the expected 6-18 month product qualification process with customers. We have not yet generated revenue from product sales (except for nominal revenue related to the sale of samples of Hyaline). We have 10 other products in development, consisting of three in electronics, four with consumer applications and three in agriculture.
>
>        *            *            *
>
> If we experience problems or delays in developing our pipeline products, we may be subject to unanticipated costs, including the loss of customers. Additionally, even after the incurrence of significant costs to develop a product, we may not be able to solve development problems or develop a commercially viable product at all. If we do not achieve the required technical specifications or successfully manage our new product development processes, or if development work is not performed according to schedule, then our revenue growth from new pipeline products may be prevented or delayed, and our business and operating results may be harmed.

100.    The April 23, 2021 Prospectus also underscored the centrality of the qualification process to the Company's revenue generation:

> ***The success of our business relies heavily on the performance of our products and developing new products at lower costs and faster development timelines.***
>
> To date our revenue has primarily been derived from relationships with partners where we seek to test and validate the ability of our biofacturing platform to improve or optimize our clients' products through biofacturing. However, our future profitability will depend on our ability to successfully execute and maintain a sustainable business model and generate continuous streams of revenue through the sale of our products across industries. We launched our first product Hyaline in December 2020, beginning the expected 6-18 month product qualification process with customers. We have not yet generated revenue from product sales (except for nominal revenue related to the sale of samples of Hyaline). We are currently in the qualification process on Hyaline with multiple customers, including sampling and discussions on commercial terms with some of them. ***Given the importance***

*of this qualification process in our current target markets, we anticipate that, even after we have launched a product, we will only generate revenue after customers have completed all aspects of the qualification process for that product and decided to place an order for our product.* Our current business model is premised on innovating and producing new products rapidly and at lower costs than traditional methods and achieving results that may only be obtained through leveraging biology. While we may launch bio-based versions of existing products or existing molecules that are too expensive to utilize in products today, biofacturing of previously unavailable, superior molecules and materials is key to our long-term success. However, if we are unable to successfully transition into becoming a biofacturer of new products and create novel products at lower costs and on accelerated development timelines, our business and results of operations will be adversely affected.

(Second emphasis added.)

101.    Further, the April 23, 2021 Prospectus purported to warn that the Company's products "could" have defects or errors that could result in production delays or adversely affect the company's business:

> *Our products, or the end products of which they are components, **could** have defects or errors, which may give rise to claims against us or delays in production and adversely affect our business, financial condition and results of operations.*
>
> Some applications of our technology or products are components of end products and therefore our success is tied to the success of such end products. We cannot assure you that material performance problems, defects, errors or delays will not arise in our products or the end products in which they are components, and as we commercialize our products, these risks may increase. We expect to provide warranties that our products will meet performance expectations and will be free from defects. The costs incurred in correcting any defects or errors may be substantial and could adversely affect our operating margins.
>
> In manufacturing our products, we depend upon third parties for the supply of our instruments and various components, many of which require a significant degree of technical expertise to produce. If our suppliers fail to produce our product components to specification or provide defective products to us and our quality control tests and procedures fail to detect such errors or defects, or if we or our suppliers use defective materials or workmanship in the manufacturing process, the reliability and performance of our products will be compromised.
>
> If our products or the end products of which they are components, contain defects or are delayed, we may experience:
>
> - a failure to achieve market acceptance for our products or expansion of our products sales;
> - the development of new technology rendering our products, or the end products of which they are components, obsolete;
> - loss of customer orders and delay in order fulfilment;
> - damage to our brand reputation;
> - increased warranty and customer service and support costs due to product repair or replacement;

- product recalls or replacements;
- inability to attract new customers and collaboration opportunities;
- diversion of resources from our manufacturing and R&D departments into our service department; and
- legal and regulatory claims against us, including product liability claims, which could be costly, time consuming to defend, result in substantial damages and result in reputational damage.

(Emphasis altered.)

102.    The statements referenced in ¶¶91–95 and ¶¶97–101 were materially false and misleading and omitted to state, *inter alia*, that: (1) key customers encountered technical issues in implementing Hyaline into their manufacturing processes; (2) the Company's commercial teams lacked insight into the qualification process, causing the Company to overestimate demand for Hyaline; (3) the market opportunity for Hyaline was smaller than the Company had previously represented; (4) as a result of the foregoing, the Company's timeline for delivery of Hyaline was likely to be delayed, which would also delay revenue generation; and (5) the Company failed to maintain adequate internal controls.

### *May 27, 2021 Form 10-Q*

103.    On May 27, 2021, after successfully completing its IPO, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendants Hoffman and Singh and contained certifications, signed by Defendants Hoffman and Singh, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

104.    Like the Registration Statement and the April 23, 2021 Prospectus, the 1Q21 10-Q purported to warn of risks the Company could be subjected to as a result of the commercialization of Hyaline and the associated qualification process.

105.    The 1Q21 stated that the Company's qualification process for Hyaline was underway and was expected to last between six to eighteen months, with implications for the Company's revenue generation:

We launched our first product Hyaline in December 2020, beginning the expected 6-18 month product qualification process with customers. We have not yet generated revenue

from product sales (except for nominal revenue related to the sale of samples of Hyaline). We are currently in the qualification process on Hyaline with multiple customers, including sampling and discussions on commercial terms with some of them. ***Given the importance of this qualification process in our current target markets, we anticipate that, even after we have launched a product, we will only generate revenue after customers have completed all aspects of the qualification process for that product and decided to place an order for our product.***

(Emphasis added.)

106.    The 1Q21 10-Q purported to warn of risks that could hamper the Company's revenue growth:

> ***It is difficult to predict the time and cost of development of our pipeline products, which are produced by or based on a relatively novel and complex technology and are subject to many risks, any of which could prevent or delay revenue growth and adversely impact our market acceptance, business and results of operations.***
>
> We have concentrated our R&D efforts to date on a select number of pipeline products based on technical feasibility and market opportunity. We launched our first product Hyaline in December 2020, beginning the expected 6-18 month product qualification process with customers. We have not yet generated revenue from product sales (except for nominal revenue related to the sale of samples of Hyaline). We have 10 other products in development, consisting of three in electronics, four with consumer care applications and three in agriculture.
>
> *            *            *
>
> If we experience problems or delays in developing our pipeline products, we may be subject to unanticipated costs, including the loss of customers. Additionally, even after the incurrence of significant costs to develop a product, we may not be able to solve development problems or develop a commercially viable product at all. If we do not achieve the required technical specifications or successfully manage our new product development processes, or if development work is not performed according to schedule, then our revenue growth from new pipeline products may be prevented or delayed, and our business and operating results may be harmed.

107.    The 1Q21 10-Q also underscored the centrality of the qualification process to the Company's revenue generation:

> ***The success of our business relies heavily on the performance of our products and developing new products at lower costs and faster development timelines.***
>
> To date our revenue has primarily been derived from relationships with partners where we seek to test and validate the ability of our biofacturing platform to improve or optimize our clients' products through biofacturing. However, our future profitability will depend on our ability to successfully execute and maintain a sustainable business model and generate continuous streams of revenue through the sale of our products across industries. We launched our first product Hyaline in December 2020, beginning the expected 6-18 month product qualification process with customers. We have not yet generated revenue from product sales (except for nominal revenue related to the sale of samples of Hyaline). We are currently in the qualification process on Hyaline with multiple customers, including

sampling and discussions on commercial terms with some of them. ***Given the importance of this qualification process in our current target markets, we anticipate that, even after we have launched a product, we will only generate revenue after customers have completed all aspects of the qualification process for that product and decided to place an order for our product.*** Our current business model is premised on innovating and producing new products rapidly and at lower costs than traditional methods and achieving results that may only be obtained through leveraging biology. While we may launch bio-based versions of existing products or existing molecules that are too expensive to utilize in products today, biofacturing of previously unavailable, superior molecules and materials is key to our long-term success. However, if we are unable to successfully transition into becoming a biofacturer of new products and create novel products at lower costs and on accelerated development timelines, our business and results of operations will be adversely affected.

(Second emphasis added.)

108.    Further, the 1Q21 10-Q purported to warn that the Company's products "could" have defects or errors that could result in production delays or adversely affect the company's business:

*Our products, or the end products of which they are components, **<u>could</u>** have defects or errors, which may give rise to claims against us or delays in production and adversely affect our business, financial condition and results of operations.*

Some applications of our technology or products are components of end products and therefore our success is tied to the success of such end products. We cannot assure you that material performance problems, defects, errors or delays will not arise in our products or the end products in which they are components, and as we commercialize our products, these risks may increase. We expect to provide warranties that our products will meet performance expectations and will be free from defects. The costs incurred in correcting any defects or errors may be substantial and could adversely affect our operating margins.

In manufacturing our products, we depend upon third parties for the supply of our instruments and various components, many of which require a significant degree of technical expertise to produce. If our suppliers fail to produce our product components to specification or provide defective products to us and our quality control tests and procedures fail to detect such errors or defects, or if we or our suppliers use defective materials or workmanship in the manufacturing process, the reliability and performance of our products will be compromised.

If our products or the end products of which they are components, contain defects or are delayed, we may experience:

- a failure to achieve market acceptance for our products or expansion of our products sales;
- the development of new technology rendering our products, or the end products of which they are components, obsolete;
- loss of customer orders and delay in order fulfillment;
- damage to our brand reputation;
- increased warranty and customer service and support costs due to product repair or replacement;
- product recalls or replacements;
- inability to attract new customers and collaboration opportunities;

- diversion of resources from our manufacturing and R&D departments into our service department; and
- legal and regulatory claims against us, including product liability claims, which could be costly, time consuming to defend, result in substantial damages and result in reputational damage.

(Emphasis altered.)

109. The 1Q21 10-Q stated the following regarding the Company's evaluation of disclosure controls and procedures:

> We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in our periodic and current reports that we file with the SEC is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

> Our management, with the participation and supervision of our Chief Executive Officer and our Chief Financial Officer, have evaluated our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on that evaluation, ***our Chief Executive Officer and our Chief Financial Officer have concluded that, as of the end of the period covered by this Quarterly Report on Form 10-Q, our disclosure controls and procedures were effective*** to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

(Emphasis added.)

110. The 1Q21 10-Q stated the following regarding changes in internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined in Rule 13a-15(f) of the Exchange Act. An evaluation was also performed under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, of any change in our internal control over financial reporting that occurred during our last fiscal quarter and that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. That evaluation did not identify any change in our internal control over financial reporting that occurred during our latest fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Verified Shareholder Derivative Complaint

111.    The statements referenced in ¶¶103–10 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) key customers encountered technical issues in implementing Hyaline into their manufacturing processes; (2) the Company's commercial teams lacked insight into the qualification process, causing the Company to overestimate demand for Hyaline; (3) the market opportunity for Hyaline was smaller than the Company had previously represented; (4) as a result of the foregoing, the Company's timeline for delivery of Hyaline was likely to be delayed, which would also delay revenue generation; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

112.    Finally, after markets closed on August 3, 2020, Zymergen issued a press release titled "Zymergen Provides Business Update," disclosing that key customers had experienced technical issues with Hyaline and that the total addressable market for foldable display applications was smaller than initially understood. As a result, the Company stated that it "no longer expects product revenue in 2021, and expects product revenue to be immaterial in 2022." The press release provided, in relevant part, as follows:

> Zymergen recently became aware of issues with its commercial product pipeline that will impact the Company's delivery timeline and revenue projections. ***Accordingly, the Company no longer expects product revenue in 2021, and expects product revenue to be immaterial in 2022.***
>
> During the quarter, ***several key target customers encountered technical issues in implementing Hyaline into their manufacturing processes*** typical of new product and process development learnings. The Company has made significant progress towards addressing these challenges and believes there are no intrinsic technical issues with Hyaline. However, this issue has resulted in a delay in the Company's commercial ramp. Zymergen is working to strengthen its commercial team to ensure the reliability and robustness of the sales pipeline qualification and forecast processes.
>
> ***The Company is also evaluating emerging data on the total addressable market for foldable display applications, which indicate a smaller near-term market opportunity that is growing less rapidly than anticipated***, as well as its impact on Zymergen's sales forecast. The Company will conduct a full re-examination of Zymergen's target markets confirming our past views or altering them if the data indicate a shift in market focus is

appropriate.

(Emphasis added.)

113.    The press release also disclosed that, in connection with the business update, Defendant Hoffman would "step down as CEO and as a member of the Board, effective immediately." The Company announced that Defendant Flatley had been appointed Acting CEO.

114.    On August 3, 2021, the Company held a conference call to discuss the contents of the August 3, 2021 press release with investors and analysts. During the call, Defendant and new Acting CEO Flatley revealed that "the Company's commercial teams did not have significant insight into the customer qualification process and into their customers and users, which resulted in forecast that overestimated near-term demand."

115.    Defendant Flatley further revealed that the technical issues customers experienced with Hyaline included "some product shrinkage in one customer site" and "material compatibility" between customers' processes and Hyaline.

116.    On this news, the Company's share price declined $26.58 per share—more than 76%—from its August 3, 2021 closing price of $34.83 per share to close August 4, 2021 at $8.25.

## DAMAGES TO ZYMERGEN

117.    As a direct and proximate result of the Individual Defendants' conduct, Zymergen will lose and expend many millions of dollars.

118.    Such expenditures include, but are not limited to, the costs, legal fees, arbitration fees, and/or other fees associated with the Securities Class Action filed against the Company and the Individual Defendants, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

119.    Additionally, these expenditures include, but are not limited to, unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

120.    As a direct and proximate result of the Individual Defendants' conduct, Zymergen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

121.    Plaintiff brings this action derivatively and for the benefit of Zymergen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Zymergen, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, as well as the aiding and abetting thereof.

122.    Zymergen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.    Plaintiff is, and has been at all relevant times, a shareholder of Zymergen. Plaintiff will adequately and fairly represent the interests of Zymergen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

124.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

125.    A pre-suit demand on the Board of Zymergen is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants Flatley, Chu, Gorjanc, Murdoch, Ocko, Peterson, Serber, and Sharma (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time of the filing of this complaint.

126.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

127.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and

attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

128.    The Director-Defendants knew of the falsity of the misleading statements at the time they were made. On April 1, 2020, the Company issued a press release that stated: "Today Zymergen is launching Hyaline, a revolutionary new film for electronics applications." The April 1, 2020 press release stated that Hyaline was Zymergen's "first standalone product to be sold commercially." Approximately one year later, the Company represented in the Registration Statement and the April 23, 2021 Prospectus reveal that Hyaline is the Company's only launched product. While the Company stated in the April 23, 2021 Prospectus—among other filings—that it had ten other products "in development," Hyaline remains the Company's only launched product. This fact supports an inference of scienter as to the Company's directors, who are charged with overseeing the Company's affairs. It is reasonable to infer that the Director-Defendants all must have had knowledge of information pertaining to the Company's *sole* launched product and the material facts and events giving rise to the claims herein, including customer reception of the product, associated technical issues, and accurate estimates of the demand for Hyaline. The Director-Defendants all served on the Board leading up to the IPO, and the Registration Statement was signed by them or on their behalf. Thus, they each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, yet they failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions with respect to the Company's business, operations, and prospects.

129.    Furthermore, throughout the Relevant Period, the Director-Defendants failed to correct the false and misleading statements made in connection with the IPO, including those contained in the Registration Statement, subsequent amendments to the Registration Statement, and the April 23, 2021 Prospectus. Indeed, the Individual Defendants caused the Company to reiterate in the 1Q21 10-Q many of the false and misleading statements contained in the Registration Statement and the April 23, 2021 Prospectus.

130.    Additional reasons that demand on Defendant Flatley is futile follow.  Defendant Flatley

is currently Acting CEO and has served as the Board's chairperson since April 2021. In addition, he is a member of the Technology and Science Committee. Due to his service as Acting CEO, Defendant Flatley is a non-independent director. The Company provides Defendant Flatley with his principal occupation, for which he receives handsome compensation, including a base salary of $1 million. In addition, in connection with his appointment as Acting CEO, he received a one-time incentive grant of stock options for 1,520,000 shares, representing many millions of dollars. As the chairperson of the Company's Board during the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Flatley signed, and thus personally made, the false and misleading statements in the Registration Statement. Moreover, Defendant Flatley is a defendant in the Securities Class Action. For these reasons, Defendant Flatley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Chu is futile follow. Defendant Chu has served as a Company director since 2016. He is the chairperson of the Technology and Science Committee and also serves as a member of the Nominating and Corporate Governance Committee. Defendant Chu has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Chu signed, and thus personally made, the false and misleading statements in the Registration Statement. Moreover, Defendant Chu is a defendant in the Securities Class Action. For these reasons, Defendant Chu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Gorjanc is futile follow. Defendant Gorjanc has served as a Company director since March 2021, and she served as chairperson of the Audit Committee throughout the Relevant Period. Defendant Gorjanc has received and continues to receive compensation

for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Gorjanc signed, and thus personally made, the false and misleading statements in the Registration Statement. Moreover, Defendant Gorjanc is a defendant in the Securities Class Action. For these reasons, Defendant Gorjanc breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Murdoch is futile follow. Defendant Murdoch has served as a Company director since September 2020, and he currently serves as a member of the Compensation Committee. Defendant Murdoch received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Murdoch signed, and thus personally made, the false and misleading statements in the Registration Statement. Moreover, Defendant Murdoch is a defendant in the Securities Class Action. For these reasons, Defendant Murdoch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Ocko is futile follow. Defendant Ocko has served as a Company director since June 2015, and he currently serves as a member of the Audit Committee and the Technology and Science Committee. Defendant Ocko has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Ocko signed, and thus personally made, the false and misleading statements in the Registration Statement. Moreover,

Defendant Ocko is a defendant in the Securities Class Action. For these reasons, Defendant Ocko breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon his is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Peterson is futile follow. Defendant Peterson has served as a Company director since December 2019. She currently serves as chairperson of both the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Peterson has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Peterson signed, and thus personally made, the false and misleading statements in the Registration Statement. Moreover, Defendant Peterson is a defendant in the Securities Class Action. For these reasons, Defendant Peterson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Serber is futile follow. Defendant Serber co-founded the Company in 2013 and served as Chief Science Officer since September 2014. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Serber with his principal occupation, in which he has received and continues to receive compensation. As a trusted Company director and a co-founder of the Company, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Serber signed, and thus personally made, the false and misleading statements in the Registration Statement. Moreover, Defendant Serber is a defendant in the Securities Class Action. Additionally, Defendant Serber's sibling, William Serber, has worked for the Company since 2013 and has been an employee since 2014. William Serber receives substantial compensation from the Company, including $240,000 in cash compensation and bonus in 2020, as well as 9,332 stock options, also in 2020. Thus, Defendant Serber has a conflict of interest that precludes him

from disinterestedly pursuing any investigation into the misconduct alleged herein. Defendant Serber is unlikely to pursue any investigation or action against the Director-Defendants, who exercise control over the Company's employees, due to the possibility that Defendant Serber's sibling William Serber could become implicated in the investigation or subject to retaliation by the Director-Defendants as a result of Defendant Serber's actions in initiating an investigation. For these reasons, Defendant Serber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137. Additional reasons that demand on Defendant Sharma is futile follow. Defendant Sharma has served as a Company director since June 2015, and he served as a member of the Audit Committee from the time of the IPO throughout the Relevant Period, and into the present. Defendant Sharma has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Sharma signed, and thus personally made, the false and misleading statements in the Registration Statement. Moreover, Defendant Sharma is a defendant in the Securities Class Action. For these reasons, Defendant Sharma breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138. Additional reasons that demand on the Board is futile follow.

139. The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. In particular, Defendants Serber, Ocko and Sharma have served together on the Company's Board since June 2015, and Defendant Chu's service on the Board dates to July 2016. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

140. Defendants Gorjanc, Ocko, and Sharma (the "Audit Committee Defendants") served as

members of the Audit Committee during the Relevant Period, with Defendant Gorjanc serving as chair. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's financial reporting process, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

141.   In violation of the Code of Conduct and the Company's corporate governance documents, the Director-Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Code of Ethics, and other corporate governance documents, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

142.   Zymergen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Zymergen any part of the damages Zymergen suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

143.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the

Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

144.    The acts complained of herein constitute violations of fiduciary duties owed by Zymergen's officers and directors, and these acts are incapable of ratification.

145.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zymergen. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Zymergen, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

146.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Zymergen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

147.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

149.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zymergen's business and affairs.

150.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

151.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zymergen.

152.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

153.    In breach of their fiduciary duties owed to Zymergen, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*: (1) key customers encountered technical issues in implementing Hyaline into their manufacturing processes; (2) the Company's commercial teams lacked insight into the qualification process, causing the Company to overestimate demand for Hyaline; (3) the market opportunity for Hyaline was smaller than the Company had previously represented; (4) as a result of the foregoing, the Company's timeline for delivery of Hyaline was likely to be delayed, which would also delay revenue generation; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

154.    In further breach of their fiduciary duties, and throughout the Relevant Period, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

155.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed

to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Zymergen's securities.

156. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Zymergen's securities.

157. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

158. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zymergen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

159. Plaintiff on behalf of Zymergen has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

160. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zymergen.

162. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Zymergen that was tied to the performance or artificially inflated valuation of Zymergen, or received compensation that was unjust in light of the

Individual Defendants' bad faith conduct.

163.    Plaintiff, as a shareholder and a representative of Zymergen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

164.    Plaintiff on behalf of Zymergen has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

165.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Zymergen, for which they are legally responsible.

167.    As a direct and proximate result of the Individual Defendants' abuse of control, Zymergen has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Zymergen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168.    Plaintiff on behalf of Zymergen has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

169.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Zymergen in a manner consistent with the operations of a publicly-held corporation.

171.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Zymergen has sustained and will continue to sustain significant damages.

172.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

173.    Plaintiff on behalf of Zymergen has no adequate remedy at law.

### FIFTH CLAIM

**Against the Individual Defendants for Waste of Corporate Assets**

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

176.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

177.    Plaintiff on behalf of Zymergen has no adequate remedy at law.

### SIXTH CLAIM

**Against the Individual Defendants for Contribution**
**Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

178.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Actions brought on behalf of Zymergen shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

180.    Federal law provides Zymergen with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

181.    The plaintiff in the Securities Class Action allege that the Registration Statement, including its amendments, and the April 23, 2021 Prospectus, contained untrue statements of material facts or

omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

182.    Zymergen is the registrant for the IPO. The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

183.    As issuer of the shares, Zymergen is strictly liable to the class action plaintiff and the class for the misstatements and omissions alleged in the Securities Class Action.

184.    The plaintiff in the Securities Class Action alleges that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

185.    The Individual Defendants, because of their positions of control and authority as officers and directors of Zymergen, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Zymergen, including the wrongful acts complained of herein and in the Securities Class Action.

186.    Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

187.    As such, Zymergen is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Zymergen, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zymergen;

(c)     Determining and awarding to Zymergen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Zymergen and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zymergen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Zymergen to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Zymergen restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 9, 2021                         Respectfully submitted,

                                                **THE ROSEN LAW FIRM, P.A.**


                                                By: _/s/ Laurence M. Rosen
                                                Laurence M. Rosen, Esq. (SBN 219683)
                                                355 S. Grand Avenue, Suite 2450
                                                Los Angeles, CA 90071
                                                Telephone: (213) 785-2610
                                                Facsimile: (213) 226-4684
                                                Email: lrosen@rosenlegal.com

                                                *Liaison Counsel for Plaintiff*

                                                **THE BROWN LAW FIRM, P.C.**
                                                Timothy Brown
                                                767 Third Avenue, Suite 2501
                                                New York, NY 10017
                                                Telephone: (516) 922-5427
                                                Facsimile: (516) 344-6204
                                                Email: tbrown@thebrownlawfirm.net

                                                *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Shauna Mellor am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____11/5_____, 2021.

_____
Shauna Mellor

JS-CAND 44 (Rev. 10/2020)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

SHAUNA MELLOR, derivatively on behalf of ZYMERGEN INC.

**DEFENDANTS**

Josh Hoffman, Enakshi Singh, Steven Chu, Jay T. Flatley, Christine M. Gorjanc, Travis Murdoch, Matthew A. Ocko, Sandra E. Peterson, Zach Serber, and Rohit Sharma, Defendants and Zymergen Inc., Nominal Defendant

**(b)** County of Residence of First Listed Plaintiff    Clark County, Nevada
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Laurence M. Rosen, The Rosen Law Firm, P.A.,
355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071, Tel: (213) 785-2610

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | **LABOR** | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 710 Fair Labor Standards Act | 830 Patent | 430 Banks and Banking |
| | 340 Marine | | 720 Labor/Management Relations | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | **PERSONAL PROPERTY** | 740 Railway Labor Act | 840 Trademark | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 370 Other Fraud | 751 Family and Medical Leave Act | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 790 Other Labor Litigation | | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 360 Other Personal Injury | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | 385 Property Damage Product Liability | | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 190 Other Contract | | | **IMMIGRATION** | 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 864 SSID Title XVI | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer    ☐ 8 Multidistrict Litigation–Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 77k(f)(1), 15 U.S.C. § 78u-4(f), breach of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets

Brief description of cause:
Shareholder derivative action brought on behalf of the company alleging violations of the federal securities and state laws

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE                    DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

(Place an "X" in One Box Only)    ☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

**DATE**   11/09/2021    **SIGNATURE OF ATTORNEY OF RECORD**    /s/ Laurence M. Rosen

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1) <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2) <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3) <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4) <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(**See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the six boxes.

(1) <u>Original Proceedings</u>. Cases originating in the United States district courts.

(2) <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3) <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4) <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6) <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8) <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

<u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** <u>Example</u>: U.S. Civil Statute: 47 USC § 553. <u>Brief Description</u>: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

<u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

<u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX.** **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.