# EXHIBIT 18

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

---------------------------------------------------------------x
:
BIAO WANG, Individually and on Behalf of All :
Others Similarly Situated, :
 :
      Plaintiff, :
 :
vs. : Case No. 5:21-cv-06028-PCP
 :
ZYMERGEN INC., et al., :
 :
      Defendants. :
 :
 :
---------------------------------------------------------------x

# Expert Report of
# Professor Charles K. Whitehead

March 14, 2025

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

# Table of Contents

I. ASSIGNMENT ........................................................................................................... 1

II. QUALIFICATIONS ................................................................................................... 3

III. SUMMARY OF OPINIONS ...................................................................................... 5

IV. BACKGROUND ......................................................................................................... 6

 A. **CUSTOMARY DISCLOSURE PROCESSES FOR EARLY-STAGE TECHNOLOGY IPO COMPANIES** ................................................................ 7

  1. Overview of IPO Processes of Early-Stage Technology Companies ......... 7

  2. Custom and Practice Regarding the Processes for Drafting, Verifying, and Revising Disclosures in an IPO Registration Statement ........................... 10

  3. IPO Registration Statement ...................................................................... 21

 B. **WHEN DRAFTING, VERIFYING, AND REVISING AN IPO REGISTRATION STATEMENT, IT IS CUSTOM AND PRACTICE TO TAKE INTO ACCOUNT DISCLOSURES IN THE IPO REGISTRATION STATEMENT AS A WHOLE** ............................................................................... 32

 C. **IT IS CUSTOM AND PRACTICE TO INCLUDE IN AN IPO REGISTRATION STATEMENT DISCLOSURES RELATING TO THE COMPANY'S MARKET OPPORTUNITY, FUTURE PRODUCT PIPELINE, AND EXPECTED PRODUCT REVENUE GENERATION** ..... 34

 D. **CUSTOM AND PRACTICE REGARDING DISCLOSURE OF FORWARD-LOOKING ESTIMATES OF MARKET OPPORTUNITY** ........................... 36

  1. Forward-Looking Estimates of Market Opportunity ................................ 36

  2. Custom and Practice Regarding Disclosure of Market Estimates ............ 39

 E. **CUSTOM AND PRACTICE REGARDING DISCLOSURES OF FORWARD-LOOKING ESTIMATES OF FUTURE PRODUCT PIPELINE AND EXPECTED PRODUCT REVENUE GENERATION** ......................... 41

V. OPINIONS ................................................................................................................. 43

 A. **THE PARTIES INVOLVED IN THE PROCESSES OF PREPARING THE IPO REGISTRATION STATEMENT WERE CONSISTENT WITH CUSTOM AND PRACTICE** ........................................................................ 43

 B. **CONSISTENT WITH CUSTOM AND PRACTICE, THE IPO REGISTRATION STATEMENT WAS DRAFTED, VERIFIED, AND REVISED BY TAKING INTO ACCOUNT DISCLOSURES IN THE IPO REGISTRATION STATEMENT AS A WHOLE** ........................................... 46

 C. **IT WAS CUSTOM AND PRACTICE TO INCLUDE IN THE IPO REGISTRATION STATEMENT DISCLOSURES RELATING TO**

        **ZYMERGEN'S MARKET OPPORTUNITY, FUTURE PRODUCT PIPELINE, AND EXPECTED PRODUCT REVENUE GENERATION..... 54**

D.    **ZYMERGEN'S PROCESSES OF DRAFTING, VERIFYING, AND REVISING THE IPO REGISTRATION STATEMENT DISCLOSURE OF FORWARD-LOOKING ESTIMATES OF MARKET OPPORTUNITY WERE CONSISTENT WITH CUSTOM AND PRACTICE FOR EARLY-STAGE TECHNOLOGY COMPANIES ............................................................ 58**

     1.    Platform Market Opportunity ................................................................... 61

     2.    Hyaline Market Opportunity ..................................................................... 63

E.    **ZYMERGEN'S PROCESSES OF DRAFTING, VERIFYING, AND REVISING THE IPO REGISTRATION STATEMENT DISCLOSURES REGARDING ITS FUTURE PRODUCT PIPELINE AND EXPECTED PRODUCT REVENUE GENERATION WERE CONSISTENT WITH CUSTOM AND PRACTICE FOR EARLY-STAGE TECHNOLOGY COMPANIES ................................................................................................ 67**

# Table of Appendices

**APPENDIX A** ............................................................................................................................... **1**

1. Zymergen's IPO Timeline, Board Oversight, and the Parties Involved ............................. 1
2. Zymergen's Processes of Drafting, Verifying, and Revising the IPO Registration Statement and the Parties Involved .................................................................................................. 14

**APPENDIX B** ............................................................................................................................... **1**

1. The Platform Market Opportunity ...................................................................................... 1
2. The Hyaline Market Opportunity ....................................................................................... 8
3. Risk Factors and Cautionary Language Related to Market Estimates ............................. 22

**APPENDIX C** ............................................................................................................................... **1**

1. Zymergen's Future Product Pipeline .................................................................................. 1
2. Expected Timing of Future Product Launches .................................................................. 6
3. Expected Product Revenue Generation ........................................................................... 10

## I. ASSIGNMENT

1. I have prepared this expert report ("Report") on behalf of Zymergen Inc. ("Zymergen"), Josh Hoffman, Enakshi Singh, Steven Chu, Jay T. Flatley, Christine M. Gorjanc, Travis Murdoch, Matthew A. Ocko, Sandra E. Peterson, Zach Serber, and Rohit Sharma (collectively, "Individual Defendants"), SVF Excalibur (Cayman) Limited, SVF Endurance (Cayman) Limited, SoftBank Vision Fund (AIV M1) L.P., and SB Investment Advisers (US) Inc. (collectively, "SoftBank Defendants"), Data Collective II, L.P., DCVC Opportunity Fund, L.P., and DCVC Management Co, LLC (collectively, "DCVC Defendants"), and True Ventures IV, L.P., True Ventures Select I, L.P., True Ventures Select II, L.P., True Ventures Select III, L.P., True Ventures Select IV, L.P., and True Venture Management, L.L.C. (collectively, "True Ventures Defendants" and, together with the SoftBank Defendants and the DCVC Defendants, "VC Defendants") with respect to the action captioned *Wang v. Zymergen Inc. et al.*, Case No. 5:21-cv-06028-PCP ("Action").[1] Other defendants in this Action include J.P. Morgan Securities LLC ("J.P. Morgan"), Goldman Sachs & Co. LLC ("Goldman Sachs"), Cowen and Company, LLC ("Cowen"), BofA Securities, Inc. ("BofA"), UBS Securities LLC ("UBS"), and Lazard Freres & Co. LLC ("Lazard") (collectively, "Underwriter Defendants").

2. I understand that the Action involves allegations of violating Section 11 of the Securities Act of 1933 ("Securities Act") by Zymergen, the Individual Defendants, and the Underwriter Defendants, and control person liability pursuant to Section 15 of the Securities Act by the Individual Defendants and the VC Defendants.[2] In the Second Amended Complaint, the Lead Plaintiff alleges that the registration statement, as amended ("IPO Registration Statement"),[3] that Zymergen filed with the Securities and Exchange Commission ("SEC") in connection with its initial public offering ("IPO"), at the time of its effectiveness, contained material misstatements and omissions regarding "the Company's biofacturing platform; the Company's ability to create

---

[1] Second Amended Class Action Complaint for Violations of the Federal Securities Laws, *Wang v. Zymergen Inc., et al.*, United States District Court for the Northern District of California (San Jose Division), 5:21-cv-06028-PCP, March 4, 2024 ("Second Amended Complaint") ¶¶ 55, 65, 73–76.
[2] Second Amended Complaint, ¶¶ 246, 256.
[3] Zymergen Inc., Registration Statement on Form S-1, March 23, 2021; Zymergen Inc., Amendment No. 1 to Registration Statement on Form S-1, March 26, 2021; Zymergen Inc., Amendment No. 2 to Registration Statement on Form S-1, April 14, 2021; Zymergen Inc., Registration Statement on Form S-1MEF, April 21, 2021.

better products faster, cheaper and more sustainably using the biofacturing platform; the product development process; the development status of 11 products in the Company's product pipeline; the market opportunity for those products; and when those products would generate revenue."[4]

3.  I have been retained by Gibson, Dunn & Crutcher LLP (counsel for the DCVC Defendants), Quinn, Emanuel, Urquhart & Sullivan LLP (counsel for the SoftBank Defendants), Goodwin Procter LLP (counsel for the True Ventures Defendants), Morrison & Foerster LLP (counsel for Ms. Singh), Ehrlich & Craig LLP (counsel for Mr. Hoffman), and Wilmer Cutler Pickering Hale and Dorr LLP (counsel for Zymergen and Dr. Chu, Mr. Flatley, Ms. Gorjanc, Dr. Murdoch, Mr. Ocko, Ms. Peterson, Dr. Serber, and Dr. Sharma) (together, "Counsel") to: (a) provide general background on the processes of preparing an IPO registration statement for early-stage technology companies,[5] including the parties involved in such processes; (b) describe the custom and practice when drafting, verifying, and revising an IPO registration statement to take into account disclosures in the IPO registration statement as a whole; (c) describe the custom and practice of including in an IPO registration statement disclosures relating to an early-stage technology company's market opportunity, future product pipeline, and expected product revenue generation; (d) describe the custom and practice regarding disclosure of forward-looking estimates of market opportunity; and (e) describe the custom and practice regarding disclosures of forward-looking estimates of future product pipeline and expected product revenue generation.

4.  I have also been asked by Counsel to opine, based on my review of the record, and my academic and professional experience, whether (i) the parties involved in the processes of preparing the IPO Registration Statement were consistent with custom and practice; (ii) consistent with custom and practice, the IPO Registration Statement was drafted, verified, and revised by taking into account disclosures in the IPO registration statement as a whole; (iii) it was custom and

---

[4] Second Amended Complaint, ¶ 11.
[5] For purposes of this Report, I define an "early-stage technology company" (and similar references) as a company that is in the early phases of creating, refining, and commercializing one or more innovative technological platforms, products, or services. Those companies typically conduct ongoing research and development ("R&D"), have limited production and market presence, and are pre-revenue or have minimal revenue, relying on private investment and/or government grants for financial support. *See* Wu, J. John and Robert D. Atkinson, "How Technology-Based Start-Ups Support U.S. Economic Growth," *Information Technology and Innovation Foundation*, November 2017, available at https://www2.itif.org/2017-technology-based-start-ups.pdf, accessed on March 14, 2025, pp. 6–13.

practice to include in the IPO Registration Statement disclosures relating to Zymergen's market opportunity, future product pipeline, and expected product revenue generation; (iv) Zymergen's processes of drafting, verifying, and revising the IPO Registration Statement disclosure of forward-looking estimates of market opportunity were consistent with custom and practice for early-stage technology companies; and (v) Zymergen's processes of drafting, verifying, and revising the IPO Registration Statement disclosures of future product pipeline and expected product revenue generation were consistent with custom and practice for early-stage technology companies.

5. I have not been asked to express, nor am I expressing, any legal opinion with respect to any of the matters in this Report. I include discussions of certain legal requirements since they provide context to understand the custom and practice described in this Report and my opinions. Further, I have not been asked to express, nor am I expressing, any opinion with respect to the veracity of factual matters set out in this Report. In the course of my review, I considered facts and statements of facts that I assumed to be accurate for purposes of rendering my opinions.

6. For my services in this matter, I am being compensated at the rate of $1,650 per hour. I have been assisted in this matter by Cornerstone Research staff, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. My compensation is neither contingent nor dependent on the opinions that I offer or on the outcome of this matter.

## II. QUALIFICATIONS

7. I am the Myron C. Taylor Alumni Professor of Business Law at Cornell Law School and Founding Director of the Law, Technology and Entrepreneurship Program at Cornell Tech. I am also an Honorary Doctor and Professor at Yaroslav Mudryi National Law University (Ukraine). I am a member of the American Law Institute and a Fellow of the American Bar Foundation.

8. My specializations include the law and practice relating to securities regulation, corporate governance, strategic transactions, and financial markets, and I teach courses in securities regulation, business organizations, mergers and acquisitions ("M&A"), corporate governance, and deal structuring. I have published many articles and given numerous lectures and presentations on

subjects including securities regulation, financial regulation, corporate governance, M&A, and deal structuring.

9. Before entering academia, I represented clients and held senior legal and business positions in the financial services industry in New York, London, and Tokyo. Following a one-year clerkship on the U.S. Court of Appeals (Second Circuit), I began my career as an associate at Sullivan & Cromwell LLP, where I worked in the firm's New York, London, and Tokyo offices, managing complex transactions and legal issues in the general corporate, capital markets, M&A, broker-dealer, and investment advisory groups.

10. In 1993, I joined Nomura Securities International ("NSI"), a broker-dealer in New York, where I became a Managing Director and the General Counsel. In 1997, I left NSI to join Salomon Brothers, where I became a Managing Director and oversaw the structuring and launch in Tokyo of the first joint venture in Japan between a U.S. and Japanese broker-dealer (Nikko Salomon Smith Barney, later Nikko Citigroup ("NSSB")).

11. After three years at NSSB, I was offered the role of coordinating Citigroup Japan's securities, banking, consumer finance, insurance, global custody, and asset management businesses. I was the Citigroup Country Officer for Japan and the head of Citibank in Japan, and I also held direct responsibility for managing Citigroup Japan's corporate and investment banking businesses, including as Chief Operating Officer of NSSB and head of the Citibank Japan Commercial Bank. In addition, I was a member of both the Citigroup International Management Committee and the Citigroup Corporate & Investment Banking Management Committee, the senior-most steering committees for the international and corporate/investment banking businesses at Citigroup.

12. At Sullivan & Cromwell LLP, I represented issuers and underwriters in capital-raising transactions, and parties to M&A and other strategic transactions, including: (1) assisting in drafting, reviewing, revising, and/or verifying (i) a range of SEC registration statements, including IPO registration statements, (ii) deal-related documents, (iii) periodic public disclosure documents, including reports on Forms 10-K, 10-Q, and 8-K, and (iv) private placement and Rule 144A disclosures; and (2) advising issuers and underwriters regarding disclosures, including forward-looking statements and disclosures regarding Risk Factors, Description of Business, and

Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") (and comparable disclosures).

13. At NSI, NSSB, and Citigroup Japan, in my capacity as in-house counsel and later as a senior banker, I reviewed the same kinds of documents and disclosures and advised issuers and bankers regarding disclosures. As the Citigroup Country Officer for Japan, I participated in internal reviews to prepare information for inclusion in public disclosures by Citigroup, which was and continues to be a public company. I also met with, and made presentations to, research analysts who prepared public reports regarding Citigroup and its business operations in Japan.

14. As a transition to a full-time academic position, I became a Research Fellow and Director of the Columbia Law School Transactional Studies Program and Associate Director of Columbia Law School's Center on Corporate Governance in 2004. I joined Cornell Law School in 2009, following a position at the Boston University School of Law, having initially taught at Cornell in 2008 as the Marc and Beth Goldberg Distinguished Visiting Professor of Law.

15. I am a co-author of two leading casebooks: *Securities Regulation: Cases and Materials (15th Edition)* and *Business Organizations: Cases and Materials (13th Edition)*. I also teach courses on securities regulation, business organizations, M&A, corporate governance, and deal structuring, which include: (i) IPOs, the preparation of SEC registration statements, and public disclosures by public companies, including reports on Forms 10-K, 10-Q, and 8-K; (ii) due diligence and disclosure practices and processes, including in IPOs; and (iii) deal-related documents.

16. I am also the founder of a technology startup incubator in Ukraine, and I have worked with and mentored early-stage technology startups in the United States and Europe.

17. My further qualifications are detailed in my curriculum vitae, which is annexed hereto as **Appendix I**. A list of the matters in which I have testified as an expert at trial or by deposition in the last four years is included as **Appendix II**.

### III. SUMMARY OF OPINIONS

18. To form my opinions, I reviewed various materials in this matter, including legal filings, deposition testimony and accompanying exhibits, board meeting materials, and other documents produced by the parties in this matter and provided to me by Counsel. I also reviewed academic

and other studies and other published research and analysis. A list of the materials I considered is set forth in **Appendix III**.

19. In reaching my opinions, I also relied upon my education as well as my expertise and academic and professional experience including as a former practicing attorney, managing director at several large financial institutions, business unit head of a U.S. public company, and scholar in securities regulation and corporate governance. I reserve the right to revise and/or supplement my opinions should additional information become available to me or in response to any amended or otherwise revised pleading, expert or other reports, testimony, or other relevant further developments in this matter.

20. Based on my education, expertise, and academic and professional experience, and the materials I reviewed, and as I explain below, my opinions are as follows:

   a. The parties involved in the processes of preparing the IPO Registration Statement were consistent with custom and practice.

   b. Consistent with custom and practice, the IPO Registration Statement was drafted, verified, and revised by taking into account disclosures in the IPO Registration Statement as a whole.

   c. It was custom and practice to include in the IPO Registration Statement disclosures relating to its market opportunity, future product pipeline, and expected product revenue generation.

   d. Zymergen's processes of drafting, verifying, and revising the IPO Registration Statement disclosure of forward-looking estimates of market opportunity were consistent with custom and practice for early-stage technology companies.

   e. Zymergen's processes of drafting, verifying, and revising the IPO Registration Statement disclosures of future product pipeline and expected product revenue generation were consistent with custom and practice for early-stage technology companies.

## IV. BACKGROUND

21. I set out my opinions in section V of this Report. Prior to doing so, in this section, I

review, including presentations at Board meetings, as well as verification by Freshfields and WSGR,[350] and backup support in the verification tracker.[351] The Drafting Group also reviewed both the Draft Registration Statement and IPO Registration Statement, including in drafting sessions where members discussed, commented on, and revised various sections that incorporated disclosures regarding Zymergen's future product pipeline, expected product launches, and future product revenue generation.[352]

163. Based on the foregoing, it is my opinion that Zymergen's processes of drafting, verifying, and revising the IPO Registration Statement disclosures regarding its future product pipeline and expected product revenue generation were consistent with custom and practice for early-stage technology companies.

Executed this 14th Day of March, 2025

----------------------------------------------
Charles K. Whitehead

---

[350] *See supra* ¶ 153–154. *See also* Appendix C, ¶¶ 8, 12, 45.
[351] *See supra* ¶ 144.
[352] *See supra* ¶ 102, 144, 154. *See also* Appendix B.2, ¶ 50, and Appendix C, ¶¶ 12, 49.