# EXHIBIT 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

------------------------------------------------------------------x

BIAO WANG, Individually and on Behalf of
All Others Similarly Situated,

                        Plaintiff,

   vs.

ZYMERGEN, INC., et al.,

                        Defendants.

Case No. 5:21-cv-06028-PCP

------------------------------------------------------------------x

# Expert Report of Professor Ilya A. Strebulaev

March 14, 2025

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL'S EYES ONLY

# Table of Contents

| | | |
|---|---|---|
| I. | Qualifications | 1 |
| II. | Assignment | 2 |
| III. | Summary of Opinions | 3 |
| IV. | Background on Zymergen and the VC Defendants | 5 |
| V. | Summary of Allegations Against the VC Defendants | 8 |
| VI. | Venture Capital Investing | 9 |
| | A. Stages of Venture Capital–Backed Company Development | 11 |
| | B. Venture Capital Investment Rounds | 12 |
| | C. Venture Capital Investor Support | 13 |
| | D. Transition to the Next Phase in a Company's Lifecycle | 17 |
| VII. | The VC Funds Each Held a Minority of Zymergen Shares and a Minority of Board Seats | 20 |
| VIII. | None of the VC Funds Could Unilaterally Direct the Actions or Strategy of Zymergen. | 21 |
| IX. | The VC Funds Were Not Uniformly Aligned in Their Circumstances, Interests, Economic Incentives, Time Horizons, or Exit Strategies with Respect to Zymergen | 25 |
| X. | The VC Defendants' Actions with Respect to Zymergen Were Consistent with Those of Early-Stage Investors | 29 |
| | A. As Is Customary, Certain VC Funds Designated a Director for Zymergen's Board of Directors | 30 |
| | B. As Is Customary, I Understand the Directors Designated by the VC Funds Had a Fiduciary Duty to All Zymergen Shareholders | 34 |
| | C. As Is Customary, the VC Funds Retained Contractual Rights to Vote on Certain Major Business Decisions of Zymergen | 35 |
| | D. As Is Customary, the VC Funds Provided Mentorship and Advice to Zymergen Management | 38 |
| | E. As Is Customary, the VC Defendants Provided Zymergen with Access to the VC Defendants' Network of Companies, Advisors, Capital Markets, and Human or Intellectual Capital | 41 |
| | F. As Is Customary, the VC Funds Provided Advice and Guidance to Zymergen Management on Follow-On Investments and the IPO Process | 45 |

**I.      Qualifications**

1.     I am the David S. Lobel Professor of Private Equity and Professor of Finance at the Graduate School of Business, Stanford University ("Stanford GSB").  I am also a Research Associate at the National Bureau of Economic Research.  I received a Ph.D. in Finance from London Business School, an M.Phil. in Finance from London Business School, an M.A. in Economics from the New Economic School in Moscow, and a B.A. in Economics from Lomonosov Moscow State University.

2.     I am the inaugural holder of the David S. Lobel Chaired Professorship in Private Equity, established at Stanford University in 2016 to promote research and teaching on private equity.  I am also the founder and Faculty Director of the Stanford GSB Venture Capital Initiative that brings together academic researchers, students, and practitioners to advance our knowledge of venture capital.  One of my research papers on the practices of venture capitalists, including those in Silicon Valley, which is based on the work done at the Venture Capital Initiative, has been awarded the Jensen First Prize for the best paper in the *Journal of Financial Economics* and the inaugural Doriot Award for the best private equity research paper.  I also founded and served as Faculty Director of the Stanford GSB program "The Emerging CFO: Strategic Financial Leadership Program," which has been attended by hundreds of senior financial leaders from around the world.

3.     In addition to the Jensen First Prize and the Doriot Award, I have been awarded a number of other significant academic awards for my research, including the Brattle Group Prize in Corporate Finance (selected by the Associate Editors of the *Journal of Finance*), the First Prize Paper for the best corporate finance paper published in the *Journal of Finance*, the Fama-DFA Prize for the best asset pricing paper published in the *Journal of Financial Economics*, the Trefftzs Award by the Western Finance Association, and the Best Paper by the Private Equity Research Consortium.

4.     I have also received several awards for my teaching, including the Stanford MBA Distinguished Teaching Award and the Sloan Teaching Excellence Award, as well as the inaugural Masters in Management Best Teacher Award at London Business School.  I currently teach two courses at Stanford, including a course on venture capital financing that I developed and have been teaching for more than 10 years.

5.      A copy of my curriculum vitae is attached as **Appendix A** to this report. **Appendix A** also provides a list of cases in which I have testified in the last four years and a full list of my publications.

**II.    Assignment**

6.      I have been retained by counsel for SB Investment Advisers (US) Inc. ("SBIA US") and three funds managed by its affiliate, SB Investment Advisers (UK) Limited ("SBIA UK"): SVF Excalibur (Cayman) Limited, SVF Endurance (Cayman) Limited, and SoftBank Vision Fund (AIV M1) L.P. (collectively, the "SoftBank Funds," and together with SBIA US, the "SoftBank Defendants");[1] Data Collective II, L.P., DCVC Opportunity Fund, L.P. (collectively, the "DCVC Funds"), and DCVC Management Co, LLC ("DCVC Management," and together with the DCVC Funds, the "DCVC Defendants"); and True Venture Management, L.L.C. ("True Venture Management") and True Ventures IV, L.P., True Ventures Select I, L.P., True Ventures Select II, L.P., True Ventures Select III, L.P., and True Ventures Select IV, L.P. (collectively, the "True Ventures Funds," and collectively with True Venture Management, the "True Ventures Defendants"). I refer to all of these entities collectively as the "VC Defendants," and specifically to the SoftBank Funds, the DCVC Funds, and the True Ventures Funds collectively as the "VC Funds." I have been asked by counsel to provide an overview of venture capital investing and to evaluate the VC Defendants' investment in and roles and responsibilities pertaining to Zymergen, Inc. ("Zymergen") in the context of the customary practices of venture capital investors in a late-stage company preparing for an initial public offering ("IPO").[2]

---

[1] I understand that Plaintiffs have identified SBIA US, rather than SBIA UK, as the entity that managed the SoftBank Funds and named SBIA US (and not SBIA UK) as a defendant. However, available public filings with the SEC identify SBIA UK, and not SBIA US, as the investment manager to the SoftBank Funds and the entity exclusively responsible for making all final decisions related to the acquisition, financing and divestment of SoftBank Vision Fund's investments, including as held by SVF Excalibur (Cayman) Limited. *See, e.g.*, Zymergen Inc. Amendment No. 2 to Form S-1, filed on April 14, 2021, p. 154, footnote 13 ("SB Investment Advisers (UK) Limited, or SBIA UK, has been appointed as alternative investment fund manager, or AIFM, and is exclusively responsible for managing SoftBank Vision Fund in accordance with the Alternative Investment Fund Managers Directive and is authorized and regulated by the UK Financial Conduct Authority accordingly. As AIFM of SoftBank Vision Fund, SBIA UK is exclusively responsible for making all final decisions related to the acquisition, structuring, financing, voting and disposal of SoftBank Vision Fund's investments, including as held by SVF Excalibur (Cayman) Limited."). *See also* SVF Investments (UK) Ltd Form 3, filed on October 1, 2021.

[2] I am not offering any opinion regarding the legal meaning of "control" under U.S. securities laws. Instead, I have been asked to examine the circumstances and actions of the VC Defendants in the context of what one would expect of a typical venture capital investor in a company similarly situated to Zymergen.

7.      In preparing this report, I have considered the materials listed in **Appendix B**. I have also drawn on my academic and professional experience. My work in this matter is ongoing, and I may supplement this report if information that alters any of my opinions comes to my attention after this report is submitted. I intend to review the opinions, reports, and testimony of other witnesses, including experts, in this matter and to address any issues they raise, if requested by counsel.

8.      For my work in this matter, I am being compensated at my standard consulting rate of $1,725 per hour. Working under my direction and guidance, personnel at Cornerstone Research, a consulting firm, have assisted me in the preparation of this report. I also receive compensation based on the fees charged by Cornerstone Research.

9.      The opinions in this report are my own. Neither my compensation nor that of Cornerstone Research is contingent upon my findings, the testimony I may give, or the outcome of this litigation.

## III.    Summary of Opinions

10.     Based on my work to date, I have reached the following opinions:

11.     *First*, each VC Fund held a minority ownership position (i.e., owned less than 50% of the total shares) in Zymergen. Consistent with the roles and responsibilities of a VC investor holding a minority interest in a portfolio company, contemporaneous correspondence between Zymergen directors and Zymergen management supports that while the directors designated by the VC Funds provided advice and guidance on communications, recruiting, and other topics, Zymergen management ultimately made their own decisions about whether to accept such advice. *See* **Section VII**.

12.     *Second*, none of the VC Funds—as minority shareholders designating no more than one director on Zymergen's eight-member board (and one of the three Preferred Stock Directors)—could unilaterally direct the actions or strategy of Zymergen. *See* **Section VIII**.

13.     *Third*, the VC Funds were not uniformly aligned in their circumstances, interests, economic incentives, time horizons, and exit strategies with respect to each VC Fund's investment in Zymergen. Each VC Fund invested in Zymergen at different prices, at different times, and in different stages of Zymergen's lifecycle. As documented in the empirical literature, such differences among separate VC investors in a company can encourage a company's

VC investors to develop conflicting interests. Indeed, examples of conflicts between the directors designated by the different VC Funds are evident in the record I reviewed. *See* **Section IX**.

14. *Fourth*, the VC Defendants' actions with respect to Zymergen were consistent with those of VC investors who take a minority equity position in their portfolio companies and do not manage the day-to-day operations of their portfolio companies. Specifically:

   a. Each VC Fund designated one director to the board of Zymergen. Consistent with the high-level approach that is customary for directors providing strategic guidance, the record supports that the directors designated by the VC Funds devoted a limited amount of time to their roles on Zymergen's board and did not manage the day-to-day operations of Zymergen. *See* **Section X.A**.

   b. Consistent with my understanding of board director responsibilities generally, the directors designated by the VC Funds had a fiduciary duty to all Zymergen shareholders. *See* **Section X.B**.

   c. Each VC Fund retained contractual rights to vote on certain business decisions of Zymergen. The contractual rights negotiated by, and provided to, the VC Funds are consistent with those of VC investors, as documented in the literature. While provisions may allow a director designated by a VC investor to vote on certain actions contemplated by a company, they do not grant the director designated by a VC investor the right to affirmatively direct an action of the company. *See* **Section X.C**.

   d. The VC Defendants provided mentorship and advice to Zymergen management, as is customary for VC investors to provide to their portfolio companies. Based on my review of contemporaneous correspondence in the record, the advice provided by the VC Defendants was consultative, and Zymergen management did not always follow the advice. *See* **Section X.D**.

   e. The VC Defendants provided Zymergen management with access to the VC Defendants' network of companies, advisors, capital markets, and human or intellectual capital. Zymergen management reciprocated by providing resources to certain of the VC Defendants. This practice is customary between VC investors and their portfolio companies. *See* **Section X.E.**

  f. The VC Defendants provided advice and guidance to Zymergen management in planning for follow-on investments and exit. This practice is consistent with that of VC investors, particularly those investors with experience and knowledge in the follow-on investment process and the IPO process. *See* **Section X.F**.

**IV. Background on Zymergen and the VC Defendants**

15. Zymergen was a biotechnology company with an aim "to design, develop, and commercialize bio-based breakthrough products that deliver extraordinary value to customers in a broad range of industries."[3] Zymergen stated that its goal was "to create new products with a proprietary platform that unlocks the design and manufacturing efficiency of biological processes with technology's ability to rapidly iterate and control diverse functions," and that its "biofacturing" process would "engineer[] microbes to make novel biomolecules that are the key ingredients in those products."[4] Zymergen was founded in 2013 by Josh Hoffman, Zach Serber, and Jed Dean.[5] The company completed four rounds of private, venture capital–backed preferred equity financing in which it raised approximately $44 million in a Series A round, $142 million in a Series B round, $419 million in a Series C round, and $296 million in a Series D round.[6] Zymergen went public in April 2021, raising $575 million in its IPO.[7]

16. After its founding, Messrs. Hoffman, Serber, and Dean served on the management team of Zymergen. **Figure 1** below lists the executive officers of Zymergen at the time of the IPO.

---

[3] Zymergen Inc. Form 424(b)(4), filed on April 23, 2021, p. 1.
[4] Zymergen Inc. Form 424(b)(4), filed on April 23, 2021, p. 1.
[5] Zymergen Inc. Amendment No. 2 to Form S-1, filed on April 14, 2021, p. 135.
[6] Zymergen also conducted a Series A-1 financing in 2015 wherein $7.6 million of debt was canceled in exchange for equity. This amount is included in the total $44 million raised in connection with Zymergen's Series A Financing above. *See* JPM-00064796.xlsx, tab "Cap Summary."
[7] "Zymergen Announces Closing of Upsized Initial Public Offering and Full Exercise of the Underwriters' Option to Purchase Additional Shares," *GlobeNewswire*, April 26, 2021, available at https://www.globenewswire.com/news-release/2021/04/26/2217175/0/en/Zymergen-Announces-Closing-of-Upsized-Initial-Public-Offering-and-Full-Exercise-of-the-Underwriters-Option-to-Purchase-Additional-Shares.html.

of the board's comments had been "incorporated[] or ignored."²⁵⁹ Dr. Sharma also appeared to provide "suggested" edits on the language used in the draft mission statement and in the draft Form S-1 to provide "briefer easier" explanations.²⁶⁰ The feedback offered by the directors designated by the VC Funds indicates that no individual VC Fund or director could dictate what information was included in the IPO offering materials—or even Zymergen's decision to undertake an IPO—and that Zymergen management had discretion about what to include in the Form S-1 registration statement.²⁶¹

Executed this March 14, 2025

_____
Professor Ilya A. Strebulaev

---

²⁵⁹ Email chain from Joshua Hoffman to Travis Murdoch, "RE: Materials for board meeting -- Jan 22," SBIA_ZY_0000022032–035 at 034.
²⁶⁰ Email chain from Rohit Sharma to Josh Hoffman, et al., "Re: Gambit -- Revised S-1," March 5, 2021, ZYMERGEN_NDCAL_000748658–660 at 658; Email chain from Rohit Sharma to Mina Kim and Ena Singh "Re: Gambit: Draft S-1," January 20, 2021, ZYMERGEN_NDCAL_000749714–715 at 714.
²⁶¹ Second Amended Complaint, ¶ 113.