# EXHIBIT 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

-----------------------------------------------------------------x

BIAO WANG, Individually and on Behalf of
All Others Similarly Situated,

                                                            Case No. 5:21-cv-06028-PCP

                    Plaintiff,

   vs.

ZYMERGEN, INC., et al.,

                    Defendants.

-----------------------------------------------------------------x

# Expert Rebuttal Report of Professor Ilya A. Strebulaev

April 25, 2025

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL'S EYES ONLY

# Table of Contents

I.   Qualifications ........................................................................................................... 1

II.  Assignment .............................................................................................................. 1

III. Summary of Opinions .............................................................................................. 2

IV.  The Young Report Does Not Provide a Commonly Understood Definition of "Control" as It Pertains to the Venture Capital Industry, and Conflates the Concept of Control Rights with Control ................................................................................................................ 6

V.   The Young Report Relies on an Unsupported and Erroneous Assumption That VC Investors Are Uniformly Aligned in Their Interests and Actions with Respect to a Common Portfolio Company ..................................................................................... 9

VI.  Opinion #1 of the Young Report Regarding the VC Defendants' Purported "Control" over the Directors Designated by the VC Funds Is Unfounded...................................... 10

VII. Opinion #2 of the Young Report Regarding the VC Defendants' Purported "Control" over Zymergen Is Flawed and Reflects a Fundamental Misunderstanding of the VC Industry ................................................................................................................ 17

    A.  The Young Report Improperly Treats the Individual VC Funds as a Single, Undifferentiated Group and Fails to Recognize That the VC Funds Were Not Uniformly Aligned with Respect to Zymergen ................................................. 17

    B.  The Young Report Fails to Recognize That Without a Board Majority, None of the VC Funds Could Affirmatively Direct the Actions of Zymergen .................. 21

    C.  The Young Report Does Not Demonstrate That the VC Defendants Exercised Control over the Day-to-Day Business Matters of Zymergen ............................... 22

        1.  Managing a Portfolio Company's Day-to-Day Business Matters Does Not Comport with the Customary Strategy of VC Investing .......................... 23

        2.  The Young Report Conflates Control Rights That Are Customary in the VC Industry with "Control" over a Portfolio Company's Day-to-Day Business Matters ............................................................................................ 26

    D.  The Young Report's Assertion That the Audit Committee Exercised "Control" over Zymergen and Its Board of Directors Is Unsupported.................................. 29

    E.  The Young Report Does Not Support the Notion That the Indemnifications Provided to the Directors Designated by the VC Funds, Which Extended to the VC Defendants, Are Evidence of "Control" by the VC Defendants .................... 32

    F.  The Young Report's Conclusions About Zymergen's Credit Agreement with Perceptive Credit Advisers and Implications of "Control" by the VC Funds Are Flawed and Unsupported ........................................................................................ 33

    G.  The Young Report's Assertion That the VC Funds "Controlled" the Issuance of Zymergen's Audited Financial Statements Is Flawed .......................................... 35

| | | |
|---|---|---|
| VIII. | Opinion #3 of the Young Report Regarding the Purported Requisite "Approval" and "Authorization" of Zymergen's IPO by the VC Defendants Is Fundamentally Flawed .. 36 | |
| | A. | The Young Report Fails to Demonstrate That Zymergen's IPO Required the Approval and Authorization of the VC Funds ....................................................... 36 |
| | B. | The Young Report Fails to Demonstrate That the VC Defendants Directed Zymergen Toward an IPO or That the VC Defendants Controlled Whether Zymergen Proceeded with the Issuance of Its Registration Statement ................. 38 |

## I. Qualifications

1. I am the David S. Lobel Professor of Private Equity and Professor of Finance at the Graduate School of Business, Stanford University ("Stanford GSB"). I am also a Research Associate at the National Bureau of Economic Research. I received a Ph.D. in Finance from London Business School, an M.Phil. in Finance from London Business School, an M.A. in Economics from the New Economic School in Moscow, and a B.A. in Economics from Lomonosov Moscow State University.

2. On March 14, 2025, I submitted an expert report in this matter (referred to hereafter as my "Initial Report"). In my Initial Report, my qualifications were outlined in Section I, and a copy of my curriculum vitae, which lists my publications, presentations, and testifying experience in the prior four years, was attached as Appendix A. An updated copy of my curriculum vitae is attached as **Appendix A** to this rebuttal report.

## II. Assignment

3. I have been retained in the above-captioned matter by counsel for SB Investment Advisers (US) Inc. ("SBIA US") and three funds managed by its affiliate, SB Investment Advisers (UK) Limited ("SBIA UK"): SVF Excalibur (Cayman) Limited, SVF Endurance (Cayman) Limited, and SoftBank Vision Fund (AIV M1) L.P. (collectively, the "SoftBank Funds," and together with SBIA US, the "SoftBank Defendants"); Data Collective II, L.P., DCVC Opportunity Fund, L.P. (collectively, the "DCVC Funds,"), and DCVC Management Co, LLC ("DCVC Management," and together with the DCVC Funds, the "DCVC Defendants"); and True Venture Management, L.L.C. ("True Venture Management") and True Ventures IV, L.P., True Ventures Select I, L.P., True Ventures Select II, L.P., True Ventures Select III, L.P., and True Ventures Select IV, L.P. (collectively, the "True Ventures Funds," and collectively with True Venture Management, the "True Ventures Defendants"). I refer to all of these entities collectively as the "VC Defendants," and specifically to the SoftBank Funds, the DCVC Funds, and the True Ventures Funds collectively as the "VC Funds."[1]

---

[1] In this rebuttal report, unless separately defined, I use the same acronyms and definitions set forth in my Initial Report.

4.      In this rebuttal report, I have been asked by counsel to review and respond to the opinions contained in the Expert Report of Christopher W. Young, Ph.D., MBA, MAFF, CVA, dated March 14, 2025 ("Young Report").  While I address opinions in the Young Report regarding purported "control" by the VC Defendants over Zymergen and the directors designated by the VC Funds, I am not offering any opinion regarding the legal meaning of "control" under U.S. securities laws.

5.      The materials I previously considered in reaching my conclusions in this matter were listed in Appendix B to my Initial Report.  I also considered those materials in connection with this rebuttal report.  These and additional materials I have considered in preparation of this rebuttal report are listed in **Appendix B** to this report.  I have also drawn on my academic and professional experience.  My work in this matter is ongoing, and I may supplement this report if information that alters any of my opinions comes to my attention after this rebuttal report is submitted, including any testimony provided by Dr. Young.

6.      For my work in this matter, I am being compensated at my standard consulting rate of $1,725 per hour.  Working under my direction and guidance, personnel at Cornerstone Research, a consulting firm, have assisted me in the preparation of this report.  I also receive compensation based on the fees charged by Cornerstone Research.

7.      The opinions in this report are my own.  Neither my compensation nor that of Cornerstone Research is contingent upon my findings, the testimony I may give, or the outcome of this litigation.

### III.    Summary of Opinions

8.      None of the opinions or analyses in the Young Report cause me to change or revise the opinions expressed in my Initial Report.

9.      Based on my review of the Young Report, I have formed the following additional opinions:

10.     *First*, the Young Report does not provide a commonly understood definition of "control" in the VC industry and, accordingly, the opinions regarding the purported possession and exercising of control by the VC Defendants over Zymergen are flawed and unfounded.  I am not aware of a single, commonly accepted definition of "control" in the academic literature about venture capital or among venture capital industry participants generally.  I am also not aware of peer-reviewed academic or practitioner literature identifying upon what VC "control" is

"predicated," or what "key indicators" of control are, as the Young Report suggests. Indeed, the book that the Young Report relies upon to define "control" does not appear to contain a definition of "control" in the context of VC investing.[2] *See* **Section IV**.

11. *Second*, the Young Report provides no support for its opinion that "[i]t is common for venture capital firms to know each other and co-invest in companies, sometimes pooling their voting rights together, ***all in hopes of having more collective control over the company's operations***."[3] The Young Report's assertion that the "VC Firms possessed the ability and power to control Zymergen through their ownership of Zymergen's shares"[4] is premised on an unsupported assumption that the VC Funds would be uniformly aligned in their interests and actions with respect to Zymergen and would act as a single entity by "pooling their voting rights together." Such a notion is not supported by the Young Report and, as documented in the academic literature, does not comport with how separate VC investors act in general with respect to a common portfolio company. *See* **Section V**.

12. *Third*, the Young Report's Opinion #1 regarding the VC Defendants' purported "control" over the directors designated by the VC Funds reflects a fundamental misunderstanding of the roles and responsibilities of a director designated by a fund of a VC firm while serving on the board of a portfolio company. In particular, the Young Report fails to recognize that directors designated by a VC fund, as board members, have a fiduciary duty of loyalty to the portfolio company and its shareholders. As support for its opinions, the Young Report appears to proffer interpretations of contracts between certain entities of the VC Defendants and directors designated by the VC Funds and cites to select documents in the record. It is unclear how these documents, which often appear to be mischaracterized in the Young Report, demonstrate that the VC Defendants purportedly exercised "control" over the director designees. *See* **Section VI**.

13. *Fourth*, the Young Report's Opinion #2 regarding the VC Defendants' purported "control" over Zymergen is flawed and reflects a fundamental misunderstanding of VC industry operations, customs, and practices. The Young Report ignores that the actions or circumstances that allegedly reflect the VC Defendants' "control" over Zymergen are in fact consistent with how VC investors

---

[2] Young Report, ¶ 69, footnote 28.
[3] Young Report, ¶ 35 (emphasis added).
[4] Young Report, Section VII.A.

HIGHLY CONFIDENTIAL–OUTSIDE COUNSEL'S EYES ONLY

(as is typical of minority investors that do not affirmatively direct the actions of their portfolio companies) provide support and guidance to their portfolio companies, fails to reliably support its assertions, and appears to misstate or mischaracterize the documents it relies upon—all of which render the conclusions of the Young Report regarding the VC Defendants' purported "control" over Zymergen flawed and unfounded. Specifically:

    a. The Young Report's assertion that the VC Funds "possessed the ability to control Zymergen through their respective ownership of Zymergen's shares"[5] is predicated on the unsupported assumption that the separate VC Funds would be uniformly aligned such that they would always "pool[] their voting rights together"—a misguided notion contradicted by contemporaneous documents and communications in the record. *See* **Section VII.A**.

    b. The Young Report's assertion that the "VC Firms possessed rights over the composition of Zymergen's Board of Directors," which were "not extended to other investors,"[6] ignores that it is customary practice for lead investors in financing rounds (such as the VC Funds) to possess such rights. Notwithstanding such rights, none of the VC Funds could affirmatively direct the actions of Zymergen because none of the VC Funds, individually or collectively, had the right to designate board members constituting a board majority. *See* **Section VII.B**.

    c. The Young Report's assertion that the VC Defendants "possessed the ability to approve or reject Zymergen's day-to-day business matters"[7] conflates control rights that are customary in the VC industry with "control" over a portfolio company's day-to-day business matters. That a VC investor retains certain protections and rights does not mean that the investor can affirmatively direct the actions of its portfolio company. Unlike other private equity strategies such as buyout investing, VC investing is typically characterized by a VC investor obtaining a minority position in a portfolio company and providing consultative advice and guidance to the company. The contractual provisions customarily negotiated by VC investors

---

[5] Young Report, ¶ 93.
[6] Young Report, Section VII.B, ¶ 105.
[7] Young Report, Section VII.C.

are necessary specifically because the VC investors are typically minority shareholders who require protective measures against major business decisions of the portfolio company. Consistent with customary practice, the VC Funds retained certain rights and protections; however, the Young Report fails to show that such rights and protections granted the VC Funds the right to affirmatively direct the day-to-day actions of Zymergen. *See* **Section VII.C**.

d. The Young Report's assertion that the Audit Committee of Zymergen's board of directors exercised "control" over Zymergen and its board is unsupported by the documents the Young Report cites. The Young Report provides no basis for its conclusion that certain instances in which the Audit Committee (on which the directors designated by the VC Funds sat) made recommendations to the board constitutes the VC Funds exercising purported "control" over Zymergen. *See* **Section VII.D**.

e. The Young Report provides no support for the speculative inference that indemnifications provided to the directors designated by the VC Funds, which extended to the VC Defendants, demonstrate that the VC Defendants "controlled" the director designees. *See* **Section VII.E**.

f. The Young Report's assertion that a "Change of Control" provision in Zymergen's credit agreement with Perceptive Credit Advisers (the "Perceptive Credit Agreement") "effectively ensured the VC Firms … maintained control of Zymergen"[8] is flawed and unsupported. Moreover, despite the Young Report's assertion that if Zymergen triggered the "Change of Control" provision it "risked default,"[9] the Young Report fails to recognize that a borrower would likely have several ways to manage such a potential default, including seeking approval or a waiver from the lender or refinancing or restructuring the borrowing from the same or an alternate lender. *See* **Section VII.F**.

---

[8] Young Report, Section VII.F, ¶¶ 138–139.
[9] Young Report, ¶ 140.

g. The Young Report's assertion that the "VC Firms controlled the issuance of Zymergen's audited financial statements"[10] is premised on documents that the Young Report appears to mischaracterize and which do not support the conclusion that the VC Funds purportedly exercised "control" over the issuance of data concerning Zymergen's financial health and viability. *See* **Section VII.G**.

14. *Fifth*, the Young Report's Opinion #3 regarding the purported requisite "approval" and "authorization" of Zymergen's IPO by the VC Defendants is fundamentally flawed. The Young Report's assertion that "Zymergen's IPO could not have occurred without the approval and authorization of the VC Firms"[11] is undermined by Zymergen governance documents cited in the Young Report. Moreover, the Young Report fails to show that the VC Defendants directed Zymergen toward an IPO or "controlled" whether Zymergen proceeded with issuing its registration statement in connection with the IPO. *See* **Section VIII**.

### IV. The Young Report Does Not Provide a Commonly Understood Definition of "Control" as It Pertains to the Venture Capital Industry, and Conflates the Concept of Control Rights with Control

15. The Young Report does not provide a definition of "control" commonly understood in the VC industry and, accordingly, the opinions regarding the purported exercise of control by the VC Defendants over Zymergen are flawed and unfounded. The Young Report purports to rely on, and apply, a definition of "control" that is "consistent with the use and understanding of the term as it is used in the field of venture capital investments."[12] Yet, the Young Report does not actually provide a definition of control, nor does it cite any reliable basis or course of conduct for a commonly understood definition of "control" in the VC industry. I am not aware of a single, commonly accepted definition of "control" in the academic literature about venture capital or among venture capital industry participants generally.

16. The Young Report cites only to one book, *The Business of Venture Capital* by Mahendra Ramsinghani ("Ramsinghani (2021)"),[13] to support its "definition of control," which purportedly

---

[10] Young Report, Section VII.G.
[11] Young Report, ¶ 6.
[12] Young Report, ¶ 68.
[13] Ramsinghani, Mahendra, *The Business of Venture Capital: The Art of Portfolio Raising a Fund, Structuring Investments, Portfolio Management, and Exits*, 3rd ed., John Wiley & Sons, Inc., 2021 ("Ramsinghani (2021)").

statement.[181] As discussed in my Initial Report, it is not unusual for VC investors to facilitate such introductions for their portfolio companies and to leverage their existing professional relationships, such as introducing a portfolio company to a consultant who may have relevant experience and expertise.[182] Moreover, the Young Report appears to mischaracterize Mr. Pontin's role with respect to Zymergen's registration statement. The Young Report claims that Mr. Pontin "played a pivotal role in determining which edits to the Form S-1 were accepted or rejected."[183] However, the documents cited by the Young Report appear to show many members of Zymergen management, as well as members of the board and the investment banking team—in addition to Mr. Pontin—providing feedback and suggestions on drafts of the registration statement.[184] Thus, the evidence cited in the Young Report does not appear to provide support for the claim that Mr. Pontin "determin[ed] which edits to the Form S-1 were accepted or rejected."[185]

Executed this April 25, 2025

_____
Professor Ilya A. Strebulaev

---

[181] Young Report, ¶ 154.
[182] Initial Report, Section X.E. *See also* Gompers, et al. (2020), pp. 185, 188.
[183] Young Report, ¶ 154.
[184] Email chain from Jason Pontin to Christopher R. Pritchard, "Re: Thoughts on our opening sentences - Jason's help needed," January 20, 2021, JPM-00186924–926; Email chain from Jason Pontin to Mina Kim, "Re: PBC Statement vs12," March 5, 2021, DCVC_0006024–036; Email chain from Jason Pontin to Pamela Marco Gliese, "SI Version with Nicole's Edits and Josh's new Section," January 20, 2021, ZYMERGEN_NDCAL_000048074–075.
[185] Young Report, ¶ 154.